1  HUEI J. DAI
2  MATTHEW D. MULLER
   MONTY MULLER
3  1684 Decoto Rd. #274
   Union City, CA 94587
4  PHONE: (415) 322-0492
   FAX: (415) 366-3326
5  matt@projectjusticeforall.org

6  *In Pro Per*

7

**FILED**

FEB 0 3 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   HUEI J. DAI,                        Case No.  2:19-cv-735-JAM-DB

12   MATTHEW D. MULLER,

13   MONTY MULLER,

14              Plaintiffs,

15        v.

     UNITED STATES OF AMERICA,           **FIRST AMENDED**
16                                        **COMPLAINT FOR DAMAGES**
     COUNTY OF SACRAMENTO,

17   SACRAMENTO COUNTY
18   BOARD OF SUPERVISORS,

19   SCOTT JONES,

20   JAIL PSYCHIATRIC SERVICES,

     REGENTS OF THE
21   UNIVERSITY OF CALIFORNIA,

22   CORRECTIONAL HEALTH SERVICES,

23   GREGORY SOKOLOV,

24   ANDREA JAVIST,

     ALBERT NAJERA,
25
     DOES 1 to 40,
26
                Defendants.
27

28

FIRST AMENDED COMPLAINT              - 1 -           *Dai, et al. v. United States, et al.*

1

**INTRODUCTION**

2      1.     This action arises from the severe mistreatment of an inmate at the Sacramento

3   County Main Jail, and the consequent suffering of the inmate's spouse and father alongside him.

4      2.     The Plaintiff MATTHEW MULLER was consigned to the since-abolished "Total

5   Separation" classification status for the sole reason that he had a history of mental illness. "T-

6   SEP" was unique to Sacramento County, according to experts, and was extreme even as compared

7   to other examples of solitary confinement.

8      3.     Mr. MULLER suffered through one and two-thirds years of profound isolation in

9   what amounted to a concrete sensory-deprivation chamber. His wife, HUEI DAI, and his father,

10   MONTY MULLER, suffered with him. They watched their loved one's mental health deteriorate

11   to the point where he was begging his father for permission to commit suicide. Powerless to secure

12   for Mr. MULLER the help and treatment he needed, they offered what support they could. And

13   wondered how much longer their family member would survive the extreme conditions.

14      4.     So debilitating were the effects of his profound isolation that they may have

15   rendered Mr. MULLER incompetent at his plea hearing. After a year of almost uninterrupted

16   solitude, Mr. MULLER was led into a packed courtroom and surrounded by more people at once

17   than he had seen separately in a year. He was terrified to be out of his tiny cell with a roomful of

18   people focused on him. The effects were telling Mr. MULLER has no memory of the hearing, but

19   the transcript revealed a string of incorrect and in at least one case nonsensical answers during the

20   plea colloquy. Mr. MULLER was unable even to accurately assist the judge in assessing his own

21   competence, answering incorrectly when asked what medications he was on.

22      5.     The extreme conditions imposed on Mr. MULLER have since been the subject of

23   a major class action lawsuit in this Court. A series of expert reports filed in that case speak

24   eloquently to the unconscionability of the conditions the Defendants allowed to persist for years.

25   *See* Exs. A to F. The reports are all the more damning because it was the Defendant Sacramento

26   County's own expert witnesses who condemned the conditions.

27      6.     The class action lawsuit has since settled, with Sacramento County agreeing to tens

28   of millions of dollars of changes just to meet minimum standards. But the changes were too late

1   for the Plaintiffs, who suffered for almost two years because of the Defendants' deliberate failure
2   to do anything sooner.

3                              **JURISDICTION AND VENUE**

4          7.      The claims alleged herein arise pursuant to 42 U.S.C. § 1983 and the First, Fifth,
5   Eighth and Fourteenth Amendments to the United States Constitution, the Americans with
6   Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29
7   U.S.C. § 794.6, and related state law.

8          8.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and
9   1367.

10         9.      Venue is properly in this Court under 28 U.S.C. § 1391(b)(1) because Plaintiffs'
11  claims for relief arose in this District and one or more of the Defendants resides in this District.

12                                    **PARTIES**

13         10.     Plaintiff MATTHEW MULLER ("MULLER") was a pretrial detainee at the
14  Sacramento County Main Jail from September 2015 through May 2017.  Mr. MULLER spent all
15  but one day of his time at the Jail in Total Separation solitary confinement.  He suffered then and
16  now from a mental health disability—bipolar disorder—and also a service-connected bone and
17  muscle disability from his time in the Marine Corps, for which he is rated as 40% disabled by the
18  Veterans Administration.  Plaintiff MULLER is a person with a disability as defined in 42 U.S.C.
19  § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).   Mr.
20  MULLER is a resident of Solano County, California.

21         11.     Plaintiff HUEI DAI ("DAI") is and was at relevant times the spouse of MULLER
22  and visited him each week at the Jail.  She is and was at all relevant times a resident of Alameda
23  County, California.

24         12.     Plaintiff MONTY MULLER is the father of MATTHEW MULLER and visited
25  him frequently at the Jail.  He is and was at all relevant times a resident of Sacramento County,
26  California.

27         13.     Defendant COUNTY OF SACRAMENTO ("COUNTY") is a political and
28  geographical subdivision of the State of California with its principal offices located in the city of

1    Sacramento, California.  Under its authority, the COUNTY operates the Sacramento County Main

2    Jail ("Jail") in which the Plaintiff Mr. MULLER was incarcerated from September of 2015 through

3    May of 2017.  The COUNTY is responsible for ensuring that the basic human needs of persons in

4    its custody are met, consistent with all applicable state and federal laws.  It is further responsible

5    for the safety and physical and mental well-being of persons in its custody, and for ensuring that

6    persons in its custody are not discriminated against in obtaining programs, services and care on

7    any impermissible basis, including but not limited to such persons' disabled status.  The COUNTY

8    is further responsible for ensuring that the substantive and procedural rights of persons in custody

9    at the Jail are not violated, and that they are not hindered from accessing the courts and counsel or

10   from assisting and participating in their own legal defense.  The COUNTY is responsible for

11   meeting those obligations by providing appropriate' funding, oversight, accountability, and

12   corrective action, and for establishing policies and practices that ensure these obligations are being

13   met.

14          14.    The Defendant COUNTY OF SACRAMENTO has at all relevant times been

15   responsible for the actions and/or inaction of the Sacramento County Sheriff's Department

16   ("SCSD") and for its policies, procedures, practices and customs.

17          15.    The Defendant SACRAMENTO COUNTY BOARD OF SUPERVISORS

18   ("BOARD") constitutes the elected decision-making body of the COUNTY empowered to

19   appropriate funds and institute laws, policies and practices regarding operation of the Jail.  The

20   BOARD has a statutory duty to provide funding sufficient to meet the needs of persons committed

21   by competent authority to the Jail or to the custody of the Sheriff, including but not limited to the

22   duty provided for by California Penal Code section 4015 ("The board of supervisors shall provide

23   the sheriff with necessary food, clothing, and bedding" for inmates held at a county jail, and "the

24   expenses thereof shall be paid out of the county treasury.").

25          16.    The Defendant SCOTT JONES ("JONES" or "SHERIFF") is and at all relevant times was

26   the elected sheriff of Sacramento County.  The Sheriff is by statute the keeper of the jails in the

27   county and acts in that capacity pursuant to his authority as administrator over persons committed

28

1    to his care and custody and not pursuant to his law enforcement role.[1] The Sheriff is authorized

2    and required pursuant to Penal Code section 4005 to "receive, and keep in the county jail, any

3    prisoner committed thereto by process or order issued under the authority of the United States,"

4    and to contract or arrange with the relevant federal authority for the costs of such custody. Pursuant

5    to Penal Code section 4006, "[a] sheriff, to whose custody a prisoner is committed as provided in

6    [section 4005] is answerable for [that prisoner's] safekeeping in the courts of the United States...."

7    The Sheriff was at all relevant times responsible for the policies, practices, procedures and customs

8    of the Sacramento County Sheriff's Department and for the administration and oversight of the Jail.

9    The Sheriff had a duty to inspect and know of, and did in fact know of and personally observe, the

10    harmful conditions in the Jail described herein. Jones is sued in his official and individual

11    capacities.

12        17.      Defendants DOES 1 to 20 ("CUSTODY DOES") are employees, contractors,

13    officers and/or agents of the Sacramento County Sheriff's Department or the U.S. Department of

14    Justice. They are persons with a duty to ensure the care and safety of inmates at the Jail; and/or to

15    supervise others in ensuring such care; and/or to develop, administer and enforce policies and

16    practices ensuring such care; and/or to contract for such care and to ensure compliance with the

17    terms of such contracts. Plaintiffs are ignorant of the names and particular capacities of the

18    CUSTODY DOES and therefore sue them by their fictitious names. Plaintiffs are informed and

19    believe, and on that basis allege, that each Custody Doe is intentionally and negligently responsible

20    in some manner for the occurrences described in this complaint, that they were personally and

21    directly involved in such occurrences and/or had a duty to supervise persons who were so involved,

22    and that the Plaintiffs' injuries described herein were actually and proximately caused by the

23    CUSTODY DOES' intentional and negligent misconduct. Plaintiffs will amend this complaint to

24    allege the CUSTODY DOES' true names and capacities when this information is ascertained.

25    Subject to such amendment, CUSTODY DOES are sued in their individual and official capacities.

26

27

28

---

[1] See Cal. Pen Code § 4000 ("Sheriffs as keepers"); § 4015(a) ("The sheriff shall receive all persons committed to jail by competent authority"); *Cortez v. County of Los Angeles*, 294 F.3d 1186 (9th Cir. 2002) (sheriffs are responsible for jail conditions not as law enforcement officials but as administrators exercising control over persons entrusted to their care).

18.     The SHERIFF, COUNTY, BOARD, NAJERA, and CUSTODY DOES are referred to collectively herein as the "CUSTODY DEFENDANTS." The CUSTODY DEFENDANTS agreed each with one or more others to commit the wrongful acts and omissions alleged herein, and did commit such acts and omissions, thereby causing injury to the Plaintiffs.

19.     Defendant JAIL PSYCHIATRIC SERVICES ("JPS") was the mental health services provider for inmates at the Jail at all times relevant to this matter. It operated at the Jail pursuant to a contract with Correctional Health Services or another unit of Sacramento County or the Sacramento County Sheriff's Department. JPS is duly incorporated under California Law and/or it is a division, associate, or subentity of the University of California, Davis, and/or the Regents of the University of California. JPS created and was responsible for implementing a Policy and Procedure Manual for delivery of mental health services at the Jail. It had a duty under contract and/or by common law and/or by voluntary assumption to develop, monitor, and correct as necessary policies and practices at the Jail for delivery of mental health and for the safety and well-being of inmates suffering from mental illnesses and symptoms. This duty included not only provision of primary health care, but also management of issues particular to incarcerated persons who are defendants in criminal matters in which they face the possible deprivation of liberty, and in some cases of life. JPS policy and practice addressed and monitored or purported to address and monitor such medico-legal patient issues as competence to stand trial. It knew or should have known that its acts or omissions would affect not only inmates' health and well-being, but also their ability to participate and assist in their criminal defense, and to make competent and rational choices in regard to that defense. JPS knew or should have known of severe and prolonged deficiencies in the provision of mental health services at the Jail, and of the threat those deficiencies posed to the health, safety, well being, and legal interests of inmates it was under contract and/or had a duty to care for. It further knew and should have known of conditions at the Jail adversely affecting inmates' mental health and legal interests. Despite its knowledge and duties, JPS chose not to correct the deficiencies that caused harm to the Plaintiffs and persons similarly situated. The choice of JPS and is parent entities was animated by their knowledge that the persons so harmed were mentally disabled, which characteristics they understood would render

them unable or unlikely to effectively seek redress of any harms JPS caused, or to attract the sympathy and assistance of persons who could obtain such redress for them.  Had JPS and its parent entities been providing mental health services for another group of patients, it would not have allowed such severe primary mental health care deficiencies to develop or persist.

20.    Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA ("UC REGENTS") is the parent and/or supervising entity of JPS and is the employer, contractor and/or supervisor of persons providing mental health services at the Jail, including but not limited to Dr. Gregory SOKOLOV.  It is a California state agency.  *See* Cal. Const. Art. IV, § 9.  The University of California, Davis, is a public university within the University of California system that is governed and administered by the Regents of the University of California.  The UC REGENTS had at all times relevant a duty to ensure its employees, contractors and subentities exercised due care consistent with all applicable professional standards in providing mental health care and other services under its supervision or aegis.  The UC REGENTS knew and should have known of severe and prolonged deficiencies in care provided at the Jail by JPS and by the UC REGENTS' employees, contractors and supervisees.  The UC REGENTS know and should have known that these deficiencies could foreseeably cause and in fact did cause the harms and damages described herein to the Plaintiff Mr. MULLER and his family members, and to other similarly situated inmates at the Jail.  Despite knowing and having a duty to know of the above deficiencies, and the probability and fact of harm they would cause, the UC REGENTS chose not to correct the deficiencies and chose instead to allow its contractors, employees and subentities to continue to act without due care and to provide services that failed to meet applicable professional standards.  The UC REGENTS was animated in this choice by its knowledge and belief that the persons affected were mentally disabled, which characteristic the UC REGENTS believed would render them unable or unlikely to effectively seek redress of any harms the UC REGENTS caused, or to attract the sympathy and assistance necessary to obtain such redress.

21.    Defendant CORRECTIONAL HEALTH SERVICES ("CHS") is and at all relevant times was a subentity or subunit of Sacramento County and the Sacramento County Sheriff's Department and was responsible for providing, supervising, and administering health services at

the Jail, and for contracting for the same.  CHS had at all times relevant to this matter a duty to ensure its employees, supervisees, and contractors exercised due care consistent with all applicable professional standards in providing mental health care and other health services.  CHS knew and should have known of severe and prolonged deficiencies in the provision of such services at the Jail.  CHS knew and should have known that these deficiencies could foreseeably and in fact did cause the harms and damages described herein to the Plaintiffs and to other persons similarly situated.  CHS nevertheless chose not to correct the deficiencies and chose instead to allow its employees, supervisees, and contractors to operate without exercising due care and without meeting applicable professional standards. CHS was animated in this choice by its knowledge and belief that the persons affected were mentally disabled, which characteristics CHS believed would render them unable or unlikely to effectively seek redress of any harms CHS caused, or to attract the sympathy and assistance of persons who could aid them in obtaining such redress.

22.     Defendant GREGORY SOKOLOV ("SOKOLOV") was the director of mental health service at the Jail.  He is a licensed physician and certified psychiatrist specializing in the provision of mental health services to persons in custody and persons who are defendants in criminal proceedings.  His specialization extends to both medico-legal issues such as competence to stand trial and to challenges and best practices in providing mental health and psychiatric services to inmates in an institutional setting.  Dr. SOKOLOV is the person who was licensed to and who did assume mental health and psychiatric care of Mr. MULLER during all times relevant to this matter.   In assuming this role and purporting to provide care, Dr. SOKOLOV knew and reasonably should have known that he would and did induce reliance on his care by Mr. MULLER and his family members, and that his assuming care of Mr. MULLER would exclude others from doing so.  Dr. SOKOLOV was also employed or contracted to provide such care and to supervise others in providing such care, and had a duty to do so consistent with professional standards and prevailing best practices for psychiatrists and mental health professionals specializing in providing care to institutionalized persons and/or in correctional settings.  Dr. SOKOLOV failed to exercise such care and failed to ensure persons he supervised exercised such care.  Dr. SOKOLOV knew and should have known of severe and prolonged deficiencies in the provision of mental health

1  services to inmates at the Jail.  He personally observed the conditions in which "Total Separation"

2  inmates, including Mr. MULLER, were held and knew and should have known the adverse effects

3  these conditions and care failures would have on Mr. MULLER and similarly situated inmates,

4  and how those conditions and care deficiencies would affect their criminal legal proceedings.  Dr.

5  SOKOLOV personally observed Mr. MULLER living in such conditions and was aware and had

6  a duty to be aware of the severe depressive and other mental health symptoms Mr. MULLER was

7  suffering as described in this complaint.  Dr. SOKOLOV nevertheless chose not to correct the

8  deficiencies he knew and should have known of as to his direct care of Mr. MULLER and as to

9  the care provided by persons he had a duty to supervise.  Dr. SOKOLOV is sued in his individual

10  and official capacities.

11     23. Defendant ANDREA JAVIST ("JAVIST") was at all relevant times the program

12  director for the Jail's mental health services provider.  She holds one or more professional licenses

13  and/or affiliations, and/or has specialized experience and training relevant to the provision of

14  mental health services to incarcerated persons, or has held herself out as having the same.  Ms.

15  JAVIST had a duty and voluntarily undertook to develop and ensure the performance of policies

16  and procedures that provided for the proper diagnosis and mental health care of inmates suffering

17  from mental health symptoms at the Jail.  She further had a duty and undertook to supervise,

18  coordinate, and provide quality assurance for the provision of such care.  Ms. JAVIST was aware

19  of severe and prolonged deficiencies in the provision of such care, and of harmful conditions at

20  the Jail that exacerbated the mental health symptoms and suffering of inmates to whom such care

21  was to be provided.  She had a duty by contract and/or by common law and/or by undertaking to

22  consult with and report to the CUSTODY DEFENDANTS such conditions and their deleterious

23  impact on inmates suffering from mental health symptoms.  Ms. JAVIST failed to act with due

24  care and according to applicable professional standards.  She knew and should have known that

25  her acts and omissions would likely, and did in fact, cause the harms described herein to Mr.

26  MULLER and his family, and to other persons similarly situated.  Ms. JAVIST is sued in her

27  individual and official capacities.

28

24. Defendants DOES 21 to 40 ("CARE DOES") are individuals and entities having some or all of the roles, responsibilities, duties and standards of care as those set forth above for Defendants SOKOLOV, JAVIST, JPS, UC REGENTS and CHS. Plaintiffs are ignorant of the names and particular capacities of the CARE DOES and therefore sue them by their fictitious names. Plaintiffs are informed and believe, and on that basis allege, that each CARE DOE is intentionally or negligently responsible in some manner for the occurrences described in this complaint, that they were personally and directly involved in such occurrences and/or had a duty to supervise persons who were so involved, and that the Plaintiffs' injuries described herein were actually and proximately caused by the CARE DOES' intentional and negligent misconduct. Plaintiffs will amend this complaint to allege the CARE DOES' true names and capacities when this information is ascertained.  Pending such amendment, CARE DOES are sued in their individual and official capacities.

25. The CARE DOES together with JPS, UC REGENTS, CHS, Dr. SOKOLOV and Ms. JAVIST are referred to collectively as the "CARE DEFENDANTS" in the allegations below. The CARE DEFENDANTS agreed each with one or more others to commit the wrongful acts and omissions alleged herein, and did commit such acts and omissions, thereby causing injury to the Plaintiffs.

26. Defendant UNITED STATES OF AMERICA ("USA") is a sovereign entity under the authority of which the United States Department of Justice and its subagencies operate. The United States has consented to be sued and waived its sovereign immunity as to certain damages caused by its employees acting within the scope of their employment. The USA is sued as the proper defendant under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), 2671-80, for certain claims brought herein. The Plaintiffs have exhausted the Federal Tort Claims Act administrative claim process.

27. Defendant ALBERT NAJERA was at all times relevant to this complaint the U.S. Marshal for the Eastern District of California. NAJERA had the authority under Title 18, section 4013 to contract with, municipal entities and officials for the keeping and care of persons in the custody of the USA and its agencies. NAJERA did in fact contract with the COUNTY, SHERIFF

1  and/or another related municipal entity for the keeping and care of federal inmates, and/or did

2  otherwise cause federal inmates, including Mr. MULLER, to be housed at the Jail.  NAJERA was

3  aware t all relevant times of unconstitutional conditions at the Jail, particularly in regard to inmates

4  with mental health disability.  NAJERA knew or should have known Mr. MULLER was classified

5  and housed in T-SEP status.   NAJERA had a statutory and legal duty to ensure that Mr.

6  MULLER's care and conditions of confinement met federal, state and local requirements, and that

7  it met the standards of the American Correctional Association.  NAJERA is sued in his individual

8  capacity.   ALBERT NAJERA is included among the CUSTODY DEFENDANTS.

9  **GENERAL ALLEGATIONS**

10  **I.     MR. MULLER SUFFERED THROUGH TWENTY MONTHS OF PROFOUND**
   **ISOLATION UNDER EXTREME CONDITIONS; HIS FAMILY SUFFERED**
11  **WITH HIM**

12  **A.     Mr. Muller's Arrival at the Jail**

13  28.     The Plaintiff MATTHEW MULLER arrived in the booking area of the Sacramento

14  County Main Jail at midday on September 21, 2015.  That morning, Mr. MULLER entered the

15  custody of the U.S. Marshal's Service after being transported by two Federal Bureau of

16  Investigations agents from another jail in Alameda County.

17  29.     At that time, Mr. MULLER had not long been in custody and had no prior

18  experience of incarceration.  Mr. MULLER was in a state of psychiatric distress at his prior jail

19  and had been sent to an inpatient facility for treatment.  However, by the time of his transfer he

20  was not in acute distress.

21  30.     In the booking area, Mr. MULLER received a short medical interview in which he

22  was asked questions such as "do you feel suicidal or homicidal?"  Medical staff transferred most

23  of Mr. MULLER's medical information from a report by his previous jail's care provider.  That

24  report and a three-day supply of medication accompanied Mr. MULLER.

25  31.     Despite his recent treatment at an inpatient psychiatric facility, the CARE

26  DEFENDANTS failed to ascertain the serious mental health issues that Mr. MULLER suffered,

27  and the likelihood that his condition would quickly deteriorate if not monitored and treated.

28

32.     At his prior facility, Mr. MULLER had been elevated to the mental health provider's most acute category of need, and then reduced one level a short time before his transfer. Even at the less emergent level of care, Mr. MULLER was meeting with mental health staff in a confidential setting at least once per week, and was meeting with a psychiatrist once every two weeks.

33.     The Defendants have a custom, policy and practice of failing to adequately screen incoming detainees for medical and mental health issues.  As reflected in the attached exhibits, Defendants have repeatedly been notified of the deficiencies and their harmful and at times lethal impact on detainees.  Nevertheless, they have chosen not to corrective action.  In particular, the CUSTODY DEFENDANTS chose to understaff their mental health care system, creating system-wide problems that included long delays between intake screening, referral to mental health services, and actual care encounters and treatment.  CARE DEFENDANTS were aware of the harmful and at times lethal effects of this understaffing, and that the services they provided fell below minimum professional standards in their respective fields.  They nevertheless chose not to take corrective action or to end or modify their contract.  They undertook to provide care, knowing that the choice would exclude others from providing care, that the Plaintiff Mr. MULLER had no other reasonable option for obtaining care, and knowing that underresourcing and that the terms under which they were providing care would not allow them to meet their professional obligations and the minimal standard of care.

34.     Mr. MULLER was booked and escorted through a cluttered hallway into a series of decrepit holding cells.  The cell smelled of sour vomit and had no operational telephone.  Mr. MULLER was periodically moved from one room to another with no explanation of where he was going or when he would be transferred to a living area.

**B.      Booking and Classification**

35.     Mr. MULLER was held for a long period in a small room with approximately seven other detainees, including one who was apparently hallucinating and speaking urgently to people who were not there.  Mr. MULLER received no lunch or dinner.

36.     Mr. MULLER was moved to another small cell where he was told to wait with

1    approximately 15 other people.  It was midnight or later, and the group was attempting to sleep,

2    but there was too little space in the room for them all to lay down at once.

3         37.    Mr. MULLER was eventually transferred to a jail "receiving cell." He had not slept

4    for over 24 hours and not eaten in nearly as long.  When he arrived at the cell, the other inmate

5    inside was semi-conscious and periodically writhing on the bottom bunk.  Trash and half-eaten

6    food were strewn about the cell, and dozens of flies were buzzing around in the cell after being

7    disturbed by Mr. MULLER's arrival.

8         38.    Upon questioning, the other inmate stated that he was going through heroin

9    withdrawal.  Mr. MULLER believed the inmate was very bad off and said that medical staff should

10   be alerted.  The inmate said that staff knew and had just given him Tylenol, and that he would just

11   get in trouble for pushing the intercom button if he asked for help.  He stated that if inmates used

12   the intercom, staff would skip over their turn to have time out of the cell.

13        In the receiving unit, where inmates wait about 10 days for long-term housing, out-of-cell

14   time could come as infrequently as once every two or three days for only 20 minutes.

15        39.    Soon after Mr. MULLER's arrival, his family visited him.  This required Mr.

16   MULLER to be entered into the phone and visit monitoring system, which in turn required what

17   Mr. MULLER later learned was a classification interview.  At the time it seemed to Mr. MULLER

18   only to be a few basic questions needed to create an account of some type.  He was not told it was

19   a classification interview and was exhausted from the disorienting booking process.

20        40.    The classification officer asked what status Mr. MULLER had been in at his prior

21   jail.  Mr. MULLER stated that he had been in general population at first, and then placed in

22   administrative segregation for mental health reasons.  Mr. MULLER stated that this had only been

23   a precaution and was unnecessary.  The officer advised that Mr. MULLER would be placed on T-

24   SEP status.  Mr. MULLER did not recognize the term and thought it perhaps had to do with his

25   phone and visiting account.

26        41.    "T-SEP," or "Total Separation," is a status unique to Sacramento Cunty.  *See*

27   Exhibit B: Eldon Vail, Sacramento County Main Jail, Mentally Ill Prisoners and the Use of

28   Segregation ("Vail Report"); Exhibit C: James Austin, *et al*., Evaluation of the Sacramento County

1    Jail Inmate Classification and T-SEP Systems ("T-SEP Report"). The T-SEP Report found that

2    inmates in this status were "placed in harsh conditions of solitary confinement and isolated from

3    direct contact with other inmates for excessive periods of time." The extreme isolation is

4    exacerbated by "startlingly and dangerously low" staffing levels that prevent inmates from

5    receiving even a bare minimum of out-of-cell time and other basic needs. Vail Report (Exhibit

6    B).

7            42.     Mr. MULLER's classification into T-SEP status was unnecessary and unjustified

8    by objective criteria usually used to classify inmates. He was not given any meaningful

9    opportunity to respond to or contest this decision, was given no statement of reasons for it, and

10   was not told the purpose of the interview.

11           43.     When Mr. MULLER returned from the visit with his family, his cellmate was gone.

12   Mr. MULLER would not be in the same living or recreation space with another human being for

13   the next one and two thirds years of his life. He would have access to an open-air exercise area

14   just five times in 20 months—less than once per season of the year. He did not receive access to

15   an indoor exercise area a single time.

16           **C.     Requests For Care**

17           44.     While languishing for days in the receiving cell, with only one 10-minute period

18   out of the cell to shower, Mr. MULLER recognized that his mental health was deteriorating. He

19   was feeling severe anxiety cycling with depressed mood. Mr. MULLER knew from his experience

20   that this mix of symptoms preceded his worst depressive episodes and once had occurred a few

21   weeks before a serious suicide attempt. He sent a medical request asking to be placed on the same

22   medications he had been receiving at his prior jail—a 3-day supply of which had been transferred

23   with him. The request was not answered.

24           45.     On September 24, a medications nurse visited Mr. MULLER's cell and told him

25   what medications he was supposed to receive. She administered his evening medication—the first

26   dose he had received in 96 hours. Because the morning antidepressant dose the nurse said he

27   would receive was incorrect, Mr. MULLER submitted another request to obtain the correct dosage.

28

He expressed his concern that in his experience, he could progress to being suicidal in his current state without proper medication. This was the second time he had requested correct medication.

46. The next day, Mr. MULLER was seen through the food-tray slot in his door by a mental health worker. She appeared to be exasperated or in a rush. After Mr. MULLER stated he was not an immediate suicide risk, she became stern and told Mr. MULLER that he was lucky this time, but if he ever used any variation of the word "suicide" in a medical request again, he would likely have his clothes taken, be put in a suicide gown, and placed in "the classroom."

47. Mr. MULLER did not then know what the care provider meant by "the classroom." He later learned that inmates placed on suicide watch—in addition to having all their clothes and belongings taken away—were put on display in a windowed room in the middle of the living units where both staff and inmates could view them as they wore nothing but a quilted blanket that fit like a sleeveless dress. *See* Exhibit D: Lindsay Hayes, Report on Suicide Prevention Practices Within the Sacramento County Jail System (calling the practice "humiliati[ng]" and advising the COUNTY that it should cease immediately).

48. Mr. MULLER's neighbor, whose door was approximately five inches away from Mr. MULLER's, and who could not help but overhear the conversation, told Mr. MULLER that the care provider was right. If an inmate was too insistent about getting help for depression or asked for something urgently, he would end up in a "turtle suit" (suicide gown). The inmate explained that he would be forced to sit in a windowed room with no toilet or place to sit except the floor. He stated that inmates had to urinate into a drain in the room. He said that there was not always a deputy available to escort someone on suicide watch to a toilet, so he knew of inmates who had to defecate in the room. When not housing an inmate, the classrooms were the only place T-SEP inmates could use hair clippers, and Mr. MULLER could tell by the rooms' smell of feces and body odor that what the inmate said was true.

**D.   Apparent Inmate Suicide**

49. After approximately one week in the receiving cell, Mr. MULLER was transferred to long-term housing in the Eighth Floor East 100 "pod" of the Jail. Mr. MULLER's second cell

1  was cleaner than the first, except that if the air intake or outflow vents were uncovered, a fetid
2  stench would periodically fill the cell.

3      50.     Mr. MULLER arrived to find another inmate's belongings in the cell. He assumed
4  he had a cellmate who was away.

5      51.     Some hours later, Mr. MULLER asked a deputy for bedding. The deputy observed
6  the mattress and blankets on the bottom bunk and replied that Mr. MULLER already had bedding.
7  Mr. MULLER stated that these belonged to his cellmate. The deputy replied that he had no
8  cellmate. When Mr. MULLER pointed out the two boxes of property, the deputy advised he would
9  "pop" (remotely open) Mr. MULLER's door, and he should push out the boxes. Mr. MULLER
10 did so, assuming the former occupant had been released or transferred to prison.

11     52.     Inmate workers arrived and opened the boxes. They harvested a number of items
12 that would be considered valuable by inmates such as commissary food. It was unusual that an
13 inmate would not have given those items away to people he knew before leaving, as was common
14 practice. The inmate workers threw out the rest of the belongings and kept the boxes.

15     53.     When Mr. MULLER spoke with other inmates during his out-of-cell time that day,
16 he learned that his cell's previous occupant had been taken out on a stretcher early that morning.
17 The inmates said the young man had been handcuffed to the stretcher, but that it was obvious from
18 his face and skin color that he was dead from asphyxiation. Mr. MULLER thought the inmates
19 might be joking with him. But several described the matter identically, and did not change their
20 stories. The deputies Mr. Muller asked were evasive. The inmate had committed suicide.

21     54.     The stark impression Mr. MULLER received of life—and death—at the jail during
22 his first 10 days stayed with him throughout his remaining 587. This was a place where death by
23 suicide was apparently so routine that the next inmate was moved into the dead man's cell just
24 hours later, and without even bothering to remove the decedent's property. The cells and living
25 areas were dark, filthy and cramped. Mental health help could be sought only at peril of public
26 humiliation, and even more severe confinement conditions than those already contributing to the
27 suffering.

28     **E.    Unavailability of Remedies or Classification Review**

55.    Although now in long-term housing, Mr. MULLER was still missing basic necessities. He had sought a vegetarian diet consistent with his Buddhist beliefs, but received no reply. The request process of the Jail was haphazard, and Mr. MULLER received no inmate handbook. Mr. MULLER attempted to ask about moving using request slips. After several weeks of nonresponse, a deputy advised Mr. MULLER that he had to write "classification" on the slip. He still received no response to further requests.

56.    Mr. MULLER also attempted to obtain new prescription glasses to replace ones that had been taken from him, but was told his family would have to bring them. But he had no prescription they could use to get glasses. He went for months with any object more than 15 feet away being a blur. In court, he could not even discern his judge's skin color, and had to ask his attorney at times whether a question was being directed to him because he could not see where the judge was looking. He eventually received a pair approximating his prescription brought from Taiwan by his then-fiancé Ms. DAI.

57.    Mr. MULLER inquired again about moving, asking a deputy why he was in T-SEP status, since other inmates told him it was usually punitive or for inmates with the most severe mental illnesses). Most deputies said he had to ask classification, though some stated he was in T-SEP status for mental health reasons, while others said it was because he had a high profile case.

58.    Mr. MULLER did not know a grievance process existed until approximately January of 2016, when another inmate asked him for help filling out a grievance form. Although grievance processes are known to most inmates, Mr. MULLER was new to incarceration and spent most of his time isolated from other inmates. Inmates told him that T-SEP status was "a one-way trip," and that filing grievances could cause custody staff to "make problems for you." Given the sort of punitive response he saw to requests for mental health help, Mr. MULLER was concerned about the consequences of asking.

59.    Mr. MULLER did not see a classification officer for nearly 1.5 years, though for much of that time he was severely depressed and sleeping or in bed for all but a few hours of each day. In February, 2017, a mental health worker visited Mr. MULLER to review his housing status.

By then, Mr. MULLER was so disconcerted by being out of his cell or around other people that he believes he either declined the interview or said he did not want to move.

### F.  Conditions In T-SEP Units

60.  T-SEP housing units were loud, filthy and degrading. Mr. MULLER's living areas were marked with periodic clamors that could erupt at any time of day or night. Loud and angry tirades by mentally disturbed inmates were common. And even those not disabled reacted as many humans would to profound isolation – acting out just to hear and do something.

61.  For over two months Mr. MULLER was housed next to an inmate who would, for episodes of three hours or more, repeatedly shout the phase "THERE'S A PRICE TO PAY!" in a menacing tone and varying inflections, banging on his door in between. It is difficult to comprehend the profoundly disturbing nature of these and other vocalizations by ill inmates, without having been trapped in a tiny cell unable to shut them out. Unsettling and indescribable sounds, banging on doors and metal surfaces, and pitched arguments between inmates could break out at any time of day or night and go on for hours.

62.  After Mr. MULLER arrived at prison in 2017, he was diagnosed with a severe vitamin A deficiency that likely contributed to his extreme and prolonged depression. Mr. MULLER stayed locked indoors for all but 3 of his 14,736 hours at the Jail. Two of the cells he occupied were entirely blocked from any outside view by a wall a few feet from the window.

63.  Most of those 14,733 indoor hours were spent in what has been described as a "concrete sensory deprivation chamber." Mr. MULLER's cells were smaller than 60 square feet, excessively cold or hot for about four months of the year, and without hot water.

64.  There were two showers available in the larger of Mr. MULLER's living units, though one was usually locked. Some deputies required inmates to lock their doors behind them during their 30-minute out-of-cell time. This left inmates without access to a toilet. So some inmates would urinate or defecate in the shower—especially mentally ill inmates. In order to use showers, Mr. MULLER twice had to lift large stools of feces from the shower floor and carry them to his cell to flush down the toilet. Other times he decided a shower was not worth cleaning up

1   what he found in the stall. This was just one of a variety of degrading experiences common in the
2   T-SEP living units.

3        65.    Those units often smelled like sewage or feces. Bored or disturbed inmates
4   periodically flooded the entire units with an inch or more of toilet water, sometimes adding
5   "cocktails" of urine, feces and other bodily fluids. While on a lower floor, Mr. MULLER on
6   several occasions had to scramble to block his door sill with a towel as waste water came pouring
7   through, leaving the towel unusable until it could be exchanged the next week.

8        66.    These floods interrupted an out-of-cell time schedule that was already perpetually
9   deficient. In principle, each inmate received just 30 minutes out of their cell per 24-hour period.
10  In practice, it was much less. With a modest time allowed between inmates, providing each 30
11  minutes in a 32-unit living area fills nearly 19 hours of the day. Adding in, movement in and out
12  of the unit, meals, medicine and staffing unavailability, it was impossible to complete the cycle in
13  24 hours.

14       67.    Accordingly, Mr. MULLER averaged no more than two hours per week of out-of-
15  cell time. He was therefore confined in a tiny concrete box for 99 percent of his one and two-
16  thirds years at the Jail.

17       68.    Frequently, the out-of-cell time available to Mr. MULLER fell in the middle of the
18  night. This left him unable to call his elderly parents. His wife would wake up and speak to Mr.
19  MULLER at 1:00AM and later since there were so few opportunities to talk at all.

20       69.    Besides calling family, inmates had to shower, shave, remove trash and use
21  cleaning supplies during their short time in the main living area. The last was especially important
22  upon arriving at a new cell. When Mr. MULLER arrived in the "Eight West" living area in late
23  2015, his new cell contained trash, standing water in the sink, and a smell that is indescribable.
24  Mr. MULLER scrubbed every surface, including the ceiling, and smeared a full stick of deodorant
25  on the walls to cover the stench. It persisted for over a week before mostly abating. However,
26  Mr. MULLER had to cover the intake vent to prevent a foul, burnt odor from wafting in. Many
27  inmates covered one or both vents in their cells for smell or temperature reasons, creating even
28  more ventilation system issues.

70.     Mr. MULLER's condition deteriorated over the course of his first several months. Medications were administered at irregular times that varied by six hours or more from day to day. Sometimes medications did not arrive at all. Mr. MULLER was unable to sleep when he did not receive evening medications, and so would be awake all nights on dates medication never arrived.

71.     Mr. MULLER was in very good physical health when he arrived at the jail. During his months there, his weight, blood pressure, blood triglycerides and other indicators of poor health rose. This was not due to unhealthy food choices. Mr. MULLER had few choices at all. T-SEP inmates were limited to a punitive subset of commissary items comprising mostly crackers, ramen and a few candy bars. They were further limited to approximately one quarter of the spending limit of other inmates. The food choices were so limited that some inmates sent money to prisoners on the floor below them, and then "fished" through the toilet pipes to pull food up from the inmates below.

72.     Mr. MULLER suffered from persistent dental pain while at the Jail. He was told he was not eligible even for a cleaning until after he had been at the Jail for a year. A dentist at another institution told Mr. MULLER that within two years he would likely lose both of his eye teeth to bone loss caused or exacerbated by prolonged lack of treatment. The Jail had advised Mr. MULLER that the only treatment available for tooth pain was to pull the tooth.

73.     Mr. MULLER has a 40% service-connected disability rating from a back and bone injury sustained in the Marine Corps. He had learned to manage the pain with a regimen of exercise and stretching. But under conditions where exercise was difficult and his depression was intensifying, Mr. MULLER's injury flared up. In addition to the back and bone pain, this caused Mr. MULLER to periodically suffer severe headaches.

74.     Less painful but more embarrassing, Mr. MULLER developed oozing sores in his buttocks region in mid-2016. Mr. MULLER believed at the time that it was caused by a latent sexually transmitted disease or some virus. He later learned they were bedsores, caused by spending almost the entire day on his bunk as a result of severe depression.

75.     Mr. MULLER suffered the most intense and prolonged depression of his life at the Sacramento County Main Jail. His criminal matter had already been pending three months when

1    Mr. MULLER arrived at the Jail. It was not a serious stressor, and Mr. MULLER had strong

2    defenses to the charges. However, the extreme conditions of privation and isolation left him in a

3    stupor for much of each day. As a result of depression, he wanted very much to kill himself.

4         76.    Mr. MULLER's father MONTY was severely distressed by the prospect his son

5    would kill himself, and that MONTY was powerless to do anything to improve his son's condition.

6    MATTHEW had begged both him and his mother for permission to die. When MONTY MULLER

7    urged his son to get help, MATTHEW explained what happened to inmates who admitted they

8    were suicidal. MATTHEW warned MONTY that if MONTY alerted Jail staff of MATTHEW's

9    wish to die, their response would only make MATTHEW more likely to kill himself to end his

10   misery. This quandary cause MONTY great distress.

11        77.    MATTHEW MULLER had only experienced auditory hallucinations during two

12   periods of his life, and neither occurred while he was in the depressed phase of bipolar illness.

13   However, Mr. MULLER suffered hallucinations at the Jail. Mr. MULLER is uncertain how often

14   they occurred because he spent so much time in a half-asleep daze. He recalls one occasion when

15   the noise from the television caused him to lose control and bang and yell at his door for someone

16   to turn it off. The next day, a neighboring inmate asked Mr. MULLER if he was all right. Mr.

17   MULLER replied that he had just snapped because he could not take the constant drone of the

18   television. His neighbor informed Mr. MULLER that the television had been off for hours when

19   Mr. MULLER began yelling at his door the day before. The noise and voices from the television

20   had been in Mr. MULLER's mind.

21        78.    Mr. MULLER also suffered a bout of severe anxiety and requested a change in

22   medication to alleviate it. His request was never answered.

23        79.    Mr. MULLER's extreme depression struck a debilitating blow to his legal defense.

24   His plans to kill himself meant it did not matter in his mind whether he won or lost his case. Mr.

25   MULLER had set a date in his head by which he was allowed to commit suicide: June 9, 2018, or

26   whenever his father passed away, if that was sooner. (Mr. MULLER believed the stress of his

27   suicide would be too great for his father.) Mr. MULLER's legal defense became irrelevant in his

28   mind. All that mattered was the run-up to his death, and trying to get through each day until then.

80.     When conscious, Mr. MULLER daydreamed about ways he could die that were outside of his control, such that he would not have to feel guilty for killing himself. When a mild earthquake struck, Mr. MULLER daydreamed of death on that theme for weeks, imagining the walls collapsing in a large quake.

81.     Although Mr. MULLER had previously practiced law and also knew firsthand that the government's case was based on falsehoods fatal to the charges, Mr. MULLER could not meaningfully assist in his own defense. He did not want to create any work for anybody, and could not summon any effort himself. Mr. MULLER asked his attorney to file a motion waiving his appearance, even though the courthouse was just across the street. Due to his extreme and prolonged isolation, it caused Mr. MULLER great distress to be around more than a few people or in an open space. Due to the panic this caused, Mr. MULLER does not even remember his guilty plea hearing. It appears from the hearing transcript that he was seriously impaired by the fallout of prolonged isolation.

82.     Mr. MULLER did not even like going to visit his family at the booths 100 feet from his cell. He felt he had to act well and perform for them so they would not become distressed. Mr. MULLER began to resent them for coming to see him and not giving him permission to kill himself. And he felt worse still for having those thoughts.

83.     Mr. MULLER eventually pleaded guilty simply because it seemed like it would be easiest for everyone else, and there was no point in taking the trouble to defend someone who was going to be dead soon. Mr. MULLER accepted the first plea offer, asking only for a change to the factual basis because it had him accepting responsibility for acts that would leave the real perpetrator at large and uninvestigated. The factual basis Mr. MULLER eventually accepted was also false, but only required him to agree that the government could prove the stated facts, and not that they were true.

84.     Mr. MULLER has since used his direct knowledge to find proof that evidence against him was fabricated. For example, knowing that the FBI could not have seized from him a pair of blacked-out googles with a blonde hair from a kidnapping victim attached, he was able to study records and photographs to assemble proof of the fabrication. But for his extreme depression

1  caused by the Defendants, Mr. MULLER could have provided his attorney with full and accurate

2  information that would have aided his defense. Instead, the defense felt irrelevant and unimportant

3  to Mr. MULLER, and he made no effort to confront the allegations.

4        85.  It was severely distressing and difficult for Ms. DAI to see the man she loved

5  deteriorate and suffer. Ms. DAI could perceive that Mr. MULLER was not always as he seemed,

6  in that he was trying to act happy and stable although his mental state was poor. Ms. DAI observed

7  Mr. MULLER's pallor, the rapid graying of his hair, his physique wasting away, and other signs

8  of his deterioration. His letters came less frequently and seemed to carry less true feeling.

9  MONTY MULLER noted the same. Both he and Ms. DAI were afflicted by the distress of

10  wondering when MATTHEW might consider suicide.

11        86.  Mr. MULLER received books from his family, but otherwise had no access to any

12  sort of recreational activity or pastime. There was no educational or mental health programming.

13  The television set was small and mounted in a high corner, such that it was little more than a blur

14  to Mr. MULLER with his approximated prescription glasses. There was no organized book or

15  library service. A sizeable portion of books circulating in the unit were bloated, wavy-paged and

16  stinking because they had been on the ground during one of the floodings. Mr. MULLER and

17  other T-SEP inmates were also denied access to the Jail law library.

18        87.  About one month after pleading guilty, Mr. MULLER sent his parents a letter. The

19  letter disclosed Mr. MULLER's poor state of health and mentioned that he was having cognitive

20  difficulties. CUSTODY DEFENDANTS intercepted the letter and gave it to the U.S. Attorney's

21  Office. It was never delivered to Mr. MULLER's parents. On information and belief, the letter

22  was withheld out of concern that its contents could alert Mr. MULLER's family of the extent of

23  his cognitive difficulties and potentially spur them to urge a withdrawal of the guilty plea.

24        88.  CUSTODY DEFENDANTS routinely conveyed Mr. MULLER's private

25  communications and those of MONTY MULLER and Ms. DAI, to the U.S. Attorney's Office.

26  There was no security justification for this intrusion into their private lives. The Sheriff's

27  Department is wholly separate from the U.S. Attorney's Office or any other federal entity. Should

28  the U.S. Attorney's Office have a legitimate need to obtain Mr. MULLER's personal

communications, it had available to it the Court's subpoena authority, with its attendant safeguards.

89.     Policy statements by the Sheriff's Department, as well as an inmate handbook Mr. MULLER borrowed, stated that inmate communications are subject to monitoring *for purposes of institutional security*. The Plaintiffs reasonably relied on this overt qualification, concluding that although a deputy might listen to a call to ensure there was no security threat, the private communication would not be transmitted to another third party.

90.     Mr. MULLER's father eventually learned from Mr. MULLER's attorney that his communications could be transmitted to prosecutors. Accordingly, during a pivotal period in their lives, Mr. MULLER and his family were constrained to talk as if there were a prosecutor sitting at their elbows. This deprived them of more than just an opportunity to speak frankly about the case. It also required them constantly to consider their words and how they might be turned against them. Although wholly innocent of posing any security threat, their family relations were degraded and intruded upon.

91.     Near the end of 2016, and beginning of the next year, Mr. MULLER began to episodically lapse into and out of severe depression, rather than suffering from uninterrupted depression. He had experienced this pattern before, and it usually preceded a recovery. And Mr. MULLER did in fact begin to cycle out of his most severe depression.

92.     Mr. MULLER and Ms. DAI had spoken about getting married. Mr. MULLER initially thought this would not be good for Ms. DAI and that she should forget him and find someone else. Ms. DAI persisted, and Mr. MULLER—in addition to loving her—was deeply moved by her compassion and dedication. He still believed it was not Ms. DAI's best option and was unsure whether he would live or die within the next two years. But he decided that if nothing else, he could offer survivor benefits or the help of his family if depression killed him.

93.     Mr. MULLER and Ms. DAI inquired about the logistics of arranging the civil ceremony at the court downstairs. Mr. MULLER was told he needed to obtain permission from the U.S. Marshal. Mr. MULLER and Ms. DAI sent a letter requesting permission. There was no reply. Mr. MULLER inquired and was told he could send the Marshal a message via the Jail. He

FIRST AMENDED COMPLAINT                    - 24 -                    *Dai, et al. v. United States, et al.*

did so, with no reply.  Mr. MULLER and Ms. DAI wrote an additional one or two letters.  A deputy eventually advised Mr. MULLER that permission had been granted, but that he could not get married until his federal sentencing was complete.  It was not clear from whom this directive came.

94.     Mr. MULLER felt embarrassed and degraded that he could not even choose the time of his marriage.  Even that important moment in his life—and more importantly in his future wife's—would be dictated by the CUSTODY DEFENDANTS for no legitimate reason.  To spare her the same shame and frustration, Mr. MULLER suggested to Ms. DAI that they should get married the day after he was sentenced, so that she could make sure she wanted to go through with it.  She did, and they were married the day after Mr. MULLER was sentenced to a 40-year prison term.

95.     Some weeks after his marriage, Mr. MULLER was transferred to prison.  At a private holdover facility midway, Mr. MULLER was classified as low security.  He was placed in a dormitory-style living area.  Almost immediately upon arriving in the living area, Mr. MULLER began to feel panic at being in an open space around more than a few people.  The panic became unbearable, and Mr. MULLER quickly sought to be moved to solitary confinement.  He was placed back in a cell by himself.

96.     Upon arriving at his destination prison, Mr. MULLER was classified into the general inmate population.  Mr. MULLER again felt acute anxiety at being around more than a handful of people in an open space.  In this instance, Mr. MULLER was assigned a cell into which he could retreat, rather than a dormitory.

97.     For a period of several weeks, Mr. MULLER rarely left his cell.  Despite having access to a large outdoor yard and exercise spaces, Mr. MULLER performed calisthenics inside his unlocked cell.  Mr. MULLER skipped meal times at midday and dinner and ate at breakfast when fewer inmates were present.  Mr. MULLER suffered panic attacks while waiting in a room with a large number of people for a medical appointment, and also while waiting for commissary food distribution.

98.     Mr. MULLER recalls that his last panic attack occurred on July 4, 2017, when he went to the dining hall for the special holiday meal and could not cope with the large number of

people there.  In the weeks after that he slowly readjusted to living around other people and being in open spaces.  Mr. MULLER was diagnosed with severely low Vitamin A levels, and was provided with a supplement.  He was prescribed new medications and attended a weekly group therapy session.  By the fall, Mr. MULLER felt happy and well-balanced and was returning to his normal physical condition.  His relationship with his wife and family greatly improved and they were in more frequent and higher quality contact than they had been during the 20 months of extreme confinement at the Sacramento County Jail.

99.     The CUSTODY DEFENDANTS made an intentional decision with respect to how Mr. MULLER and others similarly situated were confined.  The CARE DEFENDANTS made an intentional decision to undertake to provide care to Mr. MULLER under contract, knowing that under the contract's terms and available resources they could not meet a minimal standard of care, knowing that Mr. MULLER had no other reasonably available options for obtaining care, and knowing that their decision to undertake to provide care would exclude others from doing so.

100.     The CUSTODY DEFENDANTS and CARE DEFENDANTS knew their acts and omissions placed Mr. MULLER at substantial risk of suffering serious harm and knew or deliberately disregarded the fact that Mr. MULLER actually was suffering such harm.  Despite being aware of the high risk of harm and of either being aware or reckless disregarding that such harm was occurring, the CUSTODY DEFENDANTS AND CARE DEFENDANTS failed to take reasonably available measure to abate the risks and harms, where any reasonable person or entity in their position and with their responsibility would have apprehended the risks and harms and taken corrective action.

101.     By failing to take reasonably available corrective measures, the CUSTODY DEFENDANTS and CARE DEFENDANTS caused injury not only to Mr. MULLER, but also to Ms. DAI and MONTY MULLER.  The Defendants were aware specifically that Mr. MULLER was corresponding, communicating by phone, and visiting with his family, or they knew that any person in custody under his circumstances was likely to be doing so.  The CUSTODY DEFENDANTS AND CARE DEFENDANTS knew or should have known that MONTY

1   MULLER and Ms. DAI would be harmed and affected by their acts and omissions, both directly

2   and as bystanders witnessing the deterioration, suffering and suicidality of their loved one.

3        102.    The U.S. Marshal and associated CUSTODY DOES were aware by report and by

4   observation of conditions at the Jail. They were specifically aware of the privation attendant to T-

5   SEP status and that Mr. MULLER was classified in such status. They knew that the extreme

6   conditions of confinement would harm him psychologically and physically, as well as harming his

7   criminal defense. These Defendants nevertheless deliberately and intentionally chose not to cause

8   Mr. MULLER to be placed in a more appropriate status or moved to a different facility. They

9   chose to continue housing Mr. MULLER and detainees like him under contract at a facility they

10   knew did not meet constitutional standards, standards set by California statutes and regulations,

11   standards under other applicable law, or the terms of the contracts under which Mr. MULLER was

12   being held and provided care. These Defendants had no rightful option except to house Mr.

13   MULLER in a facility that met such standards.

14        103.    The injuries suffered by Mr. MULLER, Ms. DAI and MONTY MULLER were

15   caused in necessary part by the customs, policies and practices of the BOARD the COUNTY and

16   its Sheriff's Department. Those customs, policies and practices are described throughout this

17   complaint, as are their deficiencies and the conditions they created. The Plaintiffs also hereby

18   allege and incorporate by reference the observations and findings of the correctional disability

19   rights and health care experts contained in the reports attached as Exhibits A through F. These

20   reports cover and describe conditions during periods when Mr. MULLER was at the Jail and was

21   suffering the harms described herein, and in fact Mr. MULLER was interviewed by one of the

22   experts. Five of the reports are of the COUNTY's own expert witnesses. The COUNTY and

23   BOARD by these reports and others preceding it was on notice of unconstitutional conditions at

24   the Jail and how its policies, practices and customs caused and perpetuated such conditions. The

25   BOARD and COUNTY nevertheless chose deliberately and recklessly to disregard these ongoing

26   harms.

27   ///

28

FIRST AMENDED COMPLAINT        - 27 -       *Dai, et al. v. United States, et al.*

1

**STATUTES OF LIMITATIONS**

2      104.    The Plaintiffs' discovery of their injuries and their discovery that those injuries

3    were caused by the Defendants' malfeasance was substantially delayed due to the nature of those

4    injuries and the complexities of causation and medical etiology involved.

5      105.    The particular facts and circumstances involved, as well as expert testimony or

6    medical support for Plaintiffs' delayed discovery, are factual matters that will be developed and

7    proven following discovery. However, these facts include at a minimum the below.

8      106.    No sooner than July 4, 2017, the Plaintiffs discovered, for the first time, that their

9    injuries were caused by the malfeasance of the CUSTODY DEFENDANTS and the CARE

10    DEFENDANTS. At this time or later the Plaintiff MATTHEW MULLER emerged from the year

11    and a half of severe depression he suffered as a consequence of his extreme isolation and privation.

12    As is in the nature of depression, he previously attributed his suffering to his own faults and life

13    circumstances, rather than to a preventable and treatable illness and physical deterioration of the

14    brain. Upon emerging from depression, he understood that his prolonged suffering and suicidal

15    ideation had been caused in necessary part by the conditions of his confinement and not by his

16    perceived faults. Mr. MULLER discovered that even with a 40-year sentence ahead of him, he

17    felt at peace and was not suffering. In particular, he took comfort in the company of other inmates

18    and found great meaning in the opportunity his situation presented to find and assist in the

19    exoneration of wrongfully convicted inmates. Since he had been entirely denied regular social

20    contact, Mr. MULLER did not know until then that the denial severely affected him.

21      107.    In the summer of 2017, the Plaintiffs also had their first opportunity in nearly two

22    years to meet in person and converse without the shadow of intrusive monitoring that could be

23    used unfairly against them, and not simply to ensure institutional security. Plaintiffs Ms. DAI and

24    MONTY MULLER learned for the first time the truth about the allegations against Mr. MULLER.

25    They learned that the factual basis to which Mr. MULLER had stipulated was false. They then

26    understood that but for the malfeasance of the Defendants, they could have intervened in Mr.

27    MULLER's legal matters. They would have understood sooner that Mr. MULLER pleaded guilty

28    not for reasons of guilt, but instead because his depression and distorted thinking led him falsely

FIRST AMENDED COMPLAINT      - 28 -      *Dai, et al. v. United States, et al.*

1  to believe he deserved to be punished regardless of guilt, and that his legal situation was hopeless.

2  At that time, the Plaintiffs learned of the harm done to them.

3       108.  Mr. MULLER's conviction is now under challenge. Plaintiffs do not allege that

4  their causes of action will only accrue upon the vacating of Mr. MULLER's conviction, although

5  that circumstance would be evidentiary of the harms against them. The circumstances of Mr.

6  MULLER's guilty plea do not *per se* dictate its invalidity. All allegations against the Defendants

7  can be sustained and are true without regard to the lawfulness of Mr. MULLER's conviction, or

8  they can be sustained in sufficient part to establish the Defendants' liability.

9       109.  Not sooner than March 1, 2019, the Plaintiffs discovered for the first time that

10  relevant injuries against them were caused by the negligence of the CARE DEFENDANTS. At

11  the time, Mr. MULLER had spent five months in circumstances substantially similar to those he

12  faced at the Sacramento County Jail. Previously, Mr. MULLER and his family reasonably

13  believed even in conditions less extreme than those at the Jail, Mr. MULLER was likely to face

14  depression and a heightened risk of suicide at any local detention facility (which are generally

15  more restrictive than prisons). However, Mr. MULLER was in administrative segregation in a

16  Solano County Jail starting in September of 2018. He is classified in administrative segregation

17  as a practical necessity for delivery of a reasonable accommodation recommendation by mental

18  health staff—a period each day to be exposed to light and open air and walk in the yard area. In

19  addition, mental health staff prescribed a mood stabilizer—a standard treatment for bipolar

20  disorder. With these treatments, Mr. MULLER has remained stable even under the restrictive

21  conditions of a segregated custody classification. Mr. MULLER now understands that the severe

22  harm he suffered was not an inevitable incident of confinement at a local detention facility, but

23  rather was caused by the CARE DEFENDANTS' failure to provide standard and medically

24  acceptable treatment and recommendations, and by the failure of CUSTODY DEFENDANTS to

25  provide for and implement them.

26       110.  Additional facts supporting delayed discovery of injuries, causation, and essential

27  elements of the claims asserted will be developed in the course of discovery.

28

1

**CLAIMS FOR RELIEF**

2      111.    The Plaintiffs allege that as to each and every cause of action and during all times

3   relevant to the complaint, the CARE DEFENDANTS and the CUSTODY DEFENDANTS

4   (excepting these directly employed by the federal government) were acting under color of both

5   state and federal law, or under color of state or federal law.  All defendants directly employed by

6   the federal government were acting under color of federal law.

7      112.    The color-of-law character of the Defendants' actions was pursuant to their

8   employment by, election to contract with, or status as governmental authorities and entities.

9      113.    Plaintiffs further allege that each of the Defendants assisted, cooperated,

10   coordinated, agreed, and acted in concert with each of the other Defendants to commit and cause

11   the wrongful acts and omissions described herein.   Each and every Defendant assisted,

12   coordinated, agreed, and acted in concert with each of the other Defendants to cause, and thereby

13   did cause, the Plaintiffs' injuries.

14      114.    Plaintiffs allege in the alternative that each and every Defendant who is a natural

15   person acted in their official capacity and/or in their individual capacity and/or exceeded the scope

16   of their employment, position, contract, or lawful authority, to include all DOES whose identities

17   are to be ascertained.

18      115.    By the nature of the institutional and contractual relationships involved, and of the

19   acts and omissions alleged, Plaintiffs do not know and cannot reasonably be expected to allege the

20   details of the particular contracts, agreements, associations, authorities, policies, and capacities in

21   which the Defendants acted.   Plaintiffs can and will ascertain such details in the course of

22   discovery.

23      116.    On or about October 8, 2017, Plaintiff Mr. MULLER mailed a government tort

24   claim to Sacramento County.  It described the same conduct as above, except that it did not allege

25   interference and communications or invasion of privacy.  It did, however, claim loss of consortium

26   and Ms. DAI was included in the claim.

27   ///

28   ///

1

2

**FIRST CAUSE OF ACTION**

3

4

**Eighth and Fourteenth Amendments: Cruel and Unusual Conditions of Confinement
(42 U.S.C. § 1983 and *Bivens v. Six Known Unnamed Agents*)
By MULLER As To CUSTODY DEFENDANTS And CARE DEFENDANTS**

5

6

7

117.    Plaintiffs reallege and incorporate by reference each and every other paragraph as if set forth fully herein, to include allegations of damages, individual involvement, customs and policies, and action in concert.

8

9

10

118.    By the policies, customs, and practices described herein, and by their joint and individual acts and omissions, the Defendants subjected the Plaintiff MATTHEW MULLER to extreme psychiatric and physical harm with long-term effects on his brain and health.

11

12

13

14

119.    By the policies, customs, and practices described herein, and by their joint and individual acts and omissions, the Defendants subjected the Plaintiff Mr. MULLER to a substantial and increased risk of suicide and other serious harms by depriving him of adequate medical and mental health care, and of the minimal civilized measure of life's necessities and human dignity.

15

16

17

18

120.    The above harms were caused and exacerbated by the Custody Defendants' unjustifiable use of extreme isolation and confinement in severe conditions, and by the CARE DEFENDANTS' failure to prevent and intervene in such maltreatment, knowing of it and having a duty to do so.

19

20

21

121.    The Defendants prevented and excluded Mr. MULLER's family, including the Plaintiffs Ms. DAI and Mr. MULLER, from aiding Mr. MULLER or mitigating the extreme conditions of his confinement.

22

23

24

25

26

122.    The Defendants have been aware of the above harms, both as to Mr. MULLER and on a system-wide basis to inmates similarly situated. Those Defendants not specifically aware of Mr. MULLER's identity and circumstances were nevertheless aware that inmates at the Jail classified in T-SEP status and inmates suffering from mental illness were being subjected to severe suffering and denials of necessary care and basic human needs.

27

28

123.    Despite their knowledge of the tremendous suffering being imposed and of Mr. MULLER's and other inmates' inability to help themselves or obtain outside help, the Defendants

1  with deliberate indifference continued and failed to cure the deprivations, proximately causing Mr.

2  MULLER's injuries, all in violation of the Eighth and Fourteenth Amendments of the U.S.

3  Constitution.

### SECOND CAUSE OF ACTION

**Fifth and Fourteenth Amendments: Procedural Due Process**
**(42 U.S.C. § 1983 and *Bivens v. Six Known Unnamed Agents*)**
**By MULLER As To CUSTODY DEFENDANTS**

7      124.   Plaintiffs reallege and incorporate by reference each and every other paragraph as

8  if set forth fully herein, to include allegations of damages, individual involvement, customs and

9  policies, and action in concert.

10     125.   The CUSTODY DEFENDANTS' custom, policy, and practice of using prolonged

11  and severely restrictive housing and T-SEP status subjected Mr. MULLER to a substantial

12  deprivation of liberty, with no procedural safeguards or reasonably available means to challenge

13  the deprivation under Jail procedures.

14     126.   The Plaintiff Mr. MULLER had a liberty interest in not being confined to severe

15  confinement conditions and not being denied nearly all human contact and interaction. That liberty

16  interest was supported and defined by mandatory law binding on the CUSTODY DEFENDANTS,

17  including but not limited to Title 18, sections 4013 and 4086 of the U.S. Code, and Title 15 of the

18  California Code of Regulations.

19     127.   The extreme conditions and deprivations imposed on Mr. MULLER constituted an

20  atypical and significant hardship relative to the ordinary incidents of jail life in that the conditions

21  were contrary to regulatory, statutory, and constitutional law, and caused Mr. MULLER severe

22  and unnecessary suffering of a degree far greater that inmates experience elsewhere confined under

23  like custody and classification needs.

24     128.   At a minimum, Mr. MULLER should have been provided notice that he was being

25  administered a classification interview at the time it was conducted, reasonable advisement of its

26  significance and purpose, a hearing at which he could present information and evidence relevant

27  to a classification decision, notification of the decision including oral or written reasons for the

28

1   decision reached, and notice of and actual availability of a process for challenging and periodically

2   reviewing Mr. MULLER's classification and his ongoing deprivations of liberty beyond what was

3   necessary or ordinary.

4        129.    The costs of providing Mr. MULLER with the above procedure and safeguards

5   would be minimal.  There would be no adverse "ripple effect" from such provision, and in fact

6   such a process would engender an environment of responsibility and positive incentives for

7   inmates, as opposed to the then-prevailing sense that classification at the Jail was arbitrary and

8   capricious.  In any event the costs of providing the safeguards were far outweighed by the risk

9   of—and the actual—erroneous deprivation of Mr. MULLER's liberty.

10        130.    The federally-employed CUSTODY DEFENDANTS knew of Mr. MULLER's

11   arbitrary classification and of the severe and erroneous liberty deprivations that occurred as a

12   result. Despite having the authority to intervene in Mr. MULLER's classification or to move him

13   to another facility, they failed upon request to do so.  On information and belief, they requested

14   that Mr. MULLER be maintained in T-SEP status.  Their policies, practices, and omissions

15   deprived Mr. MULLER of any opportunity to challenge his confinement in what they knew to be

16   unconstitutional and harmful conditions.

17        131.    The above lack of procedural safeguards and deprivation of remedies violated the

18   Fifth and Fourteenth Amendments of the U.S. Constitution. It proximately caused Mr. MULLER's

19   injuries in that any reasonable classification process would have found that Mr. MULLER posed

20   no significant security risk and was fit for confinement in an environment allowing contact with

21   other inmates, including; if necessary a protective custody living unit.  Such classification would

22   have prevented the suffering Mr. MULLER, Ms. DAI and MONTY MULLER.

23   **THIRD CAUSE OF ACTION**

24   **First and Fourteenth Amendments: Freedom of Association**
**( 42 U.S.C. § 1983 and *Bivens v. Six Known Unnamed Agents*)**
25   **By All Plaintiffs As To CUSTODY DEFENDANTS**

26        132.    Plaintiffs reallege and incorporate by reference each and every other paragraph as

27   if set forth fully herein, to include allegations of damages, individual involvement, customs and

28

1   policies, and action in concert.

2       133.   By their acts and omissions, the CUSTODY DEFENDANTS unreasonably and

3   unjustifiably infringed the Plaintiffs' fundamental rights to familial association and to marry, and

4   their rights to correspond and communicate without unreasonable restrictions and intrusions.

5       134.   Although associations between inmates and their loved ones are necessarily

6   constrained, those constraints must bear a rational and valid relationship to a legitimate

7   governmental interest.  The CUSTODY DEFENDANTS' acts in preventing, intercepting, and

8   intruding upon the Plaintiffs' familial associations and communications exceeded any valid and

9   rational relationship to such an interest.  There was no valid security or institutional justification

10  for providing the Plaintiffs' private communications to federal prosecutors with no subpoena or

11  other process of a court.  There was no valid security or institutional justification for intercepting

12  and withholding without notice the Plaintiffs' letters to each other.  There was no valid security or

13  institutional justification for denying Ms. DAI and Mr. MULLER the right to marry until after Mr.

14  MULLER's sentencing.  There was no valid security or institutional justification for severely

15  limiting Mr. MULLER's right to contact his family or attorney by phone.

16      135.   The above infringements both individually and combined operated to severely

17  restrict the freedom, quality, and frequency of the Plaintiffs' associations and communications.

18  The infringements were all the more harmful in that they degraded an already-limited ability of

19  the Plaintiffs to associate and enjoy a family life.  These infringements and degradations caused

20  the Plaintiffs serious suffering and emotional distress.  But for the CUSTODY DEFENDANTS'

21  violation of the Plaintiffs' associational rights, Mr. MULLER may not have been convicted of a

22  criminal offense, or would have received a lesser sentence, as his family would have intervened in

23  his legal defense upon hearing the truth of his circumstances through open communication.

24      136.   The infringements described above and in the general allegations were in violation

25  of the First and Fourteenth Amendments of the U.S. Constitution.

26  ///

27  ///

28  ///

1

## FOURTH CAUSE OF ACTION

2

### Americans with Disabilities Act and Rehabilitation Act
### By MULLER As To CUSTODY DEFENDANTS And CARE DEFENDANTS

3

4      137.    Plaintiffs reallege and incorporate by reference each and every other paragraph as

5   if set forth fully herein, to include allegations of damages, individual involvement, customs and

6   policies, and action in concert.

7      138.    By their acts, omissions, policies, customs, and practices, the CUSTODY

8   DEFENDANTS and CARE DEFENDANTS violated the Americans with Disabilities and

9   Rehabilitation Acts ("the Acts").

10     139.    Mr. MULLER has one or more disabilities or handicaps as defined in the above

11  Acts, in that he suffers from bipolar disorder as well as a back and bone disorder connected to his

12  service in the U.S. Marine Corps. These disabilities impose on multiple major life functions of

13  Mr. MULLER such as his ability to think and episodically to ambulate normally. Mr. MULLER

14  has a record of such impairment and is regarded as having such an impairment.

15     140.    The CUSTODY DEFENDANTS and CARE DEFENDANTS knew of Mr.

16  MULLER's disabilities, knew of a substantial likelihood of harm to his health and federal rights,

17  and deliberately chose not to remedy the situation, which choice caused Mr. MULLER harm.

18     141.    The CUSTODY DEFENDANTS and CARE DEFENDANTS were and are public

19  entities, corporate entities and natural persons, all with obligations falling under one or both of the

20  above Acts. Those Defendants that are public entities, including but not limited to the COUNTY

21  of Sacramento and UC REGENTS, received and receive federal funds within the meaning of the

22  Rehabilitation Act.

23     142.    The Defendants above violated the Acts by failing to ensure that MULLER had

24  access to, was permitted to participate in, and was not denied the benefit of programs, services and

25  activities provided by Defendants. Instead, Mr. Muller was discriminated against by reason of his

26  disabilities and denied equal access to the programs, services and activities.

27  ///

28

143.    Mr. Muller was otherwise qualified to participate in the above programs, services and activities in that he was then appropriately classified into a lower custody status and has since succeeded in such a status.

144.    The Defendant further violated the Acts by failing to make reasonable modifications to policies, practices and procedures that would have avoided discrimination against MULLER and the damages that resulted, and that would have allowed MULLER equal participation and enjoyment of programs and facilities.

145.    The Defendants further violated the Acts by failing to house MULLER in the most open and integrated setting allowed by his disability and by refusing him an equal opportunity to enjoy and participate in such a setting and the additional programs and facilities to which it permitted access.

146.    The Defendants violated the Acts by failing to inform MULLER of his rights and by failing to offer him an adequate grievance procedure to address the ADA violations that were causing him harm.

147.    As to the CARE DEFENDANTS, the violations of the Acts alleged was by their same conduct that is also alleged to amount to deliberate indifference to a serious medical need in violation of the U.S. Constitution.

148.    As a result of the Defendants' acts, policies and procedures described herein and in the attached exhibits, MULLER was inappropriately housed in solitary confinement and denied equal access to program and facilities, causing him damages and violating the Acts. The programmatic barriers Mr. MULLER faced are well-documented above and in the attached exhibits, and include T-SEP classification and inappropriate suicide prevention measures.

## **FIFTH CAUSE OF ACTION**

### **California Unruh Act and Disabled Persons Act**
### **By MULLER As To CUSTODY DEFENDANTS And CARE DEFENDANTS**

149.    Plaintiffs reallege and incorporate by reference each and every other paragraph as if set forth fully herein, to include allegations of damages, individual involvement, customs and policies, and action in concert.

1    150.    Plaintiffs in particular incorporate the facts and allegations set forth in their

2  preceding cause of action for violation of the Americans with Disabilities Act.

3    151.    Under California law, any violation of the Americans With Disabilities Act is a *per*

4  *se* violation of the Unruh Act. *See* Cal. Civ. Code § 51(f). CARE DEFENDANTS and CUSTODY

5  DEFENDANTS violated the ADA as to Plaintiff MATTHEW MULLER and accordingly have

6  violated the Unruh Act.

7    152.    The CARE DEFENDANTS other than natural persons are business establishments

8  providing medical services and denied MATTHEW MULLER full and equal accommodations,

9  advantages, facilities, privileges and services because of his disability and medical condition.

10  CUSTODY DEFENDANTS and CARE DEFENDANTS who are natural persons aided and

11  incited the above violations, *see* Cal. Civ. Code § 52(a), and made distinctions and discriminations

12  that were contrary to the Unruh Act.

13    153.    Under California law, any violation of the ADA is also a violation of the Disabled

14  Persons Act.    *See* Cal. Civ. Code § 54(c) CUSTODY DEFENDANTS AND CARE

15  DEFENDANTS violated the ADA as to MATTHEW MULLER.

16    154.    The Sacramento County Main Jail is a public accommodation with areas and

17  services of the facility open to the public. Its physical plant is not divisible such that there is one

18  building entirely for holding inmates and another that is open to the public.

19    155.    The COUNTY and BOARD accordingly violated the Disabled Persons Act as to

20  Mr. MULLER.

21                    **SIXTH CAUSE OF ACTION**

22    **California Constitutional Rights to Privacy and Association;**
    **California Invasion of Privacy and Intrusion on Seclusion**
23    **By All Plaintiffs As To The USA And CUSTODY DEFENDANTS Except Federal Employees**

24    156.    Plaintiffs reallege and incorporate by reference each and every other paragraph as

25  if set forth fully herein, to include allegations of damages, individual involvement, customs and

26  policies, and action in concert.

27    157.    In particular, Plaintiffs' assertions in their third cause of action above are referenced

28  and realleged.

1      158.   The Plaintiffs Mr. MULLER and MONTY MULLER have a parent-child

2  relationship that was interfered with by the CUSTODY DEFENDANTS.  Their mutual help,

3  support and consultation was especially critical during the relevant times in this complaint.  The

4  Plaintiffs' family was in a state of crisis, and their inability caused by Defendants to speak freely

5  and allay the crisis damaged Mr. MULLER and his father.  MONTY MULLER was involved in

6  arranging Mr. MULLER's legal defense and paying for needed ancillary services.  Due to

7  restrictive conditions and impaired communications caused by the CUSTODY DEFENDANTS,

8  MONTY MULLER was unable to fully ascertain his son's degree of crisis or the truth concerning

9  his alleged offense conduct.

10      159.   The Plaintiff MATTHEW MULLER pleaded guilty to a federal offense in

11  significant part because of a perceived threat of harm to his family and their interests.  For example,

12  Mr. MULLER was told that cocaine was seized from his residence, which residence was also used

13  by other family members.  Mr. MULLER had never used nor possessed cocaine and knew it could

14  not be his.  He believed it must be another family member's and did not want to cause their arrest.

15  Mr. MULLER could not freely discuss this matter with his parents and simply did not have a

16  volume of communication opportunities available sufficient for them to have a meaningful

17  discussion.  In fact, the substance seized had not been cocaine, but crushed ibuprofen. Had Mr.

18  MULLER been able to communicate without unjustifiable interference, this fact would have been

19  clarified and would not have affected his plea decision.

20      160.   CUSTODY DEFENDANTS also intercepted and seized mail to and from Mr.

21  MULLER's family and withheld it without notice and without any security justification.  In

22  particular, CUSTODY DEFENDANTS withheld from Mr. MULLER's family a key letter stating

23  that he was having cognitive difficulties and was only pleading guilty because it seemed like it

24  would be best for others, regardless of the truth or the impact on himself.  Plaintiffs obtained a

25  copy of the withheld letter in 2019.

26      161.   The Plaintiffs HUEI DAI and Mr. MULLER have and had during relevant times a

27  relationship as husband and wife.  The CUSTODY DEFENDANTS prevented them from

28  establishing this relationship sooner, without any security or institutional justification.  The

CUSTODY DEFENDANTS transmitted confidential communications and information shared between Ms. DAI and Mr. MULLER to Mr. MULLER's ex-spouse and to unknown others. This included, but was not limited to, information about Mr. MULLER's proposal to Ms. DAI and their marriage plans. That information was then used by Mr. MULLER's ex-spouse in a family law matter.

162.    The Plaintiffs had a reasonable expectation of privacy, including that to the extent their communications were monitored, that monitoring would not exceed the scope required to maintain institutional security, and that such monitoring would not include disclosure of private information to unauthorized third persons such as Mr. MULLER's ex-spouse. Although the Jail stated that communications would be monitored, its policy as published to inmates stated that communications would be monitored "for purposes of institutional security," and the Plaintiffs reasonably relied on this express limitation.

163.    The Plaintiffs had no other reasonable means of exercising their familial and association rights with each other. They were know complete private means of communications.

164.    The CUSTODY DEFENDANTS and the USA mounted a serious and unnecessary invasion into the Plaintiffs' privacy and associational rights. Their incursion violated the most fundamental associations and rights of a family that they had deprived of any other means of practicing their family life. They intercepted and withheld written communications without notice or justification, and they disclosed private information to third parties what had no right to the information. These violations and intrusions amount to conduct that a reasonable person would find highly offensive, and violated the Constitution and the common law of the State of California.

## SEVENTH CAUSE OF ACTION

**Negligence; Professional Negligence; Negligent Infliction of Emotional Distress
As To All Defendants Except Federal Employees**

165.    Plaintiffs reallege and incorporate by reference each and every other paragraph as if set forth fully herein, to include allegations of damages, individual involvement, customs and policies, and action in concert.

166.    The CUSTODY DEFENDANTS and CARE DEFENDANTS had a duty to use due care in their housing of MATTHEW MULLER and their provision for his basic needs and medical and mental health care.  The Defendants were MULLER's custodians and health care providers, and by their voluntary assumption of these roles excluded others from providing for MULLER's basic needs and care.

167.    The Defendants failed to exercise the minimum care and caution required by law and violated their duty of care through their conduct described herein.

168.    As to the CARE DEFENDANTS, all failed to exercise the reasonable degree of knowledge and skill that is ordinarily possessed by members of their respective professions.

169.    As to Defendant SOKOLOV, he failed to exercise the requisite standard of care of a psychiatrist in a detention facility that posed particular health threats for persons with psychiatric illness. He knew that medications alone were insufficient to treat such illness under the relevant circumstances.  He knew of extreme conditions that inmates in T-SEP status faced, and that MULLER was among these inmates.  He knew that long periods of isolation and confinement in small spaces would have an especially deleterious effect on persons with mental illness and would exacerbate their condition. SOKOLOV further knew that MULLER and most other detainees were in criminal proceedings, and that poor mental health would harm their ability to assist in their own defense. He nonetheless failed to provide minimally adequate care.  He was also aware that nurses and other professionals whom he supervised were providing inadequate care, and failed remedy the situation and ensure his patient MULLER was receiving appropriate care from his supervisees. He knew or should have known MULLER was receiving inadequate care and could have prevented it through his due care. He knew or should have known that Mr. MULLER was improperly medicated in that he was not receiving a mood stabilizer.

170.    As to Defendants CARE DOES not limited to nurses and licensed mental health care providers, they failed to exercise the reasonable degree of skill and care required in their respective fields, in that they failed to provide appropriate care, as set forth above.  They failed to monitor MULLER's deteriorating condition and to report it to their supervisors.  All were acting in the scope of their employment.

171.    As to all other CARE DEFENDANTS, they failed to exercise due care in the hiring, contracting and supervision of medical and mental health care professionals—including failing to ensure adequate staffing levels. They knew or should have known of substandard care and custody conditions at the Jail and of the harm they were causing MULLER. They nevertheless failed to correct the situation through proper supervision of their employees and contractors.

172.    The acts and omissions of the CARE DEFENDANTS were a direct cause of harm to MULLER in that they allowed his mental health to deteriorate to the point where he suffered severe depression, suicidality, and other symptoms. These symptoms in turn caused him serious suffering and physical and biochemical deterioration of his brain.

173.    The conduct and omissions of all Defendant, violated multiple statutes and regulations that were in effect to benefit and protect MULLER. These included the provisions of Title 15 of the California Code of Regulations relating to minimum detention standards, not limited to sections 1050, 1052, 1053, 1062-1069, and 1073; and regulations relating to medical care, not limited to sections 1200-1210, 1216 and 1217. Defendant USA as substituted for NAJERA violated 18 U.S.C. § 4013 in that it failed to ensure its contract facilities met the above local standards as the statute requires, and also failed to ensure the facility met standards of the American Correctional Association (ACA) not limited to 3-5173, 3-5275, 3-5276, 3-5280, 3-5272, 3-5110-5113, 3-5144-5146, 3-5110-5113, 3-5344-5346, and 3-5123-5125. All of the above laws (including the federal provision incorporating ACA standards) were promulgated to prevent the harms Mr. MULLER suffered and MULLER was among the class of individuals the laws were intended to protect. The Defendants' violations of the laws caused the harm to Mr. MULLER in that if Defendants had complied with the laws, Mr. MULLER would not have suffered serious harm from extreme conditions of confinement and poor mental health care.

174.    The Plaintiffs MONTY MULLER and Ms. DAI were harmed by the Defendants in that they were forced to witness and endure for over a year the suffering and deterioration of their loved one MATTHEW MULLER, MONTY MULLER and Ms. DAI were respectively MULLER's father and wife during relevant times, with Ms. DAI also being his fiancé for a portion of the period. The Defendants knew or should have known that MONTY MULLER and Ms. DAI

were regularly visiting with and corresponding with MATTHEW MULLER, or knew generally that close relatives would visit MULLER and similarly situated inmates. The Defendant further knew or should have known that MONTY MULLER and Ms. DAI would know of and contemporaneously witness the severe harm being caused to MATTHEW MULLER. They witnessed MULLER's mental and physical deterioration, and his loss of desire to fight his criminal matter, to see his family, or even to live. MONTY MULLER and Ms. DAI were aware that MULLER wished to kill himself, a state caused by his inadequately treated mental illness and the extreme conditions inflicted on him by the Defendants. They perpetually feared MULLER would in fact kill himself, a fear exacerbated by reports of suicide and poor care at the Jail. This witnessing of what seemed to them the slow-motion death of their close family member, and their powerlessness in that the Jail gave them no opportunity to stop or alleviate it, caused MONTY MULLER and Ms. DAI severe emotional distress. This would foreseeably be the response that any close family member to witnessing the harms that the Defendants knew they were inflicting on Mr. MULLER.

175.    The above breaches of the Defendants' respective duties to exercise due care caused the Plaintiffs' damages and economic loss, in addition to serious emotional distress and mental and physical injury.

## **EIGHTH CAUSE OF ACTION**

### **Breach of Contract Damaging Third Party Beneficiary (Cal. Civ. Code § 1559) By MULLER As To Defendants Party To Relevant Contracts**

176.    Plaintiffs reallege and incorporate by reference each and every other paragraph as if set forth fully herein, to include allegations of damages, individual involvement, customs and policies, and action in concert.

177.    Defendants JONES, BOARD, COUNTY, and/or subunits thereof entered into a contract with one or more federal entities or employees in which they agreed to and assumed the responsibility to provide housing, BOARD and care for persons in the custody of the U.S. Marshals Service.

1          178.    The terms of the contract required the above Defendants to provide such housing,

2  BOARD and care consistent both with requirements set forth in the agreement and in accordance

3  with standards and laws that were referenced in the agreement.

4          179.    The Plaintiff Mr. MULLER was an express beneficiary of the contract in that he

5  was one of the persons described by the agreement in whose benefit that agreement created an

6  obligation. That obligation included that Mr. MULLER be provided with housing, board and care

7  in accordance with the requirements and standards set forth in the agreement.

8          180.    Plaintiffs will obtain the text of the agreement in discovery. On information and

9  belief, the above Defendants breached the agreement and their obligation to Mr. MULLER by

10  failing to provide the housing, board and care required under the terms of the agreement. The

11  above Defendants were aware at relevant times that they were in breach of the agreement and their

12  obligations toward MULLER, but nevertheless failed to cure the breach. The breach caused Mr.

13  MULLER the harms and damages described elsewhere in this complaint, in that the agreement

14  included terms providing for care and assistance MULLER did not receive due to the breach, and

15  that is provided would have prevented harms and damages Mr. MULLER suffered.

16          181.    Defendants JPS, UC REGENTS, and/or CHS entered an agreement with JONES,

17  COUNTY or a subunit thereof to provide medical and mental health care to inmates at the Jail.

18  On information and belief, this agreement included terms specifying the standards of medical and

19  mental health care inmates were to receive, and created an obligation for JPS, UC REGENTS,

20  and/or CHS to provide care to MULLER consistent with those standards. This contract was

21  accordingly made for the benefit of MULLER, among others.

22          182.    By the failures of care and treatment described above, JPS, UC REGENTS and

23  CHS breached what on information and belief were the terms of the agreement. They were aware

24  at relevant times that they were in breach, but nevertheless failed to cure the breach. As a result,

25  MULLER was caused damages as described elsewhere in this complaint, in that the agreement

26  included terms providing for care and assistance MULLER did not receive due to the breach.

27  ///

28

FIRST AMENDED COMPLAINT          - 43 -          *Dai, et al. v. United States, et al.*

1

**NINTH CAUSE OF ACTION**

2

**California Loss of Consortium**

3

**By DAI As To All Defendants Except Federal Employees**

4      183.    Plaintiffs reallege and incorporate by reference each and every other paragraph as

5  if set forth fully herein, to include allegations of damages, individual involvement, customs and

6  policies, and action in concert.

7      184.    The Plaintiff MATTHEW MULLER and HUEI DAI had a valid marriage of the

8  time they suffered the injuries described herein.

9      185.    As set forth in the preceding causes of action, the CUSTODY DEFENDANTS

10  AND CARE DEFENDANTS did inflict tortious injury upon MATTHEW MULLER not limited

11  to negligence, professional negligence and invasions of privacy.

12      186.    As a result of the above injuries, the Plaintiff HUEI DAI was deprived the solace,

13  support, affection, love, society and companionship of her spouse MATTHEW MULLER, which

14  deprivation was proximately caused by the Defendants' acts and omissions, as described above.

15  This deprivation caused Ms. DAI damages not limited to serious emotional suffering.

16

**PRAYER FOR RELIEF**

17      WHEREFORE, Plaintiffs request that the Court grant relief as follows:

18      a.    Adjudge and declare that the conditions, acts, omissions, policies and practices of

19  the CUSTODY DEFENDANTS and CARE DEFENDANTS were in violation of Plaintiff Mr.

20  MULLER 's rights under the Fifth, Eight and Fourteenth, and under the ADA and Unruh,

21  Rehabilitation and Disabled Persons Acts;

22      b.    Adjudge and declare that the conditions, acts, omissions, policies and practices of

23  the CUSTODY DEFENDANTS were in violation of the Plaintiffs' rights under the First and

24  Fourteenth Amendments of the U.S. Constitution, and under Article I, section 1 of the California

25  Constitution;

26      c.    Award the Plaintiffs compensatory damages according to proof jointly and

27  severally as to each and every Defendant;

28

1          d.       Award the Plaintiffs punitive damages jointly and severally as to each and every

2    Defendant except the USA;

3          e.       Award Plaintiffs the cost of this suit and reasonable attorneys' fees and litigation

4    expenses; and

5          f.       Award such other and further relief as the Court deems proper.

6

7                                                Respectfully submitted,

8

9    Dated: January 20, 2020                     Signed: _____
                                                         Huei J. Dai
10

11                                               Signed: _____
                                                         Matthew D. Muller
12

13

14                                               Signed:/s/ Monty Muller
                                                         Monty Muller
15

16

17

18

19

20

21

22

23

24

25

26

27

28