- When considering a disabled inmate for "segregation and/or special housing for patients with suspected communicable diseases, mental illness, or developmental or physical disabilities, pending medical clearance";
- No language requiring EC: for the process when nurses are screening for "appearance or history of developmental disability", or "slowness in speech or lack of comprehension of questions suggestive of developmental disabilities"; for any associated intellectual (developmental) disability evaluation/screening tests; or for any referrals for such tests.

▪ 1407 Access to Treatment
- No EC language contained (except as noted below);
- Existing policy language requires "facility nursing staff [to] explain access procedures orally to all individuals, especially to those unable to read." It also states that "videotapes and/or other materials may be used as an adjunct to orientation";
  - The nurses are not consistent with delivering this information verbally or otherwise to the inmates;
  - This policy and process does not include EC requirements, or the assistance of a certified sign language interpreter for deaf/hearing or speech-impaired inmate-patients when the inmate-patient's primary or sole method of communication is sign language (policy only addresses or infers foreign language);
  - There is no written requirement for the nurses to document EC provided, e.g., what methods were used to ensure the inmate-patient understood (spoke slowly, used simple terminology, rephrased sentences and words, repeated instructions/information), and determination as to how the inmate-patient understood, e.g., the inmate-patient repeated back in his/her own words their understanding of the process/information/instructions, to the nurse's satisfaction that the inmate-patient understood the encounter.
  - The SCSD detention facilities custody staff and CHS staff do not currently use videotapes as a source of orientation or to explain health care access procedures.
- With regard to "medical care services and how to obtain health care" being contained in the "Inmate Handbook" (rulebook), as mentioned in other sections throughout this report, the Assessment Team's observations (coupled with inmate interview information received) revealed that there is no consistency with issuance of the rulebooks at both the MJ and RCCC. The majority of inmates interviewed by the Assessment Team claimed that they have never been issued a rulebook; and

FINAL REPORT

- With regard to the policy language relative to "HS KITE's for sick call sign up", there is no EC language to require staff to provide writing/scribing assistance to disabled inmates (as needed) for completion and understanding of the document;
- 1409 Clinic Care – Sick Call
  - No ADA or EC language contained;
  - No language requiring a physician, mid-level practitioner or nurse, to ensure EC for disabled inmates (as needed), during scheduled appointments, pill call (as applicable), etc.;
  - Does not address medical staff citing EC-related language within the medical progress notes (for placement into the inmate-patient's medical record); and
  - Does not address staff requirements to assist with writing/scribing "HS KITE's (request for medical attention)." HS KITE's are available in the housing units, from the pill call nurses and from custody officers.
- 1410 Medical Services Provided in the Medical Housing Units
  - EC-related language does not appear necessary for this policy.
- 1411 Mental Health Services
  - No EC language contained;
  - Does not address health care staff responsibilities to ensure EC to disabled inmates (as needed) for the following identified clinical encounters:
    - Screening for mental health problems in intake during the booking process;
    - Crisis intervention and management of acute psychiatric episodes;
    - Stabilization of the mentally ill and the prevention of psychiatric deterioration in the jail setting;
    - When administering an assessment interview for MH treatment, or admitting or informing an inmate-patient about involuntary short term or voluntary admission for MH services;
    - When informing inmate-patients they have been referred to alternative care such as for substance abuse, alcoholism, and social services;
  - Does not address staff requirements to assist disabled inmates (as applicable) with writing/scribing HS KITE's; and
  - Addresses requirement that request forms "HS KITE's" (for mental health services) are made available to inmates, and that inmates are informed of the availability of mental health services, both verbally and in writing, with "Mental Health Request" forms available on each floor at central dayroom locations;
    - However, as mentioned previously, health care staff are inconsistent with providing inmate-patients with information about access to health care (including information about HS KITE's);

FINAL REPORT

custody staff do not provide a verbal or video orientation, and many inmates do not receive copies of the jail rulebook.

- 1412 Suicide Prevention – 2M – Joint Policy with JPS
  - No EC language contained;
  - No requirement for medical (CHS) and mental health (JPS) staff to provide (to the extent possible) and subsequently document EC provided to inmate-patients when providing both psychiatric and medical care for inmates who are verbalizing or exhibiting suicidal behavior. In accordance with this policy, this includes nursing intervention activities (as ordered by the treating physician) with inmate-patients, including:
    - Having the patient moved (when the patient is not already assigned a 2M bed), and providing a blue safety suit and suicide precautions;
    - Having custody staff modify the environment for the patient's safety, and explaining this procedure to the patient;
    - Documenting the nursing assessment, observations, and intervention, with a timed and dated entry in the patient's chart;
    - Having JPS staff conduct outpatient clinician evaluations within twenty-four (24) hours of receiving the psychiatric referrals from the 2M clinical staff;
    - Psychiatrist visits every 24 hours until an acute episode is resolved, and documentation of the consultative notes and treatment recommendations within the psychiatric chart; and
    - Having the psychiatrist or medical staff document within the inmate-patient's chart, the conclusion, recommendations, and termination of the 2M suicidal status (when the inmate-patient's suicide or psychiatric status is resolved and the patient no longer is at risk of suicide, and the inmate-patient continues to require medical care in the 2M unit).
- 1413 Use of Restraints and the Pro-Straint Chair;
  - No EC language contained;
  - No information requiring health care staff to provide EC (to the extent possible) or document EC for situations where mentally disordered inmates or other disabled inmates are being prepared to be placed in, or are being placed in restraints and/or the Pro-Straint chair. This includes:
    - During a medical evaluation (including circulatory status and vital sign checks) within the first 15 minutes and every two hours thereafter;
    - When medical offer and subsequently document the offering of fluids and nourishment, and when documenting exercising of the extremities, in the inmate's Health Record;

FINAL REPORT

- During medical and MH examinations prior to continuance of such restraints, and when documenting as such in the progress notes; and
  - During JPS MH assessments to assess the need for MH treatment.

- 1414 Restraint Check Method
  - No EC language contained; and
  - No language requiring medical staff to provide EC to disabled inmates as needed (for those inmates whose disability may pose a barrier to communication) for the following encounters:
    - Medical evaluations, including an inmate's circulatory status and vital signs; and
    - When medical staff document in the inmate-patient's medical record any significant change in the restrained individual's condition, and whether the restrained inmate-patient remains in the restraints longer than 2 hours.
- 1415 Patients in Safety Cells
  - No EC language contained;
  - No language requiring medical staff to provide or document EC for disabled inmates as needed for the following described encounters:
    - During medical checks of the inmate within the first 6 hours of placement in a safety cell, and every six hours thereafter (if an inmate asks questions or is asked questions by medical staff, or if there is an explanation or exchange of health care-related information) to assess the inmate's condition;
    - During physician re-evaluations for inmates who have remained in the safety or segregation cell for 24 hours beyond the initial medical clearance; and
- 1416 Patients in Segregation
  - No EC language contained;
  - No language requiring medical staff to provide and document EC for disabled inmates as needed for the following encounters:
    - Daily medical evaluations for inmates being removed from the general population and placed in segregation;
    - During pill-call while housed in segregation; and
    - During physician cell visits while in segregation (if applicable);
  - No EC language relative to the KITE process while an inmate is housed in segregation, e.g. requiring a nurse (or custody staff) to provide writing/scribing assistance or explain the KITE process with regard to medical services.
- 1417 Adult Developmental Disability
  - No EC language contained;

FINAL REPORT

- No language requiring health staff to provide or document EC for intellectually (developmentally) disabled inmates for the following described medical encounters or related processes;
  - When identifying inmates for intellectual (developmental) disabilities at booking and other encounters throughout the incarceration;
  - When determining whether the inmate has difficulties performing basic tasks, slowness or apparent difficulty in understanding;
  - When making notations on the Receiving Screening medical form or medical progress notes.
    - Note: Despite the fact that the policy requires medical staff to make appropriate notations in the "Master Problem List" in the medical record and in the JIMS system relative to a known or suspected "developmental disability" and to notify Classification staff of any housing recommendations, as mentioned in greater detail in other areas of this report, the SCSD detention facilities do not have a comprehensive or effective intellectual (developmental) disability testing/screening process, or an inmate disability tracking system.

- 1422 Special Needs Patients
  - No EC language contained;
  - No language requiring medical staff to provide or document EC to disabled inmates (as applicable) for the following health care encounters described in the policy:
    - When interacting with inmates and discussing medical conditions (and developing treatment plans) for inmates requiring assistive devices and for "developmentally disabled" inmates;
    - When admitting an inmate to the Outpatient Housing Unit;
    - For inmate plan of care and addressing pending discharge needs.
- 1425 Patients in Segregation Cells in Intake
  - No EC language contained: and
  - No language requiring medical staff to provide or document EC to disabled inmates (as applicable) for the following health care encounters described in the policy;
    - Medical assessments of the inmate-patient within the first six (6) hours of placement and at least every six (6) hours thereafter to assess the inmate's medical condition; and
    - Physician assessments for inmate-patients who remain in a segregated cell for at least 24 hours.
- 1433 Admission to Jail Acute Psychiatric Inpatient Unit
  - No EC language contained; and
  - No language requiring health care staff to provide or document EC to disabled inmates (as applicable) for the following health care encounters described in the policy:

FINAL REPORT

- JPS clinical assessments, including vital signs and a mini-mental status exam, prior to a patient being admitted to 2P, or when a patient has a change in condition, to determine if the patient meets the delirium guidelines; and
- CHS medical assessments (based on JPS referral to 2M), and subsequent housing of the patient on 2M, 2P, or transfer to an outside medical facility for acute or emergency care.

- 1435 Inmate Health Care Grievances
  - No EC language contained; and
  - No language requiring health care staff to provide or document EC to disabled inmates (as applicable) for Priority Administrative Review appointments where the inmate is medically assessed.
- 1439 Reports of Disabilities or Impairments
  - No EC language contained; and
  - Although the policy cites general ADA-related language (as outlined in the bullet below) it contains no EC direction or requirements to provide and document EC for related health care encounters. Policy language cited includes:
    - Any report of physical disability or impairment by an inmate or outside organization will be referred to a clinician for review and assessment;
      - This can include reports of mobility impairments such as amputations or paraplegic, or other disabilities that limit daily functioning such as visual, hearing, or speech. The clinician will review the report, assess the inmate's needs, and make a determination if special housing or assistive devices are needed;
    - Upon report of disability or impairment (verbal or written):
      - An MD/NP Sick Call appointment will be scheduled and the nature of the report will be documented;
      - The patient-inmates will be seen and their disability or impairment will be assessed and if indicated a plan of care will be developed; and
      - Any specific patient-inmate's needs or accommodations will be documented in the chart and communicated to medical and custody staff.
        - Note: It does not appear that the intent of the policy language as outlined in the above bullet is meant to include EC-specific needs (at least in terms of requiring staff to provide EC and document accordingly).
- 2000 Dental Care
  - No EC language contained; and

FINAL REPORT

- No language requiring dental (or medical) staff to provide or document EC to disabled inmates (as applicable) for the following dental encounters described in the policy;
  - Intake nurse discussing dental history with inmate;
  - During dental examinations and treatment;
  - During dental/oral hygiene education;
  - When providing information (during routine sick-call and medication administration services) on how to access dental hygiene services;
  - During x-rays for diagnostic purposes;
  - When discussing dental treatment plan with an inmate-patient; and
  - When discussing with the inmate and/or accepting an inmate's completed "Request for Medical Attention" (KITE) or specific dental referral form.

Although the Assessment Team cited EC-related concerns with all the custody operations orders and CHS policies detailed above, it will not be necessary to include detailed EC information in each policy. A comprehensive EC policy, or a comprehensive EC section within an operations order and CHS policy would suffice. Depending on the individual order or policy, either brief language or a simple reference to an approved EC policy would suffice.

With the exception of Operations Order 06/14, titled, "Interpreter Services", none of the aforementioned SCSD detention facilities Custody or Health Care Orders contain any specific EC-related language or references.

Operations Order 06/14, "Interpreter Services", Section I., Policy, states: "Correctional Services staff shall endeavor to communicate effectively with people who have difficulty speaking English or who are deaf or hard of hearing."

Section IV., Interpreter Services for Deaf and Hard of Hearing Prisoners, states in part: "Under the Americans with Disabilities Act (ADA), people who are deaf or hard of hearing are entitled to the same services law enforcement provides to anyone else. They may not be excluded or segregated from services, be denied services, or otherwise be treated differently than other people."

It also states, Custody staff must provide the communication aids and services needed to communicate effectively with people who are deaf or hard of hearing, except when a particular aid or service would result in an undue burden or a fundamental change in the nature of the law enforcement services being provided.

Custody staff must give primary consideration to providing the aid or service requested by the person with the hearing disability.

The County has a contract for interpreter services for deaf and hard of hearing prisoners with the NorCal Center on Deafness. The address and phone numbers are:

FINAL REPORT

4708 Roseville Road, Ste. #112, North Highlands, CA 95660 / Voice/TTY (916) 349-7500 and FAX 349-7578.

Interpreter services are available during business hours (0830-1700) by contacting NorCal Interpreter Services at (916) 349-7525. Requests for interpreters can also be emailed to dispatcher@norcalcenter.org or faxed to (916) 349-7578.

If an interpreter is needed outside of business hours, the request can be made by calling (866) 658-8417."

Section IV., also states in part, "A form is provided to assist deaf and hard of hearing prisoners in understanding the booking process. The form outlines the overall steps involved in booking and release at the Main Jail and at RCCC.

Additional information that may be helpful for law enforcement officers is available at the following website: http://www.usdoj.gov/crt/ada/policeinfo.htm

The U.S. Department of Justice pamphlet, Communicating with People Who Are Deaf or Hard of Hearing, is available at the above website or in Appendix 12-C."

The SCSD detention facilities do not have a stand-alone comprehensive EC operations order, but the draft Operations Order Inmates with Disabilities - ADA, does contain some EC procedural language.

As stated above, each individual SCSD detention facilities custody policy and each CHS policy may not need to have specific EC language embedded if a comprehensive EC policy were to be implemented for custody and health care services. The aforementioned SCSD detention facilities draft Operations Order would suffice for custody staff if it were to include a complete EC section, and subsequently be approved.

Section I titled, "Policy Statement" states in part, "It is the policy of the Sacramento County Sheriff's Department to ensure procedures are in place to provide equal treatment to all incarcerated adults. The Department will ensure inmates with qualified disabilities are afforded equal access to programs, services, and activities unless doing so would alter the nature or operations of the institution or program." It also states in part, "The Department will ensure that procedures are in place for inmates with disabilities to request reasonable accommodations and to dispute the accommodations provided under Title II of the Americans with Disabilities Act."

Section II., titled, "Definitions", provides several ADA related definitions, but does not include a definition as to EC. Included are the following definitions:

- Activities of Daily Living (ADL): "includes, but is not limited to, functions such as caring for one's self, eating, bathing, performing manual tasks, walking, seeing, hearing, speaking, learning, and working"; and

FINAL REPORT

- Reasonable Accommodation: "any change or adjustment to an environment that permits a qualified person with a known disability to participate in a job, or to enjoy benefits and privileges of programs or services as an equal to everyone without a disability."

Section III titled, "Compliance with ADA" states in part, "The Sacramento County Sheriff's Department will not discriminate against inmates or members of the public on the basis of disability in providing access to its detention facilities, programs, services and activities."

It also states in part, "Persons with a disability are entitled to an equal opportunity to participate in programs, services, or activities offered by the Sacramento County Sheriff's Department unless doing so creates an undue hardship."

The section further outlines that the duties of the ADA Division Representative (ADA Deputy) include reviewing requests, complaints and grievances related to ADA issues, and that the ADA Division Representative may respond to ADA requests or ADA grievances.

Section IV titled, "Identification of Disabled Inmates - At Intake", describes in part that the medical screening process during intake serves to identify most disabilities and accommodation needs prior to the housing of the inmate. It also explains that it is the responsibility of booking and medical staff to assess inmates upon admission for evidence of a disability or special medical need. This assessment information will be recorded on the Inmate Disability Evaluation Form (IDEF) as applicable. Language also references medical intake staff responsibilities to initiate and sign an IDEF, and forward the form to the Booking Unit and the ADA Coordinator upon determination that an inmate may have a disability.

Section V titled, "Classification and Inmate Housing", details that classification staff will be responsible for ensuring that inmates with disabilities are housed appropriately (based on their needs), reviewing all IDEF forms, notifying the ADA Coordinator to arrange for orientation of inmates who are visually impaired or unable to read, making appropriate notations on the IDEF form and forwarding the form to the ADA Coordinator for compliance review.

Section VI titled, "ADA Coordinator" explains that coordinator's responsibilities regarding reviewing and monitoring of ADA or disability-related grievances.

Section VII titled "Identifying Disabilities – Subsequent to Booking", contains general information about notifying the ADA Coordinator for any inmate staff feel has a disability.

Section VIII titled, "Program Access", outlines equal access to inmates for education and library services, including responsibilities of the Recreation

FINAL REPORT

Technician to obtain an audio headset and assortment of audio tapes that are available from the Offender Programs Unit. A designated Offender Programs Unit staff member shall provide inmates with audiotape equipment, inform them of the resources available and explain the *Inmate Request Form* process by which the inmate can access those resources via the Inmate Request Form (KITE). This section also contains policy information pertaining to service programs, and availability of American SLIs.

Section IX titled "Auxiliary Aids for Individuals with Hearing Impairments", states in part, "The type of auxiliary aid or service necessary to ensure effective communication will vary depending on the length and complexity of the communication involved. In routine matters, the exchange of written notes may be sufficient. However, when communication is more complex, extensive, or significant (e.g., during classes, counseling sessions, or disciplinary hearings in which the inmate may lose privileges), the use of a UbiDuo real-time split-screen communication device or a qualified sign language interpreter may be required."

Section X titled, ""Telecommunications Devices (TDD/TTY Equipment)", states, "Prisoners who are speech and/or hearing impaired shall be given access to the TDD/TTY equipment following Operations Order 0[illegible]/13, Telephone and TDD/TTY Equipment Access."

Section XI titled, "Interpreter Services", states in part, "Interpreter services shall be provided to Non-English speaking prisoners or for prisoners who are speech and/or hearing impaired following Operations Order 06/14, Interpreter Services."

Section XII titled, "Inability to Read and Write", states in part, "[t]he ADA Coordinator will ensure reasonable accommodations are made for inmates who are illiterate or who are physically incapable of reading or writing, which may include, but is not limited to enlarged print materials, identification of desired materials, and assistance in reading and scribing forms. All staff members shall assist inmates who have language, physical, or competency and capacity barriers, when requested to do so (e.g., assist in completing *Inmate Request Forms*, grievances, and medical requests)."

Section XIII titled, "Identifying and Handling of Armstrong Class Inmates", states in part, "[a]n 'Armstrong class inmate' is an inmate identified by the California Department of Corrections Rehabilitation (CDCR) as having ADA concerns due to current or ongoing medical and/or mental health issues. CDCR will notify the Sheriff's Department of inmates in our custody who they have identified as 'Armstrong class inmates.' They will contact the ADA Coordinator of inmates in our custody who have previously been identified. The ADA Coordinator will ensure the inmate is entered in JIMS under the Special Tracking Needs. Once contact is made with the inmate, the ADA Coordinator will notify HMU via e-mail. This e-mail should include any steps taken to address issues/concerns as well as the resolution."

FINAL REPORT

FINAL REPORT

Other sections contained within the draft Operations Order include, "Mail - Free Matter for The Blind", "Prosthetic/Orthopedic Appliances and Assistive Devices", "Restraints", "Searches", and "Facility Visitors."

Section XIX titled, "Grievances", states in part, "[a] prisoner with a disability who believes he/she is the subject of disability discrimination or who wants to appeal any denial of ADA housing and/or accommodation may submit a grievance. All grievances concerning conditions of ADA housing and/or accommodations will be made on a Grievance Form following the guidelines in Operation Order (7/02), Grievances. All ADA related grievances shall be routed through the facility Compliance unit. The Compliance unit will determine the best course of action for the grievance (e.g. Medical, Custody, Food Services) and then route it as deemed appropriate."

Section XX titled, "Compliance with PREA, states in part, "The Sheriff's Department will take the appropriate steps to ensure that inmates with disabilities (including, for example, inmates who are deaf, hard of hearing, sight impaired, have low vision, or those with intellectual, psychiatric, or speech disabilities), have an equal opportunity to participate in or benefit from all aspects of the Sheriff's Department efforts to prevent, detect and respond to sexual abuse and sexual harassment. The Sheriff's Department will ensure effective communication with inmates who are deaf or hard of hearing and when necessary will provide access to interpreters who can interpret effectively, accurately, and impartially, using any necessary specialized vocabulary. In addition, the Department will ensure written materials are provided in formats or through methods that ensure effective communication with inmates with disabilities, including inmates who have intellectual disabilities, limited reading skills, or who are sight impaired or have low vision. Inmate interpreters, inmate readers, or other types of inmate assistants will not be used except in limited circumstances where an extended delay in obtaining an effective interpreter could compromise the inmate's safety, the performance of first-responders' duties or the investigation of the inmate's allegations."

The SCSD detention facilities' Inmate/Detainee Handbook (rulebook) does not contain specific information relative to EC. There is one page of general information pertaining to inmates with disabilities. Included in the content is general information regarding Title II of the ADA and a brief explanation that inmates who have difficulty with seeing, hearing, talking, walking, moving, breathing, and learning may have a disability. The rulebook also explains that the SCSD detention facilities will ensure inmates with qualified disabilities are afforded equal access to programs, services, and activities unless doing so would alter the nature of operations of the institution or program. It also has brief non-specific information with regard to reasonable accommodations and requests.

The SCSD detention facilities do not have an EC policy for daily encounters or interactions, nor is there an EC policy when there is a higher standard for providing an ensuring EC, such as for clinical encounters (e.g., mental health, medical, or dental), due process events (e.g., classification process, inmate disciplinary [write-up] process, pre-release process, conditions of release process, Notice of Charges, or probation encounters/meetings), or other specific activities such as self-help groups e.g., Alcoholics Anonymous (AA), Narcotics Anonymous (NA) or other events such as religious activities. Likewise, there is no comprehensive policy relative to providing reasonable accommodations for inmates with disabilities, e.g., deaf/hearing-impaired, vision, speech, learning, and developmentally disabled inmates to ensure equally effective communication during the aforementioned types of events or processes, including applicable interactions with staff, other inmates, and, where applicable, the public.

There are existing policies, as cited above, which contain general information regarding adult "developmental disability," identification and report of disabilities/impairments, orientation, inmate discipline, classification, grievance processes, reading glasses, religious services, education services, interpreter services, and release processes. These policies also include some general language regarding teletypewriter (TTY) and interpreters, but they and other policies do not extend far enough, and do not provide comprehensive requirements or direction with regard to EC. Virtually all of the policies are silent with regard to providing and documenting EC, and there are no policies which define the topic or provide examples. There is no specific policy outlining a requirement to provide auxiliary aids, which are reasonable, effective, and appropriate to the needs of an inmate when simple written or oral communication is not effective. Such aids that could be included in such an EC policy could include, but not be limited to; qualified interpreters, readers, sound amplification devices, captioned television/video text displays, video remote interpreting, video visiting, Telecommunication Devices for the Deaf (TDD)/TTY, audiotaped texts, Braille materials, large print materials, and signage.

**Observations**

The Assessment Team observed a multitude of processes at various sites throughout the MJ and RCCC jails to examine the establishment of EC. Specific processes examined included but were not limited to the following: Intake/booking; medical and mental health screening; inmate classification; service of Notification of Charges; initial serving of inmate write-ups (disciplinary reports) and the inmate disciplinary hearing/process; and inmate orientation. There are additional processes where EC must also be established including education, library services, religious services, and various programs and self-help groups, e.g., Alcoholics Anonymous (AA)/Narcotics Anonymous (NA), etc. These areas were also examined as indicated below, via staff and inmate interviews.

FINAL REPORT

The Assessment Team looked to determine whether staff was making all reasonable attempts to communicate with disabled inmates (e.g., those with vision, hearing, speech, learning and developmental disabilities, as well as others) for all contacts, including normal daily interactions. The team also examined whether staff made all reasonable attempts to achieve EC while applying a higher threshold or standard for due process events (e.g., classification process, inmate disciplinary hearing and related processes, service of notice to appear), and clinical encounters (e.g., diagnosis or prognosis, intake/booking medical and other medical evaluations, discharge instructions, provision of mental health (JPS) evaluations, explanation of medications, procedures, treatment, treatment options, or surgery).

The higher standard of EC includes: identifying an inmate's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s); providing effective reasonable accommodation(s) to overcome the communication barrier; and documenting the EC, including the method used to achieve EC and how the staff person determined that the inmate understood the encounter, process, and/or proceeding.

Inmate Disciplinary (Write-up) Process

The Assessment Team observed the inmate disciplinary (write-up) process with regard to EC. Staff who interacted with inmates during the inmate disciplinary (write-up) process did not have an inmate disability tracking list; they did not establish or provide EC to the inmates during the process; nor was there any documentation of such. This includes sergeants or deputies issuing initial copies of the reports, and sergeants conducting the disciplinary hearings. It is the Assessment Team's position that the inmate disciplinary processes not observed also lacked the provision of EC. This includes issuance of the final copy of the inmate disciplinary (write-up) hearing summary and findings (disposition). This is attributed to the lack of a tracking system that would otherwise identify inmates who require staff to provide EC during these types of due process encounters.

Classification Process

The Assessment Team observed the Classification process with regard to EC. Classification staff that interacted with inmates during the classification process did not establish or provide EC to the inmates during the initial classification interviews. This is attributed to the lack of a tracking system that would otherwise identify inmates who require staff to provide EC during these types of due process encounters.

Although the Assessment Team did not observe the Service of Notice of New Charges, it is the Assessment Team's position that this process lacked the provision of EC. This is attributed to the lack of a tracking system that identifies inmates who require staff to provide EC during these due process encounters.

FINAL REPORT

FINAL REPORT

There is no current SCSD detention facilities requirement for staff to ensure a higher threshold for EC by identifying the disability, potential communication barrier, providing the necessary accommodations to ensure EC, and to document the EC and accommodations provided as well as how the staff determined that the communication and accommodations were effective.

Medical/Mental Health/Dental Encounters:

The Assessment Team observed numerous health care-related processes for EC concerns. These observations began with the intake/booking medical screening process and branched out from there.

The Assessment Team observed several inmates being interviewed by a phlebotomist (for those inmates required to do so commensurate to their charged offense) prior to their intake/medical screening. The questions asked were generally consistent. Aside from drawing the inmate's blood, the phlebotomist took blood pressure and temperature readings. Questions commonly asked were regarding the following: allergies, open wounds, asthma, diabetes, medical medications, psychiatric medications, intent to harm self or others, alcohol use, drug usage, seizures, previous housing if previously incarcerated under the jurisdiction of the SCSD detention facilities, as well as other questions. The phlebotomist appeared to be clear in her communications with the arrestees.

The phlebotomist did not ask the inmates whether they had any disabilities, whether the inmate had any issues in comprehending the process or questions being asked, or if they needed assistance in understanding the process. The phlebotomist was not aware of any mechanism for documenting any EC assistance or concerns if applicable. Because there is not an inmate disability tracking system, even for returning arrestees, the phlebotomist would be (and was) unaware of any disability concerns, unless the inmate going through the process claimed such.

The Assessment Team also observed dozens of inmates (male and female) being processed through the MJ and RCCC intake medical screening process, by several different nurses. The team observed dozens of inmates go through this process on various dates, and on both AM and PM shifts, as well as weekdays and weekends.

The intake medical screenings were not consistent, and did not contain any EC practices in terms of ensuring or documenting EC. Most of the nurses used the standard Receiving Screening Form (SCSD Correctional Health Services Medical Intake), but the form does not contain any disability-related questions. The intake screening staff also completes a form, titled, "SCSD Correctional Health Services Special Needs" with a list of contained items. The list includes a few check boxes for some physical disability-related concerns, but nothing for intellectual (developmental) disabilities, learning disabilities, or deafness/hearing

or speech impairments. There are check boxes relative to MH and glasses/contacts that would or could have EC-related concerns.

The specific questions asked are outlined in more detail in the Health Care section of this report, but depending on the nurse observed, minimal or no disability-related questions were asked, and the nurses were not aware of the need to provide and document EC for disabled inmates whose disability poses or may pose a barrier to communication, or even which inmates would need such assistance.

With regard to securing certified sign language interpreters, the Assessment Team asked numerous intake/screening nurses as well as other nurses throughout the MJ and RCCC about the process at the two jail facilities. The Assessment Team received many different responses. Most nurses were not aware that the SCSD detention facilities had a contract with an outside provider for sign language services, and did not know how to obtain a certified sign language interpreter, or if that was even an option. The Assessment Team received the following verbal responses;

- Have the inmate write everything out;
- Some inmates lip read;
- Use an officer who knows sign language;
  - A couple of names of deputies were provided to the Assessment Team as those who have been used on occasion;
- The jail has a telephone language line;
- Inmates "Surenos" have been used to sign with deaf/hearing-impaired inmates because some of them know sign language; and
- There is a TTY machine located in the sergeant's office.

One of the nursing supervisors at RCCC was aware of a list of five providers in the greater Sacramento area, and was aware of the process.

The Assessment Team was unable to observe any ICE physical examinations/health appraisals (for ICE detainees). Although the aforementioned ICE form includes some disability-related information as to mental health, learning disabilities, and "developmental history," or "appears to be developmentally delayed or mildly retarded", it is highly unlikely that an EC is being documented. It appears that staff assigned to housing units or other areas where they maintain supervision over ICE detainees, or have contact with those detainees, have minimal knowledge of the listed possible concerns. But with a lack of ADA training, no EC documentation requirements, and no policy, procedures, or practice to appropriately deal with cognitive deficits and adaptive support deficits (for intellectual [developmental] disabilities), it is highly unlikely that the EC needs are being met for intellectually disabled or learning disabled inmates, as well as other ICE detainees whose disability poses a barrier to communication.

FINAL REPORT

JPS Encounters:

The Assessment Team was able to observe several JPS interviews in the intake/booking area, including expedited referrals. More detailed information will be outlined in the health care section of this report. Obviously JPS interviews are challenging at most times, and are centered on the inmate's mental health state. But as mentioned throughout this report, clinicians and social workers largely do not have the information necessary to know about EC issues for disabled inmates. The clinicians and social workers appeared to be patient and professional in their communications with the inmate-patients.

Although the Assessment Team did not observe any other types of medical, mental health or dental encounters, it is the team's position that those also lacked the provision of EC. This is attributed to the lack of a tracking system that identifies inmates who require staff to provide EC during these clinical encounters. There is no current SCSD detention facilities or CHS requirement for medical, mental health or dental staff to ensure a higher threshold for EC by identifying the disability, potential communication barrier, providing the necessary accommodation(s) to ensure EC, and documenting the EC and accommodations provided as well as how the medical, mental health or dental staff determined that the communication and accommodations were effective.

Intake/Booking Process (Custody Staff):

The Assessment Team observed intake/booking staff process numerous inmates at the MJ. The process included interviewing the new inmates with general intake questions, e.g., gang status, prior incarceration, and enemies. The intake deputies also had discussion with the inmates during the fingerprinting and photos "mugshot" process, had the inmates sign associated paperwork, and issued the inmates the Inmate Booking Information Receipt that includes charges and bail information. During this process, staff did not know whether the inmates had a disability that may pose a barrier to communication, and as such were not prepared to provide or document EC, if necessary.

Release Process:

The Assessment Team observed the MJ release and Bond release processes. Included in the process was the serving of various documents to different inmates, which required an explanation and subsequent inmate signatures/initials, e.g., PF11 form, Release Screening form, Work Project paperwork, receipt of returned property. Other information relayed included instructions to contact a specific bail bonds company, and information on property, money, dates to report to court or other county jurisdictions. The releasing deputy does not know who may have a disability where there may be a barrier to communication. There was no EC provided, and no EC documentation for this process.

Special housing/Administrative Segregation Process/TSEP Process:

FINAL REPORT

After observations and interviews of staff and inmates at the MJ, the Assessment Team found that inmates are not being provided written notification documentation when they are removed from the general population and placed in special housing, such as administrative segregation or TSEP. As such, there is no EC or documentation being provided to the inmates. The only documentation provided is any associated inmate disciplinary reports (write-up). Again, disabled inmates (those with barriers to communication) are being placed in these restricted environments often without fully understanding the nature of the move, or their rights within the process.

**Staff Interviews**

Through interviewing dozens of housing unit deputies and sergeants, programs staff, work supervisors, and educators, and health care staff, etc., the Assessment Team concluded the following:

- Custody staff, health care staff, teachers, librarians, and other staff have not received adequate ADA training regarding EC and reasonable accommodations;
- With very limited exceptions (primarily deaf/hearing-impaired inmates), custody and non-custody staff do not know which inmates have disabilities where communication barriers exist or may exist;
- A registered nurse indicated that she has never encountered a deaf/hearing impaired or speech impaired inmate who needed a sign language interpreter. She indicated that she would use written notes if confronted with that situation;
- An RCCC nurse indicated that an SLI could be obtained through Case Management staff if necessary, but she also said that they could contact the "language line." She admitted that there are no protocols, but could write notes back and forth if that works for the inmate. She also admitted that it could be a challenge trying to secure an interpreter on the same date needed;
- An RN stated that deaf inmates can read lips and they (medical staff) would communicate with them via writing;
- A medical doctor was able to explain that the E-Chart main screen will often list a disability, and that accommodations will be provided as needed, and communications are made by using simple terminology, and written notes, if necessary;
  - An RN also indicated that only on some occasions there may alerts within the E-Chart as to inmate communication issues;
- An RN admitted that often the E-Chart does not indicate whether staff provided EC, or often does not articulate how staff communicated with a disabled inmate (those who may have communication concerns);
- An RN stated that if an intellectually disabled or learning disabled inmate is unable to read medical instructions, the inmate must first inform medical

FINAL REPORT

staff, then medical staff will have the inmate repeat back the verbal instructions, and medical staff will input the information in to the medical progress notes;

- When asked what to do when an inmate can't read medical related documentation, another nurse mentioned she would explain it to the inmate, and provide a copy of the document to the inmate and also to a deputy;
- One of the nurses (when asked) stated that hearing impaired inmates who need an SLI will receive one through court services (by going through the medical director), but also said that most inmates can and often write notes back and forth with medical staff;
- Other than Locator Cards (sometimes attached with a chrono for a listed health care appliance or other general information) in the housing units, and rare written notations contained within the electronic JIMS system (PF2, PF4 and/or PF 10 screens), staff do not have accurate or complete lists/rosters of disabled inmates;
- Most of the disabled inmates identified or known to staff at both jails (where a communication barrier exists or is likely to exist) are deaf/hearing-impaired;
- This is attributed to not having a comprehensive screening process and subsequent inmate disability tracking system, e.g., testing for intellectual (developmental) disabilities or a process for identifying reading scores to assist in the query process to assess for possible learning disabilities;
- Nearly all staff are not aware of specific EC needs for the large majority of inmates housed or assigned to their living or work areas;
- The majority of staff do not understand how to provide EC and/or are not effectively providing it;
- Most deputies who were interviewed indicated that they would explain documents, processes, and forms to inmates, and would read pertinent information, e.g., written response to grievances and KITE's, if they were asked to do so;
- A smaller number of deputies said that they write/scribe a document for an inmate if they asked, and if an inmate needed the help;
- A few of the staff members interviewed acknowledged that they have provided that specific type of assistance in the past;
- Staff do not currently document any EC (if provided);
- Most custody staff do not fully understand the difference between inmates with mental illness, intellectual "developmental" disabilities, and learning disabilities, and generally do not understand the types of accommodations that are necessary to ensure EC for these types of inmates;
- The staff that were most aware of inmate disabilities were those in the ROC program at RCCC where, by nature of the program, inmates are continuously examined for competency;

FINAL REPORT

- There is also a disability alert process, in that MH records are reviewed, and Intelligence Quotient (IQ) test is administered, and inmates receive a "MOCA" quick exam (Montreal Cognitive Assessment), which takes about 15 minutes to administer;
- A ROC-assigned psychologist explained that large print handouts are provided, and instructions are explained, rephrased/broken-down in simple terminology, and often 1-on-1 sessions are conducted to maximize inmates' understanding of instructions;
- However, ROC staff acknowledged that there is no inmate disability tracking system or disability designation process in place.

Most custody staff and other staff were open-minded and positive when asked how they would respond to an inmate who didn't seem to understand rules, policies, or expectations. Some staff stated that they would be patient and continue explaining. But most of the staff that was interviewed was not aware of specific methods (e.g., speak slowly, use simple phrases/words, allow more time for the inmate to process information, etc.) to use in order to achieve EC.

When asked about providing assistance to disabled inmates to overcome communication barriers or encountering an inmate with communication needs, staff responses included but were not limited to the following:

- Check to see if the inmate has medical or psychiatric issues, and if needed refer the inmate via a psych or medical referral;
- Refer the inmate to a "houseman or trustee" for help;
- Try to cell or bunk him with another inmate who is a friend of the inmate's, so the cellmate/bunkmate friend could help him/her;
- Would assist the inmate with writing grievances or KITE's, or explaining information;
- Have helped inmates with writing commissary slips and request slips (KITE's);
- Provide 1-on-1 attention if necessary;
- Would not write an inmate up without first having a 1-on-1 conversation and explaining instructions;
- Be patient and explain, and talk to the inmate individually;
- I would not help an inmate write; the inmate can go to another inmate or trustee; and I would give the inmate a grievance form if needed;
- Be understanding because some inmates have learning disabilities or developmental disabilities;
- Give it more effort in explaining;
- Use levels of communication;
- Use non-verbal communication and gestures;
- Review the locator card for possible information, and contact classification staff for a bed move if needed; and
- Talk to the inmate every day to get to know and understand the inmate better.

FINAL REPORT

As related to Programs, staff admitted that they do not have a tracking list (electronic or hardcopy roster) for inmates with disabilities, or for any accommodation needs or physical limitation information on the inmates (other than what might be occasionally documented on the Locator card's attached chrono [if available], or within the JIMS system PF2, PF4, or PF 10 screens). As such, staff acknowledged that they generally don't know what type of disabled inmates they have or what the inmates' specific accommodation needs are.

When asked, most staff indicated that there is a lack of assistive equipment available to assist inmates. Most staff also indicated that reading glasses can be purchased from the commissary or can be sent in by family members.

With regard to education, academic and vocational instructors from the EGUSD admitted that they do not have a list of disabled inmates, or those with EC concerns. But they indicated they would pull inmates aside and work with them individually to the extent possible to ensure each inmate understands. The teachers interviewed had no concerns with disabled inmates being assigned or possibly being assigned to their classes. One instructor indicated that there would be no problem with a deaf inmate working and that he (instructor) believes the inmate would not need a sign language interpreter. Another teacher said she would not put a deaf inmate into any classes because they don't have access to a sign language interpreter. One teacher stated that she would use an inmate signer if he were a friend of the deaf/hearing (or speech) impaired inmate. Another teacher stated that he has a deaf inmate in his computer class and the method of communication he uses is written notes.

Most of the teachers acknowledged there are not any large print materials, but that they can enlarge material on the computer screen and print it out if necessary. Some of the instructors cited that they have access to a case of reading glasses (for students) containing various reading prescription levels. Other available education accommodations that were noted include a full sheet magnifier (although at least one of the teachers claimed that some of the magnifiers turned up missing in the past), larger font on the computer screens, and lower level tests that can be administered if a student is struggling. When asked, some of the teachers said they would not have a problem moving a hearing-impaired inmate to the front of the classroom.

There are no IEPs at the SCSD detention facilities or under the EGUSD at the jail facilities, and previous IEP needs are not identified. Most teachers indicated that they would still try to accommodate disabled inmates with EC concerns, and accommodate their learning strategies to the extent possible. But some of the instructors admitted that inmates don't usually ask for help or inform the teachers as to a disability or any EC needs. Due to claimed staffing shortages, and no IEPs in place, there are no formal or recognized "pullouts" being conducted for remedial or tutoring sessions, and there are no available teacher assistants to provide needed communication and assistance to learning disabled,

FINAL REPORT

developmentally disabled, or other disabled inmates as applicable. As stated above, some of the teachers attempt to provide individual assistance to the extent possible, but this is not in policy, there is no set schedule for it, and it does not appear to be formally documented. Most of the vocational instructors would consider moving a disabled inmate to another position in the event the inmate was struggling with learning (but was still trying), and the workload appeared to be difficult for the inmate to maintain.

**Inmate Interviews**

The Assessment Team interviewed numerous disabled inmates, including those with mental illness, intellectual (developmental) disabilities (or some who may likely have intellectual disabilities), learning disabilities (or some likely to have learning disabilities), speech impairment, hearing impairment, vision impairment and other disabilities. Numerous inmates who were interviewed admitted attending special education classes in public school, and several others either claimed to have been diagnosed as learning disabled, or thought they were but were uncertain. A small number of inmates interviewed were not able to read at all, while there were additional inmates who struggled or had difficulties reading and/or comprehending short excerpts from the SCSD detention facilities Correctional Services Inmate/Detainee Handbook (rulebook), or in reading an ADA Notice as provided by the Assessment Team during the interviews.

With regard to the inmate disciplinary process, most inmates interviewed did not have a history of receiving write-ups. Some of the inmates interviewed complained that they had difficulties in understanding the disciplinary hearings. Some inmates indicated that staff does not explain to them the charges or their rights, and some disabled inmates interviewed acknowledged that they often do not understand the charges, the disciplinary process, or their rights when they receive their initial copy of the write-up, and they are often confused. Some of the inmates interviewed also explained that the hearing sergeants sometimes do not explain the charges or the outcome of the hearing to their understanding. Some complained that there have been occurrences where they did not receive an initial copy of the write-up, but had to attend the disciplinary hearing. A few of the inmates interviewed indicated that they never received their final copy of the report (with the disposition).

The Assessment Team also received several complaints from inmates categorized as OPP (as well as other disabled inmates) that staff will not assist them with writing/scribing/explaining grievances and other forms.

Classification Process:

The vast majority of inmates (including disabled inmates) interviewed had the same complaints. Most of the inmates mentioned that the classification deputies speak too fast, they don't explain what they are talking about, and they quickly

FINAL REPORT

complete the classification process. Many inmates do not understand their classification/custody level, or why they are being housed in a particular area. They claim that they often leave the classification meeting confused, and often don't understand the decisions reached during the classification meeting. Although one of the classification forms at the SCSD detention facilities has a question pertaining to any special considerations due to a disability, the classification deputies were widely not asking this or any other disability-related questions (other than mental illness-related questions). The classification process does not include an EC component (either verbally ensuring EC or associated documentation), and classification deputies do not have a mechanism to identify who the disabled inmate population is. Numerous disabled inmates who were interviewed claimed that classification deputies didn't ask them if they understood the encounter or their decision/outcome, and that they were not provided any accommodations or EC during the process.

The most egregious EC violations reported by inmates include:

MJ 2 East – An inmate who is legally blind with a TABE score of 2.0 stated that he has been requesting assistance in completing a grievance and staff are not being responsive. He stated that because there is only one custody staff member in 2 East, staff must stay in the control booth and are not available to help him with the grievance. He has requested assistance from medical staff specifically requesting that they read him medical information that is provided to him regarding his treatment and diagnosis, and medical staff do not provide him with any assistance.

RCCC KBF – A hearing-impaired inmate stated that it is difficult to hear the announcements on the public address (PA) system. He has to ask other inmates what the announcement was as staff do not communicate with him directly.

RCCC K Barracks – A deaf inmate stated that a SLI has only been provided for his initial JPS interview in booking. He claims that no SLI has been provided for his classification interview and medical appointments at the MJ. He claims that he had to pay an inmate $25.00 to make a phone call for him when the TTY was not working. The inmate said he arrived at the MJ on May 3, 2016 and that 2 days later he was moved to TSEP and kept there for 3 weeks. He stated that staff did not inform him of why he was in TSEP status. He also said that the chaplain does not provide SLI for religious services.

A deaf inmate arrived at the SCSD detention facility MJ on May 24, 2016. The arresting officers report notes a response of "No" to all questions on the Intake Screening Form. Question #9 "Is the arrestee non-responsive to the above questions" is also marked as "No". The SCSD detention facilities CHS Special Needs form reflects "Non-English Speaking and Deaf" and notes that the inmate is "Cleared for 2 East Housing". The Request for Reclassification Form dated 5/26/16 reflects 6 E housing is not appropriate and states, "Patient/Inmate is hard

FINAL REPORT

of hearing/deaf. Requires assistance for ADL's. House in 2E for LOS." It was also noted that the inmate was placed on 15-minute checks from 7/7/16 at 1125 hours to 7/8/16 at 1310 hours. The Assessment Team asked medical staff to review the inmate's medical chart to see how many occasions a physician or nurse had seen the inmate. Medical staff reported that a physician had seen the inmate on at least 6 occasions and nursing staff had seen the inmate on at least 10 occasions. There is no indication that staff attempted to determine the inmate's primary method of communication. The Assessment Team attempted to interview and communicate with the inmate on 8/12/16. The inmate is totally deaf, so the team attempted to communicate with him using written notes. This was unsuccessful as the inmate was unable to read or write English. The inmate was distraught and crying during the interview as the Assessment Team attempted to communicate with him. The SCSD staff were not able to provide the team with documentation that a SLI had been used to determine the inmate's primary method of communication, or if one was used during the Intake/Booking Process (medical and custody), classification process or medical/psychiatric encounters that occurred during the inmates 2 ½ months of being in custody. Medical staff reported that the inmate's family has indicated that he communicates in Mien; however, SCSD detention facilities staff had not verified this with the inmate using a SLI. The SCSD detention facilities medical staff reported that on August 18, 2016 an inmate who communicates in ASL was used in an attempt to communicate with the deaf inmate, but the inmate being used as an interpreter reported that the deaf inmate does not communicate using ASL.

**Conclusion**

The SCSD detention facilities do not provide disabled inmates with accommodations for medical/mental health/dental encounters.

The SCSD detention facilities do not provide disabled inmates with accommodations for the Inmate Disciplinary (Write-up) process.

The SCSD detention facilities do not provide disabled inmates with accommodations for the classification process.

The SCSD detention facilities do not provide disabled inmates with accommodations for the release processes.

The SCSD detention facilities must have a comprehensive EC custody Operations Order (policy) and CHS policy in place to ensure that reasonable accommodations are provided and EC is achieved (or all reasonable attempts are made) for disabled inmates during clinical encounters (medical, mental health and dental), due process events (e.g., classification process, inmate disciplinary process, release processes, notification of charges, probation encounters/meetings), and other specific activities such as self-help groups e.g., AA/NA or religious activities.

FINAL REPORT

A comprehensive EC custody Operations Order and CHS policy must also include inmate access to various auxiliary aids (e.g., qualified interpreters, readers, sound amplification devices, captioned television/video text displays, video remote interpreting, video visiting, TDD/TTY, audiotaped texts, Braille materials, large print materials, and signage), whether pertaining to a specific type of encounter, for work, or for recreation.

The SCSD detention facilities may decide to have a stand-alone comprehensive EC Operations Order and CHS policy, or, a comprehensive EC section within an ADA Order and policy (such as the draft ADA Operations Order, upon approval), or, incorporate necessary language within the numerous local Orders and policies as cited above. Also, as indicated above, nearly all of the local custody Operations Orders and CHS policies contain no EC language or references. A select few (as cited above) outline very brief and general EC related language, but do not extend far enough to ensure a higher standard and threshold to ensure EC and nondiscrimination.

Numerous operations orders and CHS policies contain some general EC-related language, but do not extend far enough and are not described in sufficient detail. Most are silent and do not address EC requirements.

The SCSD detention facilities must also ensure the following:

- Training: custody, health care (medical/dental/mental health), teachers, librarians, and other staff must receive adequate ADA training regarding EC, reasonable accommodations and auxiliary aids.
- Development of a comprehensive disability assessment process, with applicable screening instruments, and forms/documentation;
- Development and implementation of an electronic inmate disability tracking system to provide custody, health care, classification, education, library and other staff with an updated identification and tracking roster/list or system for identifying disabled inmates as well as their accommodation and EC needs;
- Staff must understand and follow the higher standard and threshold for EC: identify the disability and EC needs of the inmate; provide the necessary accommodations/make all reasonable attempts to ensure EC (the inmate understands staff, and staff understand the inmate); and document the encounter (including the type of EC or accommodation(s) provided, and how the staff member concluded that the inmate understood the encounter);
- Staff must understand specific methods for providing EC (e.g., speak slowly, use simple phrases/words, allow more time for the inmate to process information);
- Staff must document EC provided for clinical contacts, and various due process events;

FINAL REPORT

- The EGUSD education staff should be provided with necessary assistive equipment to assist disabled inmates (those who have EC needs);
- The EGUSD education staff should have the resources to accommodate learning strategies of those inmate-students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities;
- Sign language interpreters must be provided as necessary for due process events, clinical encounters, as well as educational and religious services when warranted;
- Classification and Inmate Disciplinary Hearing staff (as well as other staff during various due process events or clinical encounters) must make all reasonable attempts to carefully explain the process, charges, outcome, etc., and provide EC during the encounter.

An effective EC Operations Order/Policy must contain but not be limited to the following references:

- Assurance of EC with all inmates during all encounters or interactions;
- A higher standard or threshold for due process events and clinical encounters;
- A general literacy trigger (e.g., reading level) for purposes of querying inmates for inmate disciplinary events (for those who may not have been tested for learning disabilities or intellectual [developmental] disabilities, or otherwise may have literacy or cognitive concerns);
- Relevant formal classroom EC training for all staff.
- Requirement that disabled inmates with communication needs are interviewed (and provided EC as necessary) as part of the inmate grievance/appeal process as warranted.

**References**

**28 CFR 35.130(b)(1)** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability:

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service.

**28 CFR § 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability.

**28 CFR § 35.130(a)** requires that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

FINAL REPORT

**28 CFR 35.130(b)(4):** A public entity may not, in determining the site or location of a facility, make selections:

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

**28 CFR 35.160** (a) (1) A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others.

**28 CFR 35.160** (b) (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.

**28 CFR 35.160 (b)** (2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

FINAL REPORT

**<u>U.S. Department of Justice Civil Rights Division *Disability Rights Section* Commonly Asked Questions About The Americans With Disabilities Act and Law Enforcement:</u>**

**<u>V. Modifications in Policies, Practices, and Procedures</u>**

**23. Q: What types of modifications in law enforcement policies, practices, and procedures does the ADA require?**

**Example** - A department modifies the procedures for giving <u>Miranda</u> warnings when arresting an individual who has mental retardation. Law enforcement personnel use simple words and ask the individual to repeat each phrase of the warnings in her or his own words. The personnel also check for understanding, by asking the individual such questions as what a lawyer is and how a lawyer might help the individual, or asking the individual for an example of what a right is. Using simple language or pictures and symbols, speaking slowly and clearly, and asking concrete questions, are all ways to communicate with individuals who

have mental retardation.

**ADA Best Practices Tool Kit for State and Local Governments**

**Chapter 3**

**General Effective Communication Requirements Under Title II of the ADA**

**A. Providing Equally Effective Communication**

Under Title II of the ADA, all state and local governments are required to take steps to ensure that their communications with people with disabilities are as effective as communications with others. This requirement is referred to as "effective communication and it is required except where a state or local government can show that providing effective communication would fundamentally alter the nature of the service or program in question or would result in an undue financial and administrative burden."

What does it mean for communication to be "effective"? Simply put, "effective communication" means that **whatever is written or spoken must be as clear and understandable to people with disabilities** as it is for people who do not have disabilities. This is important because some people have disabilities that affect how they communicate.

How is communication with individuals with disabilities different from communication with people without disabilities? For most individuals with disabilities, there is no difference. But people who have disabilities that affect hearing, seeing, speaking, reading, writing, or understanding may use different ways to communicate than people who do not.

***Pierce v. D.C.* 128 F. Supp. 3d 250 (D.D.C. 2015)**

Deaf individual was incarcerated for 51 days. Prison staff never assessed Plaintiff's communication needs. Assumed lip-reading and written notes were sufficient. Plaintiff asserts he asked for an interpreter for medical intake, health services and various classes.

**Court:** Granted summary judgment for Plaintiff on effective communication and intentional discrimination. Denied prison's motion for summary judgment.

**Court:** Prison violated ADA/504 as a matter of law by failing to evaluate Plaintiff's need for accommodation when taken into custody.

**Violation:** Failure to assess needs of deaf inmate. Prisons have an affirmative duty to assess the accommodation needs of inmates with known

FINAL REPORT

disabilities taken into custody. Even if the individual has not made a specific request. Prison officials cannot rely solely on their own assumptions.

**Violation:** Plaintiff was not provided with required interpreter. Requested interpreter – evidenced by notes, testimony. Needed an interpreter evidenced by differences in ASL/English versus dealing with complex communications. Rejected argument that District employees said they believed Pierce understood them. No undue hardship/fundamental alteration.

***Holmes v. Godinez* 311 F.R.D. 177 (N.D. Ill. 2015)**

Plaintiffs (deaf/hard of hearing inmates) argued that prisons fail to provide effective communication, including: Visual alarms and notifications, access to TTYs, hearing aids and batteries, other auxiliary aids.

**Court:** Found for plaintiffs (denied MSJ) and granted class certification. Case demonstrates the wide range of programming requiring access, including: religious services, disciplinary hearings, medical, mental health and rehabilitation programs, educational and vocational programming.

***See also Bearden v. Clark Cty.*, 2016 WL 1158693 (W.D. Wash. Mar. 24, 2016)**

Advocates argue that effective communication requires prisons to provide videophones, not just TTYs.

**Recent agreements out of Maryland and Kentucky**

Deaf and hard of hearing inmates will have access to videophones to communicate with people outside of prison. Other select provisions: Visual notification of oral announcements regarding: emergencies; Access to interpreters and other auxiliary aids and services; Broad scheme of policy implementation, training, outreach, and monitoring to ensure equal treatment.

FINAL REPORT

## Administrative Segregation Unit, Total Separation, Disciplinary Detention Unit

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures pertaining to Administrative Segregation process are outlined in Operations Orders 06/03 Classification Process and 06/02 Housing Plan and Policy 1107 Decision Making-Special Needs.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations § 1080 Rules and Disciplinary Penalties requires that:

> Wherever discipline is administered, each facility administrator shall establish written rules and disciplinary penalties to guide inmate conduct. Such rules and disciplinary penalties shall be stated simply and affirmatively, and posted conspicuously in housing units and the booking area or issued to each inmate upon booking. For those inmates who are illiterate or unable to read English, and for persons with disabilities provision shall be made for the jail staff to instruct them verbally or provide them with material in an understandable form regarding jail rules and disciplinary procedures and penalties.

"People with disabilities" are defined to include, but not be limited to, persons with a physical or mental impairment that substantially limits one or more of their major life activities or those persons with a record of such impairment or perceived impairment that does not include substance use disorders resulting from current illegal use of a controlled substance.

Operations Order 06/03 Classification Process states, "Prisoner classification should be based on factors, which affect the security of the facility, staff, and the prisoner. Some of these factors include, but are not limited to:

- Physical characteristics, including gender, age, mental and medical conditions.
- Criminal history both in and out of custody, known gang affiliation, prior classification history, current charges or nature of charges against prisoner.
- Legal status, including propria persona (pro per) status, civil commitments, extradition status, or detention as a witness.
- Administrative segregation considerations including prior peace officer or corrections officer employment, gravely disabled status, and/or case notoriety.
- Criminal sophistication, former victims or enemies currently housed within the facility, status as a known law enforcement informant, sexual orientation/transgender status, or status as an inmate worker."

FINAL REPORT

"High Security Housing may be used to house prisoners at the MJ and RCCC based on guidelines including, but not limited to:

- Prisoners with a documented history of in-custody assaults in the last two (2) years. Assault history includes, but is not limited to, past cases of assault and pending cases. Assault history includes predatory behavior involving or victimizing other prisoners.
- Prisoners with escape or attempted escape histories from secured facilities within the last ten (10) years.
- Prisoners who have a current or past criminal history involving victimization of children or the elderly.
- Prisoners with two (2) or more major write-ups during the current custody period for rule violations.
- Prisoners who are validated gang members and/or have a history of gang related crimes.
- Prisoners who have charges filed against them as a result of a write-up during the current custody period.
- Prisoners involved in cases that have considerable press coverage or notoriety."

"Medium and Minimum Security Housing may be used to house unsentenced prisoners at RCCC who do not meet the criteria for Special or High Security Housing.

Special Housing refers to housing designated for prisoners with specific segregation needs, status as inmate workers, medical or mental health requirements, and disciplinary isolation. Special Housing needs will be determined by the classification unit and by physical plant design and limitations of each facility.

Special Housing may be used to house prisoners at MJ and RCCC who have special separation or housing needs, including but not limited to:

- Medical or mental health problems or disabilities which prevent the prisoners from caring for themselves in a jail setting, or who are required to be isolated for medical reasons.
- Prisoners who are classified as Administrative Segregation, Protective Custody, Total Separation, or Civil Commitment status, per Operations Order 06/02.
- Prisoners who are placed in disciplinary isolation. A Hearing Sergeant will assign prisoners to disciplinary isolation based on the findings of the disciplinary hearing."

"Classification officers will be responsible for conducting classification reviews in accordance with but not limited to the following guidelines:

- For prisoners in High Security Housing, every thirty (30) days.

FINAL REPORT

- For prisoners in General Population Housing, after the first sixty (60) days of custody.
- Upon request from custody staff, Medical Staff, Jail Psychiatric Services, and/or court officials, or when the legal status of the prisoner changes.
- When a prisoner is relocated and/or reclassified due to the outcome of a disciplinary hearing."

Operations Order 06/02, Housing Plan states, "the MJ and RCCC Classification Unit will assign prisoners to a housing unit based on the current housing needs of the facility and/or in accordance with Operations Order 6/03, Classification Process."

"The MJ has two (2) floors, which have designated housing areas that may be used for prisoners who have received disciplinary isolation.

- The 8 West 400 Pod is available for male disciplinary isolation.
- The 7 West 400 Pod is available for female disciplinary isolation."

Operations Order 07/03, Inmate Discipline Plan states, "no inmate may be deprived of the implements necessary to maintain an acceptable level of personal hygiene. Inmates will be allowed to keep or be provided with a toothbrush, toothpaste, soap, shaving implements, comb and tampons/sanitary napkins pads for female inmates. Inmates will be allowed to shower at least every other day. While on disciplinary isolation prisoners are allowed to keep the above items, a bible, and all legal materials to include paper/envelopes/pencil for legal correspondence."

"Major facility violations shall be punishable by any of the disciplines listed in the applicable regulations, as well as loss of commissary privileges, social visits, dayroom/outdoor recreation, telephones, housing unit programs, removal from inmate worker status, relocation, loss of good time, disciplinary isolation diet, and disciplinary isolation housing.

An inmate may be removed from general population housing when a rule violation is aggravated or if it could recur or incite other misconduct. To ensure the safety and security of the facility, an inmate may be moved to another housing unit, including a disciplinary housing unit, pending the outcome of either the disciplinary process or prosecution. A sergeant or watch commander may make this decision. The person making the decision will not be involved in the hearing.

Inmates found guilty of violating major rules may be moved to a disciplinary isolation-housing unit to serve his/her discipline. The maximum time any privilege can be suspended for a single facility Major violation shall not exceed 15 days. When multiple violations arise from a single incident, each violation may be punished concurrently or consecutively, but shall not exceed 30 days suspension. Any inmate on disciplinary isolation housing status for more than 30

FINAL REPORT

days because of multiple incidents shall have a review by the division commander before the disciplinary isolation status is continued. This review shall include a consultation with health care staff and continue every 15 days until the inmate is off discipline."

The SCSD detention facilities TSEP and ADSEG Inmate Housing Plan outlines the following privileges provided to TSEP and ADSEG inmates while they are housed at the Main Jail. Inmates classified as TSEP and ADSEG present special consideration based upon their inability or unwillingness to be near other inmates. In order to comply with Title 15, the SCSD detention facilities will provide the base minimum Title 15 standards for inmates classified as TSEP and ADSEG.

"TELEPHONE – TSEP and ADSEG inmates shall be allowed no more than 5 contact numbers entered into the phone system at any one time. Removing or adding numbers will require a request identifying the number to be added, person's name, area code and relation to inmate.

CORRESPONDENCE – TSEP and ADSEG inmates shall only be able to correspond with 5 verified mailing addresses at any one time. Removing or adding names will require a request identifying the address, receiver's name, and the person's relation to the inmate. This does not apply to legal mail.

COMMISSARY – TSEP and ADSEG inmates shall only purchase from the approved item menu and will only be allowed a maximum of $100.00 in their account at any given time. TSEP and ADSEG inmates will only be allowed a maximum weekly gift order of $30.00. If an inmate receives a gift order they will not be allowed to order commissary that week. Additionally, TSEP and ADSEG inmates will gain access to commissary only once per week.

READING MATERIAL – TSEP and ADSEG inmates shall not be allowed to loan any book, periodical or newspaper to any other inmate and will comply with the jail rules associated with the total number of publications allowed.

INMATE ORIENTATION – TSEP and ADSEG inmates shall not be allowed to have television playing when an inmate is not in the dayroom. During that time, a jail orientation video will discuss jail rules associated with general population and TSEP status."

Per policy 1107, Decision Making-Special Needs, "consultation between the Facility Commander and the Medical Director is required for actions regarding patients who are diagnosed as having significant medical or mental health disorders, as follows:

- Housing assignments.
- Program assignments.
- Disciplinary measures.

FINAL REPORT

- Admissions to and transfers from institutions.

Maximum cooperation between custody personnel and health care providers is essential so that both groups are made aware of movements and decisions regarding patients with special medical or psychiatric needs. For example, health care staff must inform custody personnel when an inmate is suicidal, homicidal, or inappropriately housed in the jail for health care reasons. An inmate's special needs may complicate housing or work assignments or disciplinary management. Medications may need to be adjusted for safety at the work assignment or before transfer."

## Observations

The Assessment Team toured the housing units that are designated to house ADEG, TSEP and Disciplinary Detention prisoners. The MJ housing is located in 8-West Pods 100, 200, 300 and 400, 8-East Pods 100, 200 and 300, 7-East Pod 100, and 7-West Pods 300 and 400. The RCCC housing is located in SBF Pod 100 and CPF Pod 100. The Assessment Team also noted that there were TSEP designated inmates housed in 2-East where inmates with medical conditions and inmates with assistive devices or disabilities that cannot ambulate stairs to access visiting, outside recreation or showers.

## Staff Interviews

The Assessment Team interviewed staff to determine if disabled inmates housed in the ADSEG, TSEP and Disciplinary Detention units have equal access to programs and services as other inmates housed in the general population units. Classification staff stated that the designation of TSEP is based on classification factors that require an inmate to be totally separated from other inmates and includes type of charges, criminal history, behavior or high notoriety crime/person. The criteria for ADSEG are escape risks, current validated prison gang, assaultive towards staff or other inmates, or who by the nature of their behavior have demonstrated potential for violence. Criteria for being placed in Disciplinary Detention are based on the disposition of a major rule infraction. Inmates do not receive written notice and/or final notice of the decision made to place or retain them in TSEP other than a verbal notice at the time of placement or the 30-day re-reviews, which are conducted face-to-face. Inmates do not receive written notice and/or final notice of the decision made to place or retain them in ADSEG status/housing. Staff stated that inmates are allowed to retain their HCAs in ADSEG, TSEP and Disciplinary Housing. Staff stated that inmates on TSEP status are restricted to $30.00 of commissary in cell. All other programs, services and activities are the same as general population inmates with the exception of available education/self-help programs due to program space restrictions.

## Inmate Interviews

The Assessment Team interviewed 9 inmates that were on TSEP and ADSEG status. Of the inmates interviewed 5 were not aware of their classification

FINAL REPORT

designation and stated that they did not understand the classification process. Three of the inmates stated that they couldn't read without reading glasses. There were 3 inmates with mobility impairments who stated that they had a difficult time ambulating up the stairs to the visiting area and also to the yard. Most inmates interviewed indicated that they would participate in education and self-help programs if they were offered. The inmates housed in MJ stated that at times yard is offered; however, some of those times it is offered at 1 or 2 a.m. Inmates also stated that the chaplain does come around, however, very infrequently. A few of the ADSEG and TSEP inmates claimed to have little contact with JPS staff.

One of the inmates housed at the MJ (was formerly on TSEP status) indicated that when he was on TSEP status, he was never informed as to why he was on that status, and he subsequently submitted a KITE to ascertain why. He later came to his own conclusion that he was placed on TSEP because he was sexually assaulted. He then agreed to go to PC status, but had remained on TSEP for about another week.

**Conclusion**

Disabled inmates placed in TSEP, ADSEG and Disciplinary Detention housing have equal access to the programs, services, and activities as non-disabled inmates. However, there are some concerns with disabled inmates having a difficult time accessing visiting and the recreation yard. This is not based on their specific housing, as these barriers would exist if they were in general population housing. More than ninety percent of the inmates interviewed were not aware of their classification, which is mainly due to staff not providing effective communication during the classification interview. This is addressed in further detail in the effective communication section of this report. The Operations Orders must include the criteria for placement into and the criteria for removal from TSEP and ADSEG status. This needs to be effectively communicated to inmates to ensure they are aware of such criteria. Although classification staff advised the Assessment Team of the criteria for designation and placement into TSEP and ADSEG status/housing, the Operations Orders do not include the specific criteria for TSEP and ADSEG classification designation. The Classification training PowerPoint does detail the specific criteria for TSEP and ADSEG classifications.

The Operations Orders should also include the following specific privileges afforded to segregated inmates:

- Hygiene;
- Exchange of clothing and bed linens and access to barbering and hair care;
- Correspondence privileges;
- Opportunity for visitation;

FINAL REPORT



- Opportunity to use the telephone;
- Access to courts and counsel;
- Access to leisure;
- Access to legal research assistance services via a unit-based or delivery system;
- Opportunity to exercise outside the cell a minimum of three hours per week; and
- Access to programs and services that will generally include:
  - Education;
  - Commissary;
  - Social Services;
  - Counseling;
  - Religious services; and
  - Medical and Mental Health Services.

**References**

**28 CFR § 35.130 (a)** states no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

FINAL REPORT



## Inmate Grievances

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable to the ADA Grievance process are outlined in: Operations Order 07/02 Grievances, 1435 Inmate Health Care Grievances, and Draft Operations Order Inmates with Disabilities - ADA.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1073 Inmate Grievance Procedure requires that;

(a) Each administrator of a Type II, III, or IV facility and Type I facilities which hold inmate workers shall develop written policies and procedures whereby any inmate may appeal and have resolved grievances relating to any conditions of confinement, included but not limited to: medical care; classification actions; disciplinary actions; program participation; telephone, mail, and visiting procedures; and food, clothing, and bedding. Such policies and procedures shall include:
(1) a grievance form or instructions for registering a grievance;
(2) resolution of the grievance at the lowest appropriate staff level;
(3) appeal to the next level of review;
(4) written reasons for denial of grievance at each level of review which acts on the grievance;
(5) provision for response within reasonable time limit; and,
(6) provision for resolving questions of jurisdiction within the facility.

Per Operations Order 07/02, Grievances, Correctional Services shall provide a written process that allows inmates to grieve specific conditions. All written grievances shall receive a written response within a reasonable time limit and will be resolved at the lowest appropriate staff level.

A grievance is a complaint by an inmate regarding any condition of confinement, act, rule or policy, written or unwritten, in which an inmate contends that there is an infringement upon his or her personal, human or constitutional rights. A grievance may include complaints against the substance of policies or rules, as well as their application. A grievance may include complaints about disciplinary and classification actions or rulings, conditions of confinement, work project supervision or home detention as well as complaints about:

- Medical care
- Program participation
- Telephone and Mail
- Visiting Procedures
- Food, Clothing, Bedding

FINAL REPORT

An inmate should first direct his/her issue to custody or supervising staff as the issue should be resolved at the lowest appropriate staff level. If custody or supervising staff is unable to resolve the issue, the inmate may file a formal written grievance. The inmate has the right to file a grievance within five (5) calendar days following the occurrence of, or after the inmate became aware of a specific incident regarding any condition of confinement, work project supervision or home detention. A grievance regarding Department policy may be filed at any time. Only one issue may be included in the grievance. If an inmate wishes to challenge several issues, each issue must be set forth on a separate grievance.

When an inmate requests a grievance form, custody or supervising staff shall provide the form. Once an inmate completes a grievance, the grievance must be turned into any housing unit staff assigned to the inmate's housing location or staff assigned to supervise the inmate's work project or home detention activities. When an inmate submits a grievance, housing unit or supervising staff shall accept the grievance.

The receiving housing unit or supervising staff shall print and sign his/her name, badge number, date and time of the acceptance of the grievance and return a copy to the inmate. Housing unit or supervising staff shall review the grievance and resolve it if possible. Any action taken or resolution offered by housing unit or supervising staff shall be documented in the grievance reply section or on a separate grievance reply form. Housing unit or supervising staff shall place the grievance and any reply in the appropriate facility repository (grievance box located on the second floor of the RCCC administration office; black box in the MJ Administration area; Administrative Supervisor's box of the Work Release Division), whether or not staff is able to resolve the problem.

ALL grievances and replies shall be forwarded to administration. Grievances shall NOT be discarded simply because the issue has been resolved. Administration will log the grievance, scan it into the Department Records Management System (RMS) and distribute unresolved grievances to the appropriate supervisor(s) for review.

Once received, the supervisor shall review each grievance submitted by custody or supervising staff and determine the initial course of action for the grievance. If the supervisor determines that the grievance has been resolved, the supervisor will approve the resolution by signing and dating the grievance and reply, then return both to administration as required above. If the supervisor determines that the grievance should be routed to a specific section for review and potential resolution, the supervisor will note this on the grievance. The supervisor will then:

- Distribute the original copy of the grievance to the appropriate shift or unit (i.e. medical, JPS, food services, home detention, work project.)
- Distribute the yellow or other copy of the grievance to the division secretary or designee so the grievance can be updated with the

FINAL REPORT

appropriate shift or unit handling the grievance into the grievance tracking system.

The supervisor assigned to handle the grievance shall review the grievance and all pertinent documents, reports, records and files related to the grievance. The supervisor may distribute the grievance to appropriate staff for resolution. If the appropriate staff person was not able to resolve the problem or the inmate wishes to appeal, the supervisor will take the appropriate action necessary to resolve the problem. This action or supervisor reply will be documented in the grievance reply section or on a separate grievance reply form. Once the grievance is answered, the supervisor will forward the entire grievance and any responses to the watch commander or unit manager within four (4) days for review.

The watch commander/unit manager has (4) four days to review and approve the response, add additional responses to the grievance or require further investigation. The completed grievance response will be forwarded to the assistant division commander for review. The assistant division commander may approve the reply by signing the completed form. In the event the grievance involves staff conduct, the assistant division commander shall notify the division commander who thereafter will decide if a copy should be forwarded to Professional Standards. The assistant division commander may return the package to a supervisor or the investigating staff for further investigation if needed.

When a grievance package is complete, the entire package shall be logged into the facility's grievance tracking system. The original grievance and any replies will be maintained by the division for seven years. The yellow copy or other copy and any response shall be placed in the inmate's file. A copy of any response will be sent back to the inmate after the investigation is completed.

If the inmate is dissatisfied with the reply, the inmate may send a written appeal on a grievance form to the division commander within five (5) days of the initial reply. The division commander will decide the manner in which the grievance is handled. Any time limit may be extended upon mutual agreement by the division commander. No reprisal shall be taken against any inmate for filing a grievance or an appeal of a grievance decision.

All inmates have the right to appeal and have resolved any grievances related to any condition of their confinement; however, grievances are to be filed on an individual basis. So-called "Group" or "Class-action" grievances are not permitted. When multiple grievances are received from more than one inmate on an identical issue, each such grievance will be processed individually. Each inmate shall be provided with a response. A statement shall be included in the response explaining that the grievance has been designated as one of multiple

FINAL REPORT

identical grievances for processing purposes and the same response is being distributed to each inmate.

The division commander, at his or her discretion, may refuse to accept grievances from an inmate if it is found the inmate is filing an excessive number of grievances of a frivolous nature or grieving issues that were previously grieved and resolved.

Per Draft Operations Order Inmates with Disabilities - ADA, the intent of the ADA Division Representative is to review requests, complaints and grievances related to ADA issues, maintain the Division's ADA files, and provide training to facility staff on auxiliary aids and services. The ADA Division Representative may respond to ADA requests or ADA grievances and will ensure the Facility ADA Coordinators are updated and informed of all ADA issues as well as perform inspections.

The ADA Coordinator, or his/her designee, is responsible for keeping the ADA division representative informed of all requests, complaints or grievances related to ADA issues, review claims, complaints and grievances regarding disabilities, and ensuring complaints and grievances are finalized.

An inmate with a disability who believes he/she is the subject of disability discrimination or who wants to appeal any denial of ADA housing and/or accommodation may submit a grievance. All grievances concerning conditions of ADA housing and/or accommodations will be made on a Grievance Form following the guidelines in Operations Order (7/02), Grievances. All ADA related grievances shall be routed through the facility Compliance unit. The Compliance unit will determine the best course of action for the grievance (e.g. Medical, Custody, Food Services) and then route it as deemed appropriate. The Compliance unit will track all ADA related grievances until finalized. A copy will be forwarded to the ADA Corrections Division Representative.

Any grievance in which an inmate claims the ADA housing and/or accommodation is causing an imminent threat to his/her health or safety shall be expedited. A copy will be forwarded to the facility Compliance unit. A copy of any grievance for ADA conditions and/or accommodations made by an inmate being held for the California Department of Corrections and Rehabilitation (e.g. parole hold, detainer) or for any Federal contract (e.g. U.S. Marshals, Immigration and Customs Enforcement) shall be made available upon that agency's official request.

Per policy 1435, Inmate Healthcare Grievances, an inmate has the right to file a grievance within five (5) calendar days of the incident regarding the problem with his/her health care. Once an inmate completes the grievance, the grievance must be turned into any housing unit custody staff assigned to the inmate's housing location.

FINAL REPORT

Custody staff will review each grievance submitted and forward the grievance to the nurse who is responsible for handling inmate health care grievances. All healthcare grievances will be logged into a CHS grievance log for tracking and resolution. The nurse will review the grievance and all pertinent medical records. The nurse may schedule a Priority Administrative Review appointment so the patient-inmate can be medically assessed. A written response indicating the action taken will be prepared and delivered to custody within ten (10) days.

The watch commander/other equivalent support unit supervisor will have four (4) days to review and approve, add additional responses to the grievance, or require further investigation. The completed grievance response will be forwarded to the assistant division commander for review. The assistant division commander may approve the reply by signing the completed form. In the event the grievance involves staff conduct, the assistant division commander, after notification of the division commander, will decide if a copy should be forwarded to Internal Affairs.

The assistant division commander may return the package to Correctional Health Services for further action. When a grievance package is complete, the entire package is forwarded to the respective division's employee responsible for logging it into the facility's grievance tracking system. The original grievance and any replies will be maintained by the division for seven (7) years. A copy of all responses will be sent back to the inmate after the investigation is completed.

If the inmate is dissatisfied with the reply, the inmate may send a written appeal on a grievance form to the division commander within five (5) days of the initial reply. The division commander will decide the manner in which the grievance is handled. Any time limit may be extended upon mutual agreement by the division commander or his/her designee.

All inmates have the right to appeal and have grievances resolved with respect to any aspect of their health care; however, grievances are to be filed on an individual basis. So-called "Group" or "Class-action" grievances will not be reviewed. The division commander, at his or her discretion, may refuse to accept grievances from an inmate if it is found the inmate is filing an excessive number of grievances of a frivolous nature or grieving issues that were previously grieved and resolved.

FINAL REPORT

**Observations**

The grievance coordinators at the MJ and RCCC provided the Assessment Team with the categories used to track grievances. This listing identifies 8 Grievance categories with 32 sub-categories and 1 Appeal category with 7 sub-categories.

| Grievance – Health | JPS |
| --- | --- |
| | Medical - Treatment |
| | Medicine |

| | |
|---|---|
| | Treatment - Conduct not Medical Attention |
| Grievance – Legal | Attorney<br>Courts<br>Law Library |
| Grievance – Other | Other - Commendations Maintenance Issues |
| Grievance – Policy or Procedure | Classification<br>Discipline<br>Facility<br>Other - Time Comps<br>Security |
| Grievance - Program | Education<br>Reentry<br>Religious<br>SWP Program |
| Grievance – Property | Mail<br>Money - Commissary/Me Co-Pays<br>Personal<br>Tank Property |
| Grievance – Services | Clothing<br>Commissary<br>Food<br>Laundry<br>Phones<br>Recreation<br>Showers<br>Visitation |
| Grievance – Staff Conduct | Sexual Misconduct – Staff<br>Treatment<br>Use-of-Force |
| Grievance – Appeal | Commissary - Items only<br>Discipline<br>Food<br>Law Library<br>Medical<br>Money - Welfare Kit Charge<br>Other |

FINAL REPORT

There is no category for ADA grievances or appeals including requests for reasonable accommodations. The grievance coordinators provided the Assessment Team with the previous 90 days of grievances. Although there is no specific ADA category the Assessment Team identified the grievances that are ADA-related. A detailed summary of these grievances is as follows:

- MJ 2 East: Inmate states he fell in the shower in 2 East Pod 100, requested to use the 2 medical shower, requested medical needs form for 2 medical shower. Response states request for showering on 2 medical is a custody matter please discuss your request with custody;
- MJ 2 East: Inmate requested assistance with showering, claims nurse stated, "There is more important things to do besides helping you with your shower". Response states this issue has already been addressed by the Medical Director and the Director of Nursing;
- MJ 8 East: Inmate states he is a developmentally disabled inmate with a TABE scorer of 0.7. He states he needs help all the time with everything and he cannot get it on TSEP. Deputy responded that he was not aware the inmate was developmentally disabled. Inmate received assistance in writing a letter and information about his charges;
- MJ 4 East: Inmate is requesting grab bars and shower chair. States he slipped and fell in the shower.
- MJ 8 East: Inmate states he had a "no stair" chrono in CDCR. Inmate states he is fully disabled due to multiple disabilities. Needs accommodations for health and safety;
- MJ 8 East: Inmate states he can't walk that 1 step to shower. How will I get to visit? He is not allowed to shower with a chair. What was the doctor thinking when he said I was clear? Response states "Patients who use assistive devices such as canes, walkers and crutches no longer require housing on the medical floor; you are ordered a lower bunk, lower tier, an extra mattress and blanket;"
- MJ 4 East: Inmate requests access to showers with handicap railing, handicap cell with lower bunk. Claims he is forced to "bird bath" or use plastic slippery chair. Claims he fell outside the shower. Claims he has been sleeping on the floor;
- MJ 3 East: Inmate is requesting an extra mattress due to degenerative disk disease. Response states an extra mattress was ordered;
- MJ 8 West: Inmates states he is an Armstrong class member and requires ground floor, limited stairs, lower/bottom bunk, eyeglasses, hearing aids, assistive device for mobility and mental health care. Response states inmate is provided a lower bed on a lower floor, as well as reasonable accommodations for stairs. Will add that inmate will have personal and attorney visits on the 2nd floor where there are no stairs. If you are unable to navigate the stairs to the recreation area a Deputy will escort you through the mezzanine level. You are already in contact with Jail Psych

FINAL REPORT

Services; eyeglasses, hearing aids mobility devices were ordered at this time;

- MJ 5 West: Inmate states he has a low bunk/low tier chrono that is not being honored. Response recommends that inmate submit a HS KITE requesting one;
- MJ 7 East: Inmate states he is totally disabled and can't do stairs for family and attorney visits. Response does not address inmates request only medical care provided;
- MJ 4 East: Inmate is requesting glasses for trial, to see witnesses and read documents. Response states that the Jail policy on glasses has been revised to accept all glasses. Contact whoever can deliver your glasses;
- MJ 6 West: Inmate states he has fallen a few times and is requesting a cane. Response states a cane was ordered. Medical contacted the floor deputy regarding the cane that was ordered by medical. The floor deputy reported that the cane was in control, and inmate was issued the cane;
- RCCC JKF: Inmate is requesting his psych medications. Response states medication were discontinued due to inmate cheeking meds;
- RCCC H Barrack: Inmate states he is not receiving psych meds. Response states he has orders for psych medications;
- RCCC SLF: Inmate states she was being questioned in the hallway outside the bubble by correctional officers and psychiatric staff while inmate workers were around walking and talking by. "I don't need anyone to know my business."

**Staff Interviews**

The Assessment Team interviewed the grievance coordinators for the MJ and RCCC facilities. The grievance coordinator at the MJ stated that she receives the custody-related grievances after they have been responded to by custody. The completed grievances must have a sergeant's signature. Deputies try to resolve the grievance issue at the lowest level. There are no timelines in which the grievance must be completed. Once the custody response is received, the grievance is forwarded to the lieutenant for review and final approval. Once the lieutenant approves the custody grievance, the grievance is issued a log number and entered into RMS.

The grievances that require a medical response or are outside the purview of custody, are forwarded to the grievance coordinator by custody staff. These grievances do not have a completed response. For medical grievances, the grievance coordinator emails a scanned copy of the grievance to medical staff for response. Once medical staff completes the response, medical staff forwards the typed completed response to the grievance coordinator. The grievance coordinator prints the response and attaches the response to the grievance and forwards the grievance and the typed response to the lieutenant for review and approval.

FINAL REPORT

SABOT CONSULTING

Inmate copies of the completed grievances (custody and medical) are forwarded to the floor officers and distributed to the inmates. The completed grievance is scanned into the inmate record. There is no detailed policy of how custody staff must distribute the copy of the grievance to ensure EC when issuing a grievance response to a disabled inmate. Prior to May of 2016, all completed grievances were shredded after being scanned; however, administrative staff is now retaining the completed grievances.

The grievance coordinator at the RCCC stated grievances are placed in a designated grievance folder in the booking area. The grievances are collected every business day morning and afternoon. Once received, grievances are assigned a log number and entered into RMS. The grievances are assigned to the appropriate area for response. There are no timelines in which the grievance must be completed. The grievances that require a medical response are scanned and emailed to medical staff for response. Once medical staff completes the response, medical staff forwards the typed response to the grievance coordinator. The grievance coordinator prints the response and attaches the response to the grievance.

Once the grievance responses are received, the grievance is forwarded to the sergeant and lieutenant for review and approval. Once the grievance response is approved, the grievance and response are scanned into RMS. The inmate copies of the completed grievances (custody and medical) are distributed to the officers inbox and are distributed to the inmates. There is no detailed policy of how custody staff must distribute the copy of the grievance to ensure EC when issuing a grievance response to a disabled inmate. All completed grievances are shredded after being scanned.

To comply with the August 28, 2012, federal court order (County Jail Plan for addressing Armstrong Class Members housed in county jails), issued by Judge Claudia Wilkins, in the matter of Armstrong vs. Brown, Case Number 94-2307CW, the SCSD detention facilities received CDCR 2275-CJ Forms-Requests for Reasonable Modification or Accommodation for Access to Housing and/or Program(s) in a County Jail from CDCR. The Assessment Team reviewed 4 CDCR 2275-CJ forms.

- DNM – Notification - Requires level terrain no obstructions in the path of travel. Ground Floor- Limited stairs. Lower/Bottom Bunk Only.
- No (Disability Placement Program) DPP Code EOP – CDCR 2275-CJ - Requires Ground Floor, Lower/Bunk, No Climbing, No prolonged standing. Requests mental health treatment.
- DD1 – CDCR 2275-CJ - Lower/Bottom Bunk. Requests help reading and comprehending docs.
- No DPP Code CCCMS – CDCR 2275-CJ – Basic nonreader. Needs reading glasses and help understanding documents.

FINAL REPORT

- DD2 – CDCR 2275-CJ – Requests assistance with reading and understanding all documents.

The SCSD detention facilities medical staff stated that after receipt of a CDCR 2275-CJ, the patient's Electronic Medical Record (EMR) is pulled and reviewed. The information from the CDCR letter attached to the CDCR 2275-CJ is placed into the EMR chart in the clinical notes. The inmate is scheduled for a face-to-face clinical visit with a doctor. During this exam the doctor evaluates and determines if the accommodations listed on the CDCR letter and CDCR 2275-CJ are appropriate.

Medical staff stated that they also receive the email notification from CDCR notifying SCSD detention facilities and identifying each parolee with a disability, including those subject to California Penal Code section 3056, being held in SCSD detention facilities, each parolee with a disability booked in the SCSD detention facilities, each CDCR out-to-court prisoner with a disability housed in SCSD detention facilities and the last-known disabilities and the accommodations in housing or programming the prisoner received as of the date he or she was transferred from a prison. Medical staff stated that the same process for the CDCR 2275-CJ listed above is followed for CDCR's County Jail Plan email notification. Medical staff stated that the information is forwarded to the facility lieutenant; however, the facility lieutenant stated that custody staff does not track the information provided by medical staff.

More than half of the housing unit officers interviewed stated that they would not assist inmates in completing grievances. The officers stated they would direct the inmate to other inmates or the "houseman" for assistance in completing the grievance.

**Inmate Interviews**

More than 35 percent of the inmates interviewed stated that they either did not know how to access the grievance process or needed assistance in completing and submitting grievances. These inmates also stated that staff had not explained the grievance process to them and that they had to rely on other inmates to explain the grievance process to them. About 10 percent of the inmates interviewed claimed that staff were reluctant to give them a grievance if the issue involved a custody staff member; however, custody staff was willing to provide the grievance if the issue being grieved was a medical issue.

**Conclusions**

One of the most important tools for any jail is the grievance process provided to inmates in order to file complaints regarding conditions as well as events in the jail where the inmate believes their rights are violated, including violations of the ADA. By providing inmates with a proper grievance process, the jail administration can resolve issues within the jail environment before the

FINAL REPORT

conditions or events lead to litigation. For the grievance process to be effective, inmates must be made aware of the process. Although the SCSD detention facilities have adopted and published a grievance process, inmates are not being made aware of the grievance process as required by the Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations which requires that information regarding the grievance process be made available during inmate orientation. As stated in this report, orientation is not being provided to inmates.

Although the Draft Operations Order Inmates with Disabilities - ADA speaks to the ADA Grievance Process, this Order has not been implemented. And based on inmates not being made aware of the method in which to request accommodations, disabled inmates essentially do not have a means to request accommodations for their disabilities or address discrimination based on violations of the ADA.

Although the Draft Operations Order Inmates with Disabilities - ADA addresses an expedited process for ADA grievances there are no specific timelines outlined in the order.

The Draft Operations Order Inmates with Disabilities - ADA does not provide for interim accommodations for inmates during the time frame the ADA grievance is being processed and responded to.

The SCSD detention facilities' ADA grievance process does not comply with the requirements of the "Opinion in Support of Order Distributing and Enforcing the Amended County Jail Order and Plan dated 8/28/12" (Armstrong v. Brown, 857 F. Supp. 2d 919, 939 (N.D. Cal. 2012), order enforced (Aug. 28, 2012), order aff'd, appeal dismissed, 732 F.3d 955 (9th Cir. 2013)).

Disabled inmates may have poor ability to express themselves in writing and they will likely have difficulty with any task requiring reading or processing written material. In particular they may have difficulty with the grievance process which requires reading and understanding. Accordingly, correctional staff is duty-bound to provide reading and writing assistance to disabled inmates who need assistance. More than half of the staff interviewed indicated they would not assist disabled inmates in accessing the grievance process. The Draft Operations Order Inmates with Disabilities - ADA requires that staff assist disabled inmates in accessing the grievance process, SCSD detention facilities must ensure staff is trained in this requirement.

SCSD detention facilities must ensure the grievance procedures are readily available to all inmates. Staff must make appropriate provisions to communicate those procedures to the disabled. Because access to the grievance process must be meaningful, staff must ensure that developmentally disabled inmates can submit grievances and staff must provide the necessary assistance to all

FINAL REPORT

disabled inmates on a case-by-case basis to ensure that those who have difficulty communicating in writing will be provided reasonable access to the grievance process. The right of meaningful access to grievance procedures is particularly important because an inmate must exhaust the jails administrative remedies by complying with that procedure before he can access the courts.

Completed grievance responses are not effectively communicated to inmates that are developmentally disabled and learning disabled.

Consideration must be given to requests for reasonable modification or accommodations separate from the grievance process for inmates to request ADA accommodations and modifications.

The CDCR 2275-CJ should be tracked in the SCSD detention facilities grievance tracking system in RMS.

**References**

**28 CFR §35.107 (b)** Requires that a public entity that employs 50 or more persons adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by Title II of the ADA.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only. Due to the "Opinion in Support of Order Distributing and Enforcing the Amended County Jail Order and Plan dated 8/28/12" (Armstrong v. Brown, 857 F. Supp. 2d 919, 939 (N.D. Cal. 2012), order enforced (Aug. 28, 2012), order aff'd, appeal dismissed, 732 F.3d 955 (9th Cir. 2013)).***

> *"Class members housed in county jails must have ready access to disability grievance forms, either the CDCR's Reasonable Modification or Accommodation Request form (CDC 1824) or a separate county jail grievance form." If Defendants elect to utilize the CDC 1824 form in any of the counties, Defendants shall collect the grievance forms from class members no less than twice a week, and shall provide copies to a designated person at the county jail. Defendants shall respond to all grievances within fifteen calendar days of receipt and make their best efforts to ensure that necessary and reasonable accommodations are provided. If a class member identifies the grievance as urgent or an emergency (i.e., if it alleges a condition which is a threat to the parolee's health or safety, or is necessary for participation or effective*

FINAL REPORT

*communication in a parole revocation proceeding), Defendants shall respond to such a grievance within five calendar days of receipt and make their best efforts to ensure that necessary and reasonable accommodations are provided on an interim basis. For the first six months in which the plan is in effect, Defendants must produce to Plaintiffs' counsel on a monthly basis all grievances collected by Defendants pursuant to this subsection. Production may shift to two times a year after the first six months.*

*d. If Defendants contend that the process outlined in Paragraph (1)(c) is unnecessary because a jail has an adequate disability grievance process, Defendants must certify, within thirty days of the acceptance of their plan, that each such jail's disability grievance policy contains the following elements:*

*i. Is readily available to all class members housed in that county's jail facilities;*

*ii. Has an initial response deadline of no later than fifteen calendar days from receipt by the designated jail staff member;*
*iii. Contains a provision for expediting a response if the appeal alleges a condition, which is a threat to the parolee's health or safety, or is necessary for participation or effective communication in a parole revocation proceeding;*

*iv. Includes a provision for review of the parolee's request by medical staff, if necessary;*

*v. Provides a right to appeal denials; and*

*vi. Requires that a copy of each and every grievance and response be provided to Defendants at the same time it is provided to the Armstrong class member.*

FINAL REPORT

## Inmate Disciplinary Process

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures pertaining to the inmate disciplinary process are outlined in Operations Order 07/03 Discipline Plan, and Policy 1107, Decision Making-Special Needs.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1080 Rules and Disciplinary Penalties requires that:

Rules and disciplinary penalties shall be stated simply and affirmatively, and posted conspicuously in housing units and the booking area or issued to each inmate upon booking. For those inmates who are illiterate or unable to read English, and for persons with disabilities, provision shall be made for the jail staff to instruct them verbally or provide them with material in an understandable form regarding jail rules and disciplinary procedures and penalties.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1081 Plan for Inmate Discipline requires that:

Each facility administrator shall develop written policies and procedures for inmate discipline, which shall include, but not be limited to, the following elements:

a) Designation of one or more subordinates who will act on all formal charges of violation of facility rules by inmates, and who shall have investigative and punitive powers. Staff so designated shall not participate in disciplinary review if they are involved in the charges.
b) Minor acts of nonconformance or minor violations of institution rules may be handled informally by any staff member by counseling or advising the inmate of expected conduct, assignment to an extra work detail, or removal from a work assignment without loss of work time credit. In addition, temporary loss of privileges such as, but not limited to, access to television, telephones, or commissary, or lockdown for less than 24 hours, may be considered minor discipline if such acts are accompanied by written documentation, and a policy of review and appeal to a supervisor.
c) Major violations or repetitive minor acts of non-conformance or repetitive minor violations of institutional rules shall be reported in writing by the staff member observing the act and submitted to the disciplinary officer. The inmate shall be informed of the charge(s) in writing. The consequences of a major violation may include, but are not limited to, loss of good time/work time, placement in disciplinary isolation, disciplinary isolation diet, or loss of privileges mandated by regulations. In addition:
(1) Charges pending against an inmate shall be acted on no sooner than

FINAL REPORT

24 hours after the report has been submitted to the disciplinary officer and the inmate has been informed of the charges in writing. A violation(s) shall be acted on no later than 72 hours after an inmate has been informed of the charge(s) in writing. The inmate may waive the 24-hour limitation. The hearing may be postponed or continued for a reasonable time through a written waiver by the inmate or for good cause.

(2) The inmate shall be permitted to appear on his/her own behalf at the time of hearing.

(3) Subsequent to final disposition of disciplinary charges by the disciplinary officer, the charges and the action taken shall be reviewed by the facility manager or designee.

(4) The inmate shall be advised of the action taken by the disciplinary officer by a copy of the record required to be kept by Penal Code Section 4019.5.

d) Nothing in this section precludes a facility administrator from administratively segregating any inmate from the general population or program for reasons of personal, mental or physical health, or under any circumstance in which the safety of the inmates, staff, program, or community is endangered, pending disciplinary action or a review as required by Section 1054 of these regulations.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, §1082 Forms of Discipline states that:

The degree of punitive actions taken by the disciplinary officer shall be directly related to the severity of the rule infraction. Acceptable forms of discipline shall consist of, but not be limited to, the following:

a) Loss of privileges.
b) Extra work detail.
c) Short term lockdown for less than 24 hours.
d) Removal from work details.
e) Forfeiture of "good time" credits earned under Penal Code Section 4019.
f) Forfeiture of "work time" credits earned under Penal Code Section 4019.
g) Disciplinary isolation.
h) Disciplinary isolation diet.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, §1083 Limitations on Disciplinary Actions, states in part:

The Penal Code and the State Constitution expressly prohibit all cruel and unusual punishment. Additionally, there shall be the following limitations:

a) If an inmate is on disciplinary isolation status for 30 consecutive days

FINAL REPORT

there shall be a review by the facility manager before the disciplinary isolation status is continued. This review shall include a consultation with health care staff. Such reviews shall continue at least every fifteen days thereafter until the disciplinary status has ended. This review shall be documented.

b) The disciplinary isolation cells or cell shall have the minimum furnishings and space specified in Title 24, Part 2, 1231.2.6 and 2.7. Occupants shall be issued clothing and bedding as specified in Articles 13 and 14 of these regulations and shall not be deprived of them through any portion of the day except that those inmates who engage in the destruction of bedding or clothing may be deprived of such articles. The decision to deprive inmates of such articles of clothing and bedding shall be reviewed by the facility manager or designee during each 24-hour period.
c) Penal Code Section 4019.5 expressly prohibits the delegation of authority to any inmate or group of inmates to exercise the right of punishment over any other inmate or group of inmates.
d) In no case shall a safety cell, as specified in Title 24, Part 2, 1231.2.5, or any restraint device be used for disciplinary purposes.
e) No inmate may be deprived of the implements necessary to maintain an acceptable level of personal hygiene as specified in Section 1265 of these regulations.
f) Food shall not be withheld as a disciplinary measure.
h) Correspondence privileges shall not be withheld except in cases where the inmate has violated correspondence regulations, in which case correspondence may be suspended for no longer than 72 hours, without the review and approval of the facility manager.
i) In no case shall access to courts and legal counsel be suspended as a disciplinary measure.

The SCSD detention facilities Operations Orders 07/03, Discipline Plan, specifically pertains to the Inmate Disciplinary (Write-up) process for inmates and detainees. The purpose of the Order is to standardize procedures for administering discipline and disciplinary diets, establishing rules and penalties for inmate conduct, and to ensure a fair and impartial inmate disciplinary process in accordance with Article 7 of Title 15 of the California Code of Regulations ("Title 15").

Section I. Policy, states, "Prisoners accused of violating a facility rule shall be provided a fair and impartial disciplinary process. Discipline shall be directly related to the severity of the offense and shall be administered in a firm, fair and consistent manner.

Section II. Compliance with California Code of Regulations Title 15, states in part, "The discipline plan shall be administered in compliance with Title 15 of the California Code of Regulations;

FINAL REPORT

- All prisoners being housed will receive an orientation booklet that contains all facility rules guiding inmate conduct and the corresponding disciplinary penalties; and
- For those inmates who are illiterate or unable to read English, and for persons with disabilities, verbal instructions or material in an understandable form regarding jail rules and disciplinary procedures and penalties will be provided;"

Section VI. Major Incident Procedures, states in part, "Once the sergeant approves the report, the approving sergeant shall deliver a copy to the inmate. The sergeant delivering a written copy of the report to the inmate shall obtain the inmate's signature on a copy, note the date and time of delivery on that copy and sign that notation." Language within the Order also states,

- "Inmates must receive a written copy of the disciplinary report at least 24 hours in advance of the hearing;
- Consequently, no disciplinary hearing for violations pending against an inmate shall occur sooner than 24 hours after the inmate has been informed of the violations in writing;
- The inmate may waive the 24-hour limitation and have a disciplinary hearing conducted immediately upon delivery of the report in writing to the inmate;
- The inmate will sign the appropriate space on the write-up acknowledging the waiver;
- The waiver shall be documented in the report. Once the inmate has received a written notice that he/she has received a disciplinary write-up (PF-10), the violation must be acted on by the hearing sergeant within 72 hours;
- The hearing officer will render a decision regarding the violations and impose discipline pursuant to Section IV, which shall be included in the report;
- A written copy of the final hearing results (PF-10) will be given to the inmate;
- An inmate may be removed from general population housing when a rule violation is aggravated or if it could recur or incite other misconduct. To ensure the safety and security of the facility, an inmate may be moved to another housing unit, including a disciplinary housing unit, pending the outcome of either the disciplinary process or prosecution;
- Inmates found guilty of violating major rules may be moved to a disciplinary isolation housing unit to serve their discipline;
- Any inmate on disciplinary isolation housing status for more than 30 days because of multiple incidents shall have a review by the division commander before the disciplinary isolation status is continued; and
- This review shall include a consultation with health care staff and continue every 15 days until the inmate is off discipline."

FINAL REPORT

Section VII. Minor incident report procedures, states in part, "Custody staff witnessing a violation of minor facility rules and wishing to impose any discipline listed above will be required to complete an Incident Report Detail (PF-10) by the end of shift." It also states in part,

- Upon completion of the report, the staff member writing the report shall notify a sergeant so the sergeant can review the report and approve/disapprove of the discipline. No hearing is required;
- If the sergeant approves the discipline, the sergeant will note the discipline imposed in the PF-10 report;
- A written copy of the report will be delivered to the inmate by the housing unit officer. The staff member delivering a written copy of the report to the inmate shall obtain the inmate's signature on a copy, note the date and time of delivery on that copy; and
- The inmate will be allowed to appeal the supervisor's discipline via the grievance procedure."

Section X. Inmate Appeals, states in part, "Inmates may appeal the disciplinary actions to a watch commander through the inmate grievance procedure within five days from the time the disciplinary decision was delivered to the inmate." It also states in part, "Inmate appeals shall be answered and returned within five working days from the time they were received by the watch commander."

The Inmate Handbook (rulebook) contains a section titled, "Conduct and Discipline", and a section titled, "Rules of Conduct Codes." The Conduct and Discipline section outlines specific rights that inmates and detainees will be afforded, their responsibilities within the process, categories of violations, contraband, and disciplinary process and penalties. The Rules of Conduct section lists the various rule codes with corresponding descriptions (specific acts).

Although there is a requirement in the Operation Orders that for those inmates who are illiterate or unable to read English, and for persons with disabilities, provisions are not routinely made by the jail staff to instruct the inmates verbally or provide them with reasonable accommodations and/or materials in an understandable form regarding jail rules and disciplinary procedures and penalties. As such, staff does not routinely provide reasonable accommodations for deaf/hearing-impaired or speech-impaired inmates (or other inmates) such as access to a qualified interpreter or accommodations for disabled inmates who have compromised communication skills, or who are otherwise unable to meaningfully participate in an infraction hearing.

FINAL REPORT

## Observations

The Assessment Team observed several Major Disciplinary (Write-up) Hearings at the MJ and RCCC jail facilities.

During observation of a hearing at the MJ, the Assessment Team observed the following SCSD detention facilities disciplinary hearing practices: inmates are permitted witnesses; inmates do not have a right to have the reporting employee present at the hearing; facilities do not utilize a staff assistant employee or an investigative employee system; hearing sergeants draw possible disposition penalties from the Sacramento County Sheriff's Department Correctional Services Inmate Rule Code Violation Schedule. Of concern was the location and method of where and how the disciplinary hearings are conducted. The hearings at the MJ are conducted in the dayrooms or near the dayrooms. The hearings at RCCC were conducted just outside the pod doorways (return area) with the inmate and the hearing sergeant standing just outside the pod.

During observation of a hearing at the MJ, the respective inmate was charged with a rule violation. The hearing sergeant asked the inmate if he was aware of the write-up. The sergeant read the report aloud, and then asked the inmate what happened, to which the inmate responded with an explanation, and there were several back and forth questions and answers between both parties. The sergeant ended the hearing by assessing a verbal warning to the inmate, and told the inmate he was going to be rehoused to another unit (as the inmate had complained of safety concerns). The sergeant advised the inmate of his appeal rights.

During observation of another hearing at the MJ (a different hearing sergeant), the Assessment Team observed the following: the sergeant read the report out loud, the inmate provided an explanation, and there were a few back and forth questions and answers. The sergeant then asked how the inmate wanted to plea, to which the inmate replied, "not guilty." The inmate was found guilty and assessed 12 hours of full restriction (but could maintain attorney visits or any program such as education, self-help groups, etc.). The sergeant explained to the inmate his right to appeal the findings to the jail commander, and he provided an explanation of possible outcomes from the appeal process.

During observation of another hearing at the MJ, the Assessment Team observed the following: The charged inmate appeared to have mental health concerns, and admitted to the charge of fighting. The sergeant asked the inmate to explain the circumstances as to what happened. The Assessment Team noted that the hearing was conducted in the unit indoor recreation area lobby, approximately 30 feet from a 1-on-1 psychiatric interview with an inmate-patient, with no barrier to preserve confidentiality for the MH encounter or for the disciplinary hearing. The sergeant asked the inmate, "do you think it is alright to fight", and asked him if he knew that fighting was against the rules. The inmate replied "yes." The inmate was found guilty, and assessed 10 days of full restriction. The sergeant explained that the inmate would receive a disciplinary shower every other PM shift, to which the inmate replied, "I don't need a shower." The inmate made slight verbalizations about harming his parents. After the

FINAL REPORT

completion of the hearing and dismissal of the inmate, the Assessment Team asked the sergeant whether there was a process built-in to consult with a clinician prior to the hearing to obtain input for MH purposes, specifically, whether the clinician believes the MH status may have contributed to some degree as to the inmate's actions. The sergeant indicted that there is no such policy or practice.

During observation of a major violation hearing at RCCC, the Assessment Team observed the following: the sergeant asked whether the inmate had received a copy of the write-up, and asked if the inmate had any questions. The sergeant asked the inmate whether he wanted to plead guilty, not guilty, or guilty with an explanation, to which the inmate pled not guilty. The sergeant asked what happened, and the inmate responded. The sergeant asked if the inmate could have pressed the emergency button and avoided the fight, and asked about the inmate's injuries. The sergeant then instructed the inmate to go back inside to his assigned pod area. There was no explanation as to the disposition, whether the hearing would be resumed later, or any other detail or instructions.

During observation of another major violation hearing at RCCC, the Assessment Team observed the following; the sergeant read the report and asked whether the inmate had received a copy of the write-up, to which the inmate acknowledged that he had. The sergeant asked whether he had been written up before, and the inmate replied, "yes." The sergeant asked the inmate to state his plea, which was "guilty." Several questions and answers were delivered back and forth, and then this hearing was also halted with any further explanation or disposition.

There were at least 2 additional hearing at the RCCC with very similar observations.

The Assessment Team was able to observe the issuance of initial copies of write-ups to inmates at the MJ, however, our multiple requests to observe the issuance of initial copies of write-ups to inmates at RCCC was not facilitated. During the initial service of write-ups, the Assessment Team noted that the control room deputies issued the initial copy of the write-up to the inmate through the control room window slot. The deputies advised the inmate of the charge and had the inmate sign the document. The deputies issued the inmate a copy and advised the inmate that the sergeant would conduct the hearing. There was no EC provided to ensure the inmate understood the charges and/or the disciplinary process.

FINAL REPORT

**Staff Interviews**

The Assessment Team interviewed sergeants who conduct disciplinary hearings and issue initial copies of write-ups for major (and minor offenses), and also spoke with deputies who issue initial copies of write-ups for minor violations. The team was informed that the deputies primarily deliver the initial copies of the

write-ups to the charged inmates. The team was also informed that within the process, inmates/detainees receive an initial copy of the charges to which they sign acknowledgement of receipt, or they can refuse to sign. Most of the sergeants interviewed indicated that they read the write-up out loud in front of the inmate.

The sergeants review and approve a deputy or staff member's report. A sergeant then schedules a disciplinary hearing. Information regarding the minimum amount of time that a hearing can be scheduled from the date and time of initial issuance of the write-up report, was identified as 24 hours, and also 48 hours, but no more than 72 hours later, unless the charged inmate waives that right to prepare for the hearing, and therefore opts for a quicker hearing to be conducted. The staff interviewed told the Assessment Team that the common practice is for the opposite shift (AM versus PM) to conduct the hearings for the write-up reports written for the opposite shift. The hearings are conducted on the floors/housing unit areas where the charged inmates/detainees reside.

The staff that was interviewed indicated that the sergeants could take away time credits (for guilty findings) for major violations, for inmates who have been sentenced by the court. The sergeants indicated that they follow an approved inmate disciplinary matrix for possible imposed penalties. Aside from time taken, other penalties include but are not limited to, DP/TSEP, loss of privileges, e.g., dayroom, visits, telephone calls, etc.

The sergeants and deputies acknowledged that there is not an alert system or tracking system to help them identify inmates with disabilities, or those whose disabilities may pose a barrier to communication, e.g., learning disabled, intellectually (developmentally) disabled, or those who may be deaf/hearing-impaired, or speech-impaired. They mentioned the JIMS system PF10 screen that provides them some information, and may contain some disability-related information. When asked about a hypothetical scenario in which an inmate did not understand the hearing or process, one of the sergeants mentioned that he would not do the hearing, would research the issue further, and might ask a psychologist as to the best approach to deal with the inmate. When asked their response if the charged inmate was unable to read the write-up, one sergeant indicated that that issue has never happened with him. He said he would have someone read it to the inmate, and that the hearing would be held at a later date. When asked about possible hearing-impaired inmates, one sergeant stated that he would conduct the hearing by reading and writing with the inmate, and he would maintain the written notes used back and forth until completion of the writing of the disposition, then he would shred all notes used. Most of the sergeants indicated that inmates receive final copies of the hearing findings, and the sergeants usually deliver them. Some of the staff said that the inmate appeal rights are written on the back of the initial and final report copies, but this was inconsistent. He said that inmates cannot call witnesses, and they can gather

FINAL REPORT

their own evidence for the hearings. The Assessment Team was also told that there is no standard assistance provided for inmates who are "illiterate." When asked about the process when a charged inmate gets moved from a specific building or pod to another, the Assessment Team was told that it is up to the discretion of the respective hearing sergeant.

The staff explained that after completion of the disciplinary hearings, the sergeant verbally explains his/her findings. However, the supervising lieutenant can later modify the findings and disposition, and ultimately is the approving authority for findings. Most of the staff interviewed stated that there is not a final copy of the disposition that is provided to the inmate. There is an employee who tracks all inmate disciplinary actions. When asked, the staff interviewed indicated that although inmates have appeal rights regarding the write-up, disposition and penalty, inmates do not receive any written documentation advising them of their appeal rights.

**Inmate Interviews**

During the inmate interviews several inmates who could not read and understand (or had some difficulties with) a section of the inmate rulebook and other material used by the Assessment Team to assist in determining inmate literacy and inmates who may have a history of developmental and learning disabilities stated they did not fully understand the write-up process. A few of the inmates were unable to remember if they had received a write-up in the past.

A summary of the statements made by inmates who recall receiving an Infraction is detailed below.

- MJ inmate (Mental Illness, prior special education): 5 write-ups; no explanation about rights while signing for initial copy or at hearing; process is confusing; no EC provided, no assistance provided;
- MJ inmate (Mental Illness): not enough time to prepare for hearing, no access to witnesses, no complaints as to the hearing, but very confused at the time of issuance of first copy and not knowing his rights;
- MJ inmate (Mental illness): 2 separate write-ups, and didn't receive initial copies; no assistance; no explanation of rights or process; was confused and had to research with no staff assistance; one sergeant explained everything, and the other sergeant did not;
- MJ inmate (Mental Illness): nobody explained the process or his rights throughout the process;
- MJ inmate (Mental Illness and likely Intellectual [developmental] Disability, and prior Special Education): does not remember everything about the process, was confused;
- MJ inmate: no EC, no explanation, was confused throughout entire process;

FINAL REPORT

- MJ inmate (Mental Illness): 19 write-ups; no EC; never received final copies; is afraid to appeal to risk getting a more serious penalty than was imposed by the sergeants;
- MJ inmate: served 3 weeks on disciplinary detention, and never received initial copy of write-up; when he received write-ups for a different offense, the staff member handed it to him without any explanation, and told him to sign it;
- MJ inmate (Mental Illness); served disciplinary detention; his only concern was not being told his rights throughout the process and an explanation as to how the process works;
- MJ inmate (Mental Illness): no EC; no assistance;
- RCCC inmate (Mental Illness)" no explanation at the time of signing for initial copy; afraid to appeal due to the possibility of getting a stronger penalty;
- RCCC inmate: no explanation of charges, process or rights;
- RCCC inmate; initial copy was slid under the cell door and 2 days later had the hearing; sergeant did not explain anything at the hearing; no mention of appeal rights; never received a final copy summary;
- RCCC inmate: while at MJ, never received an explanation as to charges, rights, process at the time of issuance of initial copy of write-up;
- RCCC inmate (Mental Illness, prior Special Education): went to administrative segregation with no paperwork or explanation; never received an initial copy of the write-up, but did have a hearing.

**Conclusions**

Because a disabled inmate's literacy level can impede his/her ability to participate in jail services, the regulations implementing the ADA require public entities to take appropriate steps to ensure that the communication of information concerning jail services, activities, and programs is as effective for the disabled as for the non-disabled. In doing so, the jail must provide such services as are necessary to afford an individual with a disability an equal opportunity to participate in jail programs and activities and in determining what services are necessary. Jail staff must give primary consideration to the requests of the individual.

Intellectually (developmentally) disabled inmates may have poor ability to express themselves in writing and will likely have difficulty with any task requiring reading or processing written material. In particular, they may have difficulty with disciplinary processes which require reading and understanding. Accordingly, jail staff is duty-bound to provide reading and writing assistance to disabled inmates who need assistance. Only through EC can staff guarantee that an intellectually disabled inmate has meaningful access to the disciplinary proceedings. The Due Process Clause requires that staff assistants provide EC to developmentally disabled prisoners during disciplinary proceedings where there is a protected liberty interest at stake.

FINAL REPORT

Additionally, when addressing inmate misconduct, staff members must take into consideration the severity of the inmate's disability and the inmate's need for adaptive services when determining the appropriate method of discipline. When the inmate does not understand that he has broken a rule, staff should provide the reasonable accommodation of direct instructions, prompting, or verbal counseling. Only if the intellectually disabled inmate continues to engage in the misconduct should staff resort to the disciplinary process.

Since inmates under the jurisdiction of the SCSD detention facilities can in some cases lose good time credits if they are guilty of major violations, the procedure for determining whether such misconduct has occurred must observe certain minimal due process requirements based on constitutional case law.

In Wolff v. McDonnell, 418 U.S. 539 (1974), the Supreme Court found that, when prisoners lose good time credits because of a disciplinary offense, they are entitled to:

- Written notice of the disciplinary violation;
- The right to call witnesses at their hearing;
- Assistance in preparing for the hearing;
- A written statement of the reasons for being found guilty; and
- A fair and impartial decision-maker in the hearing.

A second important Supreme Court case, Sandin v. Conner, 515 U.S. 472 (1995), however, sharply limits the decision of Wolff and sets a higher standard that has to be met in order to show that you have a liberty interest.

The inmates have the right to assistance if illiterate and issues are complex. This certainly includes inmates who are intellectually disabled, mentally disabled, learning disabled, and those who are unable or have difficulty reading and comprehending.

The inmates must be provided advanced written notice of charges which must be given to the disciplinary charged inmate, no less than 24 hours before his/her appearance before the Hearing Official. Additionally, applies or must be adhered to:

- There must be a written statement by the fact finders as to the evidence relied on and reasons for the disciplinary action;
- The inmate should be allowed to call witnesses and present documentary evidence in his/her defense if permitting him/her to do so will not jeopardize institutional safety or correctional goals;
- The inmate has no constitutional right to confrontation and cross-examination in disciplinary proceedings, such procedures in the current environment, where disruption remains a serious concern, being discretionary with the officials; and

FINAL REPORT

FINAL REPORT

- Inmates have no right to retain or appoint counsel in such proceedings, although counsel substitutes should be provided in certain cases.

There is no system in place for sergeants conducting the disciplinary hearings to identify disabled inmates during the hearing process. Therefore, hearing sergeants are not providing the necessary accommodations for disabled inmates. Hearing sergeants do not provide EC for disabled inmates (learning, developmental and vision), assistive devices are not provided for vision-impaired inmates (magnifiers and large print documents). Effective communication is required throughout the entire disciplinary process from the issuance of the initial copy, during the hearing, during the final issuance of the disciplinary report and during the appeal process. By not providing EC, disabled inmates are not being afforded equal access to the disciplinary process and their due process rights.

Disabled inmates (learning, developmental and mental health) are not being provided staff assistance to ensure that they are aware of their rights and that their position is presented during the disciplinary process.

The SCSD detention facilities Operations Order and local practice must allow for provision of accommodations for disabled inmates and should be mandatory.

In cases when an inmate indicates he/she does not understand the charges or otherwise objects to the clarity of the write-up or has any question about it, the Hearing Sergeant must not be allowed to proceed with the hearing. This applies even if the Hearing Sergeant determines that a reasonable person reading the charge would be able to understand the nature of what the inmate was charged with and there is no rational reason why the particular inmate might not have been able to understand the charge (e.g. inmate's inability to read or limited intellectual capacity). Remember, there is no effective tracking system to alert the Hearing Sergeant of an inmate's disability that would limit his/her ability to comprehend the nature of the charges, the Hearing process, and the inmate's rights. Additionally, and as stated above, inmates are not being provided staff assistance to ensure their position is presented at the hearing.

Staff is not taking into account the inmate's developmental and mental health disability and the adaptive support needs of the inmate (if applicable) when making a determination of the method used to address the misconduct.

Although a sergeant who was interviewed stated that he would request information from mental health if it appeared that the inmate's mental health contributed to the violation, this is not policy, and it is not uniformly applied. Staff should consult with mental health staff in cases where an inmate in the mental health program has received a disciplinary write-up, so that mental health staff can provide information relative to the inmate's mental health status at the time of the offense and information regarding the potential mental health implications of the penalty being imposed by the Hearing Sergeant (e.g., DD, TSEP, loss of

visits, phone etc.). Imposing these types of penalties may have a detrimental effect on the inmate's mental health and well-being.

The policy states that an inmate can grieve/appeal a restriction to the watch commander, but it does not require a face-to-face review to ensure the inmate's position is presented during the formal review process. In addition, violations of policy and jail rules for inmates with mental health concerns or inmates with developmental disabilities may be as a result of their disability and staff may not be aware of these factors when determining the method of intervention/discipline. Placing an inmate who is acting-out based on his mental health condition in isolation may be detrimental to his mental health and well-being.

**References**

**28 CFR§ 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(a)** requires that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

**28 CFR 35.130(b)(1)**: A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

FINAL REPORT

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

**28 CFR 35.130(b)(4):** A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

**28 CFR 35.130(b)(8):** A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Disciplinary Process*

*Reasonable accommodations shall be afforded inmates with disabilities in the disciplinary process.*

*To assure a fair and just proceeding, the assignment of a Staff Assistant (SA) and/or an Investigative Employee (IE), as provided in CCR Sections 3315 (d)(1) an (2), may be required for the inmate. The inmate and/or SA or IE may need to be assigned by a bilingual aide or qualified interpreter in order to ensure effective communication. Additional accommodations may be appropriate. All written notes utilized and exchanged for effective communication between the inmate and staff shall be attached and included with the disciplinary documents for placement in the inmate's central file.*

***The information below is for reference only. Due to the settlement***

FINAL REPORT

***agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Clark v. California" amended March 1, 2002, mandates the following:*

*DISCIPLINARY PROCESS*

*To assist DDP inmates in conforming departmental rules and regulations, all staff who interact with this population must closely monitor the inmates' daily activities. An employee may attempt to address problematic behavior informally; e.g., direct instructions, prompting, verbal counseling. The employee must ensure the inmate understands (to the best of his/her ability) the consequences of continued misconduct. If this informal intervention successfully corrects the behavior, no further disciplinary action is required. If the inmate continues the misconduct and informal intervention was not successful or the behavior was of a serious nature the misconduct must be handled in accordance with CCR, Title 15,starting at Section 3310. The method of discipline may include:*

- *Issuing a CDC Form 128-A, Chrono-Custodial Counseling*
- *Issuing a CDC Form 115 the staff member observing the misconduct must take into consideration the severity of the inmate's disability and the inmate's need for adaptive support services when determining the method of discipline.*

*To assure a fair and just proceeding, if the misconduct is recorded on a CDC Form 115 (administrative or serious rules violations), all DDP inmates must be assigned an SA. The SA can be any staff who have received training referenced in Section X, D, and training in due process hearings. The assigned SA may be assisted by a bilingual aide, reader, mental health clinician, etc., as necessary. In accordance with CCR, Title 15, Sections 3318(b) and 3315 (d)(2), the SA must:*

- *Inform the inmate of his/her rights and ensure that he/she understands the disciplinary procedures to the best of the inmate's ability;*
- *Help the inmate to prepare for the disciplinary hearing;*
- *Represent the inmate's position at the hearing;*
- *Ensure the inmate's position is understood;*
- *Ensure the inmate understands to the best of his/her ability the decisions reached;*
- *Provide the hearing official with information related to the inmate's developmental disability and the adaptive support services required;*
- *Be present at the disciplinary hearing and all interviews related to the disciplinary process;*

FINAL REPORT

- *Refrain from giving legal counselor specifying the position the inmate should take in any disciplinary proceeding; and*
- *Additional assistance as appropriate.*

*The SAs and hearing officials must be trained to communicate with DDP inmates. The SA must complete courses in the Overview of Developmental Disabilities, Staff Assistance for Inmates with Developmental Disabilities, and the Overview of the Inmate Disciplinary Process.*

*If the inmate is found guilty of a rules violation, the Chief Disciplinary Officer (CDO) must review the completed CDC Form 115 in accordance with CCR, Title 15, Section 3312.*

*The CDO must consult with the clinician assigned to DDP inmates regarding the findings and disposition of the hearing before taking action. The clinician assigned to DDP inmates must provide input as to the effectiveness of the disposition in correcting the inmate's behavior. Both the CDO and clinician must sign the completed CDC Form 115. By signing the CDC Form 115, the clinician is not endorsing the disposition of the CDC Form 115, but only acknowledging the consultation. The need for the CDO to consult with clinicians concerning the disposition of CDC Forms 115 for inmates with developmental disabilities must be incorporated into applicable Lesson Plans, Post Orders, and Operational Procedures of all designated institutions. In accordance with CCR, Title 15, Section 3313(c), the classification of a CDC Form 115 may be changed before, during, or after a disciplinary hearing from serious to administrative. Other decisions for CDC Forms 115 can be to:*

- *Affirm, reverse, or modify the disciplinary action and/or credit forfeiture;*
- *Order a different action or a different method of discipline;*
- *Dismiss the charge;*
- *Order a rehearing of the charge;*
- *Refer the charge for criminal prosecution; and*
- *Order a combination of any of these actions.*

*If a DDP inmate exhibits on going behavioral problems, institution clinical staff shall refer the case to HCSD Clark Coordinator for assistance in assessing the causes of the behavior and creating an intensive behavioral modification and treatment plan.*

*The ADA Coordinator will review CDC Form 115s at least monthly to identify any patterns of misbehavior that may be related to the DDP inmates' disabilities (see Section VI, L).*

FINAL REPORT

**U.S. Department of Justice Civil Rights Division *Disability Rights Section* Commonly Asked Questions About The Americans With Disabilities Act and Law Enforcement**

**II. Interacting with People with Disabilities**

8. Q: What steps should officers follow to communicate effectively with an individual who is blind or visually impaired?

A: It is important for officers to identify themselves and to state clearly and completely any directions or instructions -- including any information that is posted visually. Officers must read out loud in full any documents that a person who is blind or visually impaired needs to sign. Before taking photos or fingerprints, it is a good idea to describe the procedures in advance so that the individual will know what to expect.

**III. Effective Communication**

11. Q: If the person uses sign language, what kinds of communication will require an interpreter?

A: The length, importance, or complexity of the communication will help determine whether an interpreter is necessary for effective communication.

- In a simple encounter, such as checking a driver's license or giving street directions, a notepad and pencil normally will be sufficient;
- During interrogations and arrests, a sign language interpreter will often be necessary to effectively communicate with an individual who uses sign language;
- If the legality of a conversation will be questioned in court, such as where Miranda warnings are issued, a sign language interpreter may be necessary. Police officers should be careful about miscommunication in the absence of a qualified interpreter -- a nod of the head may be an attempt to appear cooperative in the midst of misunderstanding, rather than consent or a confession of wrongdoing;
- In general, if an individual who does not have a hearing disability would be subject to police action without interrogation, then an interpreter will not be required, unless one is necessary to explain the action being taken.

18. Q: Procedures at my office require citizens to fill out forms when reporting crimes. What if the person has a vision disability, a learning disability, mental

FINAL REPORT

retardation or some other disability that may prevent the person from filling out a form?

A: The simplest solution is to have an officer or clerk assist the person in reading and filling out the form. Police officers have probably been doing this for years. The form itself could also be provided in an alternative format. Providing a copy of the form in large print (which is usually as simple as using a copy machine or computer to increase type size) will make the form accessible to many individuals with moderate vision disabilities.

**V. Modifications of Policies, Practices, and Procedures**

23. Q: What types of modifications in law enforcement policies, practices, and procedures does the ADA require?

A: The ADA requires law enforcement agencies to make reasonable modifications in their policies, practices, and procedures that are necessary to ensure accessibility for individuals with disabilities, unless making such modifications would fundamentally alter the program or service involved. There are many ways in which a police or sheriff's department might need to modify its normal practices to accommodate a person with a disability.

Example: A department modifies the procedures for giving Miranda warnings when arresting an individual who has mental retardation. Law enforcement personnel use simple words and ask the individual to repeat each phrase of the warnings in her or his own words. The personnel also check for understanding, by asking the individual such questions as what a lawyer is and how a lawyer might help the individual, or asking the individual for an example of what a right is. Using simple language or pictures and symbols, speaking slowly and clearly, and asking concrete questions, are all ways to communicate with individuals who have mental retardation.

FINAL REPORT

FINAL REPORT

## Inmate Orientation

The Sheriff's Department County of Sacramento Correctional Services Operations Orders pertaining to inmate orientation are outlined in Operations Orders 04/07 Dress In/Dress Out Procedures, 04/08 Prisoner Orientation and 07/03 Inmate Discipline Plan.

Minimum Standards for Local Detention Facilities Title 15 - Crime Prevention and Corrections Division 1, Chapter 1, Subchapter 42010 Regulations, § 1069 Inmate Orientation requires that:

> (a) In Type II, III, and IV facilities, the facility administrator shall develop written policies and procedures for the implementation of a program reasonably understandable to inmates designed to orient a newly received inmate at the time of placement in a living area. Such a program shall be published and include, but not be limited to, the following:
>
> 1) correspondence, visiting, and telephone usage rules;
> 2) rules and disciplinary procedures;
> 3) inmate grievance procedures;
> 4) programs and activities available and method of application;
> 5) medical services;
> 6) classification/housing assignments;
> 7) court appearance where scheduled, if known; and,
> 8) voting, including registration.

§ 1080. Rules and Disciplinary Penalties requires that;

> Wherever discipline is administered, each facility administrator shall establish written rules and disciplinary penalties to guide inmate conduct. Such rules and disciplinary penalties shall be stated simply and affirmatively, and posted conspicuously in housing units and the booking area or issued to each inmate upon booking. For those inmates who are illiterate or unable to read English, and for persons with disabilities, provision shall be made for the jail staff to instruct them verbally or provide them with material in an understandable form regarding jail rules and disciplinary procedures and penalties.

§ 108[illegible] defines people with disabilities as including but not limited to:

> Persons with a physical or mental impairment that substantially limits one or more of their major life activities or those persons with a record of such impairment or perceived impairment that does not include substance use disorders resulting from current illegal use of a controlled substance.

Per Operations Order 04/07, Dress in/Dress Out Procedures, custody staff shall provide the prisoner with orientation materials in accordance with Operations Order 04/08 Prisoner Orientation.

Per Operations Order 07/03, Inmate Discipline Plan, all inmates being housed will receive an orientation booklet that contains all facility rules guiding inmate conduct and the corresponding disciplinary penalties. For those inmates who are illiterate or unable to read English, and for persons with disabilities, verbal instructions or material in an understandable form regarding jail rules and disciplinary procedures and penalties will be provided.

A copy of the inmate orientation book describing the inmate discipline plan, rules and penalties shall be kept at the Public Counter/Gatehouse and shall be made available to the public upon request.

Per Operations Order 04/08, Prisoner Orientation, custody staff shall be responsible for providing each inmate with an orientation handbook and giving each inmate a verbal orientation prior to being located in a housing unit.

Inmates shall be provided with an inmate orientation handbook, which includes but is not limited to the following information:

- Correspondence, visiting, and telephone usage rules.
- Rules of conduct and disciplinary procedures.
- Inmate grievance procedures.
- Available programs, activities and inmate services.
- Medical, dental, and psychiatric services.

Custody staff are responsible for being able to provide inmate orientation information in a format reasonably understandable to inmates. Considerations for providing this information includes, but is not limited to, the following:

- Inmates who do not speak or write English.
- Inmates with disabilities such as hearing or visual impairment.

Custody staff is responsible for providing a verbal orientation in summary to all inmates prior to the inmate(s) being housed in a housing unit. The verbal orientation includes, but is not limited to:

- Explaining the basic rules of conduct of the respective facility.
- Referring inmates to the inmate handbook or other appropriate orientation information.

Inmates are provided the opportunity to have questions answered about their housing facility or incarceration. The methods inmates may use to ask questions include, but are not limited to:

- Prisoner request forms.
- Medical, dental, and psychiatric service request forms.

FINAL REPORT

- Direct questions to custody staff.

Orientation information may be provided in person and/or by using a video format presentation prepared by the respective facility. At the MJ, the orientation material will be presented by custody staff in property. At RCCC, the orientation material will be presented by custody staff during intake.

Orientation information may be given in the housing unit to supplement the information given at the above locations at each facility.

**Observations**

The Assessment Team observed the intake/booking/classification and housing process at the MJ, as well as intake and processing at RCCC for both male and female inmates.

At the MJ, on several occasions during the day shift (0600-1800 hours) and night shift (1800-0600 hours), the Assessment Team observed the entire intake, booking, medical and mental health screening, and housing (including "dress-in") process. On different dates and shifts, the Assessment Team observed numerous inmates go through the entire process from beginning to end. Additionally, the Assessment Team observed several other inmates go through various parts of the process, whether intake, booking, medical screening, mental health screening, or housing. Note: in many of the latter cases, Assessment Team representatives would alternate observing particular inmates go through each phase of the process, meaning several more of these inmates were observed through the entire process.

There is no video orientation provided at the MJ, however, inmates that are being housed at the MJ are shown a PREA video. This video is shown after the inmate has been dressed out into jail issued clothing in the felony holding tank. When observing the MJ dress out process the Assessment Team noted that there are inconsistencies on how the different teams process inmates through the dress out process. One of the teams was observed providing all inmates with an Inmate/Detainee Handbook at the time of the dress out. Another team advised the inmate that the Inmate/Detainee Handbook was being offered and they could obtain one from the counter as they were placing the identification band on the inmate. Another team didn't offer or provide the inmates with an Inmate/Detainee Handbook during the dress out process. All of the teams required the inmates to sign the Inmate/Detainee PREA Attestation Form indicating that they had received the inmate handbook and had viewed the PREA education video, even though they had not received the inmate handbook.

At no time was there any verbal inmate orientation as to the jail rules, expectations, or information relative to programs, services or activities, nor was any information provided to inmates (including those with disabilities) with regard to emergencies, alarms, evacuations, disability programs or services. The

FINAL REPORT

Assessment Team also observed the classification process, and there was no verbal orientation provided during the classification interview either.

At the RCCC, the Assessment Team made numerous attempts to observe inmate processing; however, as most of the new arrivals are processed through the MJ, the team was unable to observe new arrivals being processed at RCCC.

The Assessment Team notes that at RCCC, ICE detainees are required to receive orientation. The RCCC detainee orientation is a typed 2-page document that notes "To Be Read To The Detainee" and reads as follows:

**The RCCC Detainee Orientation**

The following information must be read to all U.S. Immigrations and Customs Enforcement (ICE) detainees during intake/classification process after arrival to the Rio Cosumnes Correctional Center (RCCC). A signed copy of this document shall be placed in the detainee's file.

You are currently being detained by the U.S. Immigration and Customs Enforcement (ICE) pending the outcome of your immigration proceedings. This facility is the Rio Cosumnes Correctional Center (RCCC), which is operated by the Sacramento County Sheriff's Department. The facility is located in Sacramento, California.

The following is a brief overview of the RCCC policies and services available to you at the facility. Detailed information of each of the below items can be found in the RCCC Inmate and Detainee Orientation Handbook.

- Detainees housed at RCCC must follow all facility rules. These rules must be followed or you will be subject to disciplinary action. Anyone accused of violating a facility rule shall be provided a fair and impartial disciplinary process.
- All detainees will be counted a minimum of six times in a 24-hour period. These counts will generally occur before meals and during shift exchange. There is no talking or activities allowed during any count. All detainees will remain on their assigned bunks until count is clear.
- Meals are served three times a day. Special allergen free food trays are available for those with a doctor's order. Special religious food trays are available for those who are approved by the facility Chaplain.
- All detainees will be issued jail clothing, bedding, a towel, and personal hygiene kit. Laundry services for all clothing and bedding will be provided on a regular basis.
- All detainees will have access to telephones, mail services, incoming email services, visitation, televisions, outdoor recreation, religious

FINAL REPORT

programs, and a variety of reading materials. A schedule of programs services and daily activities is posted in your housing unit.

- All detainees will be afforded access to the law library. To visit the law library, you will need to send an inmate message request (KITE) to the law librarian. The librarian will schedule your visits.
- All detainees will have access to medical and psychiatric services 24 hours each day / seven days each week. Detainees will not be charged a co-payment for healthcare services. You can request to see medical or psychiatric staff by submitting a pink medical request (KITE) that is available in your housing location. Any medical or psychiatric emergencies should be reported to facility staff immediately.
- The ICE *Know Your Rights* video is shown regularly on facility televisions in English, Spanish and French. Information on how to contact your consulate is contained in the RCCC Inmate and Detainee Handbook.
- Additional information can also be found in the information packet posted in each housing location. This packet contains a variety of information related to pro bono legal services and how to pursue those services. This packet also contains information on how to contact ICE.
- Any ICE related questions should be directed to the onsite ICE representative or by completing an ICE inmate message request form (KITE). These request forms can be placed in the mailbox labeled "ICE" located in your housing location or given directly to the ICE representative.
- Any other questions not ICE related may be directed to housing officers or written on a RCCC inmate message request form (KITE). You will receive an answer in a timely manner.
- Do you have any questions?

You are being provided a copy of the RCCC Inmate and Detainee Handbook. You are encouraged to read through the handbook to familiarize yourself with the rules, regulations, policies and procedures to be followed while housed at RCCC.

Detainees are required to initial and certify that they were provided orientation. The staff member is required to also note if any translation service or interpreter was utilized to provide the information to the detainee.

**Staff Interviews**

The Assessment Team interviewed deputies assigned to the intake, booking and property area (assigned to escort new arrivals to their respective housing units) upon completion of intake processing). The Assessment Team also interviewed approximately 52 custody staff, which included deputies from every housing unit

FINAL REPORT

at the MJ and RCCC, where inmates are housed. Much of the interview information obtained relative to inmate orientation was inconsistent and wasn't in accordance with the aforementioned policy.

Most deputies indicated that all inmates are provided an Inmate/Detainee Handbook during processing. A few of the staff interviewed indicated that inmates are required to view a orientation video; however, the video referred to is actually specific to PREA and does not pertain to inmate orientation.

Nearly all of the housing unit deputies interviewed admitted that they (themselves) do not issue rulebooks to inmates upon arrival to their respective units. However, a few of the staff mentioned that they would provide them if the inmate asked for one.

Most of the intake, booking or housing unit staff indicated that they provide verbal orientation to inmates, or that orientation is normally given in any of those areas. A couple of the deputies mentioned they provide verbal orientation to inmates. Some staff stated that they provide the rules of the unit or basic expectations like use of the emergency call button, inmate responsibility during alarms, KITE's, and count process. However, this information is not specific to orientation-type material, such as available programs, services and activities, e.g., grievance process, library/law library, religious services, etc. including orientation material required to be covered by Title 15. Moreover, after being asked, these deputies acknowledged that they do not follow any script or written material, but rather provide these basic house rules from their memory. Although many of the deputies did acknowledge that they verbally provide the basic rules of the housing unit to the newly arrived inmates, the vast majority of them also admitted that that does not suffice as an official inmate orientation. The deputies further acknowledged that there is not a current process in place to log whether orientation was provided or to determine the specific orientation material that should be covered.

<u>**Inmate Interviews**</u>

During the inmate interviews, about two-thirds of the inmates interviewed indicated that they were not provided a rulebook. About ninety percent of the inmates stated that staff did not provide any form of orientation.

The inmates who acknowledged ever receiving a verbal orientation/information indicated that this orientation was of basic unit rules, but even most of those inmates believed that the information was more of the deputies' own house rules rather than a detailed inmate orientation. Some inmates admitted they received information from other inmates, such as their cellmates and/or "houseman". Some inmates stated that they felt lost and just learned about pertinent jail information such as programs and expectations from other inmates and not staff. Some inmates that received the Inmate/Detainee Handbook cannot read and therefore, they were not aware of the information contained in the handbook.

FINAL REPORT

Of the 8 ICE detainees interviewed; only one indicated that staff had read the orientation information to him. All detainees with the exception of one stated that they had been issued the handbook in booking.

**Conclusion**

The SCSD detention facilities do not accommodate disabled inmates during the inmate orientation process.

Disabled inmates (e.g., those with vision, hearing, speech, learning and developmental disabilities, as well as those with mental illness and other disabilities) are being held accountable for their actions, and are expected to understand the jail's rules and expectations. Yet the disabled inmates as well as the rest of the inmate population are not being informed of jail rules. Disabled inmates (such as those with vision, hearing, speech, learning and developmental disabilities, as well as those with mental illness and other disabilities) are not informed of available reasonable accommodations; they are not appropriately informed of available programs, services and activities; and they are not receiving the jail rulebook, or observing an inmate orientation video, or having specific rules or expectations explained to them by staff. As a result, the SCSD detention facilities are exposing disabled inmates to possible discrimination and exclusion from equal participation in the jail's programs and other activities.

The SCSD detention facilities do not provide (or adequately provide) inmate orientation information or materials, and do not accommodate disabled inmates (such as those with vision, hearing, speech, learning and developmental disabilities, or those with mental illness or other disabilities) during orientation. Because orientation is not provided, there is no mechanism to allow for EC and alternate or accessible methods in presenting inmate orientation materials or information.

As a result of the assessment, which included reviews of applicable policies and other documents, as well as staff and inmate interviews, findings for this area include:

- SCSD detention facilities staff are not adhering to Operations Order 04/08 Prisoner Orientation, which requires staff to provide each inmate with an orientation handbook and to give each prisoner a verbal orientation prior to being located in a housing unit. As a result:
  - There is no verbal inmate orientation information being provided (other than isolated cases where unit deputies provide an unscripted or unwritten account of the deputies' personal unit expectations); and
  - Inmates are rarely being issued jail rulebooks.

FINAL REPORT

In order for the SCSD detention facilities to come into compliance with Title II of the ADA, Operation Orders, and to ensure best practices, staff must ensure the following:

- The inmate orientation process must be comprehensive and provided in accessible formats;
- Vision-impaired and deaf/hearing-impaired inmates as well as those with learning disabilities shall be accommodated with alternate forms of communication, e.g., verbal communication, video/audio presentation, and written material (large print), in order to ensure EC in presentation of the information;
- Staff must effectively communicate the contents of the rulebook (handbook) and related materials to all inmates. This obviously includes inmates who are deaf or hearing-impaired, including those for whom written language is not an effective means of communication;
  - Staff may meet this obligation by providing a video of a qualified interpreter signing the contents of the jail rulebook, or by using on on-site interpreter or an interpreter through video interpreter services; and
  - Appropriate technology for viewing the video must be utilized.

The following information should be incorporated as part of the inmate orientation process:

- The purpose of the disability program;
- Availability of Title 15 and any pertinent existing and future disability-related forms or materials (in accessible formats to inmates with disabilities);
- The inmate grievance process and location of the forms (this should also include any possible future related forms or materials if implemented, e.g., request for Reasonable Modifications or Accommodation forms and information);
- Reasonable modifications or accommodations available to qualified inmates, e.g., SLIs for due process settings (i.e. inmate infraction hearings, notifications of charges, notices to appear) health care consultations, and classification interviews/processes;
- If implemented in the future, information regarding access to inmate staff readers or scribes, and availability of specialized library equipment for qualified hearing/vision-impaired and learning disabled inmates such as text magnifiers, large print materials, audiocassette tapes;
- The process of personal notification by staff and possible use of a dry erase/chalk board and/or lighted electrical banner for notification of announcements, visits, ducats (appointment slips) or messages in the housing unit;
- Access to a TTY and volume control telephone;
- Access to a closed captioning television in the housing unit;

FINAL REPORT

- Information regarding emergency alarms, evacuations, announcements and notices; and
- The SCSD detention facilities inmate assistance program (if further developed in the future to include assistance to hearing, vision, speech, learning and intellectually disabled inmates).

**References**

**28 CFR § 35.130(a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 C.F.R. 35.106** states that a public entity shall make available to applicants, participants, beneficiaries, and other interested persons information regarding non-discrimination on the basis of disabilities in the services, programs, or activities of the public entity.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates delivery of inmate orientation at each of CDCR's adult institutions. Examples of required information for mobility impaired inmates include the following: the purpose of the inmate disability program, availability of Title 15, rulebooks, availability of grievances and reasonable accommodation requests, reasonable accommodations/modifications available to qualified inmates, inmate assistance program or assistance that may be provided by inmates (if applicable), information regarding emergency alarms, evacuations, etc.*

As a result of the initiation of an administrative investigation (by the United States Department of Justice [USDOJ]) due to a complaint filed pursuant to Title II of the ADA, and Section 504 of the Rehabilitation Act of 1973, in March 2013, a settlement agreement was reached between the United States of America (United States Department of Justice) and the County of Arapahoe, Colorado.

The settlement agreement specifically applied to inmates who were deaf or hearing impaired. As related to inmate orientation, terms and conditions of the settlement agreement included but were not limited to the following:

FINAL REPORT

Inmate handbook:

At the earliest reasonable time, Personnel will effectively communicate the contents of the Inmate Handbook and similar publications to all inmates who are deaf or hard of hearing, including those for whom written language is not an effective means of communication. Personnel may choose to meet this obligation by providing a video of a qualified interpreter signing the contents of the Inmate Handbook, along with appropriate technology for viewing, or by providing a qualified interpreter to interpret the contents of the Inmate Handbook to the inmate who is deaf or hard of hearing.

FINAL REPORT

## Alarms/Emergencies

The Sheriff's Department County of Sacramento Correctional Services Operations Orders pertaining to the emergency response and evacuation processes include: 02/01 Use of Force; 02/04 Weapons, Tactical Weapons, and Specialized Equipment; 03/01 Critical Incident Response Plan; 03/09 Fights, Riots, Hostage and Minor Disturbances; 03/12 Evacuation Plan – Main Jail; and 03/13 Evacuation Plan – RCCC. The Assessment Team reviewed the above listed Operations Orders to identify whether they contained any language specific to ADA or inmates with disabilities.

Specifically, the Assessment Team reviewed the operations orders to determine if language included: information about staff access to a current roster/list from an electronic tracking system for disabled inmates; requirements for inmates during emergency alarms or evacuations, e.g., return to their assigned cell/bed areas, freeze movement, 'take a knee' on the ground, face the nearest wall, sit on the ground, lay on ground in a prone position, or await for specific verbal instructions from staff; inmate identification vests (or similar process), e.g., for mobility, deaf/hearing, and blind/vision impaired inmates; inmate notification; reasonable accommodations/assistance (during evacuations or emergencies); effectively communicating (as feasible) with inmates whose disability may make it difficult for them to either know or understand that an alarm or emergency may be taking place, or whose disability may pose a barrier to communications and therefore may encounter difficulties understanding how to appropriately react to emergencies, e.g., deaf/hearing impaired inmates as well as those with an intellectual (developmental) disability; de-escalation for inmates with mental illness (as applicable), and special considerations for mobility impaired inmates or others during movement or transport.

None of the operations orders reviewed contained any ADA or inmate disability language or references, and all were silent regarding an expectation to either return to their cell/bed area, freeze movement, 'take a knee' on the ground, face the nearest wall, sit on the ground, lay in a prone position on the ground, or await other verbal instructions.

Operations Order 03/12, Evacuation Plan - MJ, Section II.D. outlines the evacuation priorities of individual housing units:

1) Evacuation of prisoners exposed to immediate risk of injury;
2) Evacuation of the infirmary (2-West) and the sub-acute (2-East) prisoners;
3) Evacuation of female prisoners;
4) Evacuation of High Security, Disciplinary Housing, and acute psychiatric prisoners separate from the general population; and

FINAL REPORT

5) Evacuation of Booking and Court Holding areas.

Section II.F., states in part, "Each housing unit shall follow the evacuation procedure contained in this Order unless directed otherwise by the Incident Commander:

1) Housing unit officers should account for prisoners in their housing area, by both locator card and Control Point Group List (PF-11) unless the resources are unavailable; and

2) If locator cards or the PF-11 lists are unavailable, handwritten lists or location boards may be substituted."

The Assessment Team also reviewed the following list of Operations Orders to ascertain whether pertinent ADA language existed as well: 01/1[illegible] Division Safety Program; 01/15 Reporting of Incidents and Crimes; 02/02 Use of restraint Devices; 02/03 Use of Pro-Straint Chair; 02/05 Custody Emergency Response Team; 02/06 Prisoner Searches; 02/12 Transportation of Prisoners; 03/02 Fire Prevention – Main Jail; 03/03 Fire Suppression – Main Jail; 03/04 Fire Prevention – RCCC; 03/05 Fire Suppression – RCCC; 03/06 Emergency Systems and Equipment; 03/07 Medical Emergencies; 03/11 Natural Disasters, and 03/15 Escape Response. These Operations Orders also did not contain any relevant ADA or inmate disability information. However, most of these Orders will be outlined with noted concerns and recommendations for other ADA-related issues, and will be detailed in other sections of this report as applicable.

FINAL REPORT

**Observations**

During the time periods the Assessment Team was on grounds at the MJ and RCCC facilities, the team members observed a few emergency alarms primarily from adjacent housing areas or just outside the respective units. The Assessment Team did not observe any visual alarms (e.g., flashing lights) to alert deaf/hearing-impaired inmates as to an emergency situation or incident. It appears that the alarms are audible only. A deaf inmate housed at RCCC complained to the Assessment Team that there is no mechanism for him to immediately or quickly learn of an alarm sounding.

There were no evacuations; therefore, the Assessment Team was unable to observe these processes.

In touring the housing units, most of the units/pods had notices for emergency and fire exits routes posted, but several units/pods throughout the MJ and RCCC did not. This will be outlined in more detail in another section of this report.

**Staff Interviews**

The Assessment Team interviewed one or more deputies from every housing unit at both the MJ and RCCC facilities to obtain information relative to staff

knowledge and practices, and their expectations of inmates during emergencies and inmate evacuations. The Assessment Team asked questions pertaining to: identification of disabled inmates or staff access to an updated tracking roster of disabled inmates; requirements or expectations for inmates during emergency alarms, e.g., freeze movement, 'take a knee' on the ground, sit on the ground, face the nearest wall, lay on ground in a prone position, or await for specific verbal instructions from staff; inmate identification vests (or similar process), inmate notification; reasonable accommodations/assistance (during evacuations or emergencies); effectively communicating (as feasible) with inmates whose disability may make it difficult for them to either know or understand that an alarm or emergency may be taking place, or whose disability may pose a barrier to communications and therefore may encounter difficulties understanding how to appropriately react to emergencies; and special considerations for mobility impaired inmates or others during movement or transport.

All staff interviewed acknowledged that there is no master tracking roster of identified inmates with disabilities. Most staff were not aware of the Operations Orders requirement for staff to use the Locator Cards during emergency evacuations, and there was no consistency in a primary method with which staff would identify inmates during an emergency evacuation.

Staff provided the following responses or cited the following methods with which they would identify an inmate as having a disability or special need: they (staff) are regularly assigned to their specific unit and already know who their disabled inmates (and those with medical needs) are; observing and talking/interviewing with the inmates; the JIMS system PF2, PF4, and PF10 screens (although some staff admitted that this system usually does not tell them if an inmate has a specific disability); Locator Cards and attached medical chronos for health care appliances/assistive devices (inmates are required to maintain the chronos on their persons); face-to-face identification check (using Locator Cards); white boards in control booths (written in grease pencil) for RCCC housing units; and the white board in the Nurses Station (second floor medical at MJ) will indicate 'MA Assist' for inmates who require extra care or assistance; disabled inmates are usually housed on the second floor medical unit (for MJ).

The Assessment Team asked the housing unit deputies about the current practices and expectations of inmates during emergency alarms. Staff mentioned that they conduct periodic evacuation drills for readiness. The overwhelming majority of staff indicated that inmates are ultimately expected to 'lockdown' and return to their respective assigned cells/bed areas. The inmates must turn and face the nearest wall, place their hands inside the waistband of their pants, and stop all movement. About 20 percent of the housing unit staff stated that they use discretion as to whether to require the inmates to lay on the ground in a prone position. Some staff said they use further discretion whether

FINAL REPORT

to use physical force to ensure an inmate assumes a prone position (if an inmate does not voluntarily assume such position).

However, most of these staff acknowledged that if they are aware that a particular inmate has a mobility or other disability that precludes them from assuming a prone position, then an exception would be made, and those inmates would not be required to lay or sit on the ground if they were unable to do so.

Most staff acknowledged that when they respond to an emergency alarm in a unit where they are not regularly assigned, it is very difficult or impossible to know each inmate and whether any inmates have a disability that could prevent them from immediately being aware of an alarm, or from being able to immediately face the nearest wall or assume a prone position on the ground. Some of the staff admitted that the wristband and locator card identification systems are not effective for emergency alarm situations. Most of the staff also thought a more visible type of identification system could be more appropriate for quick identification as well as staff safety during emergency alarm situations, e.g., identification vests for specific types of disabilities, e.g., mobility, blind/vision, and deaf/hearing.

Nearly all staff interviewed stated they would provide any inmate accommodations as necessary during an evacuation or emergency situation. For emergency inmate notification, staff make a verbal announcement on their cell/housing unit intercom system. Staff indicated that they have the capability to do a major group release if necessary.

Staff seemed to be very accommodating with their responses. Most staff said they would use their assigned radio to call for staff assistance as warranted, and would provide any assistance to disabled inmates as needed, including physically helping them, obtaining a wheelchair if necessary, etc. During evacuations, staff cycle each inmate out one-by-one to make sure no inmates are left behind, and they check each cell/bed area, common area, and other areas.

**Conclusion**

Listed below are noted concerns regarding the Sheriff's Department County of Sacramento Correctional Services Operations Orders and/or staff practices and expectations of disabled inmates during emergencies and alarms:

- The aforementioned applicable Operations Orders must contain ADA or disability-related language;
- There must be a comprehensive inmate disability screening and identification process as well as an electronic tracking system in place to ensure all staff are aware of all inmates with disabilities, physical limitations, and accommodations/assistance needs;

FINAL REPORT

- Operations Order 03/12, Evacuation Plan – MJ Section II.F. must reflect any future modifications for staff responsibilities toward identifying inmates during emergencies and alarms;

- There must be written information contained in the applicable Operations Orders regarding directives or expectations for inmates (including disabled inmates) during emergencies and alarms;

    - There must be staff consistency with their expectations of inmates during emergency alarms;

    - Without any directive from the applicable Operations Orders, most staff are directing inmates to face the nearest wall (with their hands placed inside the waist bands of their pants), while other staff instruct inmates to lay on the ground in a prone position. As stated above, a portion of these staff also indicate they may use physical force if an inmate refuses to lay in a prone position;

    - Because of an inadequate health care screening process for disabilities, physical limitations, and accommodation needs, staff don't generally know which inmates have a disability, or who has the ability to assume a prone position on the ground, or who may need assistance;

    - Unless the Operations Order is modified to indicate that no inmates will be required to lay on the ground in a prone position during alarms or emergencies, then the applicable Order must contain language that mobility-disabled inmates will not be forced to a prone or in a seated position on the ground during an emergency alarm;

- There must be written information in the applicable Operations Orders regarding inmate notification (during alarms or emergencies);

- There must be written information in the applicable Operations Orders regarding identifying accommodation/assistance needs for disabled inmates, so staff can provide help as necessary during emergencies or alarms;

- There must be written information in the applicable Operations Orders regarding communicating appropriately (effectively) during emergencies or alarms, with inmates who may have a disability that provides a potential barrier to communications;

- Any prioritization for evacuating individual housing units and/or disabled inmates must be articulated in the appropriate Operations Orders;

FINAL REPORT

FINAL REPORT

  - Operations Order, 03/12 Evacuation Plan – MJ, Section II.D. as shown above, outlines the guidelines in determining how to prioritize the evacuation of individual housing units. However, in the past nearly all disabled inmates either were or were assumed to be housed on the MJ second floor (2/W and 2/E). There is no priority listed in the Order for the evacuation of disabled inmates. Although a large percentage of disabled inmates at the MJ are still housed on the second floor infirmary, many of them (various disabilities) are now being housed in other areas of the MJ as well as the RCCC.

- There are no visual alarms (audible only);
  - Deaf inmates would not quickly be alerted to alarms or emergencies;
- All housing units/pods must have the notices for emergency and fire exits routes posted;
- The SCSD detention facilities should give consideration to other more visible and easily identifiable methods of inmate identification (during emergencies) other than wristbands, e.g., identification vests for mobility, deaf/hearing-impaired and blind/vision impaired inmates.
  - Staff acknowledged that they are largely unfamiliar with inmates, their disabilities, or their special needs, when they (staff) respond to other housing units for alarms or emergencies. Most staff indicated that the wristband identification process is not effective for emergency situations.

**References**

**28 CFR § 35.105 (a)** requires that a public entity evaluate its current policies, and practices, and to the extent modification of any such policies, and practices is required, the public entity shall proceed to make the necessary modifications if they do not or may not meet the requirements Title II.

**28 CFR § 35.130 (b)(7)** requires a public entity to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

**28 CFR 35.130(b)(1)** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Evacuation Procedures:*

*Each institution/facility (DPP designated institutions, nondesignated institutions, and reception centers) shall ensure the safe and effective evacuation of inmates with disabilities.*

*Local evacuation procedures shall be adopted at each facility.*

*Each institution/facility (DPP designated institutions, nondesignated institutions, and reception centers) shall ensure custody staff in housing units where inmates with disabilities that impact placement reside maintain a copy of the identification card/picture for that inmate with the inmate roster, to alert unit staff of the special needs required for emergency evacuation of the inmate. Special needs may include personal notification for hearing-impaired inmates, or assistance provided to vision or mobility impaired inmates in responding to emergency situations.*

*Evacuation procedures shall be effectively communicated to disabled inmates during orientation process. These procedures shall also be incorporated into unit staff's post orders.*

FINAL REPORT

## Mechanical Restraints/Searches/Count

The Minimum Standards for Local Detention Facilities, Title 15-Crime Prevention and Corrections, Division 1, Chapter 1, Subchapter 4, Article 5. Classification and Segregation, contains the following section applicable to Mechanical Restraints:

§ 1058. Use of Restraint Devices.

The facility administrator, in cooperation with the responsible physician, shall develop written policies and procedures for the use of restraint devices and may delegate authority to place an inmate in restraints to a physician. In addition to the areas specifically outlined in this regulation, at a minimum, the policy shall address the following areas: acceptable restraint devices; signs or symptoms which should result in immediate medical/mental health referral; availability of cardiopulmonary resuscitation equipment; protective housing of restrained persons; provision for hydration and sanitation needs; and exercising of extremities.

Restraint devices shall only be used on inmates who display behavior which results in the destruction of property or reveal an intent to cause physical harm to self or others. Restraint devices include any devices, which immobilize an inmate's extremities and/or prevent the inmate from being ambulatory. Physical restraints should be utilized only when it appears less restrictive alternatives would be ineffective in controlling the disordered behavior.

Inmates shall be placed in restraints only with the approval of the facility manager, the facility watch commander, or the designated physician; continued retention shall be reviewed a minimum of every two hours. A medical opinion on placement and retention shall be secured as soon as possible, but no later than four hours from the time of placement. The inmate shall be medically cleared for continued retention at least every six hours thereafter. A mental health consultation shall be secured as soon as possible, but in no case longer than eight hours from the time of placement, to assess the need for mental health treatment.

Direct visual observation shall be conducted at least twice every thirty minutes to ensure that the restraints are properly employed, and to ensure the safety and well-being of the inmate. Such observation shall be documented. While in restraint devices all inmates shall be housed alone or in a specified housing area for restrained inmates which makes provisions to protect the inmate from abuse. In no case shall restraints be used for discipline, or as a substitute for treatment.

The provisions of this section do not apply to the use of handcuffs, shackles or other restraint devices when used to restrain inmates for security reasons.

The SCSD detention facilities Operations Orders applicable to inmate searches, mechanical restraints, and inmate counts, are outlined in the following Orders:

FINAL REPORT

02/01 Use of Force; 02/02 Use of Restraint Devices; 02/03 Use of Pro-Straint Chair; 02/05 Custody Emergency Response Team (CERT) and Cell Extraction Procedure; 02/06 Prisoner Searches; 02/12 Transportation of Prisoners; 04/01 Intake, Search, Reception and Holding; 04/04 Use of Sobering Cell; 04/05 Use of Safety, Segregation, North Holding #2, and Multipurpose Rooms; 06/04 Counts and Lockdowns; 06/06 Organized Searches in a Housing Unit (Shakedowns), and 06/08 Court Pull Procedures.

The CHS Administrative Policies applicable to inmate searches, mechanical restraints, and inmate counts, are outlined in the following policies: 1413 Use of Restraints and the Pro-Straint Chair; 1414 Restraint Check Method; 1415 Patients in Safety Cells; 1416 Patients in Segregation; and 1429 Patients in Segregated Cells at Intake.

Operations Order 02/01 Use of Force, states in part, "Officers shall use only that force which is reasonable, given the facts and circumstances perceived by the officer at the time of the event, to effectively bring an incident under control. The reasonableness of the force used must be judged from the perspective of a reasonable officer on the scene at the time of the incident."

It also states in part, "The application of force shall cease when control of a prisoner or situation is achieved and shall not be used as a form of punishment. The objective in applying reasonable force is to control persons and incidents thereby minimizing injury to all persons involved."

With regard to Alternative Resolutions in Lieu of Force/De-escalation, it states,

"Staff should be cognizant of the unique environment in a correctional setting. Each situation shall be evaluated to determine the urgency of enforcement action. In situations where an immediate response may escalate or aggravate the situation, officers should consider the containment of the event as a tactic. Further, staff shall appropriately de-escalate the level of force in response to the suspect's level of compliance. Possible alternative resolutions in lieu of the application of force include:

- Containment of the situation;
- Shutting off utilities (Water, Electricity);
- Negotiation; and
- Waiting situation out until suspect(s) voluntarily comply

Operations Order 02/02 Use of Restraint Devices, states in part, "Restraint devices shall only be used on prisoners who display behavior that results in the destruction of property or reveals the intent to cause physical harm to self or others. Physical restraints should be utilized only when it appears less restrictive alternatives would be ineffective in controlling the disorderly behavior. The use of restraints shall not be used as a form of discipline or as a substitution for treatment. Sworn staff utilizing restraints shall be trained in the proper use of the

FINAL REPORT

device(s). The provisions of this order do not apply to the use of handcuffs, shackles, or other restraint devices when used to restrain prisoners for security or transportation purposes. Sworn staff has the option of using an appropriate authorized restraint device to move or restrain a prisoner for security reasons."

The Order also states in part, "Restraint devices include any devices which immobilize a prisoner's extremities and/or prevent the prisoner from being ambulatory. The following restraint devices are authorized for use:

- Pro-Straint Chair;
- Protective Helmet;
- Handcuffs / Leg Shackles / Belly Chains;
- Posey (5-point) soft ties;
- Leather leg and/or wrist cuffs;
- Plastic Handcuffs;
    - Plastic cuffs should only be used when none of the more conventional methods can be used due to the size of the inmate or lack of available equipment. A cutting tool must be readily available in case the cuffs need to be removed;
- Multi-Prisoner Cuff Chains (used for transportation/security only); and
- R.E.A.C.T. Belt (used only in court when authorized).

With regard to Procedures and Observation of Restrained Prisoner, the Order also states in part, "Custody staff shall follow these procedures when restraining prisoners, who threaten or display behavior that results in the destruction of property or reveal an intent to cause physical harm to self or others, in restraint devices: Prisoners shall be placed in restraints only with the approval of the watch commander or designated watch commander;

- Restraints shall not be used in a manner that would cause unnecessary injury or discomfort. Only sworn staff shall apply and remove restraints. Sworn staff applying the restraints shall always thoroughly search the prisoner, double-lock the restraints, and check all restraints to reduce the risk of injury to the inmate;
- A "Spit Net" will be used when appropriate to prevent spitting or biting;
- While in restraint devices all prisoners shall be housed alone or in an area that will protect the person from abuse;
- A custody supervisor shall ensure the prisoner's sanitary needs are met;
- A medical evaluation shall be requested and conducted, if possible, within the first fifteen (15) minutes and every two hours thereafter. Prisoners restrained for a period exceeding six (6) hours shall require a medical evaluation prior to continuance of such restraints;
- Custody staff shall conduct direct visual observation of the restrained prisoner at least twice every thirty (30) minutes to ensure the restraints are properly employed and to ensure the safety and well-being of the prisoner;

FINAL REPORT

- A custody supervisor shall conduct a direct visual observation once every thirty (30) minutes;
- Continued retention in restraints beyond one hour shall be reviewed and approved by the watch commander or designated watch commander. Clear and articulable facts must exist to justify continued retention;
- A mental health evaluation shall be requested and conducted as soon as possible but within six (6) hours of placement in restraints. Prisoners restrained for a period exceeding six (6) hours shall require a mental health evaluation prior to continuance of such restraints."

The Order further states in part, "Prisoners housed in the Acute Psychiatric Unit (JPS) at the **Main Jail**, shall require the consent of the psychiatrist or designee prior to being placed in restraints except when emergency circumstances exist;

- Upon the request by JPS personnel to restrain a prisoner, custody staff shall notify a watch commander and receive additional authorization;
- Prisoners shall be restrained in those cells designated for JPS use and JPS staff shall primarily be responsible for observation of the prisoner;
- Custody staff assigned to the medical floor will be responsible for following the procedures outlined in Section III."

With regard to dialysis treatment, the Order states in part, "Restraints will not be routinely used on prisoners receiving dialysis treatment. Limitations of the use of restraints during dialysis:

- Restraints will only be applied on inmates who display behavior which results in the destruction of property or reveals an intent to cause physical harm to self or others; and
- An individualized assessment of any need for restraints will be made for each inmate who receives dialysis treatments."

Operations Order 02/03 Use of the Pro-Straint Chair, states in part, "The Pro-Straint Chair is a restraint device which immobilizes a prisoners extremities and/or prevents the inmate from being ambulatory. Other restraint devices that may be utilized with the Pro-Straint Chair are:

- Handcuffs / Leg shackles;
- Leather leg and/or wrist cuffs;
- Protective helmet; and
- Soft restraints attached to the side of the Pro-Straint Chair."

The Order also states, "Custody staff shall follow these procedures when restraining prisoners, who threaten or display behavior that results in the destruction of property or reveal an intent to cause physical harm to self or others, in the Pro-Straint Chair;

- The Pro-Straint Chair shall not be used in a manner that would cause unnecessary injury or discomfort. Only sworn staff shall apply and remove

FINAL REPORT

the restraints. Sworn staff placing a prisoner into the Pro-Straint Chair shall always thoroughly search the prisoner and double-lock and check all restraints/straps to reduce the risk of injury to the prisoner.;

- Prisoners may be placed in the Pro-Straint Chair with their hands handcuffed behind their back or with the prisoners arms handcuffed to the sides of the Pro-Straint Chair with soft restraints or handcuffs;
- If it becomes necessary to hold the prisoner handcuffed behind the back for more than one hour, the prisoner should be released from the metal handcuffs and re-handcuffed to each side of the Pro-Straint Chair with soft or "Posey" restraints or handcuffs;
- While in the Pro-Straint Chair, a prisoner shall be housed alone or in an area that will protect him/her from abuse;
- Custody staff shall notify a custody supervisor and request medical staff if the prisoner's condition appears to deteriorate;
- In addition to the cardiopulmonary resuscitation (CPR) equipment that is maintained at each medical station, rescue breathing "pocket" masks and Automated External Defibrillators are strategically placed throughout each facility, available for rapid emergency response in the event that CPR is necessary;
- A medical evaluation shall be requested and conducted, if possible, within the first fifteen (15) minutes and every two hours thereafter. Prisoners restrained in the Pro-Straint Chair for a period exceeding six (6) hours shall require a medical evaluation prior to continuance of such restraints;
- Custody staff shall conduct direct visual observation of a prisoner in the Pro-Straint Chair at least twice every thirty (30) minutes to ensure the restraints are properly employed and to ensure the safety and well-being of the prisoner;
- A custody supervisor shall conduct a direct visual observation once every thirty (30) minutes; and
- A mental health evaluation shall be requested and conducted as soon as possible but within six (6) hours of placement in the Pro-Straint Chair. Prisoners restrained for a period exceeding six (6) hours shall require a mental health evaluation prior to continuance of such restraints."

Operations Order 02/05 Custody Emergency Response Team (CERT) and Cell Extraction Procedures, states in part, "The intent of this is to establish consistent and safe methods to handle critical incidents that may require the utilization of C.E.R.T. and the implementation of cell extraction procedures to reduce the risk of injury to staff and prisoners. Safe procedures to extract a violent, non-cooperative or armed prisoner from his/her cell who fails to comply with direct orders will be addressed. Only the amount of force necessary to overcome resistance and maintain control shall be used during a cell extraction. The use of force shall cease when control of a prisoner or situation is achieved and shall not be used as a form of punishment. This policy is to be used in conjunction with,

FINAL REPORT

but does not supersede, either the General Order or Correctional Services Operations Order regarding the use of force."

With regard to cell extraction procedures, the policy states in part, "The C.E.R.T. Sergeant or designee may take the following steps during the cell extraction:

- Direct the prisoner to voluntarily exit the cell;
- Direct the prisoner to comply with the commands given to him/her so that he/she can be escorted safely out of the cell;
- Give the prisoner reasonable time to comply with the commands;
- If the prisoner does not comply, the C.E.R.T. Sergeant or designee will direct the extraction team to remove the prisoner
- The C.E.R.T. Sergeant or designee will determine if the prisoner will be placed in:
  - An authorized restraint device(s) as per Operations Order 02/02, Use of Restraints; and
  - A safety or segregation cell, multipurpose room, or other area where the prisoner can be regularly monitored and safe from other prisoners as per Operations Order 04/05, Use of Safety Cell, Segregation Cell, North Holding #2, and Multipurpose Rooms;
- If the prisoner and/or staff are injured, necessary medical treatment will immediately be summoned. Treatment of the injured party will occur when the scene is rendered safe."

Operations Order 02/06, Prisoner Searches, states in part, "Intake staff shall use the type of search, level of force and means of restraint necessary to conduct a thorough search of combative, uncooperative or high-risk arrestees." It also states, "All strip searches shall be conducted individually and in an area of privacy so that the search can be observed only by officers participating in the search. Only necessary personnel shall be present during the search. At least two sworn personnel shall participate in a search."

Operations Order 02/12, Transportation of Prisoners, states in part, "Prior to transporting a prisoner from another facility, transport staff should check with custody staff, medical staff, and/or psychiatric staff to determine if the prisoner has any special needs or to determine any anticipated behavior.... Transporting deputies shall minimally conduct a pat-down search and metal detector search consistent with departmental guidelines on all prisoners before placing the prisoner in the vehicle.... Transporting deputies shall ensure that all prisoners are restrained. All restraints that have a locking cuff will be double locked. All prisoners will be restrained by one of the following means:

- Handcuffs;
- Security Belly/Waist Chains;
- Leg Chains/Shackles; and
- Multiple Prisoner Chains (four, six, ten, chains).

FINAL REPORT

The Order also states, "If a vehicle needs to be evacuated at any time during a transport, deputies may have prisoners stand, sit, kneel, or lie prone in a safe area. One deputy shall monitor the prisoners. Medical needs, not perceived as emergencies, shall be attended to by medical staff upon arrival at the destination or as soon as practical."

Operations Order 04/01 Intake, Search, Reception and Holding states in part, "If a strip search is required, the search shall be performed in accordance with Operations Order 02/06", and also states, "telephone access to the prisoners will be provided in accordance with Operations Order 06/13-Telephone and TDD/TTY Equipment Access."

Operations Order 04/04 Use of Sobering Cell, states in part, "Prisoners placed in the sobering cell should be medically cleared for custody by medical staff, and should not have a medical condition which requires emergency medical treatment. It also states, "Custody staff shall perform direct visual observations of prisoners in a sobering cell no less than once every half hour. Each check shall include a visual check of the prisoner to ensure he or she is breathing regularly. An arousal attempt to ensure the prisoner will respond to verbal or pressure stimulation shall be done by custody staff." It further states, "Prisoners will not remain in a sobering cell longer than six (6) hours without an evaluation by medical or custody staff to determine if the prisoner has an urgent medical problem", and "[i]f the prisoner has a serious medical condition, he or she will be removed from the sobering cell. Urgent medical needs will be addressed by available medical staff or the prisoner will be referred to the appropriate medical facility. A report will be taken to document the incident."

Order 04/05 Use of Safety, Segregation, North Holding #2, and Multipurpose Rooms, states in part, "The Safety Cell shall only be used to hold those prisoners who threaten or display behavior that endangers self, other people, or property. Examples include, but are not limited to:

- Combative or violent behavior;
- Threats or attempts to harm self or others; and
- Destruction of property."

The Order also states, "Prisoners placed in physical restraints may be placed in a safety cell" and " shall only be kept in a safety cell until they are no longer a danger to self or others and/or they no longer pose a threat to the safety or security of the facility."

The Order further outlines the following:

"Custody staff shall make reasonable accommodations to provide prisoners access to the inmate telephone system in accordance with California Penal Code 851.5. Custody staff shall document the telephone access for prisoners placed

FINAL REPORT

in segregation cells and/or will document the reasons why telephone access is restricted;

Prisoners in housing units who are in need of immediate mental health services referral and/or have been placed in restraints may be temporarily placed in a multipurpose room or North Holding #2 at RCCC for observation;

Custody staff shall notify medical staff within fifteen (15) minutes that a prisoner is temporarily housed in a safety or segregation cell and shall work with medical staff to address the nutritional, fluid, and hygiene needs of the prisoner; and

If a prisoner's behavior indicates that entering the cell to provide food, fluids, medical evaluation, or sanitary needs would result in a use of force incident or be unsafe for the prisoner, medical staff, or deputies, then a supervisor shall be notified."

Operations Order 06/04 Counts and Lockdowns, states in part, "Scheduled lockdowns and counts of all prisoners shall be conducted at least three times during each shift. Each shift shall be responsible for conducting one face-to-locator counts as described in Section III of this order conducted at the beginning of a shift."

The Order also states, in part, "Prisoners housed in infirmary cells shall be locked down at all times unless undergoing medical treatment which makes it necessary for them to be out of their cells... The standard procedure for advising prisoners to return to their cells is via a verbal announcement or an announcement over the intercoms located in the housing units."

Operations Order 06/06 Organized Searches in a Housing Unit (Shakedowns), states in part, "Routine searches shall be conducted by custody staff to maintain the security of the facility, provide for the safety of staff and inmates, and to provide for the division commander to manage operations. These described searches shall be conducted by sworn and non-sworn staff of all areas of the facility to which prisoners and/or the public have or could have access."

Operations Order 06/08 Court Pull Procedures, states in part, "If a prisoner(s) is leaving a custody facility to attend court in a different building, custody staff shall apply the proper restraints for transport. Prisoners restrained solely for security reasons are not subject to Title 15, Section 1058 restraint device requirements. The restraints may include a multi prisoner handcuff chain or belly chain/shackle combination. Although not preferred, handcuffs or other restraint devices may be used with supervisor approval." It also states, "Transport staff is responsible for segregating prisoners in the transport vehicle according to classifications."

Correctional Health Services (CHS) Administrative Policy 1413 Use of Restraints and the Pro-Straint Chair, states in part, "Restraint devices may be used to overcome resistance and to gain and maintain control of persons in custody.

FINAL REPORT

Restraint devices include any devices which immobilize an inmate's extremities and/or prevent the inmate from being ambulatory. The use of restraints shall not be used as a form of punishment. Except as defined separately under Jail Psychiatric Services Policy, the application of restraints is not initiated by medical staff."

The Order also states in various parts, "Deputies shall visually monitor inmates restrained in Safety and/or Segregation Cells at least twice every thirty (30) minutes. Deputies shall document observations in the Safety and/or Segregation Log", and "Deputies shall notify a Sergeant and request medical staff if the inmate's condition appears to deteriorate."

The order also indicates the following: the Sergeant shall review the continued need for restraint of the inmate at least once every two (2) hours; a medical evaluation shall be requested within the first fifteen (15) minutes and every two (2) hours thereafter which will include circulatory status and vital signs; and inmates restrained for a period exceeding eight (6) hours shall require a medical and mental health examination prior to continuance of such restraints.

The (CHS) Administrative Policy 1414 Restraint Check Method, states in part, "Restraint checks will be completed by medical staff on all individuals placed in physical restraints by custody. Patients in the Psychiatric Unit will be monitored by JPS staff. Restraint checks will be initiated within 15 minutes of the time medical staff is notified that an individual has been placed in restraints. Deputies will perform a visual restraint check twice every thirty minutes. Additional checks will be completed by medical staff when medically indicated to ensure restraints are properly employed. All necessary adjustments to the position of restraints will be completed by custody. Each restraint-check by nursing staff will be documented on the Restraint Check Flow Sheet by the Nurse. Medical evaluation, including the circulatory status and vital signs, will be completed on restrained individuals within the first fifteen minutes, and at least every two (2) hours, and as often as medically indicated."

The Order also states in part, "JPS will be notified of the individual's placement in restraints." The Order contains language that recommendations shall be made to custody every two hours for range of motion to all extremities based upon nursing judgment, and that in cases of persons with altered sensorium or possible history of diabetes or overdose, the physician shall be contacted.

Correctional Health Services (CHS) Administrative Policy 1416 Patients in Segregation states in part, "Inmates that have been removed from the general population and placed in segregation are evaluated daily by medical personnel, and these encounters are documented. Notations are made of any signs of physical illness or trauma. Observations regarding the patient's attitude or outlook such as depression, suicidal ideations shall be reported to Nursing Supervisor and documented." It also states, "Behavior permitting, inmates in

FINAL REPORT

administrative segregation are not to be deprived of privileges afforded other Inmates. All health care services are available."

The (CHS) Administrative Policy 1425 Patients in Segregated Cells at Intake, states in part, "Recently arrived arrestees with behavior serious enough to require isolation in a segregation cell may have underlying medical or mental health problems. Medical staff must be alerted when an arrestee, who may be unknown to facility staff, is placed in a segregation cell." It also states, "Evaluation shall emphasize detection of serious infectious disease, head trauma, acute states of delirium, and serious mental disorders which would require intervention to prevent life-threatening deterioration." The Order states, "Once the initial assessment has been completed, nursing staff will continue to assess, evaluate and document every six (6) hours", and "The Nursing Supervisor will be notified when a patient has remained in a segregation cell for eight hours. If an arrestee remains in the segregation cell for 24 hours, he/she must be evaluated by a physician. Should the nurse observe a significant change in the patient's condition or an injury, the Nursing Supervisor and the physician shall be notified immediately."

With the exception of mental illness, all of the aforementioned SCSD detention facilities Operations Orders and CHS Policies are silent regarding inmates with mobility impairments (or other disabilities). Likewise, there is no information regarding accommodations for mobility-disabled inmates (including those with prosthetic limbs), such as those inmates whose disabilities may prevent the application of restraint equipment in the ordinarily prescribed manner. Reasonable accommodations must be applied in these instances as warranted. There is no policy or procedure verbiage with respect to mechanical restraints being applied to ensure effective application while reasonably accommodating an inmate's mobility disability.

None of the Orders contain procedures for custody staff to follow relative to mobility-disabled inmates during the pat-down or strip search process. There is no information pertaining to inmates who use wheelchairs and/or who have severe mobility impairments and are unable to perform standard strip search maneuvers to be afforded reasonable accommodation to ensure a thorough search.

None of the Orders contain information or direction to staff relative to prosthetic devices, dental plates, or other removable items. There is no language pertaining to modifications for pat-searches or strip-searches, for inmates who have a disability (mental or physical) that prevents the employment of standard search methods.

None of the Orders contain procedures as to what to do in the event an inmate does not voluntarily remove or relinquish his/her prosthetic device during the unclothed body search process.

FINAL REPORT

Operations Order 06/04 Counts and Lockdowns does not require standing inmate counts, therefore there is no reasonable accommodation concerns for this area.

Operations Order 02/05 CERT and Cell Extraction Procedures is silent with respect to inmates with mobility disabilities (including those with prosthetic limbs). As a result, there are no specific procedures for staff to follow with regard to consideration for accommodations for mobility-disabled inmates or those with prosthetic limbs during these occurrences.

None of the aforementioned Operations Orders or CHS Policies pertaining to safety cells, sobering cells or Pro-Straint Chair, and Safety and Segregation Rooms contain any language pertaining to inmates with mobility disabilities, or prosthetic limbs, or directions for custody staff to follow regarding application of restraints on an inmate with a prosthetic limb prior to being placed in a Restraint Chair.

Operations Order 06/08 Court Pull Procedures does not contain language requiring staff to ensure that inmates with prescribed HCAs/ADs/DME are allowed to maintain their devices at all times, including the time period while the inmate is waiting in the court processing/holding area while being processed to or from court.

The Order (as well as all of the aforementioned Orders and Policies are silent with regard to possible assistance (staff assistance or inmate assistance), which could be provided for inmates with severe mobility impairments, e.g., wheelchair users, or those who may have difficulty ambulating to or from court, with or without an assistive device.

**Observations**

The Assessment Team did not observe the court processing, as those services are under the authority of the county and court system. The Assessment Team did observe the court processing (bus loading process) at both the MJ and RCCC jails. Detailed information is contained in the Transportation section of this report.

**The Assessment Team did not observe any physical restraints being actually applied.**

**Staff Interviews**

The Assessment Team did not interview deputies assigned to the court processing area, as the process is under the authority of the county and court system. The Transportation section of this report captures interviews of Transportation staff.

FINAL REPORT

Most of the custody staff (MJ and RCCC) that was interviewed was not aware of any specific procedures pertaining to special accommodations for mobility impaired inmates (or those with prosthetic devices) during the search restraint process, and they had not been trained in that area. Nearly all of the custody staff who were interviewed had not had to search a mobility impaired inmate wheelchair user or an inmate with a prosthetic limb. However, most indicated that they would conduct any searches in a separate setting (except during emergencies), and would preserve the inmate's dignity. Most of the staff indicated that they would accommodate inmates with reasonable accommodations as necessary, e.g., using a chair next to the wheelchair to transfer back and forth during the search process, etc.

**Inmate Interviews**

The Assessment Team did not interview any inmates during the transportation or court bus loading process. The Assessment Team did not interview any inmates during the court movement process, as the oversight authority for that process falls under the county and court system.

**Conclusion**

The SCSD detention facilities do not currently have adequate SCSD detention facilities Operations Orders or CHS policies/procedures and training in place to ensure that staff provides mobility-disabled inmates (including those with prosthetic limbs) the necessary accommodations with respect to using mechanical restraints and conducting searches. It is essential that this be incorporated into the orders, policies and training and that staff be sufficiently trained within the local policies.

The SCSD detention facilities Operations Orders should contain procedures with regard to possible assistance (staff assistance or inmate assistance), which could be provided for inmates with severe mobility impairments, e.g., wheelchair users, or those who may have difficulty ambulating to or from court, and other areas with or without an assistive device.

The SCSD detention facilities do not have a modified restraint policy for mobility-disabled inmates.

The SCSD detention facilities do not provide accommodations for mobility-disabled inmates who are subjected to body searches.

Operations Order 02/02 Use of Restraint Devices should include language regarding inmates with mobility disabilities. Specifically, the Order should include information relative to accommodations for mobility-disabled inmates (including those with prosthetic limbs), such as for those inmates whose disabilities may prevent the application of restraint equipment in the ordinarily prescribed manner. Language should also be included to indicate that reasonable accommodations must be applied in these instances as warranted. Procedure language should

FINAL REPORT

articulate that when applying mechanical restraints staff must ensure effective application while reasonably accommodating the inmate's mobility disability.

Operations Order 02/06 Prisoner Searches (and possibly other related Orders) should include procedures for custody staff to follow in the event an inmate does not voluntarily remove or relinquish his/her prosthetic device during the strip-search search process. The Order and procedures should contain information for staff to follow relative to mobility-disabled inmates (including wheelchair users, and those with prosthetic limbs, etc.) during the clothed body search process. The Order should contain information pertaining to inmates who use wheelchairs and/or who have severe mobility impairments and are unable to perform standard strip search maneuvers to be afforded reasonable accommodation to ensure a thorough search.

Operations Order 02/05 CERT and Cell Extraction Procedure, should contain procedures regarding staff considerations when preparing to cell extract or while extracting mobility-disabled inmates (including those with prosthetic limbs).

Operations Order 04/05 Use of Safety, Segregation, North Holding #2, and Multipurpose Rooms, should contain procedures regarding the handling and placement of inmates with mobility disabilities.

Operations Order 02/03 Use of Pro-Straint Chair and CHS Policy 1413 Use of Restraints and the Pro-Straint Chair, should contain procedures for staff to follow relative to the application of restraints for inmates with a prosthetic limb prior to being placed in a Restraint Chair.

Operations Orders 02/12 Transportation of Prisoners, and 06/08 Court Pull Procedures, should include procedures which would require staff to ensure that inmates with prescribed or authorized HCAs/ADs/DME are allowed to maintain their devices at all times, including the time period while the inmate is waiting or preparing to be processed to or from court. The SCSD detention facilities policies should also include procedures regarding providing assistance (staff assistance or inmate assistance) to inmates with severe mobility disabilities, e.g., wheelchair users, or those who may have difficulty ambulating to or from court (or in preparation for court) with or without an assistive device.

The SCSD detention facilities' administration and staff should ensure the following; assistance is provided to inmates who struggle or may struggle to push themselves in their wheelchairs moving to or from court.

The SCSD detention facilities staff must not temporarily remove canes or other assistive devices, which have been prescribed to or otherwise authorized for the inmates, and staff must receive training to that end. Custody staff must be trained and understand the medical referral process for inmates who may have difficulties ambulating and may need a reasonable accommodation such as an HCA/AD/DME, i.e. a cane, walker, or crutches.

FINAL REPORT

**References**

**28 CFR § 35.130(a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR 35.130(b)(1)** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

**28 CFR 35.130(b)(4)** A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

FINAL REPORT

**28 CFR 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

**28 CFR 35.130(b)(8)** A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

**28 CFR 35.130(h)** A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following relative to mobility-disabled inmates (and inmates with other disabilities):*
*Restraints*

- *Inmates who have a disability that prevents application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodation, under the direction of the supervisor in charge. Mechanical restraints shall be applied to ensure effective application while reasonably accommodating the inmate's disability.*

*Searches*

- *Inmates who have a disability that prevents the employment of standard search methods shall be afforded reasonable accommodation under the direction of the supervisor in charge. Such searches shall be thorough and professional, with the safety and security being the paramount concern.*

FINAL REPORT



- *Inmates who use wheelchairs and who may have severe mobility impairments and are unable to perform standard unclothed body search maneuvers shall be afforded reasonable accommodation to ensure a thorough search, including body cavities. If the search includes removal or disassembly of a health care appliance, it shall be conducted in a clean setting.*
- *If a search requires removal of the appliance, a compliant inmate shall be allowed to remove the appliance and tender it to staff. If forcible removal of an appliance from a noncompliant inmate is necessary, health care staff shall be available for consultation regarding the safe removal of the appliance.*
- *No inmate/parolee shall be required to lie or sit on extremely hot or cold surfaces to perform strip search maneuvers.*
- *Health appliances attached to the inmate's/parolee's body will be removed for inspection only during an unclothed body search.*
- *Complex devices (i.e., electronic medical devices, etc.) shall be disassembled for inspection only when there is reasonable cause to believe the inmate has concealed contraband inside the device. Inspection of such devices shall require approval from a Captain or above after consultation with appropriate medical staff. Only a trained professional shall disassemble such devices.*

- *To ensure the safety of staff and inmates/parolees, all institutions/facilities (DPP designated institutions, nondesignated institutions, and reception centers) shall establish procedures for the routine inspection of health care appliances, i.e., inspection of a mobility impaired inmate's prosthetic device whose disability does not impact placement.*

FINAL REPORT

## Release/Discharge/Transfer

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures applicable to the release and transfer of inmates, and the issuance and retention of HCAs/ADs/DME are outlined in: Operations Orders 02/12 Transportation of Prisoners, 04/03 Prisoner Clothing, Property and Funds, 04/07 Dress In/Dress Out Procedures, 04/09 Releases, 04/10 Property and Money Return and Release Procedure, Draft Operations Order Inmates With Disabilities - ADA, Policy 1423 Post Release Medical Care Planning, and Policy 1430 Reports of Disabilities and Impairments.

These policies are silent with respect to the disposition of prescribed HCAs/ADs/DME upon the release and transfer from the SCSD detention facilities. In an effort to identify the practice of whether inmates are allowed to retain their devices upon transfer or release, the Assessment Team interviewed custody, transportation and medical staff. The Assessment Team also observed the inmate release process at the MJ and RCCC.

### Observations

The Assessment Team observed the release process at the MJ and RCCC. During the observations there were no disabled inmates with prescribed HCAs/ADs/DME being released or discharged. The Assessment Team also toured the property rooms in both the MJ and RCCC. During the tour/observations the team identified numerous HCAs/ADs/DME that were stored in the property rooms at both MJ and RCCC property rooms. The team identified the following HCAs/ADs/DME being stored; a wheelchair, and numerous walkers, canes, and crutches.

### Staff Interviews

The Assessment Team interviewed transportation staff as well as deputies assigned to the inmate release process. Staff who were interviewed stated there is no tracking system to identify inmates who are disabled or who have an HCA/AD/DME prescribed to them. Some staff stated that if the inmates had an assistive device on their person, when released the inmates would be allowed to retain their respective device. Other staff stated that an inmate would not be released with the assistive device unless it was verified that it was his/her personal property.

The Assessment Team interviewed transportation staff relative to the transfer of disabled inmates with HCAs/ADs/DME. Staff stated that disabled inmates are transferred with their device. Staff also mentioned that inmates are allowed to use their HCA/AD/DME to access the transportation vehicle at which point the device is retained by staff until the transport has reached its final destination. The inmate is then re-issued their HCA/AD/DME to exit the transportation vehicle.

FINAL REPORT

The Assessment Team interviewed medical staff assigned to the area responsible for the issuance of HCAs/ADs/DME and custody staff involved in the release process. Medical staff stated that the HCAs/ADs/DME issued by the SCSD detention facilities do not become the property of the disabled inmates, and inmates are not supposed to take them when released. One RN stated that arrangements could possibly be made for permanent full time wheelchair users to be released with a wheelchair. Custody staff stated that the inmates could retain their HCAs/ADs/DME when released; however, wheelchairs are not provided to the inmates upon release. Staff stated that they would try to see if someone could pick the inmate up as opposed to allowing the inmate to be released with a county-issued wheelchair. Staff stated that there have been occasions when an inmate's personal HCA/AD/DME was put in stored property and they had to issue an HCA/AD/DME to the inmate upon his/her release.

**Conclusion**

There was conflicting information provided by staff whether inmates are allowed to retain their HCA/AD/DME when being released. In addition, the SCSD detention facilities do not have a policy regarding the retention of the devices for inmates that are being released. The Assessment Team observations of the property room storage that had HCAs/ADs/DME being stored was very concerning. There is not an effective tracking system in place for inmates that have been issued or arrived into custody with a HCA/AD/DME. There is a potential possibility that some disabled inmates are being released without their HCA/AD/DME, which are necessary for them to ambulate.

The SCSD detention facilities do not have a policy for the retention of HCAs/ADs/DME by disabled inmates that are being transferred. The Sacramento County Jail must incorporate provisions into their operations orders to ensure inmates are permitted to retain their prescribed or authorized HCAs/ADs/DME upon release, transfer or discharge.

**References**

**28 CFR § 35.130 (a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

FINAL REPORT

**28 CFR 35.130(b)(1):** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
>
> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

> (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.***

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Health Care Appliances:*

*Health care appliances shall be retained and maintained by inmates upon release to parole.*

*Transportation:*

*The special needs of inmates with disabilities shall be considered in transporting them. An inmate's special health care aids and appliances shall be transported with the inmate upon transfer.*

FINAL REPORT

## Transportation

The Sheriff's Department County of Sacramento Correctional Services Operations Orders applicable to inmate transportation are outlined in Operations Orders 02/12 Transportation of Prisoners, 02/13 Inter-Facility Transfers/Court Appearances, and 03/07 Medical Emergencies.

Per Operations Order 02/12, custody staff assigned to the transportation of prisoners shall transport prisoners in a manner that will provide the highest levels of safety and security available to both the prisoners and transport staff. Custody staff shall operate Sheriff Department vehicles in accordance with the General Orders and state law.

Sworn staff assigned to the correctional facilities may be responsible for transporting prisoners. Prisoner transport may occur for a variety of reasons and may be scheduled or unscheduled. Most scheduled transports are conducted by the Long Haul Transportation Unit, the Medical Transportation Units, and the RCCC Facility Transportation Bus Details; however, it may become necessary for the individual shifts to assign staff for transportation duties.

Situations where individual shifts may be responsible for supplying transportation staff may include:

- Unscheduled emergency medical transports "Med Runs".
- Transportations to the Sacramento County Mental Health Center (SCMHC).
- Late notice scheduled medical appointments.
- Warrant pickups from other agencies.
- Inter-facility transfers (FATRNS).

Medical Transport Units ("Med Transport") operate out of the MJ and RCCC. Each facility has designated personnel that are responsible for transporting inmates to and from scheduled appointments.

The Long Haul Transportation Unit operates out of the MJ Division and is supervised by the Intelligence Unit Supervisor. The Long Haul Transportation Unit is responsible for transporting inmates to various places within the State of California. The unit is minimally responsible for transporting the following inmates:

- All newly committed state prisoners to state facilities.
- Prisoners returning from state and county facilities back to Sacramento County per court order.
- Prisoners committed to state and mental health facilities.
- Persons held in other California jurisdictions on Sacramento County Superior Court and Sacramento County Juvenile Court warrants.

FINAL REPORT

- Sacramento County Juvenile Probation Wards to their guardian's county of residence.
- Local prisoners scheduled for satellite courts within the county.

The RCCC Facility Transportation Bus(es) ("branch bus") operates out of RCCC and is supervised by on duty RCCC shift supervisors. The RCCC buses are generally used for transporting prisoners scheduled for court and inter-facility transfers to and from the MJ and RCCC.

Transportation staff assigned to transport prisoners shall, prior to transporting a prisoner from another facility, check with custody staff, medical staff, and/or psychiatric staff to determine if the prisoner has any special needs or to determine any anticipated behavior.

Transporting deputies shall ensure that all prisoners are restrained. All restraints that have a locking cuff will be double locked. All prisoners will be restrained by one of the following means:

- Handcuffs
- Security Belly/Waist Chains
- Leg Chains/Shackles
- Multiple Prisoner Chains (four, six, ten, chains)

Unscheduled "med runs" are typically handled by the individual shifts. Staff assigned to a "med run" involving prisoners having an emergency medical issue that requires ambulance transport shall follow the procedures outlined in the previous sections.

Per Operations Order 02/13, Inter-Facility Transfers/Court Appearances, RCCC booking staff will verify releases and which prisoners will go on Bus #1. Releases from RCCC without their own transportation arrangements will be transported to the MJ. Releases from RCCC will be processed within the MJ Central Control lobby. Bus Crew #1 will coordinate with MJ Central Control in securing the Central Control Lobby and processing the group of released prisoners. Once the release process is completed the prisoners will be directed out through the Front Lobby.

RCCC prisoners with court appearances generally will not gather their cell/tank property as it is anticipated they will return to RCCC upon completion of the court appearance. RCCC Bus Crews will coordinate with Court Transportation for exchange of inmates in the MJ garage.

After transporting the first group of inmates to court, Bus Crew #1 will transport FATRNS to RCCC, focusing on taking the general population transfer inmates. Departure from the Main Jail is approximately 0700 hours. The inmate files and paperwork bound for RCCC should transfer on the same trip as the transferring inmates. RCCC laundry services will be notified of the arriving transfers.

FINAL REPORT

Bus Crew #2 will transport FATRNS to RCCC, focusing on taking the remaining general population transfer inmates and inmates who need to be separated from the general population. Upon returning to RCCC, Bus Crew #1 will transport remaining inmates with court appearances and assist with processing FATRNS as needed.

The bus crews will coordinate with Court Transportation for court returns at approximately 1130 hours and will transport afternoon court appearances from RCCC. Arrival at the MJ is approximately 1230 hours. Bus crews will coordinate with Court Transportation for court returns at approximately 1500 hours and again at approximately 1700 hours. Any inmates remaining in court or at the MJ after 1700 hours will be transported to RCCC, prior to 2300 hours. Transportation duties will be a shared responsibility between MJ and RCCC. On odd numbered calendar days, RCCC will be responsible for transportation. On even numbered calendar days, MJ will be responsible for transportation.

Per Operations Order 03/07, Medical Emergencies, if medical staff determines the inmate must be transported to an outside medical facility, a sworn supervisor shall assign custody staff to accompany the inmate. If the inmate is transported by ambulance, at least one custody staff member shall accompany the inmate in the ambulance. Additional custody staff may respond to the hospital in a separate Sheriff's Department vehicle. If the inmate is to be transported by custody staff, normal transportation procedures shall apply.

FINAL REPORT

**Observations**

The Assessment Team observed two deputies coordinate and process a busload of inmates being transported from the RCCC to the MJ (releases and court). One of the inmates that was processed and boarded that particular transport bus was walking with assistive devices (crutches). During the processing, the transporting deputy processed the inmate last, allowed him to use his assistive devices until he was seated in the transport bus, at which point the deputy took the assistive devices and secured them for the transport. The deputy assisted the inmate navigating up the bus steps stabilizing the inmates and ensuring he did not fall.

Although not assigned to the SCSD detention facilities transportation teams, the Assessment Team observed 2 court transportation deputies process 2 mobility disabled inmates onto a wheelchair accessible transport vehicle. One of the inmates was able to navigate into the vehicle, as he wasn't a fulltime wheelchair user. The deputies assisted him into the transport vehicle. The other inmate was a fulltime wheelchair user and the deputies after lifting the inmate and the wheelchair into the vehicle, ensured the inmate in his wheelchair was secured with the wheelchair straps.

The Assessment Team inquired about the accessible vehicles used to transport wheelchair users. MJ staff advised the Assessment Team that the accessible

transport vehicle was maintained in a county vehicle garage next the MJ. The Assessment Team obtained the keys to the vehicle and with the assistance of a county garage employee examined the accessible transport vehicle. The vehicle can accommodate one wheelchair user, the lift is functional, has the safety straps/belts for securing the wheelchair and inmate, and they appear to meet safety and ADA regulations.

**Staff Interviews**

The Assessment Team asked questions of various deputies, including those assigned to Long Haul transportation, RCCC facility transport, and medical transports.

The deputy assigned to Long Haul transportation stated that the identification of disabled inmates that require wheelchair accessible transportation is based on the location of the inmates housing. Inmates in wheelchairs are housed on the 2nd floor and this would alert them of the need for the accessible vehicle. If a disabled inmate with an assistive device (cane, walker etc.) is being transported, they are allowed to retain their assistive device until they are seated at which time the transporting officer stores the assistive device until the inmate arrives at his/her destination. Once at the destination, the inmate can again use the assistive device to disembark the transportation vehicle. In the event the inmate requires assistance in navigating the steps to the bus, the deputies assist the inmate in boarding the bus. If an inmate cannot safely board the bus with staff's assistance, the inmate would be transported in an accessible vehicle. The deputy stated that there is one wheelchair accessible vehicle to transport disabled inmates that require accessible transportation.

The deputy assigned to RCCC facility transport stated that they receive the court list of inmates to be transported. There may be information in JIMS (PF4/PF10) that would alert them of a disabled inmate and the need for an accessible vehicle. The inmate's housing (M-Barracks/MHU) may also alert transportation staff of a disabled inmate's need for accessible transportation. In the event they need a wheelchair accessible van, transportation staff must get the van from the MJ since the wheelchair accessible vehicle is kept there. The deputy stated that if a disabled inmate with an assistive device (cane, walker etc.) is being transported, they are allowed to retain their assistive device until they are seated at which time the transporting officer stores the assistive device until the inmate arrives at their destination. Once at the destination, the inmate can again use the assistive device to disembark the transportation vehicle. In the event the inmate requires assistance in navigating the steps to the bus, the deputies assist the inmate in boarding the bus. If an inmate cannot safely board the bus with staff assistance, the inmate would be transported in an accessible vehicle. The deputy stated that there is one wheelchair accessible vehicle to transport disabled inmates that require accessible transportation.

FINAL REPORT

The SCSD detention facilities transportation staff stated that this is the only ADA accessible transport vehicle available for transporting inmates that require accessible transportation from the MJ to other jurisdictions (jails/prisons), medical transports, from the MJ to RCCC and from RCCC to the MJ.

The staff responsible for issuing the keys to the wheelchair accessible vehicle stated that there is no specific tracking of disabled inmates transported by the vehicle other than the record of staff who were issued the vehicle keys.

**Inmate Interviews**

During the inmate interviews some disabled inmates stated that deputies provide accommodations during the court transport process such as, assisting them up the vehicles and providing assistance in pushing wheelchairs; however, some reported the following issues and concerns regarding the transportation process:

- Inmate housed in CBF stated that after arrival at the MJ he was transported to court in a "paddy wagon". The vehicle has steel benches and no handrails for him to hold on to during the transport and it is very difficult for him to remain seated without falling to the vehicle floor. He stated he is transported in a wheelchair from his housing unit to the transportation area and from the vehicle to the courthouse;
- Inmate housed in 2 East stated that he has to crawl into the van when being transported to court;
- Inmate housed in 2 East stated he is usually transported in a wheelchair; however on one occasion a wheelchair was not provided;
- Inmate housed in 2 East stated that when he was housed at RCCC he had to crawl into a regular van. Claims that the deputies told him if he didn't get in the vehicle, he was essentially refusing court. He further claims that on one occasion when he was scheduled for court staff did not transport him to court. Following this, his attorney asked him why he had refused court, and he advised his attorney that he had not refused;
- Inmate housed in 2 East stated he has been left on 3 separate occasions when he was scheduled for court and no accessible vehicle was available. Claims the deputies advised the court that he had refused court. Stated that he is transported in a big "paddy wagon" and staff tell him to try to get up on the vehicle, and he has to slide to get on;
- Inmate housed in 4 East stated that he is not provided accommodations for long distances and stairs;
- Inmate housed in 4 West stated that it is very painful to walk to court. When he doesn't go to court across the street it is very difficult to walk up the stairs;
- Inmate housed in 5 West stated that cane was taken away in court holding cell. Claims he has to climb up stairs to court. States it is very difficult with a cane, and;

FINAL REPORT

- Inmate housed in 6 West stated that cane was taken away in court holding cell;
- Inmate housed in 2M stated that custody staff broke his wheelchair when they tried to force it into the wheelchair van, and thus jammed it against the lift;
- Inmate housed in 2M stated that he has broad shoulders, and it is very painful when the custody staff does not double handcuff him. He has to walk up 2 sets of stairs to court with the restraints on while in pain, and he claims it is dangerous walking up the stairs;
- Inmate housed in 6E stated that he has been transported where staff didn't let him use his cane to get on to the transport vehicle. On one occasion he refused, and ultimately a judge ordered the administration to provide him a wheelchair in the future;
- Inmate housed in 7W claimed that he has to get out of his wheelchair and "crawl" into the van and seat. He acknowledged that staff does assist him. He stated that on about three occasions, custody staff hurt him while trying to help him, as they "grabbed" his arms and bruised him; and
- Inmate housed in 7W claimed that on one occasion, a custody officer tightened his handcuffs too tight, and he considered it "excessive."

**Conclusion**

The SCSD detention facilities do not always provide reasonable accommodations for disabled inmates during transport to court. One of the most egregious ADA violations that the Assessment Team learned of pertained to staff requiring inmates to crawl into transport vehicles. It was also difficult to understand the process and temporary denial of canes while the inmates are placed in temporary holding cells with other inmates.

Alarming to hear were the claims that disabled inmates were not transported to court while the court was advised that the inmate had refused to attend court.

With the lack of a tracking system to identify disabled inmates and their accommodation needs, inmates are being required to access the courts without the necessary accommodations.

Operations Orders and practices should ensure that prescribed canes for disabled inmates are maintained in the possession of the respective inmate at all times.

With only one accessible vehicle, if the vehicle is in use for a Long Haul transport, court transport from RCCC to the MJ, transport from the MJ to RCCC or a medical transport that does not require emergency transport and another disabled inmate requires accessible transportation, the SCSD detention facilities would not be able to accommodate the disabled inmate.

FINAL REPORT

FINAL REPORT

**References**

**28 CFR § 35.130 (a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR 35.130(b)(7)** states that a public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

**28 CFR 35.130(b)(1):** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

**28 CFR 35.130(b)(3)** A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

**28 CFR 35.130(b)(8)** A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

**28 CFR 35.130(h)** A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual

risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only.***
*Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to mobility-disabled inmates under the Armstrong v. Brown settlement agreement.*

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Transportation:*

*The special needs of inmate's with disabilities shall be considered in transporting them. An inmate's/parolee's special health care aids and appliances shall be transported with the inmate/parolee upon transfer.*

*Accessible vehicles shall be used to transport inmates/parolees in wheelchairs and those whose disability, i.e., mobility, necessitates specialized transportation. All other inmates/parolees shall be transported in standard vehicles.*

FINAL REPORT

FINAL REPORT

## Intellectual Disabilities (Housing Units Adaptive Supports)

The Minimum Standards for Local Detention Facilities, Title 15 - Crime Prevention and Corrections, Division 1, Chapter 1, Subchapter 4, Article 5. Classification and Segregation, contains the following section applicable to intellectual disabilities:

§ 1057. Developmentally Disabled Inmates.

> The facility administrator, in cooperation with the responsible physician, shall develop written policies and procedures for the identification and evaluation of all developmentally disabled inmates.
>
> The health authority or designee shall contact the regional center on any inmate suspected or confirmed to be developmentally disabled for the purposes of diagnosis and/or treatment within 24 hours of such determination, excluding holidays and weekends.

Correctional Health Services Administrative Policy 417, Adult Developmental Disability, describes the purpose of the policy as, "To stress the identification of persons with developmental disability and to refer known or suspected cases for appropriate evaluation and treatment." The policy requires that "medical shall contact Jail Psychiatric Services regarding any inmate who is suspected or confirmed to be developmentally disabled."

Developmental disability is defined as "represent[ing] one or more conditions whose onset occurs before age 18 and results in a substantial handicap. Qualifying conditions include mental retardation with an I.Q. of 70 or less, autism, neurological disability, cerebral palsy, and epilepsy."

The policy and procedures provide that "The identification of a person with developmental disability begins at booking and continues throughout incarceration. The intake medical personnel should be alert to the possibility of developmental disability by looking for:

- Difficulty in performing basic tasks associated with the process;
- Slowness or apparent difficulty in understanding; and
- A history of treatment for developmental disability through a Regional Center or special education class."

Policy 417 further explains the following procedure:

If there is suspicion of a developmental disability, a notation will be made on the Receiving Screening medical form and a referral made to the JPS Outpatient Department.

In cases where there is uncertainty as to whether the inmate has a psychiatric condition as opposed (or in addition to) development disability, referral for mental health evaluation is appropriate.

FINAL REPORT

With regard to referrals, a referral will be made once JPS clinical staff contacts the inmate and identifies an inmate's developmental disability status. The regional center serving Sacramento County is:

- Alta California Regional Center
  2241 Harvard St., Sacramento, CA 95815
  (916) 978-6400
  FAX (916) 489-1033

  Counties served: Alpine, Colusa, El Dorado, Nevada, Placer, Sacramento, Sierra, Sutter, Yolo, Yuba.

It is the responsibility of Jail Psychiatric Services' clinical staff to initiate an Alta Regional Center referral for a person suspected to have developmental disability or to contact Alta Regional for those persons who are already clients of Alta Regional.

Policy 1417 provides information relative to the role of the Alta Regional Center, the referral process, establishing a diagnosis, recommendations for management and treatment, etc. The procedures address assistance to be rendered by CHS and JPS for the local regional center, and that regional center representatives may provide input to health care services staff.

The Master Problem List in the medical record should be updated to note the presence of known or suspected developmental disability. JPS staff should also make an entry into the JIMS system and if necessary, notify classification of any special housing recommendations.

Where developmental disability was not identified during the booking or initial classification process, notification of the jail classification officer should be made by JPS Staff as soon as the condition is identified.

Policy 1417 also states that, "Persons with developmental disability are potentially vulnerable in the custody setting and may require special consideration in the classification process. Likewise, multidisciplinary treatment and discharge planning should take this information into account. The inmate's developmental disability status should be shared as necessary with treating health professionals, discharge planners, probation officers, and others who are actively involved in the care and custody of the individual." Additionally, there is brief language relative to sharing information when a "developmental disabled" inmate is transferred.

Correctional Health Services Administrative Policy 1107, Decision Making – Special Needs, defines the treatment for patients with special medical or psychiatric needs. The policy states that consultation between the Facility Commander and the Medical Director is required for actions regarding patients

FINAL REPORT

who are diagnosed as having significant medical or mental health disorders, as follows:

- Housing assignments;
- Program assignments;
- Disciplinary measures; and
- Admissions to and transfers from institutions.

The procedures within the policy describe that "maximum cooperation between custody personnel and health care providers is essential so that both groups are made aware of movements and decisions regarding patients with special medical or psychiatric needs. For example, health care staff must inform custody personnel when an inmate is suicidal, homicidal, or inappropriately housed in the jail for health care reasons. An inmate's special needs may complicate housing or work assignments or disciplinary management. Medications may need to be adjusted for safety at the work assignment or before transfer. Other examples include:

- Suitability for travel based on medical evaluation;
- Preparation of a summary or copy of pertinent Health Record information to ensure continuity of care;
- Medication or other therapy required en route;
- Instructions for transporting patients in lay terminology regarding medications or other special treatment; and
- Specific precautions that should be taken (i.e. masks or gloves)."

The procedures also state, "For each inmate treated for a major medical problem in jail, the treatment staff will develop a written treatment plan. Custody staff must be informed of the treatment plan when necessary to ensure coordination and cooperation in the ongoing care of the inmate without violating the confidentiality of the clinical record."

**Observations**

As the aforementioned CHS Policies do not reflect a comprehensive screening process or program, there is not a disability tracking system in place, custody post orders do not reflect specific responsibilities relative to intellectually disabled inmates/detainees, and there are numerous noticeable gaps as related to staff duties and ensuring equal access to services, programs, and activities for intellectually disabled inmates. Many intellectually disabled inmates are often vulnerable and manipulated, and historically victimized. Nondiscrimination and safety are of paramount concern with this population in the jail environment.

Without proper identification of an inmate's cognitive deficits coupled with adaptive deficits (and adaptive support needs/accommodations) custody, health care services, EGUSD teachers, and other staff will not be able to know what reasonable accommodations to provide intellectually disabled inmates, and may

have difficulty ensuring safety. An acceptable screening instrument/testing process and screening results form would enable Mental Health clinician to outline the adaptive support needs of each developmentally (intellectually) disabled inmate. Such form could be maintained and secured in all housing units where intellectually disabled inmates are housed, and by all work supervisors and teachers who supervise these inmates.

There is not currently a testing instrument or process in place to examine for inclusion into an Intellectual Disability Program (regardless of the age of onset), where the following are both present:

- Low cognitive functioning (usually IQ of 75 or below); and
- Concurrent deficits or impairments in adaptive functioning (the abilities necessary to care for oneself and to access programming and services in the jail setting).

Staff is widely unaware of the safety/vulnerability/victimization concerns and special concerns and accommodations needs of this population, as they have not been identified. Even those with prior regional center services, or those who were tested in CDCR and placed in the Developmental Disability Program (DDP) are not placed on a jail-wide tracking list, and there are no documented adaptive support accommodations needs. Also, because there is no tracking system or testing process, there is not a clustering or semi-clustering approach for these inmates. Other inmates such as cellmates, and inmates housed in the same pods/units may not be thoroughly screened for predatory/victimization concerns.

There is a strong likelihood that non-diagnosed intellectually disabled inmates are receiving write-ups, being found guilty, and possibly being moved to ADSEG or TSEP without procedural due process rights or reasonable accommodations being provided. If this is happening, part of the explanation is because staff are not aware of the need to provide specific types of adaptive support services/accommodations to the intellectually disabled inmates (which are specific to each individual), and because there is not a consult process built into the disciplinary hearing process between the hearing sergeant and a clinician.

Staff are not aware of the primary adaptive deficits that intellectually disabled inmates may possess. Adaptive Deficits may be identified in various areas during the adaptive deficit evaluation conducted by a psychiatrist, psychologist or LCSW. Examples of areas in which adaptive deficits may be presented are:

- Health and Safety
  - The intellectually disabled inmates may appear naïve about maintaining health in terms of eating; identifying, treating, or preventing illness; basic safety considerations, such as following rules or seeking assistance. These inmates will likely use inappropriate behavior with others and have difficulty communicating choices/needs and participating in social interactions.

FINAL REPORT

- Socialization Skills
  - The intellectually disabled inmates may show difficulty establishing and maintaining positive relationships. They may give up possessions to other inmates. They may become vulnerable to sexual predators, manipulation by other inmates, and/or be recruited for gang activities. The intellectually disabled inmates may engage in a repetitive cycle of disciplinary infractions involving other inmates or correctional officers. This could be suggestive of a lack of judgment and failure to understand the consequences of their actions.
- Academic Skills
  - The intellectually disabled inmates may show evidence of poor cognitive abilities/skills related to learning, such as reading, writing, and using basic mathematical concepts.
- Communications Skills
  - The intellectually disabled inmates may have poor ability to express themselves verbally or in writing.
- Leisure
  - The intellectually disabled inmates may not have acquired many leisure and recreational interests that reflect personal preferences and choices.
- Self-Advocacy/Use of Inmate Resources
  - The intellectually disabled inmates may have difficulty advocating for themselves during classification interviews/processes, disciplinary proceedings, and the inmate grievance process, and may waive their rights without understanding what they are doing.
- Self-Care Skills
  - The intellectually disabled inmates may show evidence of poor self-care; e.g., seldom bathing, soiled or unkempt clothing, poor eating habits, and/or the inmate's cell may be disorganized/dirty.
- Self-Direction
  - The intellectually disabled inmates may have difficulty making choices; learning and following a schedule; initiating activities appropriate to particular settings, conditions, schedules, and personal interests; completing necessary or required tasks; seeking assistance when needed; resolving problems in familiar and unfamiliar situations; and demonstrating appropriate assertiveness and self-advocacy skills.
- Work
  - The intellectually disabled inmates may have difficulty maintaining a work assignment due to inappropriate social behavior and a lack of related work skills.

Staff are widely unaware of some of the common adaptive support services that intellectually disabled inmates may need, such as;

- Monitoring for Pressuring/Victimization

FINAL REPORT

- Assistance with reading/writing/scribing/explaining
- Reminders to brush their teeth
- Reminders/instructions on cell cleaning
- Monitoring clothing (dirty/clean)
- Monitoring and assistance with Commissary/Packages/Property
  - Intellectually disabled inmates are often taken advantage of
- Health Care Appointments/Pill-line/Medications
- Laundry Exchange
- Showers
- Yard/Dayroom/Social Interaction.

There is not a multi-disciplinary committee or support team specific to periodically monitor intellectually disabled inmates, monitor the on-going potential for victimization and whether they can function safely, monitor their programming, ensure their accommodation needs are being met, and ensure the inmates are functioning at an acceptable level in the jail environment.

**Staff Interviews**

Most custody staff that were interviewed admitted that they have received little to no ADA training, or training specific to intellectual disabilities. Many staff do not understand the difference between intellectual disabilities, mental illness, and learning disabilities, and they don't know who the intellectually disabled population is. There were a couple of deputies who knew of inmates who had received services from Alta Regional Center in the past. But the staff members acknowledged that the only way to know what type of assistance to provide the inmates is just through knowing and observing them, and from any help that a respective inmate may ask for.

The large majority of staff indicated that they would help intellectually disabled inmates. When asked general questions about observing behavior traits that may be associated with an intellectual disability, staff responded with some of the following answers; refer the inmate to JPS, refer the inmate to CHS, be patient, provide simple instructions, repeat instructions, have trustee or houseman help the inmate, observe the inmate more closely, talk to him every day, house in M-Dorm or MHU, give them extra time, talk confidentially, give very specific directions, use levels of communication, use non-verbal gestures, etc.

When asked questions involving safety or possible victimization concerns for intellectually disabled (or possible intellectually disabled) inmates, staff provided the following responses; move him to a different pod, move him "off the floor", talk to the inmate and find out what the issues are, "nip it in the bud if we see someone doing something", confirm issue and "roll-up" the suspect (and issue a write-up), "we need more training on this, but I would try to handle internally", nobody gets victimized in this unit, address the issue with the responsible inmate, address the issue with the entire dorm, investigate, look for possible video

FINAL REPORT

evidence, put him (intellectual disabled inmate) in TSEP or PC, make sure he is not housed with an enemy, and take care of the inmate the best we can.

**Inmate Interviews**

As addressed throughout this report, because the SCSD detention facilities do not administer a comprehensive testing/screening process for intellectual (developmental) disabilities, and there is not a disability tracking system in place, it was difficult for the Assessment Team to accurately select intellectually disabled inmates for interview. However, through the process, several inmates (from the MJ and RCCC) were interviewed who were or were possibly intellectually disabled. A few of the inmates claimed that they received services from Alta Regional Center. Some of the inmates admitted to being in special education in public school, which was one possible indicator. Some of the inmates interviewed also admitted (when asked) that they needed reminders for activities in the jail, e.g., showering, cleaning their cell/bed area, programming, meeting time schedules, managing their time, and keeping clean clothing.

Some of the inmate comments and concerns are outlined below:

- RCCC KBF – Intellectually disabled inmate with prior Alta Regional Services stated that when he asks for assistance from staff, they do not help him. Claims that inmates call him a "crybaby and retard." Says that he doesn't remember to get his laundry.
- RCCC SLF – Possible intellectual disability. Has had to pay inmates to write her letters. Stated she paid $25.00 for another inmate to write 4 letters. All of her commissary was stolen from her. Doesn't know how to use the telephone. Her Bunkie helps her out, and she shares her food with her. Claims she was forced to hold contraband for other inmates. She does not know about any programs (visiting, medical, and law library etc.). She claims she requires diapers for incontinence, and medical staff will not provide them. She soils her clothes and can't get clean clothes. Another inmate that assists her also reported this.
- RCCC SLF – Intellectual disability. She is an Alta Regional Center client. Inmate claims that she was moved from her dorm to a cell because other inmates were teasing her and threatened her. Claims that she forgets to shower.
- MJ Inmate – Possible intellectual disability (unable to read, special education in public school and receives SSI benefits). Has had numerous write-ups. Claims his cell is "filthy," and he has trouble cleaning it or getting help to do so.
- MJ Inmate - Intellectual disability (prior Alta Regional Center consumer, special education, unable to read). Has trouble understanding many jail processes. Was very confused with the inmate disciplinary process. Has difficulty remembering, and staff does not help him (he goes to trustees).

- MJ Inmate – Possible intellectual disability (poor reading). Claims he has been victimized for commissary items in the past.

**Conclusion**

The SCSD detention facilities must have a comprehensive custody Operations Order relative to intellectually disabled inmates. The CHS must either create a new policy relative to JPS services and services for intellectually disabled inmates, or provide necessary modifications for policies 1417, Adult Developmental Disability, and 1107, Decision Making – Special Needs.

Policies and procedures must include directions and information regarding the following:

- A comprehensive screening/testing process with recognized instruments, to allow psychiatrists, psychologists, or LCSW's to determine whether inmates are intellectually (developmentally) disabled. The testing must include an examination for:
  - Low cognitive functioning (usually IQ of 75 or below); and
  - Concurrent deficits or impairments in adaptive functioning (the abilities necessary to care for oneself and to access programming and services in the jail setting).
- An electronic disability tracking system to identify inmates with disabilities (including intellectual disabilities), their required accommodation needs (including adaptive support services), any physical limitations, and other pertinent information
- Staff responsibilities regarding safety/vulnerability/victimization issues, special concerns, and accommodations needs of this population
  - This includes classification screening for predator/victimization concerns with other inmates within the housing unit, as well as other related responsibilities.
- Housing protocols for intellectually disabled inmates (possible clustering/semi-clustering approach)
- Inmate disciplinary process as related to intellectual disabilities
  - Including responsibilities for deputies, sergeants, work supervisors, mental JPS staff, etc.
  - Clinical consult process for inmate write-ups
  - Monitoring of patterns or numerous individual write-ups
    - Monitor possible placement in administrative segregation or TSEP housing for intellectually disabled inmates, possibly as a result of receiving write-ups and being found guilty, but not being afforded procedural due process rights, or their required adaptive support needs.
- Multi-disciplinary committee or support team specific to periodically monitor intellectually disabled inmates, their ongoing potential for victimization, and whether they can function safely; monitor programming;

FINAL REPORT

ensure inmates' accommodation needs are being met, and ensure that inmates are functioning at an acceptable level in the jail environment

- Monitoring may include but not be limited to: safety/victimization/vulnerability, commissary, write-ups, personal hygiene (e.g., showering, brushing teeth, clean clothes), work, education, program activities, yard/dayroom, leisure activities and ensuring that housing unit deputies and work supervisors are providing adaptive support accommodations.

An ADA training component must be developed and implemented regarding disabilities (including intellectual disabilities) to provide custody and non-custody staff the tools and knowledge to ensure all disabled inmates are not discriminated against on the basis of their disabilities, and to ensure equal access to all programs, services and activities offered by the SCSD detention facilities and any associated contractor, e.g., EGUSD, CHS. Staff must be trained to:

- Be aware of safety and victimization concerns and uphold a policy of zero tolerance for inmates or staff belittling or name calling individuals with intellectual disabilities
- Be proactive to engage intellectually disabled inmates verbally (sometimes in confidential settings), provide accommodations, assistance, and adaptive support services, and not delegate this to inmate trustees or "housemen"
- Understand that this population may have difficulties advocating for themselves, and may be reluctant to ask for help
  - Understand that many intellectually disabled inmates may have a dual diagnosis, with either medical and/or mental health concerns, and those concerns must also be met, whether or not the inmate seeks assistance
- Understand that disabled inmates cannot arbitrarily be rehoused or moved without a thorough examination of associated events/circumstances, and they must be treated fairly and equally
- Understand that intellectually disabled inmates may be confused at times, and may need constant or periodic instructions, or simple reminders to complete a task or to understand.

Custody staff post orders should also reflect assigned duties as applicable to this population.

FINAL REPORT

**References**

**28 CFR § 35.105 (a)** requires that a public entity evaluate its current policies, and practices, and to the extent modification of any such policies, and practices is required, the public entity shall proceed to make the necessary modifications if they do not or may not meet the requirements Title II.

**28 CFR § 35.130 (b)(7)** requires a public entity to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

**28 CFR 35.130(b)(1)** A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.

**28 CFR § 35.152(b)(1)** Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.***

*Notices, Announcements, and Alarms:*

*Written Materials: Each designated DDP institution/facility must ensure that CCR notices, orientation packages, announcements, and similar printed materials are accessible to inmates with developmental disabilities. Institution staff must provide the necessary assistance to all DDP inmates on a case-by-case basis to ensure that those who have difficulty reading and/or communicating in writing will be provided reasonable access to forms, regulations, and procedures. Local operational procedures must reflect specific notices, announcements, and alarm procedures for DD2 and DD3 inmates. Post orders for staff assigned to provide such services to DD2 and DD3 inmates must reflect these specific procedures.*

*Verbal Announcements: Each designated DDP institution/facility must ensure effective communication is made with inmates with developmental disabilities regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, and unlock, etc. Local operational procedures must reflect specific requirements for verbal announcements impacting DD2 and DD3 inmates. Post orders for staff assigned to provide such services to DD2 and DD3 inmates must reflect these specific procedures, i.e., prompts for visits or hearings, if an inmate does not respond.*

FINAL REPORT

*Count And Movement*

*Each designated DDP institution and facility must review local policies and procedures to ensure DDP inmates are provided with necessary prompting so that they comply with count time expectations, respond to visits, keep work/school schedules, and respond to meals and other movement calls. Local operational procedures must reflect specific count and movement procedures for DD2 and DD3 inmates. Post orders for staff assigned to designated buildings/units/wings that house DD2 or DD3 inmates must reflect the specific count and movement procedures.*

*Evacuation Procedures*

*Local evacuation procedures must be adopted at each designated DDP facility to ensure the safe and effective evacuation of inmates with developmental disabilities. Local operational procedures must reflect specific evacuation procedures for DD2 or DD3 inmates. Post orders for staff providing services for DD2 or DD3 inmates must reflect these procedures.*

*All DDP inmates will be provided instructions for evacuation/emergency procedures during orientation before initial classification at designated institutions.*

FINAL REPORT



## Training

The Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures pertinent to training are outlined in Operations Order 01/02 Command and Responsibility, Draft Operations Order Inmates with Disabilities - ADA, and policy 1302, Staff Development and Training.

Per Operations Order, 01/02 Command and Responsibility, the Administrative/Training Sergeant works under the supervision of the Assistant Division Commander and/or the Operations Lieutenant for the division to coordinate all training, including the jail-training program for new officers. The Admin/Training Sergeant maintains division forms, Operations Orders, fire and armory equipment, and assists with personnel assignments and issues. He/she also directly supervises the Training Coordinator, Law Library Officer, Safety Officer, Facility Maintenance staff, and other authorized positions.

Per Draft Operations Order Inmates with Disabilities - ADA, the ADA Coordinator is responsible to provide training to staff in regards to ADA policies and procedures. Additionally, it is the ADA Corrections Division Representative's responsibility to provide training to facility staff on auxiliary aids and services. Although, these policies require the ADA Division Representative and ADA Coordinator to provide ADA training, this Draft Operations Order is currently not approved and in place. As such, there is no order or policy requirement to provide annual formalized ADA training, one-time formalized ADA training, or formalized ADA training during new employee orientation.

**Observations**

The SCSD detention facilities require all officers assigned to the MJ and RCCC to attend and complete a 66-hour Standard Training for Corrections Program certified course titled Adult Corrections Officer Supplemental Core Course. This course is for officers who completed the Peace Officer Standards and Training (POST) Regular Basic Course (academy) and are newly assigned to corrections. The course is designed to complete competencies in the following topics, Title 15 regulations on inmate supervision; codes, statues, and legal documents, inmate classification, gangs and subcultures, evidence and contraband, communication, mechanical restraints and safety cells, cell extractions, booking and receiving, releasing, maintaining security, distribution of supplies and commissary, monitoring psychological and physical health, and PREA. Although some of these modules contain some ADA-related information, these training modules are specific to general training requirements for corrections, and are not ADA-specific.

The training modules do not cover a deeper sense of what disabilities or impairments are, and how these disabilities affect inmates and staff with respect

FINAL REPORT

to discrimination (nondiscrimination) and disabled inmates gaining equal access to programming, services and activities in accordance with Title II of the ADA. The training modules do not cover effective communication, reasonable accommodations, HCAs/ADs/DME, disability identification (screening/testing/evaluating), interim accommodations, inmate grievances/requests for modifications or accommodations, staff assistance, inmate disciplinary (infraction) process, accessibility/path of travel, learning disabilities, adaptive deficits/adaptive supports (for developmentally disabled inmates), housing, work/education, law library/recreational library, group therapy/individual therapy, or inmate orientation.

## Staff Interviews

Most housing unit, medical (including county and registry staff), and support staff who were interviewed could not recall specific ADA training they had received either at the academy or on site at the jail. Some staff members were able to recall having received training at the academy regarding mental health and other disabilities; however, this training was directed towards street law enforcement.

## Conclusion

Because the SCSD detention facilities do not currently have a comprehensive ADA identification process, and because there is not an ADA tracking system in place, nor an adequate ADA training program, the Assessment Team representatives determined that staff in large part are not aware of many inmates who have disabilities covered under the ADA. Moreover, staff members do not have a thorough understanding of the rights afforded to inmates under the ADA, or how to ensure equal access and non-discrimination (whether they know who the particular disabled inmates are or not).

In accordance with the spirit of Title II of the ADA, and the 1991 Section-by-Section Analysis, the SCSD detention facilities have failed to develop and incorporate a comprehensive ADA training component for custody and non-custody staff. The ADA or inmate disability program/plan cannot and will not function unless a comprehensive training regimen consists of: formalized lesson plans, certified or otherwise qualified ADA expert trainers, close monitoring of the training program, and curriculum consisting of all major aspects of ADA, including but not limited to: disability identification/verification, tracking system, housing, HCAs/ADs/DME (including removal/non-removal), reasonable accommodations, equal access, transportation, searches, mechanical restraints, inmate grievances, orientation, work/industries/job assignments, education, alarms, notices, emergencies, evacuations, library operations/equipment, religious services, and visiting. Quite simply, a quality ADA training program must be in place to ensure staff are appropriately trained to perform their job duties and to help ensure disabled inmates are provided equal access to programs, services and activities provided at the jail facilities, and thus not discriminated against.

FINAL REPORT

The SCSD detention facility training requirements should include the requirement that formalized ADA training be provided to custody and non-custody staff (managers, supervisors, and rank-and-file employees) at the jail facilities.

A comprehensive formalized ADA training curriculum must be developed and incorporated. This should be a primary formal classroom-training course for custody and non-custody staff (managers, supervisors, and rank-and-file staff) at the jail.

The SCSD detention facilities must ensure that ADA instructors receive appropriate ADA training and provide the level of subject matter expertise needed to effectively provide formalized classroom ADA training to staff.

<u>**References**</u>

**28 CFR § 35.130 (a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR Section-by-Section Analysis, Section 35.105** Self-Evaluation commenters suggested that the rule require that every self-evaluation include an examination of training efforts to assure that individuals with disabilities are not subjected to discrimination because of insensitivity, particularly in the law enforcement area. Although the Department of Justice did not add such a specific requirement to the rule, the Department felt it would be appropriate for public entities to evaluate training efforts because, in many cases, lack of training leads to discriminatory practices, even when the policies in place are nondiscriminatory.

***The information below is for reference only. Due to the settlement agreement and subsequent Armstrong v. Schwarzenegger Federal Court Ordered Injunction (January 18, 2007), the CDCR was ordered to do the following (with regard to providing ADA related training, which pertains to disabled inmates as well as inmates with other disabilities):***

*Settlement Agreement (January 3, 2001)*

*The CDC (CDCR) will provide Disability Placement Program (DPP) training to institution/parole staff on ADA regulations and DPP requirements. This training shall include but not be limited to evacuation and emergency procedures, reasonable accommodations and effective communication.*

*Federal Court Injunction (January 18, 2007)*

*Within 60 days of the date of this Order, defendants, subject to the approval of*

FINAL REPORT

SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

*plaintiff's counsel, shall select and retain outside experts to provide training of health care staff and correctional counselors in effective communication issues.*

*Within 60 days of the date of this Order, the parties shall jointly agree on outside experts, and defendants shall retain them to provide training to all custody staff who work in administrative segregation units, the security housing units, or Receiving and Release on their obligations not to confiscate assistive devices and the reasons therefor.*

*Defendants' employees may jointly provide training with the outside experts. The training of all appropriate staff shall be completed by September 1, 2007, and a regular schedule of ongoing and refresher training shall be established.*

FINAL REPORT

Page 312



## ADA Coordinator

The SCSD detention facilities do not have any operations orders, policies or procedures solely for the MJ and RCCC Compliance Sergeant (ADA Coordinator) or for the ADA Deputy (Assistant ADA Coordinator/ADA Corrections Division Representative) in place. However, there is a Draft Operations Order titled, 'Inmates with Disabilities – ADA', which is pending further revision and approval.

The MJ and RCCC facilities each have their own Compliance Sergeant and ADA Deputy assigned to ADA or disability-related compliance responsibilities.

In accordance with a County of Sacramento, Department of Personnel Services, Position Description Questionnaire (PDQ), for the RCCC Compliance Sergeant position, general work/oversight responsibilities include: 25 percent of the work time to create and implement an ADA transition plan and future compliance enforcement; 25 percent monitoring and enforcing compliance efforts related to the ICE Contract and the 2000 Federal Detention Standards; 15 percent coordinating and monitoring the custody/classification portion of the JBCT program; 15 percent conferring and cooperating with personnel associated with other county agencies, outside law enforcement, mental health, medical, and others as required to ensure compliance; 10 percent coordinating facility audits and inspections; 5 percent monitoring Title 15 compliance, dayroom and recreation goals, and policy updates; and 5 percent engaging in the protection of life and property, as well as participating in investigations of criminal offenses to identify, apprehend, and prosecute the responsible parties by collection, preservation, and analysis of facts and evidence, and other related responsibilities include locating, interviewing or interrogating victims, witnesses, and suspects.

In accordance with the specific PDQ for the RCCC ADA Deputy position, general work/oversight responsibilities include: 40 percent assisting in creating and implementing an ADA transition plan and future compliance enforcement; 20 percent conferring and cooperating with personnel associated with other county agencies, outside law enforcement, mental health, medical, and others as required ensuring compliance; 20 percent assisting in coordinating facility audits and inspections; 15 percent assisting in monitoring Title 15 compliance, dayroom and recreation goals, and policy updates, etc.; and 5 percent engaging in the protection of life and property, and participating in investigations of criminal offenses to identify, apprehend, and prosecute the responsible parties by collection, preservation, and analysis of facts and evidence, and additional duties such as locating, interviewing, or interrogating victims, witnesses, and suspects.

The Assessment Team also requested a copy of any existing documents relative to ADA or disability-related duties, e.g., PDQ, post orders, and duty statements, for the MJ Compliance Sergeant and ADA Deputy. However, upon interviewing

FINAL REPORT

the staff in these two identified positions, they indicated that such documentation did not exist specific to their assignments.

Specific ADA/disability-related functions and responsibilities for the Compliance Sergeant and ADA Deputy at both the MJ and RCCC facilities are outlined in the aforementioned Draft Operations Order Inmates with Disabilities – ADA.

In accordance with the Draft Operations Order, the purpose of the policy is to establish standard and consistent procedures by which an inmate with a disability is identified, assessed, and provided appropriate reasonable accommodations in compliance with Title II of the ADA.

The policy statement (within the Order) provides that is it the policy of the SCSD detention facilities to ensure procedures are in place to provide equal treatment to all incarcerated adults. The policy statement states, "The Department will ensure inmates with qualified disabilities are afforded equal access to programs, services, and activities unless doing so would alter the nature or operations of the institution or program. Limitations may be imposed for legitimate safety requirements necessary for the safe operations of services, programs, and/or activities." The policy statement further adds, "The Department will implement modifications to facilities and programs where possible to allow for reasonable accommodations for inmates with disabilities. This practice will be followed unless doing so would be an undue burden to the Department, cause a fundamental alteration to a program, or pose a direct threat of substantial harm to the health and safety of the individual or others. The Department will ensure that procedures are in place for inmates with disabilities to request reasonable accommodations and to dispute the accommodations provided under Title II of the ADA."

The Operations Order provides numerous ADA/disability-related definitions, including: ADA, Assistive Device, Disability, Activities of Daily Living (ADL), Orthopedic Appliance, Prosthesis, Reasonable Accommodation, Service Animal, and Undue Hardship.

The definition provided for 'Disability' is:

1. "A physical or mental impairment that substantially limits one or more of the major life activities of such individual;
2. A record of such an impairment; or
3. Being regarded as having such impairment."

Draft Operations Order Inmates with Disabilities - ADA, Section III. A., states, "The Sacramento County Sheriff's Department will not discriminate against inmates or members of the public on the basis of disability in providing access to its detention facilities, programs, services and activities.

FINAL REPORT

1. The Americans with Disabilities Act Inmate Notice will be prominently posted in all inmate housing units; and
2. The Americans with Disabilities Act Public Notice will be prominently posted at the public entrances of all jail facilities."

Section B. states, "Persons with a disability are entitled to an equal opportunity to participate in programs, services, or activities offered by the Sacramento County Sheriff's Department unless doing so creates an undue hardship."

The Draft Operations Order contains ADA/disability information and responsibilities specific to the ADA Corrections Division Representative (ADA Deputy/Assistant ADA Coordinator), and the ADA Coordinator (Compliance Sergeant).

Section III. C. (Compliance with ADA), (ADA Corrections Division Representative), states,

1. "The intent of the ADA Division Representative is to review requests, complaints and grievances related to ADA issues, maintain the Division's ADA files, and provide training to facility staff on auxiliary aids and services;
2. The ADA Division Representative may respond to ADA requests or ADA grievances and will ensure the Facility ADA Coordinators are updated and informed of all ADA issues as well as perform inspections; and
3. The ADA Division Representative will represent the Department on ADA related issues."

Note: the other identified ADA Corrections Division Representative duties outlined in the Order, are captured below within the language relative to ADA Coordinator's responsibilities (i.e., Section XVII. [Identifying and Handling of Armstrong Class Members], and Section XIX. [Grievances]).

Section VI. of the Draft Order indicates that the ADA Coordinator (or designee) will:

1. "Keep the ADA Division Representative informed of all ADA related requests, complaints, and grievances related to ADA issues;
2. Maintain an ADA file on each disabled arrestee/inmate documenting each contact in regards to their ADA needs, accommodations, special education and requests;
3. Provide training to staff in regards to ADA policies and procedures;

FINAL REPORT

4. Initiate contact with the disabled inmate within two working days of receiving the ADA paperwork and, if necessary, ensure that the court is notified of any accommodations needed;

   a. The ADA Coordinator and inmate may agree at any time to suspend monthly follow-ups if there is no change in the inmate's status; and

   b. If the inmate needs to contact the ADA Coordinator after suspending follow-up visits, the inmate can do so via an Inmate Request form (KITE);

5. Notify classification deputies when a disabled inmate is housed and may require an accommodation to access programs, services, or special education;

6. Review claims, complaints and grievances regarding disabilities;

7. Ensure complaints and grievances are finalized;

8. Confer with medical staff each month to review whether accommodations continue to be appropriate and necessary and document the contact;

9. Audit the location and condition of the TDD machine once per month; and

10. Perform a follow-up review every thirty calendar days to ensure the inmate has equal opportunity to participate in programs, services and activities and to discuss any issue the inmate may have regarding their treatment."

There are numerous ADA Coordinator duties outlined throughout the Operations Order in various sections of the Order. These responsibilities include:

Section IV. (Identification of Disabled Inmates – At Intake):

1. Receipt of all Inmate Disability Evaluation Forms (IDEF) from intake medical staff for inmates who have (or may have) a disability.

Section V. (Classification and Inmate Housing);

1. Receive notifications from classification staff to arrange inmate orientation of inmates who are visually impaired or unable to read;

2. Receive IDEF forms with appropriate notations from classification staff for compliance review; and

3. In coordination with classification staff, ensure necessary, reasonable accommodations are made to allow inmates with disabilities equal access to work assignments.

Section VII. (Identifying Disabilities – Subsequent to Booking);

FINAL REPORT

May receive notifications from staff at any time for an inmates who staff believe has a disability, based upon personal observation of the inmate, oral statements by the inmate, or a written request from the inmate.

Section VIII. (Program Access);

1. Make arrangements to accommodate special educational needs unless access to these services prevents safe operation of the program or activities; and
2. Maintain a list of qualified sign language interpreters who can be utilized in time of need.

Section XII. (Inability to Read or Write);

1. Ensure reasonable accommodations are made for inmates who are physically incapable of reading or writing, which may include, but is not limited to; enlarged print materials, identification of desired materials, and assistance in reading and scribing forms.

Section XIV. (Prosthetic/Orthopedic Appliances and Assistive Devices):

1. Receive notification (from the Watch Commander) if an appliance/assistive device is not returned to or provided to an inmate (after a physician examined the inmate and determined that the previously removed device or an alternative accommodation is to be provided to the inmate).

Section XVII. (Identifying and Handling of Armstrong Class Members);

1. Receive contacts from staff regarding in-custody inmates who have been previously identified as a CDCR Armstrong class member;
2. Will act as the central contact point for CDCR. The ADA Coordinator at each facility (MJ and RCCC) will act as a liaison between identified Armstrong inmates and the classification unit;
3. After receiving notification from CDCR as to an Armstrong class member in custody at an SCSD detention facility, the ADA Coordinator will notify the ADA Division representative. The ADA Coordinator will ensure the inmate is entered into the JIMS, under the Special Tracking Needs, and will follow the same process outlined in Section 11.0 of this policy (Order); and
4. Once contact is made with the inmate, the ADA Coordinator will notify HMU via email. This email should include any steps taken to address issues/concerns as well as a resolution.

FINAL REPORT

Section XVIII. (Facility Visitors);

1. Visitors who will require reasonable accommodation will be asked to notify the ADA Coordinator or on-duty Watch Commander of their needs prior to visiting.

Section XIX. (Grievances);

1. All ADA related grievances shall be routed through the facility Compliance Unit. The Compliance unit will determine the best course of action for the grievance (e.g., medical, custody) and then route it as deemed appropriate. The Compliance Unit will track all ADA related grievances until finalized. A copy will be forwarded to the ADA Corrections Division Representative.

The following sections of the Operations Order do not contain information or responsibilities specific to the Compliance Sergeant: (Section III. (Compliance with ADA); Section IX. (Auxiliary Aids for Individuals with Hearing Impairments); Section X. (Telecommunications devices [TDD/TTY Equipment]); Section XI. (Interpreter Services); Section XIII. (Mail – Free for the Blind); Section XV. (Restraints); Section XVI. (Searches); and Section XX. (Compliance with PREA).

The Draft Operations Order, PDQs (RCCC), and information received from the two Compliance Sergeants and both ADA Deputies are conflicting as to the working titles of the positions.

The Compliance Sergeant position must have the authority and the civil service rank to raise pertinent issues to executive level management and affect change or modifications to the ADA inmate disability program as warranted. The Compliance Sergeant positions (at the MJ and RCCC) must also have normal 'hands on' day-to-day oversight and involvement over the ADA or inmate disability program. The Compliance Sergeant or ADA Deputy positions must maintain all ADA related documents to assist in identifying ADA or disability-related requirements for the operation of the SCSD detention facilities.

**Observations**

The Assessment Team did not have any specific observations to report with regard to the Compliance Sergeants, or ADA Deputies at either the MJ or RCCC facilities. However, through staff interviews of the MJ Compliance Sergeant and MJ ADA Deputy, as well as the same positions for the RCCC facility, and a multitude of staff (from numerous disciplines) assigned to the MJ and RCCC facilities, numerous inmate interviews, examinations of applicable documents and forms, and general observations of virtually all detention facility processes and activities, the Assessment Team determined there are numerous areas where a detailed Operations Order is necessary to provide procedures for applicable ADA or disability-related functions. For many applicable ADA or

FINAL REPORT

disability-related topics, the Draft Operations Order does not address the issues, there is key information not included within the content, or there are concerns with the written Order itself as well as with current practices. Some of the key concerns will be captured in the conclusion (below), and the major concerns will be cited throughout this entire report.

**Staff Interviews**

As mentioned above, the Assessment Team interviewed both Compliance Sergeants (MJ and RCCC), and both ADA Deputies (MJ and RCCC), and asked pertinent questions of other selected staff (e.g., housing officers, custody and non-custody staff who deal with grievances, infractions, and inmate referrals).

The team attempted to gain a better understanding of the separate roles and responsibilities between both Compliance Sergeants as well as both ADA Deputies.

From interviews of staff (custody and non-custody), a review of documents and logs, and general overall observation, the Assessment Team drew the following findings: The Compliance Sergeants for the MJ and RCCC facilities are designated at the Sheriff's Sergeant classification, but the positions are not dedicated solely for ADA-related duties. Per the PDQ for the RCCC position, only 25 percent of the duties are associated to ADA or a disability program (charged with creating a transition plan and for future compliance enforcement). Within the other 75 percent of the duties (as outlined above) there is a very small percentage of responsibilities tied to inmates with disabilities, e.g., ICE inmates who happen to have a disability, and monitoring of the custody/classification portion of the JBCT program will have some involvement with inmates who happen to have a disability. The Compliance Sergeants acknowledged that they have various responsibilities outside of ADA, as stated above, e.g., MOUs, contracts, litigation or compliance with Federal laws. One of the ADA staff members interviewed confirmed that the RCCC PDQs are consistent with the duties and percentage of work time actually being completed.

As mentioned above, there is not a PDQ, post order or duty statement for the MJ Compliance Sergeant (ADA Coordinator) to outline any ADA or disability program responsibilities, or, the Assessment Team was not provided with such. Both Compliance Sergeants have been in their respective positions a very short time. They have received no ADA Coordinator-specific training, and relatively little training applicable to ADA or disabilities. However, PREA, MH, and Crisis Intervention Team (CIT) trainings were cited as having been received in the past.

The ADA Deputies for the MJ and RCCC facilities are designated at the Sheriff's Deputy level, but the positions are not dedicated solely for ADA or disability program related duties. The MJ and RCCC ADA Deputies have been assigned to their new positions for approximately five months and two months respectively (at the time of interviews). They have not had any specific ADA training to

FINAL REPORT

prepare them for their new assignment, other than minimal general ADA information provided at the Sheriff's Academy, and an 8-hour online course that reportedly did not focus in any depth on Title II of the ADA. One of the deputies explained that despite being new in the position, he would be transitioning out of the assignment very soon.

Per the PDQ for the RCCC position, only 40 percent of the duties are geared toward ADA or an inmate disability program (tasked with assisting in creating and implementing an ADA transition plan and future compliance enforcement). As explained earlier in this report section, there is not a PDQ, post order, or duty statement for the MJ ADA Deputy to outline the ADA or disability program responsibilities, or, the Assessment Team was not provided with such. The specific duties of the new positions have not been fully explained to them, and they are in the process of attempting to better understand their roles and responsibilities.

One of the ADA Deputies admitted that he has not really performed much ADA or disability-related work outside of a physical accessibility standpoint. The other ADA Deputy admitted that only a small amount of work time is allocated to ADA or disability-related duties, but he works primarily on PREA and jail operations. One of the ADA Deputies indicated some contact with non-mobility-impaired, inmates, e.g., assisting an intellectually disabled inmate with access to legal law materials and addressing issues brought to his attention, such as grievance and KITE issues. But he clarified that he does not automatically receive ADA-related grievances or KITE's, and most are funneled to the medical department. The ADA deputies have admittedly not reviewed any grievances pertaining to effective communication issues or inmates with learning or intellectual/developmental disabilities.

The ADA staff is aware of the email notifications received from CDCR, for CDCR Armstrong class members housed at the SCSD detention facilities. But they do not receive these notices, unless the receiving medical staff informs them (which rarely occurs). A couple of the ADA staff members were not aware of previous inmate grievances submitted regarding either shower chair issues or accessibility concerns.

Although some staff and inmates are aware of the newly assigned ADA staff, and have reportedly asked the ADA staff for assistance or information, e.g., health care appliances and reasonable accommodations for inmates, many inmates and some staff are not aware of their existence or positions. The staff interviewed admitted that there is not a health care appliance/assistive device inspection log (for accountability or functionality).

Although one of the ADA staff believed that the jail rulebook addresses the Compliance Sergeant (ADA Coordinator) position, the rulebook has a very brief

FINAL REPORT

FINAL REPORT

section about ADA and Title II, but there is no language regarding the ADA Coordinator or other ADA staff.

Additional information obtained through the ADA staff interviews included but is not limited to the following: the Compliance Sergeants for the MJ and RCCC as well as both ADA Deputies do not maintain daily monitoring of the ADA Program, and do not currently have on-going ADA or disability monitoring (whether daily, weekly or monthly) relative to the inmate grievance process/resolution, inmate request (KITE) process, inmate disciplinary process, inmate tracking process, touring ADA housing units and work sites, interviewing housing officers, clinicians, teachers, work supervisors, or other staff, or interviewing inmates regarding ADA concerns or issues.

The ADA staff at both detention facilities have numerous other required duties outside of ADA or inmate disabilities. There is no adequate inmate disability identification or tracking system in place for proper identification of inmates with disabilities. In speaking with the ADA staff, they did not have a clear or thorough understanding as to what their specific job duties entailed as related to inmates with disabilities. At the time of the interviews, it did not appear that the Draft Operations Order had been available to them to review. The Compliance Sergeants and ADA Deputies do discuss pertinent ADA-related issues as necessary.

The majority of all detention facility staff (both facilities) who were interviewed were not familiar with the process to secure a contract sign language interpreter in the event of a due process event or clinical encounter (if the inmate's primary method of communication is signing). One of the ADA staff provided the Assessment Team with an SLI list of contractors, and both ADA Deputies were aware of this list. One of the ADA Deputies did not believe that health care staff has ever inquired about the list or did not know if some of them are aware of its existence. The ADA Deputies were not aware of any instances where jail staff have had to utilize a contract provider, but indicated that staff have done "workarounds" in the past by having deaf/hearing-impaired or speech-impaired inmates use written notes. When asked whether a certified SLI has ever been used for a deaf and mute inmate housed in MJ 2nd floor medical unit, the ADA Deputy who was asked did not know. The ADA Deputies explained where the TTY machines were located in the 2 detention facilities. Of the dozens of staff interviewed, only a couple of them were trained in or knew how to use the TTY equipment.

The ADA staff were not trained in or familiar with providing EC to inmates with disabilities, where there may be barriers to communication, e.g., intellectually disabled/developmentally disabled, learning disabled, mental health, deaf/hearing-impaired, and speech-impaired. The ADA Deputies were unsure as to how to obtain the names of inmates who have an intellectual/developmental disability or a learning disability, but would consult with staff from the psychiatric

department for a list of inmates with mental health concerns. One of the ADA Deputies said he has provided alternatives to writing inmate disciplinary reports on some inmates with disabilities, but acknowledged that disciplinary reports for ADA inmates by other staff are generally not routed to the ADA staff for review.

Some of the ADA staff interviewed (as well as medical and other custody staff) indicated that there was no master list of health care appliances/assistive devices issued to inmates at the MJ and RCCC facilities.

The Compliance Sergeants (ADA Coordinators) do not track or log any activities or tours through the housing units or other areas, and do not track or log any interviews of disabled inmates or key staff.

Neither the Compliance Sergeants nor the ADA Deputies have received any formal ADA training that would qualify them to perform the relevant ADA functions and oversight over the program or to serve as ADA trainers to staff.

The Compliance Sergeants do not maintain or have access to an inmate disability tracking system or list to identify inmates with disabilities. Currently, they also do not receive the names or a list of CDCR Armstrong class members housed at the MJ or RCCC facilities.

**Conclusion**

In violation of Title II of the ADA (as specifically described below), the SCSD detention facilities do not have a dedicated ADA Coordinator in place at either the MJ or RCCC facility to coordinate efforts to comply with and carry out the multitude of necessary responsibilities of the position, which also includes oversight of employee accountability and allegations of noncompliance. In the absence of a comprehensive inmate disability program/plan, and clear duties delineated for the positions, the Compliance Sergeants (ADA Coordinators) for the MJ and RCCC facilities as well as the ADA Deputies (Assistant ADA Coordinator/ADA Corrections Division Representative) for both facilities are unable to effectively perform their duties.

As a result, they will ultimately be unable to help ensure that the SCSD detention facilities are abiding with Title II of the ADA, and will not be able to ensure the employment of best practices with respect to inmates with disabilities. Given the mandates under ADA, the various court orders, injunctions and settlement agreements ordered or approved by the courts (around the nation), the current lack of an acceptable ADA training component for both custody and non-custody staff is concerning.

The Compliance Sergeants (ADA Coordinators) and ADA Deputies (ADA Assistants/ADA Corrections Division Representatives) at the two facilities have not been adequately trained regarding ADA or in the development of a comprehensive inmate disability program. Likewise, they do not currently

FINAL REPORT

possess the requisite expertise or training to provide effective oversight to ensure overall program and staff accountability or to ensure that all detention facility staff is trained with regard to ADA and an effective inmate disability program.

28 CFR § 35.107(a) states that a public entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part.

As stated above, the SCSD detention facilities have not designated a dedicated employee to coordinate its efforts to comply with and carry out its responsibilities under Tittle II of the ADA, including investigation of any complaint alleging noncompliance or any actions that would be prohibited. The Compliance Sergeant at each facility (MJ and RCCC) only performs ADA/disability-related functions about 25 percent of the time (or slightly more as there are likely occasional ADA-related issues during the course of the other approximate 75 percent of their duties). The Compliance Sergeants are still working to determine what their job duties fully entail or what they should consist of in the future. Much of the ADA/disability-related workload is either shared or handled by the two respective ADA Deputies. However, the Deputies are also in the process of working to determine their own work responsibilities within the position while trying to also determine what additional specific job duties must be added.

Although the Compliance Sergeants have electronic access to the JIMS system PF-2, PF-4 and PF-10 screens for very limited ADA/disability-related information; they do not maintain ADA related documents to assist them in identifying ADA requirements for the operation of their respective detention facility.

The Operations Order-Inmates with Disabilities - ADA, is currently in draft form and is likely going to be modified further prior to approval. Although a senior supervisory or manager level (e.g., Sheriff's Lieutenant) is the strongly recommended employee classification for a dedicated ADA Coordinator position, the position of Sheriff's Sergeant may be acceptable so long as the incumbent has sufficient command authority over the program to effect necessary change and program modifications as needed and has ongoing dialogue with the executive management team to keep them apprised of compliance, trends, training needs, and recommendations for overall program improvement.

The operations order should require the ADA Coordinators to be dedicated positions (or a single dedicated position for oversight of both facilities) for ADA responsibilities, and not have other duties (e.g., PREA, ICE, custody/classification monitoring of the JBCT Program).

The position must have command authority over the program, have the ability to effectively oversee daily operations, have the responsibility to affect change or

FINAL REPORT

modifications as needed, and have the authority to engage with executive level management on a regular basis.

The operations order must include a more exhaustive list of responsibilities for the ADA Coordinators.

The operations order must also require the ADA Coordinators to tour units, interview staff and inmates on a regular basis, and monitor all disability-related tracking documents. The ADA Coordinators should maintain all ADA-related documents to assist them in identifying ADA requirements for the operation of the SCSD detention facilities.

The operations order should articulate that the ADA Coordinators will regularly monitor all facets of the ADA program to help ensure that inmates are being afforded equal access to all programs, services and activities offered by the SCSD detention facilities (and other entities, e.g., EGUSD and volunteer chaplains), and not being discriminated against in accordance with Title II of the ADA.

As a result of the assessment, which included reviews of applicable operations orders and policies as well as staff and inmate interviews, findings for this area include:

- Draft Operations Order Inmates with Disabilities – ADA, must include the following:
  - Articulate that the ADA Coordinators will regularly monitor all facets of the ADA program to help ensure that inmates with disabilities are being afforded equal access to all programs, services and activities offered by the SCSD detention facilities, and not being discriminated against in accordance with the ADA, Title II;
  - Provide greater information and a more exhaustive list of additional ADA/disability-related responsibilities for the ADA Coordinators and ADA Deputies which are not currently captured in the Order:
    - These duties are outlined in detail throughout most of the sections of this entire report. Examples include:
      - Oversee an inmate disability tracking system; tour housing, work, education, library and other units; interview inmates with disabilities and other inmates; periodically interview custody and non-custody staff (e.g., housing officers, academic/vocational instructors, classification staff, health care staff, self-help group sponsors/staff); review inmate request for accommodations and inmate grievances related to ADA/disabilities; monitor the inmate disciplinary process as related to inmates with disabilities; ensure EC for inmates with disabilities relative to due process events and clinical encounters; provide auxiliary aids, reasonable accommodations, and equal access to

FINAL REPORT

programs, services and activities; review removal/non-removal of health care appliances/assistive devices;

- The operations order must contain a listing of all applicable disability-related forms and documents, including forms/documents currently being used as well as those that will need to be developed and implemented in the future (e.g., related to custody, medical, mental health, and academic), based on future management decisions. Specific examples are cited throughout other sections of this report;
- Examine whether the ADA Coordinator positions should be designated at a Sheriff's Lieutenant level or above, or to remain at the Sheriff's Sergeant classification;
- There must be a requirement for both ADA Coordinators to be dedicated positions for ADA responsibilities (no PREA or other non-ADA duties), or consider approval for a single dedicated ADA Coordinator position for oversight over both MJ and RCCC facilities;
- The ADA Coordinator position(s) must have command authority over the ADA program;
  - The ability to effectively oversee daily operations;
  - The ability to affect change or modifications as needed; and
  - The authority to engage with executive level management on a regular basis;
- The MJ ADA Coordinator and ADA Deputy positions must have a PDQ, duty statement or post order to identify specific duties and responsibilities for the positions;
- Clarification must be made as to the specific working title of the positions (Compliance Supervisor/ADA Coordinator, and ADA Deputy/Assistant ADA Coordinator/ADA Corrections Division Representative);
- The Compliance Sergeants, and ADA Deputies must be adequately trained to effectively perform their ADA and disability-related duties, and all custody and non-custody staff must be trained with regard to the ADA and an inmate disability program;
- The Compliance Sergeants and ADA Deputies must have a greater understanding of their respective roles and responsibilities;
- While the Draft Operations Order indicates that the purpose of the policy is to establish standards and consistent procedures by which an inmate with a disability is identified, the current inmate disability identification process is severely flawed. For example, there is no testing/screening for intellectual disabilities; there are concerns with the medical intake screening process for potential disabilities; there is no current method to identify possible learning disabilities, e.g., a reading or literacy test (other than for those testing for EGUSD classes);

FINAL REPORT

- Develop and implement an electronic comprehensive inmate disability tracking system;
- The Compliance Sergeants and ADA Deputies must be made aware of the CDCR Armstrong class members housed at the SCSD detention facilities;
- The operations order does not contain the newer revised full ADA definition (the revised definition is defined in another section of this report);
- The operations order must also contain other pertinent definitions not currently captured in the order, e.g., Compliance Supervisor (ADA Coordinator), ADA Deputy, TDD/TTY, Talking Book Program, Inmate Disability Tracking Program, disability codes (to be established), qualified interpreter, intellectual disability (developmental disability), Equally Effective Communication, due process, clinical encounter, auxiliary aids and services (e.g., qualified readers and qualified interpreters);
- Section III. of the order cites non-discrimination and ADA compliance, but numerous processes, forms, and training (as explained in detail throughout other sections of this report) must be put in place to ensure that discrimination does not take place relative to ADA and inmates with disabilities; and
- The jail rulebook does not refer to Compliance Sergeants (ADA Coordinators) or ADA Deputies (ADA Corrections Division representatives), and has very limited ADA/disability-related information. Numerous disability-related topics must be included, and are outlined in other sections throughout this report.

**References**

**28 CFR § 35.130(a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.107(a)** states that a public entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part.

***The information below is for reference only.***

*Due to the settlement agreement and subsequent Armstrong v. Schwarzenegger Federal Court Ordered Injunction (January 18, 2007), the CDCR was ordered to do the following with regard to their ADA program which includes inmates with disabilities, e.g., mobility, blind/vision, deaf/hearing, learning, and those with*

FINAL REPORT



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

*kidney disease (undergoing dialysis treatment):*

*"Within 45 days of this Order, defendants shall appoint one full-time staff member at the Associate Warden level or higher as the ADA Coordinator at each institution designated to house prisoners with disabilities impacting placement (including designated reception centers and designated security housing units and condemned housing) to work only on ADA compliance matters..."*

FINAL REPORT

Page 327

## Notices

The Sheriff's Department County of Sacramento Correctional Services Operations Orders pertaining to ADA Notices are outlined in the draft Operations Order Inmates with Disabilities - ADA. This Operations Order indicates that The Americans with Disabilities Act Inmate Notice will be prominently posted in all inmate-housing units and the Americans with Disabilities Act Public Notice will be prominently posted at the public entrances of all Jail facilities.

These Notices are required to advise disabled inmates and other interested persons of information regarding the provisions of Title II of the ADA and its applicability to services, programs, or activities and to make the information available in a manner necessary to apprise individuals of the protections against discrimination assured them by the ADA. The Notices are also required to make available to all individuals the name, office address, and telephone number (for the public) of the employee designated to coordinate compliance with the ADA.

### Observations

The Assessment Team conducted a site assessment and review of all inmate housing units and public entrances at the MJ and the RCCC facilities. The site assessment revealed that the ADA Notices are not prominently displayed in any of the housing units in the MJ and RCCC facilities. The public entrances at the MJ and RCCC facilities do have ADA Public Notices posted. However, the ADA Notices refer individuals to the Department ADA Coordinator "Ivanna Chow" and to the Manager, EEO Disability Compliance Countywide ADA Coordinator.

### Conclusions

The SCSD detention facilities do not provide the Notices to all inmates as required by 28 CFR § 35.106. As a result, inmates are not provided information regarding the provisions of Tittle II of the ADA and its applicability to the services, programs, or activities. They are not apprised of the protections against discrimination assured them by the ADA, and they are not informed as to the name, office address, and telephone number of the employee or employees designated to coordinate compliance with the ADA.

### References

**28 C.F.R. § 35.106** requires a public entity to make available to applicants, participants, beneficiaries and other interested persons information regarding the provisions of Title II and its applicability to the services, programs, or activities of the public entity, and make such information available to them in such manner as the head of the entity finds necessary to apprise such persons of the protections against discrimination assured them by Title II of the ADA.

**28 C.F.R § 35.107** requires a public entity that employs 50 or more persons to designate at least one employee to coordinate its efforts to comply with and

FINAL REPORT

SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

carry out its responsibilities of title II of the ADA, including any investigation of any complaint communicated to it alleging its noncompliance or alleging any actions that would be prohibited. The public entity shall make available to all interested individuals the name, office address, and telephone number of the employee or employees designated pursuant to this paragraph.

FINAL REPORT

Page 329



## Custody Staff

All staff must have a working knowledge of and comply with all existing operations orders, post orders, policies, procedures and directives. Unlike the operations orders, policies and procedures, post orders contain specific post-related instructions and requirements and typically are required to remain at the specific post site. Post orders clearly outline duties, responsibilities, and expectations of staff. Without post orders, there is limited accountability for staff performing their day-to-day responsibilities/duties. In addition, staff should be required to sign the post orders acknowledgement log acknowledging that they read and understood the post orders.

**Observations**

The Assessment Team reviewed the following post orders:

- 8 WEST 400 Pod Disciplinary Housing Unit
- JKF Security Checks Post Order Protocol
- Booking Security Check Post Order Protocol
- CBF Cleaning Procedures Post Order Protocol
- CBF Daily Event Schedule
- CBF Security Checks Protocol
- Detainee Correspondence Post Order Protocol
- Detainee Orientation Post Order Protocol
- Emergency Psychiatric Evaluation Post Order Protocol
- Gatehouse Security Check Post Order Protocol
- Hunger Strike Post Order Protocol
- ICE Compliance Fire Drills Post Order Protocol
- ICE Detainee Classification Process Post Order Protocol
- ICE Detainee Strip Search Post Order Protocol
- ICE Guidelines Post Order Protocol
- ICE Notifications Post Order Protocol
- JKF Cleaning Procedures Post Order Protocol
- JKF Daily Event Schedule
- KBF Cleaning Procedures Post Order Protocol
- KBF Daily Event Schedule
- KBF Security Checks Post Order Protocol
- Kitchen Security Check Post Order Protocol
- Laundry Security Check Post Order Protocol
- MSDS/Hazardous Substance Inventory Log Post Order Protocol
- RBF Cleaning Procedures Post Order Protocol
- RBF Daily Event Schedule
- RBF Security Checks Post Order Protocol
- SBF Cleaning Procedures Post Order Protocol
- SBF Daily Event Schedule
- SBF Security Checks Post Order Protocol

FINAL REPORT

- Security Housing Food Services Post Order Protocol
- Special Management Unit Post Order Protocol
- Tower Security Check Post Order Protocol
- Booking Post Order
- CBF Post Order
- Gatehouse Post Order
- JBCT (ROC) Program Post Order
- JKF Post Order
- KBF Post Order
- Kitchen Post Order
- Laundry Post Order
- RBF Post Order
- SBF Post Order
- Tower Post Order

Based on this review it was found that the custody post orders do not contain any language relative to staff requirements and duties regarding disabled inmates, or reasonable accommodation requirements, etc. It was also found that there are no post orders for custody positions at the MJ and the RCCC minimum and medium security barracks housing units and custody support positions.

## Conclusions

The existing SCSD detention facilities custody post orders must be developed and/or revised with specific requirements for staff to ensure disabled inmates have equal access to programs, services and activities, and staff are aware of the assistance and accommodations/modifications that they must provide for disabled inmates. Examples of specific information to be inserted include, but are not limited to: assistance to inmates with learning and developmental disabilities, reasonable accommodation requirements during verbal announcements, alarms, and evacuation procedures for disabled inmates. For custody positions that currently do not have post orders in place, post orders must be developed with specific requirements for staff to ensure disabled inmates have access to programs, services and activities. This means, in part that staff must be aware of the assistance and accommodations/modifications they need to provide for disabled inmates.

## References

**28 CFR § 35.105 (a)** requires that a public entity evaluate its current policies and practices, and to the extent that modification of any such policies and practices is required, the public entity shall proceed to make the necessary modifications if they do not or may not meet the requirements of Title II.

*The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.*

FINAL REPORT



*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*"Each institution/facility (DPP designated institution, nondesignated institution, and reception center), shall ensure custody staff in housing units where an inmate with impairments that impact placement resides, maintains a copy of the identification card/picture for that inmate with the inmate roster, to alert unit staff of the special needs of the inmate during count, emergency evacuation, verbal announcements, etc."*

*Post Orders:*

*Specific ADA requirements are required to be incorporated into staff unit post orders. This includes the following areas:*

- *Verbal Announcements and Alarms;*
- *Evacuation Procedures; and*
- *Count.*

*Staff post orders must be revised to include the specific requirements for staff to ensure they are aware of assistance and modifications that must be provided to disabled inmates.*

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.***

*Notices, Announcements, and Alarms:*

*Written Materials: Each designated DDP institution/facility must ensure that CCR notices, orientation packages, announcements, and similar printed materials are accessible to inmates with developmental disabilities. Institution staff must provide the necessary assistance to all DDP inmates on a case-by-case basis to ensure that those who have difficulty reading and/or communicating in writing will be provided reasonable access to forms, regulations, and procedures. Local operational procedures must reflect specific notices, announcements, and alarm procedures for DD2 and DD3 inmates. Post orders for staff assigned to provide such services to DD2 and DD3 inmates must reflect these specific procedures.*

*Verbal Announcements: Each designated DDP institution/facility must ensure effective communication is made with inmates with developmental disabilities regarding public address announcements and reporting instructions, including*

FINAL REPORT

*those regarding visiting, yard release and recall, count, lock-up, and unlock, etc. Local operational procedures must reflect specific requirements for verbal announcements impacting DD2 and DD3 inmates. Post orders for staff assigned to provide such services to DD2 and DD3 inmates must reflect these specific procedures, i.e., prompts for visits or hearings, if an inmate does not respond.*

*Count And Movement*

*Each designated DDP institution and facility must review local policies and procedures to ensure DDP inmates are provided with necessary prompting so that they comply with count time expectations, respond to visits, keep work/school schedules, and respond to meals and other movement calls. Local operational procedures must reflect specific count and movement procedures for DD2 and DD3 inmates. Post orders for staff assigned to designated buildings/units/wings that house DD2 or DD3 inmates must reflect the specific count and movement procedures.*

*Evacuation Procedures*

*Local evacuation procedures must be adopted at each designated DDP facility to ensure the safe and effective evacuation of inmates with developmental disabilities. Local operational procedures must reflect specific evacuation procedures for DD2 or DD3 inmates. Post orders for staff providing services for DD2 or DD3 inmates must reflect these procedures.*

*All DDP inmates will be provided instructions for evacuation/emergency procedures during orientation before initial classification at designated institutions.*

FINAL REPORT



## Accountability

The SCSD detention facilities do not have any existing operations orders, policies or procedures for the MJ or RCCC pertinent to investigating, monitoring or tracking allegations or violations of Title II of the ADA. Since there is no local policy requirement, the Assessment Team did not observe or review the tracking of ADA or disability-related allegations or violations against inmates.

**Observations**

Sacramento County Sheriff's Department, Operations Order 01/03, Employee Conduct, states in part; "The purpose of this Order is to outline the standards of employee conduct at the Main Jail and Rio Cosumnes Correctional Center (RCCC)."

Section II. Related General Orders, states in part, "Employees shall be aware of and adhere to the policies and regulations within the Sheriff's Department's Departmental General Orders and Divisional Operations Orders."

Section III. General Behavior, states in part, "All persons employed at the correctional facilities, either in a paid or volunteer capacity must observe all rules, regulations, and laws pertaining to custodial facilities. Any failure to do so may result in disciplinary action, exclusion from the facilities, or legal consequences."

However, Operations Order 01/03, Employee Conduct, does not contain specific language regarding staff accountability with regard to violations or allegations relative to the ADA or inmates with disabilities.

Sacramento County Sheriff's Department, Operations Order 07/02 Grievances, states in part, "Correctional Services shall provide a written process that allows inmates to grieve specific conditions. All written grievances shall receive a written response within a reasonable time limit and will be resolved at the lowest appropriate staff level."

Section II. Definitions, states in part, "A grievance is a complaint by an inmate regarding any condition of confinement, act, rule or policy, written or unwritten, in which an inmate contends that there is an infringement upon his or her personal, human, or constitutional rights." It also contains language indicating that a grievance may include complaints against the substance of policies or rules, conditions of confinement, medical care, classification actions, disciplinary actions, program participation, telephone, mail and visiting procedures.

Section III. Grievance Procedures, states in part; "An inmate should first direct his/her issue to custody or supervising staff as the issue should be resolved at the lowest appropriate staff level. If custody or supervising staff is unable to resolve the issue, the inmate may file a formal written grievance."

FINAL REPORT

Section IV. Supervisor Responsibilities, states in part; "The watch commander/unit manager has four days to review and approve the response, add additional responses to the grievance or require further investigation. The completed grievance response will be forwarded to the assistant division commander for review. In the event the grievance involves staff conduct, the assistant division commander shall notify the division commander who thereafter will decide if a copy should be forwarded to Professional Standards."

Operations Order 07/02 Grievances, encourages and expects internal problems to be solved at the lowest possible level of inmate contact, offers administrators a means for continuous review of administrative policy and procedures, and provides written documentation of inmate complaints. The Order allows inmates a grievance/appeal process for a multitude of issues, e.g., conditions of confinement, including but not limited to: health care, classification actions, disciplinary actions, program participation, telephone, mail, visiting, etc.

Although the Order does not contain a separate avenue for writing or tracking confidential letters directly to an executive or other administrators, and does not contain specific information relative to disabilities, health care appliances, or other ADA or disability concerns/issues, the grievance process is the mechanism for formal and informal resolution of disability-related concerns. Likewise, although not defined in written policy as such, KITE's (including HS KITE's) are the expected process for disability-related requests, e.g., access to programs, services and activities, including health care, reasonable accommodations, effective communication, staff assistance, health care appliances/assistive devices/durable medical equipment, and auxiliary aids.

Section IV. Supervisor Responsibilities, states in part, "The watch commander/unit manager has four days to review and approve the response, add additional responses to the grievance or require further investigation. The completed grievance response will be forwarded to the assistant division commander for review. In the event the grievance involves staff conduct, the assistant division commander shall notify the division commander who thereafter will decide if a copy should be forwarded to Professional Standards.

There is no specific policy or procedure, however, to formally track ADA-related grievances or issues (either by egregious, serious, or repeat allegations or violations, or by housing unit, nature of complaint, team/shift, date, or other criteria) in order to monitor disability-related problem areas for immediate or on-going attention.

As stated above in Section IV. Supervisor Responsibilities, it is implied that the administration and Professional Standards staff would follow-up on complaints of staff misconduct. But this does not describe or include any timelines or any specific course of action (or staff disciplinary matrix for any substantiated ADA or disability-related allegations).

FINAL REPORT

**Staff Interviews**

Assessment Team members interviewed the Compliance Sergeants (ADA Coordinators) and the ADA Deputies (Assistant ADA Coordinators), as well as Inmate Grievance Office staff and numerous other custody and non-custody supervisors and staff throughout the MJ and RCCC.

**Inmate Interviews**

During the inmate interviews, some inmates who are permanent wheelchair-users and other mobility-disabled inmates, as well as inmates who are deaf, have kidney disease (undergoing kidney dialysis), mental illness, and those with other disabilities reported incidents that can be classified as egregious ADA or disability-related violations and which would meet the criteria for investigating, monitoring and tracking. Specific allegations and information are captured throughout this report.

**Conclusion**

The SCSD detention facilities are in violation of Title II of the ADA, with regard to implementation or oversight of a defined accountability or investigative mechanism to monitor and track staff ADA violations. It is paramount that the SCSD detention facilities develop and implement a policy and practice relative to accountability and investigations specific to ADA and disabled inmates.

The SCSD detention facilities do not have an existing policy (or procedures) pertinent to monitoring, investigating and tracking violations of Title II of the ADA. Nor do they have a mechanism to specifically capture staff ADA violations (e.g., egregious or serious violations or repeat occurrences).

The SCSD detention facilities currently handle inmate grievances and staff complaints in accordance with existing SCSD detention facilities Operations Order 07/02, Grievances. However, this process only captures alleged violations as a result of inmate grievances filed. This process does not capture events where supervisors, managers or other staff identify violations of Title II of the ADA (or any violations relative to future SCSD detention facilities policies).

The SCSD detention facilities must ensure a new policy (and related procedures) are written and implemented regarding monitoring, investigating and tracking staff violations or allegations of violations of Title II of the ADA (as well as violations or allegations of violations of future local ADA-related policies).

As a result of the assessment, the team found:

- There is no existing policy pertaining to monitoring, investigating and tracking staff violations (or allegations of such violations) of Title II of the ADA;
- The SCSD detention facilities need to incorporate a written policy and procedures regarding monitoring, investigating, and tracking staff

FINAL REPORT

violations (or allegations of violations) of Title II of the ADA (and any new SCSD detention facilities operations orders pertaining to the ADA or an inmate disability program);

- Staff must be trained on any new policy and expectations; and
- Staff must be subject to discipline for violations of the ADA.

**References**

**28 CFR § 35.130 (a)** states that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**28 CFR § 35.107 (a)** states that a public entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part.

***The information below is for reference only. Due to Federal Court Ordered Injunction (January 18, 2007), the CDCR was ordered to do the following (with regard to instituting an Accountability Plan) to hold managers and staff accountable for violations of the ADA and related settlement agreements, court injunctions, etc., as pertained to inmates with disabilities:***

*Federal Court Injunction (January 18, 2007)*

*Accountability:*

*"Within 120 days of the date of this Order, defendants, in cooperation with the Office of the Inspector General and the Receiver in Plata v. Schwarzenegger, shall develop a system for holding wardens and prison medical administrators accountable for compliance with the Armstrong Remedial Plan and the orders of this court. This system shall track the record of each institution and the conduct of individual staff members who are not complying with these requirements. Defendants shall refer individuals with repeated instances of non-compliance to the Office of Internal Affairs for investigation and discipline if appropriate."*

*"Within 60 days of the date of this Order, defendants shall amend post orders and duty statements of correctional staff as appropriate to include the Armstrong requirements for which they are responsible."*

FINAL REPORT



## Policies and Procedures

The Assessment Team reviewed the Sheriff's Department County of Sacramento Correctional Services Operations Orders, Correctional Health Services Policies and Procedures and the Correctional Health Services Standardized Nursing Procedures that specifically pertain to or should pertain to inmates with disabilities. The following list details the Operation Orders and Policies and Procedures that require revision with ADA-specific requirements.

**Sheriff's Department County of Sacramento Correctional Services Operations Orders**

| | |
|---|---|
| 01/05 | Training Program / Training Requests |
| 01/11 | Line-Ups |
| 01/15 | Reporting of Incidents and Crimes |
| 02/01 | Use of Force |
| 02/02 | Use of Restraint Devices |
| 02/03 | Use of Pro-Straint Chair |
| 02/04 | Weapons, Tactical Weapons and Specialized Equipment |
| 02/05 | CERT and Cell Extraction Procedures |
| 02/06 | Prisoner Searches |
| 02/12 | Transportation of Prisoners |
| 02/13 | Inter-Facility Transportation and Court Appearances |
| 03/03 | Fire Suppression – Main Jail |
| 03/05 | Fire Suppression – RCCC |
| 03/09 | Fights, Riots, Hostage and Minor Disturbances |
| 03/12 | Evacuation Plan - Main Jail |
| 03/13 | Evacuation Plan - RCCC |
| 03/16 | Crimes Occurring Within Correctional Facilities |
| 03/17 | Preventing, Detecting, Responding to Inmate Detainee Sexual Assault |
| 04/01 | Intake, Search, Reception and Holding |
| 04/02 | Evidentiary/ Exposure Blood Draws |
| 04/03 | Prisoner Clothing, Property, and Funds |
| 04/04 | Use of Sobering Cell |
| 04/05 | Use of Safety, Segregation, North Holding #2, and Multipurpose Rooms |
| 04/07 | Dress-In/Dress-Out Procedures |
| 04/08 | Prisoner Orientation |
| 04/09 | Release Procedures |
| 04/10 | Property and Money Return and Release Procedures |
| 04/12 | Missing Property and Property Claims |
| 05/04 | DNA Samples |
| 05/08 | Work Project Assignment |
| 05/09 | Weekenders |

FINAL REPORT

| | |
|---|---|
| 05/10 | Service of Processes on Prisoners |
| 06/02 | Housing Plan |
| 06/03 | Classification Process |
| 06/04 | Count and Lockdowns |
| 06/08 | Court Pull Procedures |
| 06/09 | Prisoner Movement Within a Facility |
| 06/10 | Recreation, Exercise and Showering |
| 06/11 | Laundry, Clothing & Linen |
| 06/13 | Telephone/TDD/TTY Equipment Access |
| 06/14 | Interpreter Services |
| 06/17 | Social and Media Visits |
| 06/19 | Inmate Workers |
| 06/20 | Court Holding Area and Courtroom Security |
| 07/01 | Inmate Message Requests (KITE's) |
| 07/02 | Grievances |
| 07/03 | Discipline Plan |
| 08/04 | Educational Services |
| 08/05 | Commissary Operations |
| 08/06 | Prisoner Services |
| 08/07 | Law Library |
| 08/10 | Jail Industries |
| 08/11 | Religious Services |
| 09/01 | Housing Unit Inspections and Cost Recovery |
| 09/10 | Maintenance Requests and Equipment Repair |
| 10/01 | Health Care Services |
| 10/02 | Psychiatric Services |
| 10/03 | Health Care Treatment Access |
| 10/04 | Medical Intake Screening |
| 10/05 | Suicide Prevention Program |
| 10/08 | Medicine Distribution "Pill Call" |
| 10/09 | Dental Services |
| Draft | Inmates With Disabilities - ADA |

**Correctional Health Services Policies and Procedures**

| | |
|---|---|
| 1125 | Prosthesis |
| 1128 | Reading Glasses for Inmates |
| 1129 | ICE Detainee Procedural Considerations |
| 1302 | Staff Development and Training |
| 1404 | Receiving Screening |
| 1407 | Access to Treatment |
| 1409 | Clinic Care – Sick Call |
| 1410 | Medical Services Provided in the Medical Housing Unit |
| 1411 | Mental Health Services |

FINAL REPORT

| | |
|---|---|
| 1412 | Suicide Prevention – 2M – Joint Policy with JPS |
| 1413 | Use of Restraints and the Pro-Straint Chair |
| 1414 | Restraint Check Method |
| 1415 | Patients in Safety Cells |
| 1417 | Adult Developmental Disability |
| 1421 | Hunger Strike |
| 1422 | Special Needs Patients |
| 1423 | Post Release Medical Care Planning |
| 1424 | Sexual Assault |
| 1425 | Patients in Segregation Cells in Intake |
| 1431 | Footwear in the Jails |
| 1433 | Admission to Jail Acute Psychiatric Inpatient Unit |
| 1435 | Inmate Health Care Grievances |
| 1436 | Two East Inmate Transfers |
| 1439 | Reports of Disabilities or Impairments |
| 1601 | Medication Administration |
| 1801 | Informed Consent |
| 1803 | DNA Procedure at MJ and RCCC |
| 1900 | Health Record Format and Contents |
| 2000 | Dental Care |

FINAL REPORT

**Conclusion**

The Sheriff's Department County of Sacramento Correctional Services and Correctional Health Services must revise the operations orders and policies and procedures identified above adding specific ADA language and requirements, as they relate to disabled inmates. In addition, policies and procedures must be created to ensure: EC is provided to disabled inmates; inmates are screened and evaluated for disabilities and accommodations needs based on their disabilities; and out-of-cell time is made equitable to the extent possible for inmates with disabilities. The Sheriff's Department County of Sacramento Correctional Services and Correctional Health Services must also ensure their operations orders and policies and procedures address accommodations that must be provided to disabled inmates (e.g., those with learning and developmental disabilities) to ensure disabled inmates have equal access to programs, services, and activities.

**References**

**28 CFR § 35.130 (b)(7)** requires a public entity to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

**28 CFR 35.105** requires a public entity to evaluate its current services, policies, and practices and the effects thereof, that do not or may not meet the requirements of Title II of the ADA and to the extent modification of any such services, policies and practices is required, the public entity shall proceed to make the necessary modifications.

**28 CFR 35.130 (a)** No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;
(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or
(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

(4) A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or
(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

(7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

(8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Armstrong v. Brown settlement agreement.***

FINAL REPORT

*As a result of the ADA, the court approved settlement agreement for CDCR, titled, "Armstrong v. Davis" (now Armstrong v. Brown) amended January 3, 2001, mandates the following:*

*Notice, Announcements, and Alarms*

*Written Materials*

*Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure that CCRs, Notices, Orientation Packages, Job Announcements and similar printed materials that it distributes to inmates are accessible to inmates with disabilities.*

*Each institution/facility shall ensure that accommodations such as magnifiers, photocopying machines with capability to enlarge print for vision-impaired inmates, inmate or staff assistance, computer assisted devices audiotapes and Braille are provided when necessary. Institution staff shall provide the assistance and equipment necessary to all inmates with disabilities on a case-by-case basis to ensure that have difficulty reading and/or communication in writing e.g., learning disabled inmates, are provided reasonable access to forms CCRs, and procedures. The type of equipment available will vary based upon the institution's mission designation. Information regarding access to written materials will be provided to disabled inmates during the orientation process.*

*Verbal Announcements and Alarms*

*Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure that effective communication is made with inmates who have hearing impairments impacting placement regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, unlock etc.*

*All verbal announcements in housing units where inmates with hearing impairments impacting placement reside shall be done on the public address system (if applicable) and by flickering the unit lights on and off several times alerting impaired inmates that an announcement is imminent.*

*The verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, etc. These procedures shall be communicated to disabled inmates during the orientation process. These requirements shall be incorporated into unit staff post orders.*

*Local policies and procedures shall be adopted to reflect this obligation.*

FINAL REPORT

*Evacuation Procedures:*

*Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure the safe and effective evacuation of inmates with disabilities.*

*Local evacuation procedures shall be adopted at each facility.*

*Each institution/facility (DPP designated institutions, nondesignated institutions, and reception centers) shall ensure custody staff in housing units where inmates with disabilities that impact placement reside maintain a copy of the identification card/picture for that inmate with the inmate roster, to alert unit staff of the special needs required for emergency evacuation of the inmate. Special needs may include personal notification for hearing impaired inmates, or assistance provided to vision or mobility impaired inmates in responding to emergency situations.*

*Evacuation procedures shall be effectively communicated to disabled inmates during orientation process. These procedures shall also be incorporated into unit staff's post orders.*

***The information below is for reference only. Due to the settlement agreement and approval by the Federal Court, the information outlined is applicable to disabled inmates under the Clark v. California settlement agreement.***

*Notices, Announcements, and Alarms:*

*Written Materials: Each designated DDP institution/facility must ensure that CCR notices, orientation packages, announcements, and similar printed materials are accessible to inmates with developmental disabilities. Institution staff must provide the necessary assistance to all DDP inmates on a case-by-case basis to ensure that those who have difficulty reading and/or communicating in writing will be provided reasonable access to forms, regulations, and procedures. Local operational procedures must reflect specific notices, announcements, and alarm procedures for DD2 and DD3 inmates. Post orders for staff assigned to provide such services to DD2 and DD3 inmates must reflect these specific procedures.*

*Verbal Announcements: Each designated DDP institution/facility must ensure effective communication is made with inmates with developmental disabilities regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, and unlock, etc. Local operational procedures must reflect specific requirements for verbal announcements impacting DD2 and DD3 inmates. Post orders for staff assigned*

FINAL REPORT

*to provide such services to DD2 and DD3 inmates must reflect these specific procedures, i.e., prompts for visits or hearings, if an inmate does not respond.*

*Count And Movement*

*Each designated DDP institution and facility must review local policies and procedures to ensure DDP inmates are provided with necessary prompting so that they comply with count time expectations, respond to visits, keep work/school schedules, and respond to meals and other movement calls. Local operational procedures must reflect specific count and movement procedures for DD2 and DD3 inmates. Post orders for staff assigned to designated buildings/units/wings that house DD2 or DD3 inmates must reflect the specific count and movement procedures.*

*Evacuation Procedures*

*Local evacuation procedures must be adopted at each designated DDP facility to ensure the safe and effective evacuation of inmates with developmental disabilities. Local operational procedures must reflect specific evacuation procedures for DD2 or DD3 inmates. Post orders for staff providing services for DD2 or DD3 inmates must reflect these procedures.*

*All DDP inmates will be provided instructions for evacuation/emergency procedures during orientation before initial classification at designated institutions.*

FINAL REPORT



## Americans with Disabilities Act Assets/Features

The Sheriff's Department County of Sacramento Correctional Services Operations Orders applicable to requesting or facilitating repair and maintenance requests, are outlined in Operations Orders 09/10, Maintenance Requests and Equipment Repair.

The purpose of the Order is to standardize the procedures for maintenance requests and facility equipment repair at the MJ and RCCC.

Section I of the policy (Overall maintenance), states in part, "Custody and assigned staff at each facility are responsible for inspecting facility equipment in their respective work areas on a daily basis and will promptly report all needed repairs."

Section II (Main Jail), state in part, "At the Main Jail facility equipment needing repair and general maintenance will be fielded through the project officer using a Maintenance Request form."

Section III (RCCC), states in part, "At RCCC, facility equipment needing repair and general maintenance will be fielded through the project officer using the maintenance hotline phone listing, which is available from the projects officer and/or administration.

Section III also states in part, "If a maintenance issue is not urgent, the after-hours non-emergency line may be used to leave a message", and "If the maintenance issue is an emergency, a supervisor shall be notified. Employees should not leave a message on the non-emergency line and should contact the projects officer or the trade directly.

However, there are no policies or procedures with regard to inventorying and tracking structural or fixed assets/features, e.g., grab bars, transfer bars, raised toilets, sinks, water fountains, and exercise apparatus. Likewise, there are no existing policies or procedures to identify specific categories or priorities specific to ADA-related maintenance requests/repairs.

For the MJ, the Assessment Team interviewed the Basement Project Manager (sworn sheriff's deputy), as well as an SCSD Sheriff's Lieutenant. The Basement Project Manager is responsible for receiving maintenance/work request issues, and submitting them to the SCGS. For RCCC, the Assessment Team interviewed SCSD detention facilities Records Officer (non-sworn) who is responsible for the RCCC maintenance and work order process. The team also interviewed two SCGS Facility Managers, who work collaboratively with the aforementioned staff, and are responsible for receiving and following up on maintenance requests. The process at both detention facilities is basically identical. There are minor differences, e.g., the specific buildings and areas for

FINAL REPORT

written work requests/work orders are different, and some of the RCCC areas include industries.

For both jails, potential work orders/requests can be initially identified by staff, or inmates can report an issue or discrepancy and notify a deputy or appropriate jail staff. Staff may initiate a general order (work request) for maintenance and repair work requests electronically through the SCSD detention facilities Web-Portal. Specifically, staff complete the order (work request) by identifying the location and specific issue warranting repair or replacement, and answering relevant questions via drop-down menus and a comments section. All electronic requests submitted by staff are received by either the MJ Basement Project Manager or the RCCC Records Officer who has oversight of the RCCC work request process.

The MJ Basement Project Manager and RCCC assigned Records Officer receive the electronic email notification of requests (from requesting staff member), and make all reasonable attempts to informally ensure all appropriate maintenance/repair/replacement requests are completed as soon as possible. If the issue(s) cannot be resolved informally, the MJ Basement Project Manager or RCCC Records Officer electronically navigates through the County Automated Facility Maintenance (CAFM) management system. Each respective party (as applicable) will input the requests and information (type of issue, location, etc.) into a work order, and forward the order to the SCGS.

Categories for work orders include: routine, urgent and emergent. The aforementioned staff at both the MJ and RCCC indicated that they make immediate phone calls to the SCGS for emergent issues, and ongoing communication takes place between them and the SCGS Facility Managers as to any remaining open work orders (including those in immediate need). The Assessment Team was informed that work orders never 'fall off' (are not deleted from) the CAFM system until 7 days after completion of the repair or replacement. Most work orders associated with ADA are considered routine maintenance issues (which are the lowest level of the priorities), but both the MJ Basement Project Manager and RCCC Records Officer indicated that they inform an SCGS Facility Manager if an issue involves ADA non-compliance.

Once the SCGS Facility Manager receives the electronic Work Order from either the MJ Basement Project Manager or RCCC Records Officer, he dispatches a maintenance staff member to provide maintenance repair or replacement as necessary. According to the staff members interviewed, routine maintenance requests generally take 2-3 working days to complete. The Assessment Team was informed, however, that routine ADA work requests as well as emergency requests are usually completed on the same day that the SCGS Facility Manager receives the electronic work order from the MJ or RCCC.

FINAL REPORT

Both aforementioned staff members from the MJ and RCCC admitted that there is not a master listing or inventory of ADA structural or fixed assets or features, nor is there a policy, procedure, or standard practice for identifying 'ADA' within the work order or request process. The only current method to identify a maintenance issue as ADA-related, would be to incorporate language into the comments section of the initial request email and subsequent work order outlining the discrepancy as ADA-related. However, as Operations Order 09/10 currently does not require this, and there is no other related written policy or procedure, there is no current directive for staff to do this. The MJ Basement Project Manager and RCCC Records Officer both acknowledged the SCGS maintenance staff for their diligence with regard to promptly fixing maintenance issues as they arise.

The SCGS Facility Managers interviewed confirmed there is no standard report generated or monitored to track the state of repairs for ADA or disability-related maintenance issues, unless SCGS staff individually sort [in the CAFM system] by a specific known item/issue/discrepancy, or, unless requesting staff or the MJ Basement Project Manager or RCCC Records Officer identify a particular issue as 'ADA' (in the request email or electronic work order comments section). They also confirmed the following: there is no master list of structural or fixed ADA assets/features; there are no ADA or disability categories for maintenance work orders; there are no expedited timelines or priority categories specifically for ADA or disability-related maintenance requests; and there is no regular preventive maintenance or serviceability checks for the few structural or fixed ADA assets/features that do exist at the MJ and RCCC.

One of the SCGS Facility Managers interviewed indicated that he could create or produce just about any type of report or spreadsheet as requested. But in interviewing all pertinent staff members, the primary report utilized is a general report listing open and completed work orders.

The Assessment Team received the following related documents (reports) produced from the CAFM system: spreadsheet of all open and closed work orders submitted during the previous 12 months (and beyond); a spreadsheet of all open and completed work orders for Facility 505 (MJ - Lorenzo Patino Hall of Justice) and Facility 507 (RCCC); and a listing of all open and completed work orders (since 6/1/16) specifically focusing on areas (not necessarily specific to actual structural or fixed ADA assets or features) where mobility-disabled inmates are most likely housed and where ADA fixed/structural assets or features exist or should exist (e.g., MJ 2nd floor, RCCC MHU, M-Dorm). However, SCGS staff was unable to produce any historic list of service call or maintenance requests (open or completed) specifically for ADA or disability-related issues.

One of the CAFM reports (spreadsheet) received for open/completed work orders contained the following fields: preventive maintenance work record code,

FINAL REPORT

description, requestor, status, current date, and current time. A second CAFM report received contained the following fields: facility code (505 [MJ] or 507 [RCCC]); floor (e.g., 2nd floor); facility name; address; work order #; work order description; status (e.g., O, C, X, D, T); status description (e.g., in-progress, dispatched, completed, on-line); work order creation day; work order completion day; and requestor. The above listed 'status' letters/codes represent the following: O=Open (possibly dispatched, in-progress, on-hold, on-line, or vendor); C=Completed; D=Deferred; T=Terminated work order (possibly work was not needed or had already been completed); X=Duplicate (previous work order had already been completed.

A review of the CAFM generated Report for the MJ (for the previous 12 months) showed a listing of approximately 3,060 work orders submitted. Of those work orders, only 2 were identified in the CAFM Report as ADA or disability-related. As stated above, this is the exception, as there is no current policy or common practice to identify these as such. One of the two work orders was applicable to inmates (including mobility-impaired inmates). This particular work order was submitted as a facility-wide request to install handrails in every shower in the MJ due to "ADA Compliance rules", and also "old style showers" need to have a slip grip tape installed on the floor. The work order was submitted on 1/19/16, and is still categorized as an 'Open' work order. The second ADA-related work order concerns visiting civilians/non-inmates (not applicable to an Inmate Disability Program), and is specific to the Women's ADA (courtroom side) toilet not flushing. This work order was submitted on 8/[illegible]/16, and is currently categorized as an 'Open' work order.

Of the more than 3,000 MJ work orders submitted during the previous 12-month period, only about 13 of the work orders were either clearly, likely, or somewhat likely to be ADA (disability/accessibility) related. A number of these would depend on what type of inmate (whether disabled and depending on specific type of disability) lived in the cell, bed area, or was housed in the respective housing unit. There were at least a couple of dozen additional work orders (in addition to the aforementioned 13 referred to) that may have also been ADA (disability/accessibility) related, also depending upon whether a disabled inmate lived in the cell, bed area, or was assigned to the respective housing unit. However, for both scenarios, without an electronic or other tracking process to identify disabled inmates (e.g., mobility and vision-impaired), and in the absence of a policy and process to identify and track ADA-related work orders, it is extremely difficult to obtain this information.

A review of the second CAFM generated report (spreadsheet) depicted all existing 'Open' work orders (regardless of when submitted) as well as all work orders submitted since 6/1/16, regardless of status (e.g., open, completed, etc.). This spreadsheet captured the MJ building/area 505 (Lorenzo Patino), specifically the 2nd floor, and RCCC building/area 537, specifically MHU and M-

FINAL REPORT

barracks. This report is not normally generated or reviewed specifically for identifying or tracking ADA related work requests/work orders or otherwise. However, the Assessment Team specifically asked for this type of report as these are the primary areas (though not exclusive) where inmates with disabilities are currently or most likely to be housed, e.g., those with mobility and vision-impairments.

Information gleaned from approximately 129 MJ (2nd floor) work orders included: none of the work orders were flagged or identified as ADA (disability or accessibility) related; about 47 of the work orders are categorized as current 'Open' work orders (approximately 22 between 2011-2015 [primarily 2015]); About 82 are categorized as 'Completed'; and about 7 are either clearly, likely, or somewhat likely to be ADA (disability/accessibility) related. Of the approximate 7 ADA (or likely ADA related) work orders; about 4 of them are currently categorized as 'Open' work orders. Note: some of the work orders from this spreadsheet are also captured in the previously identified spreadsheet (CAFM generated report for work orders for the previous 12 months).

Information obtained from the 41 RCCC (building area 537 – MHU, and M-Barracks) work orders included: none of the work orders are flagged or identified as ADA (disability or accessibility) related; 3 of the work orders are categorized as 'Open' work orders; 38 are identified as 'Completed'; and about 7 from RCCC are either clearly, likely, or somewhat likely to be ADA (disability/accessibility) related. Of the 7 ADA (or likely ADA) related work orders, all of them are identified as 'Completed.'

There is no identification or tracking category to specifically identify ADA or disability-related Work Requests/Work Orders, there is no log or list specific to ADA/disabled inmates or disability-related work requests/orders, and there are no existing records of ADA or disability-related maintenance or service calls.

The requests are categorized according to problem, but not relative to ADA, a disabled inmate, or a disability-related maintenance/repair issue.

Staff explained that ADA or disability-related maintenance/repair issues are normally categorized as 'Routine' (lowest level of priority category), but are often fixed or replaced immediately or within about 2-3 days.

Staff interviewed indicated the Compliance Sergeants (ADA Coordinators) and ADA Deputies (Assistant ADA Coordinators) for the MJ and RCCC do not receive copies of the work requests/work orders for monitoring, tracking or other purposes.

**Conclusion**

Although Operations Order 09/10, Maintenance Requests and Equipment Repair is applicable to requesting or facilitating repair and maintenance requests, neither

FINAL REPORT

the SCSD detention facilities nor SCGS have an operations order, policy, procedure, or process in place to track the state of repair for structural or fixed ADA assets and features. The current housing process is severely flawed in that it places mobility-disabled inmates in housing which is not accessible with regard to their cells, paths of travel, and inappropriate or non-fixed assets/features, such as grab bars, transfer bars, accessible toilets, showers, and sinks. It is vital that the SCSD detention facilities house mobility-disabled inmates in housing commensurate with their ADA needs as well as their custody level and programming needs (notwithstanding other overriding placement factors, e.g., mental health housing). The SCSD detention facilities must develop and put into place a comprehensive process to include an inventory and tracking system of housing placements available to inmates with mobility disabilities (i.e. full-time wheelchair users, intermittent wheelchair users, mobility-disabled inmates who do not use wheelchairs [but may require the use of an assistive device], etc.), and the status of repairs for ADA accessible assets/features and ADA-related maintenance (Work Requests/Work Orders).

ADA Title II Regulations, 28 CFR 35.133 Maintenance of Accessible Features, mandates that a public entity must maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by qualified individuals with disabilities (e.g., inmates with mobility disabilities).

28 CFR 35.152 Jails, Detention and Correctional Facilities, and Community Correctional Facilities, subsection (b)(3) Discrimination Prohibited, requires public entities to implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe and appropriate housing.

As a result of the assessment, which included reviews of applicable policies and other documents, as well as staff interviews, findings for this area include:

- The SCSD detention facilities and SCGS have no policies or procedures that pertain to requesting or facilitating repair and maintenance requests.
- The SCSD detention facilities and SCGS have no policies or procedures with regard to inventorying and tracking structural or fixed assets/features, e.g., grab bars, transfer bars, raised toilets, sinks, water fountains, exercise apparatus.
- There are no existing SCSD detention facilities operations orders or SCGS policies or procedures to identify categories or priorities specific to ADA requests/repairs.
- There is no identification or tracking category to specifically identify ADA-related Work Requests.
- There is not a log or list specific to ADA-related work requests.

FINAL REPORT

- There is not currently a requirement for staff or supervisors to indicate on the electronic Work Request or Work Order that a request pertains to an ADA issue.
  - A couple of the employees interviewed (who have maintenance-related duties) indicated that the only way of knowing whether a work request/work order is ADA related is if the staff member who input the information into the work request email or work order request to SCGS indicates such in the comments section, but this is not currently required or routinely done.
- There is not an existing inventory list or tracking system for structural or fixed ADA assets/features (i.e.., grab bars, transfer bars, raised toilet seats, accessible sinks, water fountains, and exercise apparatus).
- There are no existing records to track ADA-related service calls for repairs or replacements completed, or to identify the length of time an ADA asset or feature may have been inoperable or missing.
- Fixed or structural ADA assets or features are not routinely checked for serviceability, and there is no known documentation of such.
- Work Requests/Work Orders are categorized according to the problem/discrepancy, but not relative to whether it's an ADA asset or feature or ADA related issue.
- There is not an official automatic priority list for ADA-related Work Requests (priority is based on criteria levels [e.g., emergent, urgent, routine], that do not pertain to the ADA).
- ADA-related Work Request/Work Order information is not being forwarded to the Compliance Sergeants (ADA Coordinators) or ADA Deputies (Assistant ADA Coordinators) at the MJ or RCCC for possible monitoring or tracking.
- In the two CAFM generated reports (spreadsheets) which tracked the description of work requested and submitted for the MJ and RCCC, with the exception of 2 (out of over 3,000 work orders submitted) there was no indication as to whether the listed requested repairs were ADA (disability or accessibility) issues, fixed ADA structural assets or features, or from a mobility-disabled inmate's cell or bed area.

**References**

**28 C.F.R. §§ 35.133 and 35.152**, detailed above.

***The information below is for reference only. Due to Federal Court Ordered Injunction (January 18, 2007), the CDCR was ordered to do the following (with regard to the state of repair of accessible ADA features):***

*In January 2007, in the United States District Court, Northern District of California, the Honorable Judge Claudia Wilken issued a Federal Court Injunction against the California Department of Corrections and Rehabilitation (CDCR) as a result of violations of the Americans with Disabilities Act (ADA), Section 504 of the*

FINAL REPORT

*Rehabilitation Act, and a previous court settlement agreement. One of several key issues cited in the Federal Injunction pertained to an inventory of housing placements, the status of state of repairs of accessible ADA features, and maintenance (Work Requests/Work Orders). Specifically, the Order mandated CDCR to generate an inventory of housing placements available to inmates with mobility disabilities (i.e., full time wheelchair users, intermittent wheelchair users, mobility impaired inmates not requiring the use of wheelchairs, and inmates with a vision disability). The Order included the requirement to include information regarding the current state of repair of accessible features for each placement. The placement inventory was required to be updated continuously as new information is received regarding placement factors and maintenance. Upon completion of the inventory, CDCR was required to no longer house the aforementioned type of disabled inmates at any placements without adequate accessible housing, including working (operational) accessible toilets and showers, etc.*

FINAL REPORT

## Introduction Accessibility Survey

The survey section of this report is an effort to identify accessibility barriers as defined according to the 1991 Americans with Disabilities Act Standards for Accessible Design (Revised July 1, 1994) (ADAAG) and/or the 2010 Americans with Disabilities Act Standards (ADAS). Although "ADAAG" is the commonly used term for the 1991 ADA Standards, the term technically applies to the Guidelines published by the Unites States Access Board. When Guidelines are codified into law by the United States Department of Justice, they become Standards and are enforceable as law. Please refer to Part III Assumptions & Considerations / Technical Assumptions for a detailed explanation of ADAAG and ADAS. For purposes of this report, we will use the term "ADAAG" when referring to the 1991 ADA Standards and "ADAS" when referring to the 2010 ADA Standards.

The field survey for SCSD detention facilities was conducted using a digital level, tape measure and door pressure gauge. Photographs of typical compliant and noncompliant conditions were taken at each of the facilities. Collected data was reviewed and analyzed for appropriate recommendations to remove the barriers.

The field surveys were performed on October 17 and 18, 2016. Both areas that were currently being used as well as inactive areas such as Rodger Bauman Facility (RBF) were surveyed.

**OVERVIEW OF ADA REQUIREMENTS AS APPLICABLE TO SACRAMENTO COUNTY JAIL FACILITIES**

The Americans with Disabilities Act of 1990 (ADA) is civil rights legislation designed to extend civil rights protection to persons with disabilities.

There are four Titles to the ADA. Title II is the one that applies to Public Entities such as SCSD detention facilities.

Title II Public Services and Transportation - Prohibits state and local governments from discrimination by requiring "program accessibility". Program accessibility can be attained by rescheduling and/or relocating programs to accessible locations or by making physical facility changes, called "structural changes" in the ADA. Program accessibility must be achieved to the extent that it does not cause "an undue burden" to the Public Entity.

28 CFR, PART 35 --NONDISCRIMINATION ON THE BASIS OF DISABILITY IN STATE AND LOCAL GOVERNMENT SERVICES is the document that describes the ADA requirements for Public Entities such as SCSD detention facilities. These requirements include:

§35.105 Self Evaluation – requires that all Public Entities were to have evaluated all of their services, policies and practices to determine if they are all accessible

FINAL REPORT

to persons with disabilities. The Self Evaluation was to have been completed by July 26, 1993. We have not been provided with a copy of an ADA Self Evaluation prepared by Sacramento County that included the County Jail facilities. Online research provided information that other County departments such as Transportation had prepared ADA Transition Plans (http://www.sacdot.com/Pages/AmericansWithDisabilitiesAct-ADA.aspx).

It should also be noted that corrective work to remove architectural barriers to program access did not begin with the ADA. Previous requirements to prepare a Self Evaluation and Transition Plan and to remove architectural barriers began with Section 504 of the Rehabilitation Act of 1973 for public entities receiving federal funding. We have likewise not been provided with a copy of a Section 504 Self Evaluation prepared by Sacramento County that included the County Jail.

§35.150 Existing Facilities – requires that "a Public Entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." However, the law does not require a "public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens.

The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity." We are not aware that the Sacramento County Sheriff's Office determined that any action that would have improved access to any of the services, programs and activities represent a fundamental alteration of those services, programs or activities or would result in an undue financial burden.

35.150(b)(1) indicates that a public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance. 35.150(d) also requires that In the event that structural changes are required to achieve program accessibility, the Public Entity shall develop by January 26, 1993 a Transition Plan setting forth the steps necessary to complete

FINAL REPORT

FINAL REPORT

such changes. Structural changes were to have been completed by July 26, 1995.

We are not aware if the County of Sacramento prepared a Transition Plan or of any structural changes that were performed at any of the SCSD detention facilities between January 26, 1993 and July 26, 1995.

It should be noted that the requirements for a Self Evaluation and Transition Plan under the ADA are taken from Section 504 of the Rehabilitation Act of 1973, which applied to projects that received federal funding. The ADA extended those requirements to Public Entities receiving state or local funding.

§ 35.151 New construction and alterations – requires that newly constructed and altered facilities built by or on behalf of Public Entities shall be fully accessible if construction commenced after January 26, 1992. Public Entities had the option of using the Uniform Federal Accessibility Standards (UFAS) or ADAAG as the technical standards for new construction and alterations.

28 CFR Part 35 was amended on September 15, 2010 and included new sections that affect the SCSD detention facilities.

35.151(k) Detention and correctional facilities

(1) New construction of jails, prisons, and other detention and correctional facilities shall comply with the 2010 Standards except that public entities shall provide accessible mobility features complying with section 807.2 of the 2010 Standards for a minimum of 3%, but no fewer than one, of the total number of cells in a facility. Cells with mobility features shall be provided in each classification level.

(2) *Alterations to detention and correctional facilities.* Alterations to jails, prisons, and other detention and correctional facilities shall comply with the 2010 Standards except that public entities shall provide accessible mobility features complying with section 807.2 of the 2010 Standards for a minimum of 3%, but no fewer than one, of the total number of cells being altered until at least 3%, but no fewer than one, of the total number of cells in a facility shall provide mobility features complying with section 807.2. Altered cells with mobility features shall be provided in each classification level.

However, when alterations are made to specific cells, detention and correctional facility operators may satisfy their obligation to provide the required number of cells with mobility features by providing the required mobility features in substitute cells (cells other than those where alterations are originally planned), provided that each substitute cell—

(i) Is located within the same prison site;



(ii) Is integrated with other cells to the maximum extent feasible;

(ii) Has, at a minimum, equal physical access as the altered cells to areas used by inmates or detainees for visitation, dining, recreation, educational programs, medical services, work programs, religious services, and participation in other programs that the facility offers to inmates or detainees; and

(iv) If it is technically infeasible to locate a substitute cell within the same prison site, a substitute cell must be provided at another prison site within the corrections system.

(3) With respect to medical and long-term care facilities in jails, prisons, and other detention and correctional facilities, public entities shall apply the 2010 Standards technical and scoping requirements for those facilities irrespective of whether those facilities are licensed.

***§ 35.152 Jails, detention and correctional facilities, and community correctional facilities.***

(b) *Discrimination prohibited.*

(1) Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(2) Public entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals. Unless it is appropriate to make an exception, a public entity–

(i) Shall not place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available;

(ii) Shall not place inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment;

(iii) Shall not place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed; and

FINAL REPORT

(iv) Shall not deprive inmates or detainees with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed.

(3) Public entities shall implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing.

The United States Department of Justice (USDOJ) has issued a document titled "Guidance on the 2010 ADA Standards" and a copy can be found in Appendix A.

It should be noted that Title II does not define "barrier" as does Title III for Public Accommodations. Similarly, Title II entities are not required to remove physical barriers even if they are "Readily Achievable", since this concept does not apply to Public Entities. As described in §35.150, a Public Entity is required to identify all programs, services and activities and to determine if people with disabilities are provided nondiscriminatory access to them. An example of a "service" at Sacramento County Jail would be a toilet within a prison cell; if there are no accessible cells/toilets with grab bars as required by the 1991 ADAAG or UFAS, that would be an example of lack of program access. Another example would be a path of travel leading to a building where a program (e.g., classroom) is provided that has a slope of 10%. While this latter condition could be addressed by providing an assistant that could push a wheelchair user up the steep slope, it is doubtful that the former condition could be made fully accessible by other means than installing grab bars.

Citing past case law is also illustrative of the nexus between correcting conditions that are non-compliant with the 1991 ADAAG or UFAS and the obligation to provide program access. "While the ADAAG regulations clearly are not dispositive in this case, they can still provide guidance as to whether an existing facility is readily accessible and usable by individuals with disabilities." Brown v. County of Nassau, 736 F. Supp. 2d 602, 617 (E.D.N.Y. 2010). The United State Supreme Court has also noted that "older facilities" can avoid structural changes by "relocating services to alternative accessible sites" or using other methodology, but if these measures are "ineffective in achieving accessibility" the public entity is "required to make structural changes." Tennessee v. Lane, 541 U.S. 509, 532 (2004). Title II "imposes on public entities the requirement that they provide qualified disabled individuals with meaningful access to public services, which in certain instances necessitates that public entities take affirmative steps to remove architectural barriers to such access in the process of altering existing facilities." Ability Center of Greater Toledo v. City of Sandusky, 385 F.3d 901, 913 (6th Cir. 2004).

FINAL REPORT

Therefore, there are two different criteria that apply to the two SCSD detention facilities:

FACILITIES CONSTRUCTED PRIOR TO JANUARY 26, 1992:

For those facilities that were constructed prior to January 26, 1992, structural changes are required if any condition that does not comply with ADAAG limits or prevents the ability of an inmate with a disability to access any program at the Sacramento County Jail and other methods do not provide a similar level of compliance.

FACILITIES CONSTRUCTED OR ALTERED AFTER JANUARY 26, 1992:

For construction projects that have been performed after January 26, 1992 (including alteration projects), all work should be in compliance with ADAAG. For projects that commenced construction after March 15, 2012, all work should be in compliance with the 2010 ADAS, which for Title II entities includes 28 CFR Part 35.151 and the 2004 ADAAG. Refer to the detailed description of both standards in **Section D** below.

FINAL REPORT

## Accessibility Survey's

The SCSD is responsible for the care and custody or all prisoners falling under the jurisdiction of the Sacramento County Court System. The SCSD also contracts with the U.S. Government to house federal inmates. The SCSD operates two detention facilities: the MJ and the RCCC. The MJ is located at 651 I Street in downtown Sacramento and RCCC is located approximately 25 miles South at 12500 Bruceville Road in Elk Grove.

The MJ, opened in approximately 1989 and is a Type II facility that houses nearly all of the County's pretrial population, a number of federal pretrial prisoners. The structure is comprised of two 9-story towers with a vertical spine in between that contain circulation and exercise space. Inmates are housed on seven floors (each floor includes two levels of stacked cells), with the Superior Court and Jail Administration support space located on the first two floors of the facility.

The MJ has a rated capacity for 2,380 male and female inmates and contains 2,432 beds. Inmate areas include the basement level, which contains the Kitchen and Laundry; first floor, which includes Medical Intake Screening, Women's Booking, Holding, Clothing Exchange & Release, Men's Booking & Holding; second floor, which includes the Medical, Dental and Psychiatry Units; third floor and general inmate housing on floors 3-8. Each inmate has a cell with a toilet, lavatory, mirror, and bed. Inmates eat and participate in programs in a common day room area equipped with tables, chairs, and telephones. Some areas such as the Male Release Tank were occupied on the day of the site visit and were not inspected.

The SCSD detention facilities accommodates inmates with disabilities by issuing different size wheelchairs to inmates who require this type of mobility device, and some inmates are allowed to keep their personal wheelchairs. Nursing staff assists inmates with disabilities with their bathing activities while housed in the Medical Unit. SCSD detention facility staff indicated that the MJ currently houses a small population of inmates with various types of disabilities.

FINAL REPORT

SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Typical conditions observed in the MJ that are not compliant with ADAS:

Basement

Neither of the Kitchen inmate restrooms provide a 60" diameter clear turning space, grab bars or toilet accessories within accessible reach range and the doors only provide 30" clear width. The urinal rim in one of the restrooms is 25" AFF and there is no 60" wide space at the toilet

FINAL REPORT

Page 360





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- All of the Laundry folding counter is 36" AFF, which is too high for a person in a wheelchair to work at

1st Floor

- Transaction counters are typically 42" – 44" AFF and openings that are used to pass items back and forth between staff and inmates are 52" AFF

Page 361





- Changing benches in Dress In rooms that are not a minimum of 24" deep x 48" long

- Use of typical combination lavatory/toilet unit that does not provide knee space for a front approach at the lavatory or drinking fountain bubbler
- Female segregation cell restroom is only 28" wide at rear of toilet and lacks 60" diameter clear maneuvering space, toilet lacks grab bars, flush control is not on wide side of fixture and centerline of fixture is 13-1/2" from adjacent wall

FINAL REPORT





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Lack of 60" clear width at toilet and 60" diameter turning space in holding cells and inmate restrooms

- No grab bars at toilet in holding cells or inmate restrooms

FINAL REPORT

Page 363



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Inmate restrooms and holding cells with toilet seat height of 14-3/4" – 15-1/2" AFF and flush control is not on wide side of fixture
- Width of opening into toilet compartment in holding cells, Male Interview Waiting Room, Male Dress In rooms and Female Clothing Exchange is 24" - 28"

- No 30" wide x 29" high x 17" deep knee space at lavatory or drinking fountain in holding cells or inmate restrooms, drinking fountain bubbler is more than 5" from front of fixture and mirrors are too high for a wheelchair user to see their reflection

FINAL REPORT

Page 364





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Bottom of reflective surface of mirror 47" - 49" AFF in holding cells and inmate restrooms
- Highest operating part of paper towel dispenser in Medical Intake Screening inmate restroom is 52" AFF
- Toilet paper dispenser in Medical Intake Screening inmate restroom and Women's Booking & Holding Side inmate restroom is located behind toilet and not on side wall 7" – 9" in front of toilet

- Slope of floor in holding cells is 4.0

Page 365



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Holding cell, Male Interview Waiting Room, Male Dress In rooms & Female Release pay telephones lack 29" long cords and/or are not adjacent to a 30" x 48" clear floor space due to benches located below and/or the volume control buttons are 57-1/2" – 62" AFF

- The clear accessible width to the Female Release counter is only 30"

FINAL REPORT

Page 366



## 2nd Floor

- Drinking fountain in corridor is not accessible to a wheelchair user or person who cannot bend or stoop due to the spout height and lack of knee space

- Psychiatry Unit shower is not 60" wide minimum, lacks a compliant seat and spray attachment, the controls are not mounted on the wall adjacent to the seat and the mirror and coat hook are too high

FINAL REPORT





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Psychiatry Unit & Medical Unit cells lack grab bars at the toilet, toilet seat height is 15-1/2" AFF and there is no knee space at the lavatory/drinking fountain

- Lack of wheelchair seating with a 30" wide x 27" high x 19" deep knee space in Psychiatry Unit, Medical Housing and Medical Unit Wheelchair Pod day rooms

FINAL REPORT

Page 368



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Psychiatry Unit showers lacks grab bars or a folding seat

- Medical Unit Housing and Wheelchair Pod day room drinking fountain lacks knee space for a front approach, spout height is 37" - 41" AFF and/or lacks a spout high enough for individuals who have difficulty bending or stooping

FINAL REPORT

Page 369





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Medical Unit Wheelchair Pod cells lack 36" long rear grab bar, the side grab bar only projects 43" – 44" from the rear wall and the lavatory lacks knee space and the rim height is 36-1/2" AFF

- Wheelchair Pod shower controls are not located on wall adjacent to seat, seat is not the required minimum size, there is no spray attachment, a grab bar extends above the seat so a wheelchair user cannot lean against that wall and the mirror and coat hook are too high

FINAL REPORT

Page 370





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Medical Unit Housing shower is not a standard 30" x 60" or alternate 36" x 60" roll-in shower design, the door is only 24" wide and has a 6" curb

- Lack of 60" diameter clear turning space in Dental Exam room and X-Ray room

Page 371



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Fixed examination chairs and tables do not accommodate wheelchair side transfer

- Medical Holding Cell lacks 60" wide space at toilet, toilet seat height is 15" AFF and clear width of opening into toilet compartment is only 27" wide

FINAL REPORT

Page 372



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Medical Housing Day Room telephones are too high and lack a 29" long cord

- Medical Housing Cell 6 door is only 30" wide, lacks grab bars at toilet, toilet seat height is 15" AFF, lavatory lacks knee space and encroaches on required clear space at cell door

FINAL REPORT

Page 373





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Medical Housing 200 Pod Day Room drinking fountain lacks knee space and spout is 40-1/2" AFF

- Door from Family Visiting to Attorney Visiting Room is only 24" wide

FINAL REPORT

Page 374



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Attorney Visiting Room rooms lack 30" x 48" clear floor space at counter due to fixed stool and lacks 60" diameter turning space since room is only 42-1/2" wide

- Release Cell door is only 32" wide, there is only 39" clear width at the toilet and 28" at the lavatory, the toilet lacks grab bars and the toilet seat height is 15-1/2" AFF

FINAL REPORT

Page 375



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Release Cell issue counter is 38" AFF

- Inmate restroom door requires 8 pounds of opening force and closes from fully open to within 12 degrees of the latch in only 3-1/2 seconds, rear grab bar is mounted with ½" clearance to the flush valve, not parallel to wall and 15" past centerline of toilet to one side and 21" to the other side, centerline of toilet is 23" from adjacent wall, lavatory rim is 35-1/2" AFF, pipes are not insulated and soap and paper towel dispensers are more than 40" AFF to the highest operating part

FINAL REPORT

Page 376



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

FINAL REPORT

3rd Floor

- Medical Exam Room table cannot be lowered to 17" – 19" to allow a wheelchair user to transfer on and off and there is only 22" clear width on each side of the table

- Medical Exam Room toilet room is only 38" wide and rear grab bar is only 24" long

3rd, 4th, 5th,, 6th, 7th & 8th Floor

- All visiting rooms are located up a flight of stairs from the housing unit levels and there is no accessible route

Page 377



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- All Attorney Visiting rooms lack a 60" diameter clear maneuvering space, and a 30" w. 27" h. x 19" d. knee space below the counter to allow a wheelchair user to make a front approach

- Stairs to mezzanine levels in dayrooms and Recreation Rooms lack a cane detectable railing below

FINAL REPORT

Page 378





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Lack of 30" w. x 27" h. x 19" knee space at all dayroom tables

- Housing Unit showers are not a standard 30" x 60" or alternate 36" x 60" roll-in shower design, the door is only 24" wide and has a 6" curb

FINAL REPORT

Page 379





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Housing Unit dayroom pay telephone volume control buttons are 58-1/2" AFF and have 18" long cords
- Housing Unit day room drinking fountains are not high/low and not located in an alcove or out of the circulation path and lack a 27" high knee space 8" in from the front of the fixture

- Common Recreation Room drinking fountain is not high/low, is not located in an alcove or out of the circulation path, lacks a 27" high knee space 8" in from the front of the fixture and the shaving mirrors are too high

FINAL REPORT

Page 380



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Cell doors only provide 28-1/2" clear opening
- Cell toilets lack grab bars, toilet seat height is 15" AFF, combination toilet/lavatory lacks knee space at lavatory and bottom of mirror is 53" AFF

- Recreation Room toilets only have a 35" wide clear floor space, the seat height is 15" AFF, there is no knee space at the lavatory and the door is only 30" wide

FINAL REPORT

Page 381



- Yard toilets lack grab bars and only provide 32" clear space in front of toilet and 27" clear width at cased opening to toilet compartment

- Yard urinal rims are 25" AFF and the flush controls are 47" AFF

RCCC in Elk Grove has a rated capacity for 1,625 male and female inmates. The camp is divided into 2 separate compounds for male and female inmates and serves as the County's branch jail facility housing overflow pretrial detainees and sentenced male and female inmates. The County operated the original facility as a road camp until the first facilities and infrastructure were built in 1959. Currently, RCCC contains more than 18 temporary and permanent buildings of various vintages and uses. RCCC can house male and female inmates of all classifications and houses inmates en route to other jurisdictions, federal prisoners under contract with the U.S Bureau of Prisons, and reciprocal prisoners from other counties. A staff of more than 180 Sheriff's Department employees supervises inmates and several support services activities augment the custody staff and provide services and programs for inmate housing.

The female side of the compound is known as the Sandra Larsen Facility (SLF) and is entirely self-contained and has no interaction with the male side. SLF has

FINAL REPORT

3 dormitory pods; Golden Poppy (60 beds - minimum security), Kinya (92 beds - minimum security) and Camelia (70 beds - medium facility), each with its own day room and recreation yard. Ramona Hall houses maximum-security inmates in cell-type housing. A kitchen, dining hall, infirmary, visiting area and recreation room are also provided at SLF.

The men's minimum-security housing is all provided in the HF. Medium security inmates are housed in the A, J & K barracks as well as JKF and RBF. Maximum-security inmates are housed in CBF 500 mod and SBF 200-500 mods.

The original construction dates of RCCC are unknown. The County of Sacramento took possession of RCCC and the existing buildings in 1947. The first structures and infrastructure constructed by Sacramento County as part of a detention facility starting in 1959, prior to the enactment of the ADA. RBF, CBF, JKF and SBF are all masonry construction and the barracks are a combination of masonry and wood frame construction. Several modular classroom buildings were placed on site in and provide educational and program space.

Although the topography of the RCCC is generally level and much of the walkway system complies with ADAS and CBC, we observed a number of locations with noncompliant running slope, cross slope and level changes. Also observed were a number of wood and metal ramps with noncompliant slopes and handrails.

Typical conditions observed at RCCC that are not compliant with ADAS:

SLF Intake & Booking, Laundry, Medical & Visiting

- Transaction counters are typically 42-1/2" AFF

FINAL REPORT





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Holding cell doors are only 30" wide and provide a 29" clear width when fully open

- Holding cell and dorm dayroom pay telephones are not adjacent to a 30" x 48" clear floor space due to benches or counters located below and/or the volume control buttons are 54" - 56" AFF

FINAL REPORT

Page 384

SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Laundry unisex restroom lacks a 60" diameter clear turning space and a 60" clear space adjacent to the toilet, grab bars at the toilet, centerline of toilet is 15" from adjacent bathtub and toilet seat height is 15-1/2", lavatory apron is 27-3/4" AFF and pipes are not insulated, bottom of reflective surface of mirror is 56" AF and paper towel dispenser is 54" AFF

- Less than 42" clear aisle width in the Laundry storage area where inmates work

FINAL REPORT

Page 385



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Fixed examination chairs and tables do not accommodate wheelchair side transfer

- All Attorney Visiting stations have a 28" wide door and have fixed stools and lack a 60" diameter clear maneuvering space, and a 30" w. 27" h. x 19" d. knee space below the counter to allow a wheelchair user to make a front approach

FINAL REPORT

Page 386



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- All Social Visiting stations have a fixed stool and lack a 60" diameter clear maneuvering space

Program & Dining Area (Sutter Hall)

- Inmate restroom lacks a 60" wide toilet compartment with grab bars to accommodate a wheelchair user, the lavatory apron is all 25-1/2" AFF and the pipes are not insulated, the shower compartment has a 4-1/2" curb and is not a standard 30" x 60" or alternate 36" x 60" roll-in configuration and lacks grab bars and a seat, the bottom of the mirrors is 52" and the paper towel dispenser is 52-1/2" AFF

FINAL REPORT

Page 387



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Hall and Dining Hall drinking fountain only provides a 22" - 23" high knee space, is not in an alcove or outside the path of travel and the spout is 39" - 40" AFF

FINAL REPORT

Page 388





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- There is not a 30" wide x 48" long clear floor space adjacent to at least one of each type of exercise machine

- Law Library station in the Dining Hall has a fixed stool and lacks a 30" wide x 27" high x 19" deep knee space

FINAL REPORT

Page 389



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Dining Hall tray slide is 37-1/2" AFF

- Lack of 30" w. x 27" h. x 19" knee space at all Dining Hall tables

FINAL REPORT

Page 390



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

## Housing Areas

- Kinya dorm dayroom restroom has 28" high lavatory aprons, pipes are not insulated, shelves are all 64" AFF, 31" clear space provided in front of toilet, centerline of toilet is 19-1/2" from adjacent wall and toilet compartment door stile width is 16"

- Kinya dorm ambulant toilet compartment only provides a 31" wide door that is not self-closing, the seat height is 15" AFF and the grab bars are only 36" long

FINAL REPORT

Page 391





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Golden Poppy dorm bathrooms lack any lavatories with 30" wide x 27" high x 19" deep knee space, the lavatory pipes are not insulated, none of the toilet compartments have a 32" wide door, grab bars and are 60" wide and provide a 48" clear space in front of the toilet

FINAL REPORT

Page 392





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Golden Poppy dorm showers lack a seat and grab bars and have a 3-1/2" high curb

- All dorm dayroom showers compartment are not a standard 30" x 60" or alternate 36" x 60" roll-in configuration with grab bars on 2 walls, seat and spray attachment and the floor slopes 4.5%

FINAL REPORT

Page 393





SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Dorm bathroom drinking fountains provide a 22" - 23" high knee space, is not in an alcove or outside the path of travel and the spout is 39" - 40" AFF

- Lack of 30" w. x 27" h. x 19" knee space at all dorm dayroom tables

- Door threshold at entrance to Kinya and Camelia dorms is 1-1/2" high

Page 394



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Door thresholds from dayrooms to yards are 1" – 2-1/2" high and the exterior landing at Kinya dorm slopes 12.7%

- Kinya dorm recreation yard cross slope is 3.1% - 4.6% and no picnic tables at any recreation yard with 30" wide x 27" high x 19" deep knee space

FINAL REPORT

Page 395



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- No picnic tables at any recreation yard with 30" wide x 27" high x 19" deep knee space

- Much of the recreation yard for Camelia dorm does not provide a stable, firm and slip-resistant surface

FINAL REPORT

Page 396



- All Ramona Hall housing and safety cell doors are only 29" wide, centerline of toilet is 15-1/2" from adjacent wall, combination toilet/lavatory unit lacks knee space at lavatory and drinking fountain bubbler, no clear floor space at desk due to fixed stool and desk only provides 25-1/2" high knee space

- Ramona Hall bathroom door is only 30" wide, the bathtub lacks grab bars and a seat, the toilet lacks grab bars and the seat height is 15-1/2", neither shower is a standard 30" x 60" or alternate 36" x 60" roll-in shower and both have a 12" high curb at the compartment entrance and the room lacks a 60" diameter clear maneuvering space

FINAL REPORT



<u>Exterior Circulation Route</u>

- 1" high elevation change at several locations along path of travel to Program Area at relocatables

- There is no accessible route to the portable toilets adjacent to the classrooms and none of the portable toilets is accessible to a wheelchair user

FINAL REPORT



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- The ramp to Classroom 1 & 2 slopes 19/1%, the handrails circumference exceeds 6-1/4" and lack extensions, the lower landing is only 48" deep and has a ¾" high elevation change

Classrooms 1, 2 & 3

- Door threshold at Classroom 1 is 1" high

FINAL REPORT

Page 399



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- The threshold from the ramp access at Classroom 3 is 2" high

- Ramp to Classroom 3 slopes 9.5% and lacks handrail extensions at the top and the handrails are not continuous

FINAL REPORT

Page 400





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- None of the tables in Classroom 3 provide a 30" wide x 27" high x 19" deep knee space

- Classroom 3 sink is 38" AFF and lacks knee space

FINAL REPORT

Page 401





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Classroom 3 only has an 18" wide clear width to reach the baking area and all counters are 35-1/2" AFF

CBF

- Cell doors are only 27-1/2" wide and provide a 27" clear opening when fully open, combination toilet/lavatory unit lacks knee space at lavatory and drinking fountain bubbler, no clear floor space at desk due to fixed stool and cell lacks 60" diameter clear maneuvering space

FINAL REPORT

Page 402



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Lack of 30" w. x 27" h. x 19" knee space at all dayroom tables

- Lack of cane detectable barrier below dayroom stairs and stairs lack level handrail extensions and have open risers with no contrasting striping at nosing and upper approach

FINAL REPORT

Page 403





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Dayroom sink is 36" AFF and lacks knee space below to allow a wheelchair user to make a front approach

- All dorm dayroom showers compartment are not a standard 30" x 60" or alternate 36" x 60" roll-in configuration with grab bars on 2 walls, seat and spray attachment and the floor slopes 4.9%

FINAL REPORT

Page 404



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- No pull up stations are accessible to a wheelchair user since the bars are 61" AFF, which is above accessible reach range

- Yard toilet centerline is 21" from adjacent angled wall and lacks grab bars and 60" clear width to side of lavatory, lavatory lacks knee space and rim height is 35-1/2"

FINAL REPORT

Page 405



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Law Library lacks clear floor space at station due to fixed stool

- No accessible route to Visiting or Classrooms upstairs (stairs only), handrails lack level extensions, horizontal portion of handrail brackets is less than 1-1/2" below the handrails and upper approach and stair treads lack a contrasting nosing stripe

FINAL REPORT

Page 406



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- None of the 19 Visiting stations provide a 30" x 48" clear floor space due to the fixed stool and the 2 private Visiting room doors also have fixed stools and only have a 27" clear opening when the door is fully open

- 2nd floor classrooms lack any stations with a 30" wide x 27" high clear floor space due to the fixed stools and the sink rim height is 36" AFF

FINAL REPORT

Page 407



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- floor classroom door is only 31" wide, toilet lacks grab bars and 60" clear width from adjacent wall to side of lavatory, lavatory centerline is only 14" from adjacent wall, rim height is 36" AFF and only 23" high knee space is provided below, mirror is 58" AFF and shelf is 49" AFF

<u>SBF</u>

- Law Library lacks clear floor space at station due to fixed stool

FINAL REPORT

Page 408





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- No showers are a standard 30" x 60" or alternate 36" x 60" roll-in shower with spray attachment, folding seat and grab bars

- None of the 19 Visiting stations provide a 30" x 48" clear floor space due to the fixed stool and the top telephone button is 63" AFF

FINAL REPORT

Page 409



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

<u>KBF</u>

- Holding cells and Classroom restroom only provide 53" – 57-1/2" clear width between wall and side of lavatory at toilet, side grab bar only projects 48" from rear wall and lavatory only provides 27" high knee space at apron

- Holding tank #1 toilet only provides 3[illegible]" clear width at toilet, toilet seat height is 15-1/2" AFF, lacks grab bars and bottom of reflective surface of mirror is 55-1/2" AFF

Page 410



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Yard toilet only has 55" clear width from wall to side of toilet, lacks grab bars, lavatory apron only provides 27-1/2" high knee space, bottom of reflective surface of mirror is 43" AFF and drinking fountain does not accommodate inmates who have difficulty bending or stooping

FINAL REPORT

Page 411



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Although a wheelchair seating space is provided in the 100 Pod day room, there is not a 19" deep toe space due to the ½" high metal base plate

- 100 Pod day room drinking fountain does not accommodate inmates who have difficulty bending or stooping

FINAL REPORT

Page 412



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- 100 Pod accessible toilet side grab bar only projects 48" from rear wall

- 100 Pod shower is not a compliant alternate 36" x 60" roll-in shower with spray attachment, folding seat and grab bars are on the wrong walls

FINAL REPORT

Page 413



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- 200 Pod, 300 Pod, 400 Pod, 500 Pod and 600 Pod shower is similar to 100 Pod shower but lacks a folding seat

- Barbershop counter is 39" AFF and only 16" deep and is a protruding object, fixed stool encroaches into 60" diameter clear turning space, centerline of sink is only 13-1/2" from side wall and sink lacks insulated pipes and knee space below to allow for a front wheelchair approach

FINAL REPORT

Page 414



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Kitchen inmate restroom toilet centerline is 20" from adjacent wall, only 53-1/2' is provided from the adjacent wall to the side of the lavatory, the side grab bar only projects 48" from the rear wall, the lavatory apron is only 26-1/2" AFF and the highest operating part of the soap and paper towel dispensers is 51" – 52" AFF

- Kitchen inmate worker tables do not provide a 30" wide x 27" high x 19" deep wheelchair seating space

FINAL EXPERT

Page 415



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

<u>Booking</u>

- The 4 counters are all 41" AFF and there is no lowered counter for a wheelchair user

- Holding Cells 1 & 2 provide 42-1/2" clear space in front of toilet, toilet lacks grab bars, centerline of toilets is 19-1/2" from adjacent wall and combination unit does not provide knee space at lavatory and drinking fountain bubbler

FINAL REPORT

Page 416





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Holding Cell 3 only provides 32" clear width at toilet, toilet lacks grab bars and seat height is 15-1/2" AFF and combination unit does not provide knee space at lavatory and drinking fountain bubbler

- The mat in front of the fingerprint machine is 1" thick

FINAL REPORT

Page 417



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Medical Screening

- Door is only 29-1/2" wide and room lacks 60" diameter clear maneuvering space

- Urinal only projects 13" from wall, rim is 24" AFF, only a 21-1/2" deep clear floor space is provided in front to the lavatory, lavatory is only 14-1/2" deep and pipes are not insulated

FINAL REPORT

Page 418





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- The 4 clothing window counters are all 40-1/2" AFF and there is no lowered counter for a wheelchair user

- Changing benches are only 12" deep

FINAL REPORT

Page 419

SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- None of the 28 Visiting stations provide a 30" x 48" clear floor space due to the fixed stool and there is only 26-1/2" high knee space provided below the counter

- All 3 attorney rooms lack a 60" diameter clear turning space and a 30" x 48" clear floor space due to the fixed stool

FINAL REPORT

Page 420



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Medical Housing Unit

- Hard and soft cells only provide 29" clear width at toilet, toilet lacks grab bars and centerline is 10" from adjacent wall, combination unit does not provide knee space at lavatory and drinking fountain bubbler and door is only 29-1/2" wide

- All of the lavatories only provide a 2[illegible]" high knee space to the underside of the support beam and the bottom of the reflective surface of the mirror is 42" and the mirrors are tilted away from the user

FINAL DRAFT

Page 421





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- The restroom has 6 toilets but no 36" wide ambulant toilet with parallel grab bars is provided, there is only 28" clear width between the toilets to reach the accessible toilet, only 40-1/2" clear width is provided at the accessible toilet to the adjacent toilet and the urinal rim is 18" AFF

- The ramp to the shower has a 10.0% slope, is only 37" wide, has a handrail on only one side and the horizontal portion of the handrail bracket is less than 1-1/2" below the handrail

FINAL REPORT

Page 422





- The open shower is not a standard 30" x 60" or alternate 36" x 60" roll-in configuration with grab bars on 2 walls, seat and spray attachment and the floor slopes 6.0% at the floor drain

- None of the 3 changing seats outside the shower is a minimum of 24" x 48"

FINAL REPORT



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Most of the yard is not a stable, firm and slip-resistant surface

- Door to yard has a 1" high vertical threshold, knob hardware, exterior landing with a 6.6% slope and closer projects [illegible]" into door opening and bottom of closer is 76" AFF

FINAL REPORT

Page 424



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

M Dorm

- Entry door threshold is 1-3/4" high and vertical

- All of the lavatories only provide a 25-1/2" high knee space to the underside of the support beam, the pipes are not insulated, the floor slopes 7.7% at the floor drain and the mirrors are tilted away from the user

FINAL REPORT

Page 425





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- There is only 27" clear width between the toilets to reach the accessible toilet, only 35" clear width is provided at the accessible toilet to the adjacent toilet and the urinal rim is 19" AFF

- The ramp to the shower has a 12.2% slope, is only 37" wide, has a handrail on only one side and the horizontal portion of the handrail bracket is less than 1-1/2" below the handrail

Page 426



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

B Barracks (re-entry Dorm)

- The exterior landing at the entry slopes 14.2%, has s 40" long bottom landing and lacks handrails and lacks a 24" landing at the strike side of the door

- Counter is 49" AFF

FINAL DRAFT REPORT

Page 427



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- All 12 lavatories have a 24-1/2" high knee space to the bottom of the support beam, the pipes are not insulated and the bottom of the reflective surface of the mirrors is more than 40" AFF and the mirrors tilt away from the user

- The rim at all 3 urinals is 19" AFF and none of the toilets are accessible or provide grab bars

FINAL REPORT

Page 428





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Open shower has a 6" high curb at the entry and lacks a folding seat and grab bars

- Lowest leading edge of security mirror is 69" AFF and projects 16" from wall

FINAL REPORT

Page 429



A Barracks

- Exterior landing at the entry slopes more than 8.33% and lacks a 24" landing at the strike side of the door

- Running slope at transition from concrete to asphalt paving in yard is 13.7%

FINAL REPORT



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

K Barracks

- None of the telephones are within reach range as the highest control is 59" AFF and all have 18" long cords

- Both doors to the yard have a 1-1/2" high vertical threshold and a 4-1/2" elevation change at the edge of the stoop

FINAL REPORT

Page 431



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Fishbowl

- Adjacent KITE's box handle is 54-1/2" above walking surface

- Walk from KITE's box to Fishbowl has 4.6% cross slope

FINAL REPORT

Page 432



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Fishbowl counter is 38" AFF

D Barracks

- Entry door threshold is 1" high and vertical

FINAL REPORT

Page 433





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Rim at all 4 urinals is 25" AFF and no toilets are accessible and have grab bars, most likely accessible toilet centerline is 14-1/2" from adjacent wall and only provides 34-1/2" clear width to adjacent toilet

- Walk to yard has 4" vertical elevation change at stoop

FINAL REPORT

Page 434



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- All exterior telephones top button is 56" AFF and have 18" long cord

- Walk to Yard at adjacent gate has 7.1% running slope and 1" vertical lip at the bottom

FINAL REPORT

Page 435



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Laundry Exchange

- Exterior issue counter is 43" AFF

- Threshold at inmate entry door is 1-1/2" high and vertical

FINAL REPORT

Page 436



- Inmate restroom lacks 60" diameter clear turning radius and has only 42" clear width from wall adjacent to toilet to side of lavatory, toilet lacks grab bars and door is only 32" wide and has knob hardware, lavatory pipes are not insulated and soap and paper towel dispensers are more than 40" AFF



- Sewing machine station is not usable by a wheelchair user since the treadle encroaches on the required knee space



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Barbershop and classroom doors have a 1-1/2" high threshold

- Barbershop sink is 36-1/2" AFF and lacks knee space below

- Exterior walks between Laundry and classrooms have cross slopes of 3.7% - 4.8%

FINAL REPORT

Page 438



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Prefabricated ramp to Classrooms 3 & 4 has a 10.3% slope and handrails are 32" above ramp surface and lack horizontal extensions at the top landing and inside handrail is not continuous

- None of the stations in Classroom 3, 4 or 5 provide a 27" high knee space

FINAL REPORT

Page 439



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Ramp to Classroom 5 slopes 18.8%, has handrails that exceed a 6-1/4" outside diameter and lack horizontal extensions, top landing is only 45" x 48" and is 1-1/2" below the floor level and bottom landing does not align with direction of ramp

FINAL REPORT

Page 440



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Big Yard

- No accessible route that is stable, firm and slip-resistant is provided to handball, baseball, horseshoe, picnic and basketball areas or drinking fountain

FINAL REPORT

Page 441





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- No wheelchair accessible portable toilets are provided

- Inmate worker approach to Kitchen has 7.9% running slope but no handrails

FINAL REPORT

Page 442





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Exterior Kitchen inmate restroom door landing has 7.0% running slope at entrance, wash sink lacks knee space below and soap and paper towel dispensers are more than 40" AFF

- Exterior Kitchen inmate restroom toilet lacks grab bars, centerline is 15-1/2" from adjacent wall and toilet paper dispenser is above and behind toilet

FINAL REPORT

Page 443

SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

<u>Dining Hall</u>

- Entry and exit ramps lack horizontal handrail extensions and edge protection and intermediate landing is only 6[illegible]" long.

FINAL REPORT

Page 444



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

<u>RBF</u>

- Barbershop sink is 36-1/2" AFF and lacks knee space below

- Temporary Holding Cell has combination unit that lacks knee space at lavatory and grab bars at toilet, centerline of toilet is 15-1/2" from adjacent wall, doorway only provides 28" clear opening and only 27-1/2" clear width is provided between fixed bed and toilet.

Page 445





SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Open shower has a 4-1/2" high curb at the entry and *the folding seat is not mounted on the compliant wall with respect to the grab bars, and* lacks a spray attachment

FINAL REPORT

Page 446

SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Dorm 11

- Toilet lacks grab bars and only provides 29" clear width at rear wall and 45" clear space from rear wall, entrance into toilet is only 20" wide to shelf, centerline of lavatory is only 11" from adjacent wall and provides 17" high knee space

FINAL REPORT

Page 447



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Dorm 20

- Combination unit lacks grab bars at toilet and knee space at lavatory and entrance to toilet is less than 32" clear width

- "Accessible" door to Yard has 5" vertical elevation change at stoop

FINAL REPORT

Page 448



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- West and East Yard toilets lack grab bars, enclosure is only 36" wide x 44" long and has a 2-1/2" vertical elevation change at entrance (West yard) and combination unit lacks knee space at lavatory

<u>Main Law Library (Honor Side)</u>

- None of the stations provide knee space due to the fixed stool

FINAL REPORT

Page 449





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Inmate worker restroom has 7" step at entrance, no accessible toilets with grab bars, only 35" clear space in front of toilets to lavatories and lavatories have knob faucets, only provide 28" high knee space at apron and lack insulated pipes

<u>Re-Entry Dorm</u>

- None of the stations in Classroom 1 & 2 provide a 27" high knee space

Page 450





SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Sink in Classroom 2 is used by inmates for art classes and lacks a 27" high knee space below and sink height is 36" AFF

- Inmate restroom lacks 60" diameter clear turning space, only provides 34" width at toilet, toilet lacks grab bars, door has knob hardware and only provides 9" strike side clearance on pull side and lavatory only has 22-1/2" high knee space

FINAL REPORT

Page 451



SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

Recreation Hall

- Entrance door has 1-1/2" high threshold and only 10" strike side clearance at the exterior pull side

- No accessible route is provided to the stage

FINAL REPORT

Page 452



JKF

- North Holding Tank #2 (used as safety cell) restroom has typical combination toilet/lavatory unit that lacks knee space at lavatory and grab bars at toilet and lacks 60" wide clear space at toilet due to fixed restraint bed

The conditions cited above are not intended to be an all-inclusive list of noncompliant conditions; numerous other noncompliant conditions were observed and noted during our site visit.

Other factors that should be considered when reviewing this Report:

Although there are no ADA requirements for the clear vertical height above a bunk bed when a disabled inmate occupies the lower bunk, some cell arrangements provide limited headroom above the lower bunk, resulting in the inability for a wheelchair user to transfer onto and off the bunk from their wheelchair and remain erect. Studies have indicated that a minimum vertical clearance be provided above the top of the mattress to provide adequate space for an adult male to sit upright.

Although the ADA has not yet adopted requirements for examination tables in medical facilities, the US Access Board has recently proposed guidelines that address the need for adjustable examination tables that enable disabled patients to transfer between the table and their wheelchair. More information can be obtained at http://www.access-board.gov/medical-equipment.htm. We recommend that SCSD consider purchase of new medical diagnostic equipment that complies with the Access Board recommendations.

FINAL REPORT

## Technical Requirements / Standards

28 CFR Part 35 Nondiscrimination on the Basis of Disability in State and Local Government Services; Final Rule, which implements subtitle A of Title II of the ADA, Public Law 101-336, prohibits discrimination on the basis of disability by public entities. Per the preamble to Subpart D – Program Accessibility, Section 35.149 Discrimination Prohibited, this requirement applies to "facilities now in existence, because the cost of retrofitting existing facilities is often prohibitive." The preamble goes on to note "the regulation makes clear, however, that a public entity is not required to make each of its existing facilities accessible." The law requires that Public Entities must make all of its programs accessible "except where to do so would result in a fundamental alteration in the nature of the program or in undue financial and administrative burdens." It does not require that a Public Entity make all of its existing facilities accessible via structural changes where other methods provide accessibility to services, programs and activities of the Public Entity.

Since the Sacramento County Jail is subject to Title II of the ADA, the primary obligation to inmates of the jail (as opposed to employees who are covered under Title I of the ADA) is to provide access to individuals with disabilities to all of its services, programs and activities. This concept was adopted directly from Section 504 of the Rehabilitation Act, which required access to programs and activities that received Federal assistance.

28 CFR 35.150 applies to alteration projects; all alteration projects commenced after July 26, 1992 were to comply with the scoping and technical requirements in force at the time. Modular buildings placed on the RCCC after that date would also have been required to comply with the same requirements. Please refer to the next section for an explanation of these requirements.

### 1991 ADAAG & 2010 ADAS

The 1991 Americans with Disabilities Act Accessibility Guidelines (ADAAG), published by the U.S. Access Board and adopted as the Americans with Disabilities Act Standards for Accessible Design (ADA Standards) by the USDOJ, was the Federal technical standard applicable when constructing new facilities or altering existing public accommodations to comply with the ADA up until March 15, 2012. The U.S. Department of Justice published new requirements in 2004 that have now been codified as the 2010 Americans with Disabilities Act Standards (ADAS), which replaced the 1991 ADAAG as of March 15, 2012 for Title II entities

However, even in the absence of a technical requirement under ADAAG or ADAS, a public entity must provide access to all of its programs subject to the exceptions described above.

FINAL REPORT

FINAL REPORT

The 2010 ADAS introduced new scoping requirements that did not appear in the 1991 ADAAG. Specific to Sacramento County Jail, ADAS Section 232 Detention Facilities and Correctional Facilities includes requirements that had no precedent in the 1991 ADAAG, and therefore are not subject to the Safe Harbor provision of ADAS. Refer to Section III General Assumptions Item No. 1 for an explanation of the Safe Harbor provision. As of March 15, 2012, Sacramento County Jail is required to comply with these new scoping provisions for new construction and alteration work subject to the exceptions provided under Title II.

Among these new requirements are:

1. At least 3% of the total number of cells in a facility are required to provide mobility features that comply with ADAS Section 807.2. These features include a 60 inch diameter turning space, accessible bench, clear floor space at the bed for a wheelchair transfer, and accessible toilet and bathing facilities that serve these cells.
2. At least 2% of the total number of cells are required to be equipped with audible emergency alarm systems.
3. Patient bedrooms or cells in infirmaries are required to comply with the percentages listed above, as well as applying to medical isolation cells.
4. Special holding cells are required to provide a minimum of one (1) cell that complies with Section 807.2. Such cells include cells for the purpose of orientation, protective custody, administrative or disciplinary detention or segregation, detoxification or medical isolation.
5. Visiting areas serving accessible cells shall be accessible on both the visitor and inmate side.

*California Building Code*

The California Building Code (CBC), as opposed to the ADA, which is a civil rights law, is a building code modeled after the International Building Code, which is a "model code". Building codes such as the CBC do not apply to existing buildings as does the ADA, but only apply when new construction, additions and alteration projects occur. The CBC contains accessibility requirements that were first developed in 1982 and are only applicable in California. Since the CBC requirements pre-date the ADA, the technical and scoping requirements are different than those found in ADAS. In recent years, the differences between the CBC and ADAS have been reduced, but some still remain. The State of California Division of the State Architect is currently attempting to have the CBC certified by the USDOJ as equivalent with the ADA. This has resulted in the current 2013 edition of the CBC being at least as stringent in all respects with ADAS, as well as having more stringent requirements for certain elements such as accessible toilet compartments. The 2016 edition of the CBC becomes

effective on January 1, 2017, but there are no code changes that affect the Sacramento County Jail facilities.

Although the CBC does not act as a "trigger" to require barrier removal, its requirements come into play when performing certain types of barrier removal work. As described above, if an element does not comply with ADAS (and does not qualify for the Safe Harbor exemption), then it must be corrected subject to the undue hardship limitation. However, if the CBC has a more stringent requirement than ADAS, then the corrective work must then comply with the CBC.

As described above, some buildings have been remodeled or placed into service since the passage of the ADA, particularly at the RCCC. While these should have fully complied with ADAAG/ADAS and the CBC accessibility requirements in force at the time of building permit submittal, we found that there were several locations where these buildings did not comply, such as at RCCC. Additionally, the CBC has contained accessibility requirements since 1982, although its applicability to detention and correction facilities has been a subject of contention for some time. Lastly, as indicated above, Sacramento County is required to comply with Section 504 of the Rehabilitation Act of 1973. Section 504 scoping and technical requirements for accessibility were provided in the Uniform Federal Accessibility Standards (UFAS), first issued in 1984. Although UFAS did not include scoping requirements for detention and correction facilities, it did include most of the same type of requirements for building elements as now found in ADAS and the CBC.

*Current ADAS and CBC requirements for Detention & Correction Facilities*

If structural changes to existing facilities will be performed, the following is a partial list of scoping and technical requirements that apply to the SCSD detention facilities:

- There must be a minimum of 2 drinking fountains per floor and one must accommodate wheelchair users with a maximum spout height of 36" AFF and another spout at 38" – 43" AFF (ADAS 211.2 & CBC 11B-211.2)
- There must be a minimum of 5% of the total of each type of seating that provides a knee space that allows a wheelchair user to make a front approach (ADAS 226.1 & CBC 11B-226.1)
- Floor and ground surfaces must be stable, firm and slip-resistant (ADAS 302.1 & CBC 11B-302.1)

FINAL REPORT



- Changes in level are not permitted to exceed 1/4" vertical or 1/2" at a

maximum 1:2 bevel (ADAS 303 & CBC 11B-303)

- All accessible spaces shall provide a 60" diameter clear maneuvering space or a T-shaped space per Figure 304.3.2 / 11B-304.3.2 (ADAS 304.3.1 & CBC 11B-304.3.1)

- The bottom of objects along a path of travel must be 80" AFF minimum if they project more than 4" into the path of travel (ADAS 307.2 & CBC 11B-307.2)
- 27" minimum height cane-detectable railings are required where the vertical clearance below an object is reduced to less than 80" AFF (ADAS 307.4 & CBC 11B-307.4)

- The maximum reach range to an accessible control is 48" AFF (ADAS 308 & CBC 11B-308)

FINAL DRAFT

- Walking surfaces shall not exceed 2.08% cross slope and 5.0% running slope unless they provide handrails on both sides and level landings for each 30" of vertical rise (ADAS 403.3 & CBC 11B-403.3)
- The minimum clear width along an accessible route must be 36" (ADAS 403.5.1 & CBC 11B-403.5.1)
- The minimum clear width at a turn must be 42" (ADAS 403.5.2 and CBC 11B-403.5.2)
- Doors must be 36" minimum width and provide a minimum 32" clear width opening when open 90 degrees (ADAS 404.2.3 & CBC 11B-404.2.3)
- Accessible doors (including doors to accessible toilet compartments) must have 18" minimum strike side clearance and 60" deep clearance on the pull side (ADAS 404.2.4.1 & CBC 11B-404.2.4.1)

- Accessible door landings must not exceed 2.08% (1/4":1'-0") slope (ADAS 404.2.4.4 & CBC 11B-404.2.4.4)
- Accessible door thresholds must be ½" high maximum and be beveled at a 1:2 maximum slope (ADAS 404.2.5 & CBC 11B-404.2.5)
- Accessible door hardware shall not require tight grasping, pinching or twisting of the wrist and shall be operable with one hand (ADAS 404.2.7 & CBC 11B-404.2.7)
- Door opening force shall not exceed 5 pounds and closing speed shall not be less than 5 seconds from 90 degrees open to within 12 degrees of door latch (ADAS 404.2.8 and CBC 11B-404.2.8 and 11B-404.2.9)
- Ramp slope shall not exceed 8.33% (ADAS 405.2 & CBC 11B-405.2)
- Top landings at ramps must be 60" x 60" minimum and bottom landings 72" minimum in length (ADAS 405.7 & CBC 11B-405.7)

FINAL DRAFT



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Ramps must have a curb or barrier with the bottom less than 4" above the ramp surface (ADAS 405.9.2 & CBC 11B-405.9.2)

X < 4
100

- Stair nosing must have contrasting stripes (ADAS Advisory 504.4 & CBC 11B-504.4.1)
- Ramp handrails must be 34" minimum - 38" AFF maximum above ramp surface (ADAS 505.4 & CBC 11B-505.4)
- Horizontal portion of handrail brackets shall be 1-1/2" minimum below handrail (ADAS 505.6 & CBC 11B-505.6)

FINAL REPORT

Page 459





- Ramp handrails must have 12" long level extensions at the top and bottom of ramp runs (ADAS 505.10 & CBC 11B-505.10)

- Accessible drinking fountain spouts must be 36" AFF maximum (ADAS 602.4 & CBC 11B-602.4)
- Accessible drinking fountain spouts must be 5" maximum from the front edge of the fixture (ADAS 602.5 & CBC 11B-602.5)
- All drinking fountains must be located in alcoves or otherwise out of pedestrian way (CBC 11B-602.9)
- Accessible mirrors must have the bottom of the reflective surface at 40" AFF maximum (ADAS 603.3 & CBC 11B-603.3)
- Shelves must be located between 40" - 48" AFF (ADAS 603.4 & CBC 11B-603.4)
- Accessible toilet accessories in sanitary facilities must have the highest operating part at 40" AFF maximum (CBC 11B-603.5)
- Accessible toilets must be located 17" – 18" from the adjacent wall (ADAS 604.2 & CBC 11B-604.2)
- Accessible toilets must have 60" clear width to adjoining obstructions and 48" clear in front of toilet (ADAS 604.3 & CBC 11B-604.3)

FIGURE 11B-604.3.1
SIZE OF CLEARANCE AT WATER CLOSETS

- Accessible toilet seats must be 17" – 19" AFF (ADAS 604.4 & CBC 11B-604.4)
- Accessible toilets must have a minimum 36" long rear grab bar and a minimum 42" long side grab bar, both mounted 33" – 36" AFF (ADAS 604.5 & CBC 11B-604.5)

REPORT



- Accessible toilet flush controls must be located on the wide side of the fixture and not require more than 5 pounds of operating force (ADAS 604.6 & CBC 11B-604.6)
- Toilet rooms with 6 or more toilets or combination of toilets and urinals must have an ambulatory toilet with parallel grab bars 35" - 37" apart (ADAS 604.8.2 & CBC 11B-604.8.2)
- Accessible urinal rims must be 17" AFF maximum and the flush controls must be 44" AFF maximum (ADAS 605.2 & CBC 11B-605.2)
- Accessible urinals must be 13 1/2" deep minimum (ADAS 605.2 & CBC 11B-605.2)
- Accessible lavatories must provide a minimum 27" high knee space 8" in from the front of the lavatory and the apron must be 29" minimum AFF (ADAS 606.2 & CBC 11B-606.2)

(a) Elevation

(b) Plan

- Accessible lavatories must be 34" AFF maximum to the rim (ADAS 606.3 & CBC 11B-606.3)

REPORT



- Accessible lavatory controls must not require grasping (ADAS 606.4 & CBC 11B-606.4)
- Accessible lavatory pipes must be insulated (ADAS 606.5 & CBC 11B-606.5)
- Roll-in showers must have a minimum 60" wide opening, a 17" – 19" high folding seat with controls on the adjacent wall, grab bars and 60" long spray hose attachment (ADAS 608.2.2 & CBC 11B-608.2.2)

- Roll-in shower thresholds must not exceed ½" high (ADAS 608.7 & CBC 11B-608.7)
- Space between grab bar and objects below must be 1-1/2" minimum (ADAS 609.3 & CBC 11B-609.3)

- Accessible telephones must have an adjacent 30" x 48" clear floor space and minimum 29" long cords (ADAS 704.2.1 & 704.2.4 & CBC 11B-704.2.1 & 11B-704.2.4)
- Accessible seating must provide a minimum 30" w. x 27" h. x 19" d. knee space (ADAS 902.4.1 & CBC 11B-902.4.1)
- Dressing and changing benches must be 24" d. x 48" l. minimum (CBC 11B-903.3)

FINAL REV

SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

SABOT CONSULTING

- Transaction counters and work surfaces must provide a minimum 36" long section at 28" – 34" AFF and provide a minimum 30" x 48" clear floor space that allows for a front or parallel approach (ADAS 904.4 & CBC 11B-904.4)
- Tray slides at food service lines shall be 28" - 34" AFF (ADAS 904.5.2 & CBC 11B-904.5.2)
- A minimum of one of each type of exercise equipment shall have a 30" wide by 48" long adjacent clear floor space

FINAL REPORT

Page 463

## Conclusions and Recommendations

We believe that due to inadequacies with the physical plant at both SCSD detention facilities, SCSD does not comply with the ADA in providing access to all programs for inmates with disabilities. The area that presents the most physical barriers is the MJ. Barriers in this area include lack of accessible cells with required maneuvering clearances and accessible toilet fixtures, sanitary facilities and showers and dining/day room seating that does not accommodate wheelchair users. It also appears that inmates with disabilities are underrepresented in the worker population and that an inmate with a disability would encounter difficulties in many of the RCCC work environments.

An additional problem that was noted was the reported lack of an accessible route to any of the yard areas, which are located midway between the main level and mezzanine level of each housing floor. Access from each level of housing is provided by stairs, which are used able-bodied inmates but do not provide an accessible route for inmates with disabilities. From discussions with staff, we learned that elevator access is provided from the main level at each housing floor, but not all staff was aware of the location of this elevator (Elevator 'D'). Therefore, this barrier can be removed by informing all staff of the location of the elevator and installing policies to allow inmates with disabilities to use the elevator when they are provided with yard time.

**Main Jail**

Although the construction of MJ utilizes poured in place concrete for walls, it is possible to alter these structures to create wider openings and walls can be removed to combine multiple smaller rooms into one larger room. This type of alteration can be costly, so use of this alternative should be kept to a minimum and used when placing different classifications of inmates in other more accessible facilities is not feasible.

However, a number of accessibility improvements can be made without these expensive types of projects, including:

- Enlarging a minimum of one shower and/or installing partitions or walls and installing folding seat, grab bars and shower spray attachment to create compliant configuration roll-in showers in each area
- Replacing combination toilet room fixtures with newer fixtures that provide the required clearances
- Installing or relocating grab bars at toilets
- Installing toilet seats to raise the seat height to accessible range
- Lowering a minimum of one (1) urinal in toilet rooms to accessible height in each area
- Insulating lavatory pipes
- Lowering mirrors

FINAL REPORT

- Replacing benches in dressing and shower rooms with accessible size benches with backs or long side against walls
- Replacing a 36" long section of each type of counter with an accessible counter at 28" – 34" AFF
- Removing fixed stools at a minimum of one (1) of each type of visiting or interview room
- Lowering a minimum of one (1) 1 telephone in each area and call buttons so the highest operating part is 48" AFF and replacing cords with minimum 29" long cords
- Rearranging furnishings and equipment to provide a minimum 36" wide clear accessible route and 60" diameter turning space in all rooms and spaces where services, programs and activities occur, especially at medical examination tables
- Where inmates with visual impairments are present, relocate protruding objects out of the circulation path and install cane detectable railing below stairs

The most difficult barrier to correct at the MJ is the lack of any Family or Attorney Visiting Rooms on the main level of each housing floor. Providing elevator access from the main level to the mezzanine level at any of these pods would be problematic, if not impossible. We recommend that SCSD detention facilities explore the possibility of converting cell space into Visiting Rooms on the main level of at least some housing floors.

**Rio Cosumnes Correctional Center**

As noted elsewhere in this report, some of the barracks housing facilities do provide accessible beds but the sanitary facilities are not designed and constructed to enable ease of use for inmates with disabilities and several building entrances and doors to adjacent yards are not compliant. Part of this condition can be attributed to the age of the buildings, since most were designed prior to the passage of the ADA. The barracks housing units are constructed of concrete masonry and/or wood frame, which is a construction type that is relatively simple and inexpensive to alter compared to the MJ. Replacing plumbing fixtures with compliant accessible fixtures, adding partitions to create compliant roll-in showers, installing grab bars, replacing ramps and exterior door landings are all reasonably inexpensive alterations. Other recommended alterations to improved the level of accessibility in the barracks buildings include:

- Relocate toilets to 17" -18" from adjacent wall and install rear and side grab bars
- Lower a minimum of one (1) urinal so that the rim is 17" AFF maximum and the flush controls are 44" AFF maximum
- Relate / replace a minimum of one (1) lavatory so the rim is 34" AFF maximum, the minimum clear knee height at the apron is 29" AFF and insulate the pipes

FINAL REPORT

- Lower the mirror above the proposed accessible lavatory so the bottom of the reflective surface is 40" AFF maximum
- Install walls/partitions, folding seat, grab bars & shower spray hose and reconfigure shower controls to create a compliant accessible roll-in shower
- Replace ramps and install handrails where running slope exceeds 5.0%
- Replace exterior door landings so the threshold height does not exceed ½" with a 1:2 maximum bevel.

Accessible routes must be provided to all activity areas such as athletic fields and classrooms. Compliant aluminum ramps can replace existing ramps and stairs at modular buildings and are available from a number of manufacturers such as TMP Services (http://www.tmpservices.com/aluminum.aspx).

Seating within dining facilities and housing unit dayrooms is another area where SCSD detention facilities has not provided equal access to inmates with disabilities. Most tables do not provide a knee space that allows a wheelchair user to roll completely under the table and have use of a dining surface equivalent to able-bodied inmates. Replacement tables should be provided or stools should be removed in these spaces so that wheelchair users can dine comfortably with other wheelchair users as well as able-bodied companions. We recommend that dining and dayroom seating should be reconfigured in each area so that wheelchair users are provided with the opportunity to sit with other wheelchair users or able-bodied companions. Removal of fixed stools at a minimum of one (1) Visiting Room in each area would also provide the minimum required quantity of visiting rooms.

RCCC is generally quite accessible due to its level topography. A system of concrete and asphalt pedestrian routes is provided through the facility that experiences a large amount of pedestrian traffic from inmates and staff. Concrete is a far longer-lasting paving material than asphalt or other surfaces and usually provides the greatest degree of accessibility due to its longevity and relative need for maintenance, but is more costly than asphalt. We encountered a number of areas where the running slope and cross slope exceed the maximum allowed by the ADA. Additionally, we observed several where the concrete has moved vertically and level changes along the Path of Travel exceed the maximums allowed by the ADA.

Although the SCSD detention facilities employs a program whereby deputies assist inmates with disabilities in circulating throughout the facility, the ADA encourages independent movement if it is feasible to do so. The alternative system currently employed would only be considered an equivalent alternative to structural barrier removal if a deputy was available at all times to all inmates needing such assistance. Additionally, deputies should receive proper training on how to provide safe assistance to wheelchair users. Therefore, the exterior pedestrian route should be made as compliant as possible. All required

FINAL REPORT

emergency exits should also be provided with compliant walks that connect to the pedestrian circulation path to enable these inmates to reach a safe distance away from a building in the event of an emergency.

Several features at the SCSD detention facilities can be easily corrected, such as replacement of knob-type door hardware with lever hardware, replacement of non-compliant door thresholds and provision of accessible changing benches. Mirrors can be added or lowered to accessible heights, lavatory pipe insulation can be added, and grab bars can be replaced or relocated; there are a number of newer penal-style toilet fixtures that are now available that were not available when these facilities were originally constructed. High/low drinking fountains can replace existing single-height fixtures and exterior door landings can be replaced. Toilet seats can be installed on existing toilets, depending upon security requirements. These seats are available in 1" – 4" thicknesses to correct existing toilet seat heights as low as 13" AFF.

We recommend that these barrier removal efforts be undertaken as soon as possible, especially where it can be demonstrated that the changes will significantly increase the level of accessibility. Some barrier removal will required the services of a licensed architect and structural engineer and will involve additional design study.

FINAL REPORT

## Assumptions and Considerations

In performing this survey, there are a number of parameters which are defined to document the application of the requirements of the 1991 ADAAG, 2010 ADAS & CBC. We have divided these assumptions and considerations about the survey into three broad categories: Facility, General, and Technical Assumptions. While some of the General issues may sound very technical, the concepts are important and have general implications.

**Facility Assumptions / Considerations**

1. Inmate Areas versus Staff Areas –All areas that inmates currently use were surveyed for purposes of identifying and correcting barriers as part of this survey. However, we did not survey staff work stations since they would be included as part of a reasonable accommodation per Title I of the ADA. Areas where inmate workers perform their job duties are not considered staff work areas for the purpose of this study.
2. Shower Spray Attachment –Due to safety concerns, flexible spray attachments at accessible showers may be provided by staff on an as-needed basis when inmates make a request. Spray attachments should be stored close to shower areas, immediately available to staff and in working order at all times.

**General Assumptions**

1. Safe Harbor Provision - The survey and citations applied are based upon whether a particular element complied with the 1991 ADAAG; if so, then compliance with the 2010 ADAS is not required even if the ADAS is more stringent than the 1991 ADAAG. This is referred to by the United States Department of Justice (USDOJ) as the "Safe Harbor Provision". However, if an element did not comply with the 1991 ADAAG then it is now required to comply with the 2010 ADAS. One example would be a wall switch or control used by inmates; if the height of such an element was 52" and a front approach is possible, this complies with the 1991 ADAAG and would not be cited. However, if the height of this item was 56", it would not be in compliance with the 1991 ADAAG and would now have to be lowered to 48" in conformance with the 2010 ADAS.
2. Plumbing Fixture Counts – Some solutions may result in a reduction of the fixture count in a restroom. The SCSD should verify if this is compliant with applicable building codes and operational requirements.
3. No Testing of Hidden Conditions - No testing of operational systems such as fire alarms or review of building, fire or health codes was undertaken as part of this inspection.
4. Visual Fire Alarms – ADAAG require that visual alarms be located 80" above the floor or 6" below the finish ceiling, whichever is lower. We did

FINAL REPORT

not perform an inspection of visual alarm device locations as part of our services. We recommend that the SCSD employ the services of a licensed fire protection engineer to survey both Jail facilities to determine if the visual alarms comply in all locations.

5. Drinking Fountains – If a building has multiple drinking fountains within 200 feet of each other and both are accessible to the same inmate population, our recommendation is to make one a wheelchair accessible fixture (36" maximum spout height and knee space below) and one for individuals with difficulty bending or stooping (spout height 38" – 43") and to provide directional signage indicating the location of the companion fixture. The assumption is that the travel time to go to the other fixture is acceptable accommodation.
6. Braille / tactile exit signage – The 2010 ADAS requires Braille / tactile exit signage where illuminated exit signs are provided at doors. We did not verify if illuminated exit signs are actually required by the building code at any doors; if one was provided we recommend that a Braille / tactile exit sign be provided. Also see Item 5 under Technical Assumptions below.
7. Furnishings, Fixtures & Equipment (FF&E) – Both the 1991 ADAAG and 2010 ADAS apply to fixed or built-in elements of buildings, structures & site improvements. Therefore, non-fixed elements such as classroom desks would not be covered by technical requirements. However, since the lack of accessibility of these elements can limit or prevent access to programs, activities and services at Sacramento County Jail we strongly urge that these elements be reviewed for compliance with the most relevant technical criteria.

**Technical Assumptions:**

Detectable Warning Requirement - Barriers were not cited requiring the use of detectable warnings at curb ramps and other areas as a warning to visually impaired individuals that they are about to enter a hazardous area. Detectable warnings with truncated domes, as specified in the 1991 ADAAG have been controversial due to issues of maintainability, safety for those with various impairments, including vision, and locational requirements. A Joint Final Ruling issued by the USDOJ, the U.S. Access Board and the U.S. Department of Transportation called for temporary suspension of the requirement pending further study until July 26, 2001. The suspension expired and detectable warnings were again made a requirement. However, the 2010 ADAS removed the requirement for detectable warnings so we have opted to apply the most current standard. It is anticipated that the USDOJ will adopt the requirements for detectable warnings for Public Rights-of-Way when the final rule is approved, but detectable warnings will not be required within private or public property. The CBC still requires that a 36" deep band of truncated domes be provided at the

FINAL REPORT

bottom of all curb ramps and where a pedestrian way is adjacent to a vehicular way and not separated by a curb.

1. Slip Resistance – ADAS Section 302.1 require floors on accessible routes and accessible room areas to be "slip-resistant". The Access Board recommends a coefficient of friction (COF) of 0.6. Ramps require a higher COF of 0.8.

   SCSD detention facilities should be aware that some VCT (vinyl composition tile) and sealed concrete slab floors may not have a Coefficient of Friction (COF) of 0.6, and therefore would not be considered slip-resistant. Floors like polished vinyl are very slippery. Furthermore, water, contaminants and floor treatments lessen slip-resistance from the cited coefficients. Detailed product information is only now being documented and made available. However, the actual testing to determine slip resistance requires expensive equipment and is not easily performed in place. Therefore, testing was not included in the scope of work.

2. *Door Closers* –the 1991 ADAAG and 2010 ADAS do not have a requirement for maximum opening force for exterior hinged doors. However, most building codes require the maximum opening force to be no greater than 8.5 pounds and the CBC requires that exterior and interior doors along an accessible route not require an opening force exceeding 5 pounds. Although the ADA does not contain a similar requirement, it has been our experience that this requirement is extremely necessary for many individuals to enter a building. It has been our experience that existing door closers can only be adjusted to within approximately 3 pounds of their current operating force. Accordingly, at doors operated by inmates, we recommend replacement of door closers as opposed to simply adjustment where the opening pressure exceeds 5 pounds.

3. Dimensional Tolerances – Section 3.2 of the 1991 ADAAG states that all dimensions are subject to conventional building industry tolerances for field conditions. Although many studies have been performed to determine what are acceptable dimensional tolerances, there are relatively few widely-accepted tolerances. The 2010 ADAS Section 104.1.1 Construction and Manufacturing Tolerances which reads "All dimensions are subject to conventional industry tolerances except where the requirement is stated as a range with specific minimum and maximum end points." One example would be a toilet centerline dimension from an adjacent wall; whereas the 1991 ADAAG required an absolute 18" dimension and the 2010 ADAS allows a range of 16" – 18", a toilet located 18-1/2" from the side wall might have been considered within conventional industry tolerances under the old regulations but not the new ones.

FINAL REPORT

It should be noted that in the case of new construction, design documents can often lead to dimensions that exceed 1991 ADAAG /2010 ADAS/CBC maximums and minimums, such as a ramp that is designed with a 1:12 slope. The contractor may construct the ramp with a slight field tolerance, which results in a ramp that slightly exceeds the 1:12 slope, which is actually the maximum slope allowed, not a desired slope. Therefore, design documents should specify maximums and minimums where applicable and also allow for field tolerances. Advisory 104.1.1 of the 2010 ADAS states that "recognized tolerances are not intended for design work."

4. *Building, Fire & Health Codes* – Our scope of services did not include verifying items such as the required number of exits in a facility and their location, areas of refuge, if visual fire alarms are required or design requirements in areas where food is prepared. We recommend that SCSD detention facilities consult with qualified consultants in each discipline to determine if any barrier removal required by the ADA affects these other code requirements.
5. Call Buttons – Although the ADA nor the CBC include any requirements for call buttons in standard housing cells, SCSD detention facilities might consider inclusion of a system when performing alterations of existing cells and the construction of new housing units. Call buttons are provided in cells so that inmates can contact staff in the event of an emergency.
6. Signage – Section 216.1 of the 2010 ADAS / 11B-216.1 of the 2013 CBC contains an exemption for compliance for signage in detention and correctional facilities that is not located in public use areas. Although the exception is provided, it is our recommendation that compliant tactile and visual signage be provided if possible to ensure program accessibility

FINAL REPORT



## List of Polices Reviewed

The Assessment Team reviewed the following list of the Sheriff's Department County of Sacramento Correctional Services Operations Orders and the Correctional Health Services Policies and Procedures. Although the majority of these policies are addressed within this report (based on their applicability to disabled inmates and to the overall assessment), some of the policies listed below were not pertinent to inmates with disabilities. However, the Assessment Team did an exhaustive review of all of the listed policies to be certain.

01/01 Introduction
01/02 Command and Responsibilities
01/03 Employee Conduct
01/04 Employee Assignments, Attendance / Daily Schedules, Time Off, Time Sheets
01/05 Training Program / Training Requests
01/06 Correctional Services Identification Cards
01/07 Volunteer Program
01/08 Intelligence Unit
01/09 Prisoner and Video Monitoring Requests
01/10 Operational Video System
01/11 Line-Ups
01/12 Concealed Weapon Permits
01/13 Supply Requisition
01/14 Division Safety Program
01/15 Reporting of Incidents and Crimes
01/16 Public Information Plan
01/17 Operations Orders Review and Update
02/01 Use of Force
02/02 Use of Restraint Devices
02/03 Use of Pro-Straint Chair
02/04 Weapons, Tactical Weapons, and Specialized Equipment
02/05 CERT and Cell Extraction Procedures
02/06 Prisoner Searches
02/07 Access to Facilities
02/08 Access to Facilities - Deliveries and Services
02/09 Metal Detector and X-ray Machine Operation
02/10 Key Control and Equipment Issuance
02/11 Communications Equipment
02/12 Transportation of Prisoners
02/13 Inter-Facility Transportation and Court Appearances
02/14 Evidence and Contraband Disposition
02/15 Perimeter Patrols
03/01 Critical Incident Response Plan
03/02 Fire Prevention - Main Jail

FINAL REPORT





03/03 Fire Suppression - Main Jail
03/04 Fire Prevention - RCCC
03/05 Fire Suppression - RCCC
03/06 Emergency Systems and Equipment
03/07 Medical Emergencies
03/08 First Aid Kits
03/09 Fights, Riots, Hostage and Minor Disturbances
03/10 Death or Serious Injury of a Prisoner
03/11 Natural Disasters
03/12 Evacuation Plan - Main Jail
03/13 Evacuation Plan - RCCC
03/14 Bomb Threats, Suspicious Items, or Explosions
03/15 Escape Response
03/16 Crimes Occurring Within Correctional Facilities
04/01 Intake, Search, Reception and Holding
04/02 Evidentiary/ Exposure Blood Draws
04/03 Prisoner Clothing, Property, and Funds
04/04 Use of Sobering Cell
04/05 Use of Safety, Segregation, North Holding #2, and Multipurpose Rooms
04/06 Identification Process
04/07 Dress-In/Dress-Out Procedure
04/08 Prisoner Orientation
04/09 Release Procedures
04/10 Property and Money Return and Release Procedures
04/11 Mass Arrests
04/12 Missing Property and Property Claims
04/13 Housing of Juveniles -Main Jail
05/01 Arrest Types and Bookings
05/02 Cal ID/ ID Hold/ Merging X-Reference Numbers
05/03 Prisoner File System/ Teletypes/Information Requests
05/04 DNA Samples
05/05 Pre-Trial Release Program
05/06 Bail & Surrender
05/07 Sentence Computation
05/08 Work Project Assignment
05/09 Weekenders
05/10 Service of Processes on Prisoners
05/11 Classified Documents
05/12 Archives
06/01 Log Books
06/02 Housing Plan
06/03 Classification Process
06/04 Count and Lockdowns

FINAL REPORT



06/05 Housing Unit Checks
06/06 Organized Searches in a Housing Unit (SHAKEDOWNS)
06/07 Processing Prisoners Out of a Housing Unit
06/08 Court Pull Procedures
06/09 Prisoner Movement Within a Facility
06/10 Recreation, Exercise and Showering
06/11 Laundry, Clothing & Linen
06/12 Hair Care and Cosmetology Services
06/13 Telephone/TDD/TTY Equipment Access
06/14 Interpreter Services
06/15 Prisoner Correspondence
06/16 Publications
06/17 Social and Media Visits
06/18 Confidential Visits
06/19 Inmate Workers
06/20 Court Holding Area and Courtroom Security
07/01 Inmate Message Requests (KITE's)
07/02 Grievances
07/03 Discipline Plan
08/01 Inmate Welfare Trust Fund Debits and Credits
08/02 Inmate Trust Fund Debits and Credits
08/03 Corrections Cashier
08/04 Educational Services
08/05 Commissary Operations
08/06 Prisoner Services
08/07 Law Library
08/08 In-Propria Persona (Pro-Per)
08/09 Cost Recovery for Housing of Prisoners
08/10 Jail Industries
08/11 Religious Services
09/01 Housing Unit Inspections and Cost Recovery
09/02 Facility Sanitation and Cleanliness
09/03 General Waste Disposal
09/04 Hazardous Materials Controls
09/05 Infectious Waste Disposal
09/06 Pest Control
09/07 Vermin Infestation
09/08 Smoking Ordinance
09/09 Maintenance Equipment Accountability
09/10 Maintenance Requests and Equipment Repair
10/01 Health Care Services
10/02 Psychiatric Services
10/03 Health Care Treatment Access
10/04 Medical Intake Screening

FINAL REPORT



10/05 Suicide Prevention Program
10/06 Blood and Body Fluid Exposure
10/07 Communicable Disease Management
10/08 Medicine Distribution "Pill Call"
10/09 Dental Services
10/10 Health Equipment and Control
10/11 Health Records
11/01 Food Services
11/02 Meal Counts and Services
11/03 Staff Meals
11/04 Culinary Equipment Control

1000 Department and Division Overview
1001 Mission Statement
1002 Organizational Chart
1003 Staffing Information
1004 Program Descriptions
1100 Responsible Health Authority
1101 Medical Autonomy
1102 Administrative Meetings and Reports
1103 Quality Improvement Program
1104 External Medical Peer Review
1105 Policies and Procedures
1106 Public Advisory Committee
1107 Decision Making - Special Needs
1108 Support Services
1109 First Aid Kits
1110 Access to Diagnostic Services
1111 Notification of Next of Kin
1112 Medical Review of In-Custody Deaths
1113 Medical Research
1114 Inmate Workers
1115 Utilization of Volunteers
1116 Direct Orders
1117 Health Care Philosophy
1118 Female Reproductive Services
1119 Individualized Treatment Plans
1120 Continuity of Care
1121 Health Promotion and Disease Prevention
1122 Hospital Care
1123 Exercising
1124 Personal Hygiene
1125 Prosthesis
1126 Health Care Maintenance

FINAL REPORT



1127 Notification of Inmate Death or Impending Death
1128 Reading Glasses for Inmates
1129 ICE Detainee Procedural Considerations
1130 Transfer Medications
1302 Staff Development and Training
1303 Basic Training for Correctional Personnel
1304 Medication Administration Training
1305 Licensure
1306 Credentialing and Privileging-Adult Medical
1306.1 Credentialing and Privileging-Adult Mental Health
1307 Medical Assistant – Scope of Practice
1400 Medical Transportation
1401 Transfer of Patients with Acute Illnesses
1403 Emergency Services
1404 Receiving Screening
1405 Detoxification – Management of Intoxicated Patients
1406 Heroin Detoxification – Intake Protocol
1407 Access to Treatment
1409 Clinic Care – Sick Call
1410 Medical Services Provided in the Medical Housing Unit
1411 Mental Health Services
1412 Suicide Prevention – 2M Joint Policy with JPS
1413 Use of Restraints and the Pro-Straint Chair
1414 Restraint Check Method
1415 Patients in Safety Cells
1416 Patients in Segregation
1417 Adult Developmental Disability
1418 Health Inventory and Communicable Disease Screening
1419 Chemically Dependent Patients
1420 Court Orders
1421 Hunger Strike
1422 Special Needs Patients
1423 Post Release Medical Care Planning
1424 Sexual Assault
1425 Patients in Segregation Cells in Intake
1426 Incident Reporting
1427 Pregnant Diabetics
1428 Management and Removal of Taser Probes
1429 Emergency Response
1430 Hyperthermia
1431 Footwear in the Jails
1433 Admission to Jail Acute Psychiatric Inpatient Unit
1434 Evaluation and Care of Inmates Subject to Disciplinary Diet
1435 Inmate Health Care Grievances

FINAL REPORT

1436 Two East Inmate Transfers
1437 Bedtime Snack (HS Snack)
1438 Advanced Directives / DNR
1439 Reports of Disabilities or Impairments
1440 Emergency Mode
1600 Management of Pharmaceuticals
1601 Medication Administration
1604 Over-the-Counter Medications
1605 Over-the-Counter – indigent Patient
1700 Communicable Disease Plan
1701 Diseases and Conditions Reportable to Public Health
1702 Communicable Disease Outbreak Investigation
1703 Employees with Communicable Infections
1704 Immunocompromised Patients
1705 Transport of Patients with Communicable Infections
1706 Transmission Based Isolation
1707 Blood-borne Pathogen Exposure Control Plan
1708 Standard Precautions
1709 First Aid Following Exposure to Blood and/or Body Fluids
1710 Care of Respiratory Therapy Equipment
1711 Cleaning and Disinfection of Hand or Foot Care Instruments
1712 Handwashing
1713 Disposal of Used Needles and Syringes
1714 Personal Protective Equipment
1715 Tube and Draining Wound Care
1716 Use of Sterile Disposable Items
1717 Microbiological Cultures of the Environment and Personnel
1718 Waste Management Policy
1719 Airborne Pathogen Exposure Control Plan
1719.1 Employees with Unprotected Exposure to Patients with TB
1720 Respiratory Isolation
1721 Varicella Zoster
1724 Pertussis
1725 Rubella Infection
1726 Rubeola Infection
1727 Amebiasis
1728 MRSA Infections
1729 Conjunctivitis
1730 Coxsackie Virus
1731 Gastroenteritis (Viral)
1731.1 Gastroenteritis (Bacterial)
1732 Influenza Vaccine
1733 Meningitis
1736 Streptococcal (Group A) Infections

FINAL REPORT



SABOT
CONSULTING

SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

1737 West Nile Virus
1738 Ecto-Parasites
1739 Pediculosis Infestation
1740 Scabies Infestation
1741 Hepatitis C
1800 Collection of Forensic Evidence
1801 Informed Consent
1802 Body Cavity Searches
1803 DNA Procedure at MJ and RCCC
1900 Health Records Format and Contents
1901 Confidentiality of the Health Record
1902 Transfer of Health Records and Information
1903 Records Retention
1904 Modifications to Medical Records
2000 Dental Care
2100 Tear Gas Usage
2101 Disaster Plan
2300 Food Service
2301 Inmate Medical Clearance for Food Handling
2302 Health and Hygiene Requirements – Food Service Workers

FINAL REPORT

Page 478

## List of Forms, Notices and Documents Reviewed

The Assessment Team conducted an exhaustive review of the following SCSD detention facilities forms, notices and documents as part of the assessment. Some of the items listed below are mentioned throughout the report as related to the review. Many of the forms, notices and documents reviewed were applicable to inmates with mobility disabilities and/or were relevant to the overall assessment, while others were found not to be pertinent.

- Agreement to Appear
- Authorization for Release of Medical /Health Information
- Classification Checklist - ICE Detainees
- Classification PF4
- County Jail Message Request
- Correctional Health Services Special Medical Intake
- Correctional Health Services Special Needs Form
- Correctional Services Inmate/Detainee Handbook
- Correctional Services Property and Clothing Record
- Community Resource Guide
- EGACE Registration Form
- EGUSD General Rules
- EGUSD Orientation Sign-up
- EGUSD Student Interest Form
- Foreign Warrant Arrests/Defendant's Rights
- HALT/RSAT Program Information
- Health Services KITE
- ICE Classification Worksheet
- ICE Physical Examination/Health Appraisal
- Inmate Booking Information Receipt
- Inmate Information Request
- Inmate Reclassification Notice
- Inmate Rule Code Violation Schedule
- Inmate/Detainee PREA Attestation Form
- Intake Screening Form JPS Clinical Assessment
- Jail Psychiatric Services Outpatient Referral
- JBCT Group Schedule
- JPS Frequency of Services
- Main Jail Division COMPAS Classification Housing Plan
- Main Jail Division Intake Classification
- Main Jail Division Request for Reclassification
- Main Jail Division Classification Worksheet
- Outdoor Recreation Schedules
- Personal Jewelry Waiver and Release of Liability

FINAL REPORT

SABOT CONSULTING
SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

- Property Receipt Report
- RCCC Classification Worksheet
- RCCC Detainee Orientation
- RCCC Master Schedule
- Reentry Client Admit Data Sheet
- Reading Glasses Policy
- Reentry Services
- Reinstatement of Probation
- Release from Custody Information
- Release Screening Form
- Reply to Inmate Grievance Suggestion

FINAL REPORT

Page 480

## Abbreviations and Acronyms Used

**AA** – Alcoholics Anonymous

**AB** – Assembly Bill

**ABE** – Adult Basic Education

**AD** - Assistive Device

**ADA** – Americans with Disabilities Act

**ADAAG** – Americans with Disabilities Act Accessibility Guidelines

**ADAS** – Americans with Disabilities Act Standards

**ADL**- Assistance with Daily Living

**ADSEG** – Administrative Segregation

**AFF** – Above Finished Floor

**ASL** – American Sign Language

**BiPAP** – Bilevel Positive Airway pressure

**BPH** – Board of Parole Hearings

**BTBL** – State of California Braille and Talking Book Library

**CAFM** – County Automated Facility Maintenance

**CASAS** – Comprehensive Adult Student Assessment System

**CASE** – Clark Adaptive Support Evaluation

**CBC** – California Building Code

**CBF** – Christopher [illegible] Facility

**CBJT** – Competency Based Jail Treatment

**CCR** – California Code of Regulations

**CDC** – California Department of Corrections

**CDCR** – California Department of Corrections and Rehabilitation

**CDO** – Chief Disciplinary Officer (CDCR)

**CENAPS** –Center of Applied Sciences

**CERT** – Custody Emergency Response Team

**CHS** – Correctional Health Services

**CIT** – Crisis Intervention Team (training)

**CJ** – County Jail

**COF** – Coefficient of Friction

FINAL REPORT



FINAL REPORT

**COPD** – Chronic Obstructive Pulmonary Disease

**CPAP** – Continuous Positive Airway pressure

**CBF** –Christopher Boone Facility

**CPR** – Cardiopulmonary Resuscitation

**CPS** – Child Protective Services

**DD** – Disciplinary Detention

**DDP** – Developmental Disability Program (CDCR)

**DD1** – No acronym (code means mild intellectual disabled CDCR inmate with mild cognitive deficits/adaptive supports

**DD2** – No acronym (code means moderate intellectual disabled CDCR inmate with moderate cognitive deficits/adaptive support needs, and/or victimizations concerns

**DD3** – No acronym (code means severe intellectual disabled CDCR inmate with severe cognitive deficits/adaptive support needs, and/or victimization concerns

**DME** – Durable Medical Equipment

**DPH** – No acronym (code means permanent deaf/hearing impaired CDCR inmate)

**DPM** – No acronym (code means permanent mobility impaired CDCR inmate, non-wheelchair user)

**DPO** – No acronym (code means intermittent CDCR wheelchair user)

**DPP** – Disability Placement Program (CDCR)

**DPV** – No acronym (code means permanent vision impaired CDCR inmate)

**DPW** – No acronym (code means permanent full-time CDCR inmate wheelchair user)

**DVHU** – Domestic Violence Housing Unit

**EC** – Effective Communication

**EGACE** – Elk Grove Adult and Community Education

**EGUSD** – Elk Grove Unified School District

**EKG** – Electrocardiogram

**ELA** – English Language Arts

**EMR** – Electronic Medical Record

**ESL** – English Second Language

**FAF** – Facility and Fleet (Maintenance)

**FATRNS** – Inter-Facility Transfers

**FOSS** – Frequency of Services Scale

**GED** – General Educational Development

**GP** – General Population

**H** – High

**HALT** – Housing for Accountable Living Transitions (Substance Abuse Treatment)

**HCA** – Health Care Appliance

**HCSD** – Health Care Services Division (CDCR)

**HiSET** – High School Equivalency Test

**HF** – Honor Facility

**HMU** – Health Management Unit

**HS** – Health Services

**ICE** – Immigration and Customs Enforcement

**ID** – Identification

**IDEF** – Inmate Disability Identification Form

**IE** – Investigative Employee (CDCR)

**IEP** – Individual Education Plan

**IMAP** – Incarcerated Men's Accountability Program

**IQ** – Intelligence Quotient

**IWF** – Inmate Welfare Fund

**JBCT** – Jail Based Competency Treatment

**JIMS** –Jail Inmate Management System

**JKF** – Joseph Kievernagel Facility

**JPS** – Jail Psychiatric Services

**KBF** – Kevin Blount Facility

**L** – Low

**LB/LT** – Lower bunk/Lower Tier

**LCSW** – Licensed Clinical Social Worker

**LPS** – Lanterman-Petris-Short

**LVN** – Licensed Vocational Nurse

FINAL REPORT

**M** – Medium

**MD** – Medical Doctor

**M Dorm** – Medical Dorm

**MFT** – Marriage and Family Therapist

**MH** – Mental Health

**MHU** – Medical Housing Unit

**MJ** – Main Jail

**MOCA** – Montreal Cognitive Assessment

**MS** – Medium Security

**NA** – Narcotics Anonymous

**NCCT** – Northern California Construction Training

**NP** – Nurse Practitioner

**OPP** – Outpatient Psychiatry

**PA** – Public Address

**PC** – Protective Custody

**PDQ** – Position Description Questionnaire

**PHH** – Personal Health History

**POHR** – Problem Oriented Health Record

**POST** – Peace Officer Standards and Training

**PPD** – Purified Protein Derivative

**PREA** - Prison Rape Elimination Act

**QUEST** – Question, Understand, Evaluate, Succeed, Transform (in-custody gang diversion program)

**RBF** – Roger Bauman Facility

**RC** – Reception Center

**RCCC** – Rio Cosumnes Correctional Center

**REACT** (Belt) – Remote Electronically Activated Control Technology

**RMS** – Records Management System

**RN** – Registered Nurse

**ROC** – Restoration of Competency

**RSAT** – Residential Substance Abuse treatment

FINAL REPORT



SHERIFF'S DEPARTMENT COUNTY OF SACRAMENTO CORRECTIONAL SERVICES
AMERICAN WITH DISABILITIES ACT ASSESSMENT
DECEMBER 22, 2016

**SA** – Staff Assistant (CDCR)

**SBF** – Stewart Baird Facility

**SCGS**- Sacramento County General Services

**SCSD** – Sacramento County Sheriff's Department

**SCMHC** – Sacramento County Mental Health Center

**SLI** – Sign Language interpreter

**SLF** – Sandra Larson Facility

**SMI** – Serious Mental Illness

**SMU** – Special Management Unit

**SOAP** – Subjective Objective Assessment Plan

**SOB** – Shortness of Breath

**SRN** – Senior Registered Nurse

**SVPA** – Sexually Violent Predator Act

**SWP** – Sheriff's Work Project

**TDD** – Telecommunications device for the Deaf

**TSEP** – Total Separation

**TST** – Tuberculin Skin Test

**TTY** – Tele-Typewriter

**UCD** – University of California, Davis

**UFAS** – Uniform Federal Accessibility Standards

**US** – United States

**USDOJ** – United States Department of Justice

**VCT** – Vinyl Composition Tile

**WebJPF** – Web-based Jail Person File

**W&I** – Welfare and Institutions

**XREF** – X Reference (inmate jail number)

FINAL REPORT

Page 485